# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

### Civil Action No.:5:12-CV-610-F

| | | |
|---|---|---|
| CITY GRILL HOSPITALITY GROUP, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR** |
| v. | ) ) | **PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF MOTION FOR** |
| NATIONWIDE MUTUAL INSURANCE COMPANY | ) ) ) | **RELIEF DUE TO DEFENDANT'S SPOLIATION OF RELEVANT** |
| Defendant. | ) ) ) | **EVIDENCE** |

NOW COMES Plaintiff City Grill Hospitality Group, Inc. ("Plaintiff"), and respectfully submits this Memorandum in Support of Plaintiff's Motions for Partial Summary Judgment and for Relief due to Defendant's Spoliation of Relevant Evidence.

### *STATEMENT OF ISSUES PRESENTED*

1.    Whether Plaintiff is entitled to summary judgment on any and all the issues of whether or not Nationwide's policy was in full force and effect on the date of a fire which occurred in Plaintiff's restaurant on January 24, 2012, and whether Defendant can exclude said fire from coverage and thereby deny the claim based upon a origin and cause investigation which determined the fire to have been intentionally set and determined that agents of Plaintiff were directly involved with the setting of the fire.

2.    Whether or not the Defendant is guilty of spoliation of crucial evidence in this case and whether or not Plaintiff is entitled to have the Court strike Defendant's origin and cause

1

experts thereby allowing summary judgment as it relates to whether Defendant can exclude said fire from coverage and thereby deny the claim based upon a origin and cause investigation which determined the fire to have been intentionally set and determined that agents of Plaintiff were directly involved with the setting of the fire.

## STATEMENT OF THE CASE

This lawsuit arises from a fire casualty claim brought by Plaintiff on a policy of insurance underwritten by Defendant. Plaintiff was the owner and operator of a Miami Subs restaurant which suffered extensive damage due to a fire which occurred on January 24, 2012. Plaintiff's claim was denied by Defendant in May 2012 allegedly on two separate grounds. First, Defendant determined that the fire was intentionally set and that Plaintiff and/or its agents were involved in the setting of the fire. Second, Defendant determined that Plaintiff and/or its agents had made material misrepresentations in the claim process. During the initial claim investigation, Defendant retained the services of two fire investigation experts. The were Hunter B. "Terry" Lacy ("Lacy"), who is Plaintiff's primary fire origin and cause investigator, and Henry B. Martini, P.E. ("Martini"), who is Defendant's electrical engineer. At the time of the initial claim investigation, both were employees of Donan Engineering, Inc. ("Donan").

Subsequently, Plaintiff brought this action to enforce its rights under the terms of the policy. In accordance with the rules of the Court, Plaintiff and Defendant created a discovery plan and obtained a Court Scheduling Order (the "Order") and promptly engaged in extensive discovery. The Order contained a time for fact discovery and a staggered time for service of expert reports. During discovery, Plaintiff tendered the expert reports of Steven Booth ("Booth"), who is Plaintiff's origin and cause expert; Steven Stone ("Stone"), who is Plaintiff's electrical engineer; and, subject to pending motions already before the Court, James Small

("Small"), who is a proposed rebuttal electrical engineer. Also during discovery, Defendant tendered the federal expert reports of both Lacy and Martini, and both experts modified their federal reports in comparison to their claim reports in response to the criticisms and analyses of Booth and Stone. Finally, during discovery, Plaintiff discovered that Defendant and/or its agents utterly failed to preserve important, relevant evidence examined during the claim investigation.

Plaintiff and Defendant have timely complied with the Order and have completed discovery and impassed at mediation. The parties are now tendering to the Court their dispositive motion. Additionally, Plaintiff, in conjunction with it motion for partial summary judgment is also moving the Court to impose appropriate relief against Defendant due to the failure of Defendant and/or its agent to properly preserve relevant evidence examined as a part of Defendant's investigation of Plaintiff's claim.

## STATEMENT OF THE FACTS

On or about January 12, 2012, Defendant issued to Plaintiff a renewal comprehensive business casualty loss policy (the "Policy") with policy number ACP BPFM 2214526608. (Ex. A - Aff. of Diamantopoulos: ¶ 4). A fire occurred in Plaintiff's Miami Subs restaurant (the "Premises") on January 24, 2012, at approximately 15 minutes or so before 9:00 a.m. and was reported at approximately 8:42 a.m. on that Tuesday morning, authorities were alerted and firefighters came and suppressed the fire promptly. There was extensive smoke damage to the structure. At that time, all premiums were current and the Policy was otherwise in full force and effect. (*Id.* at ¶ 5). Accordingly, Plaintiff notified Defendant of it's loss and the claims process began.

Within one day of the fire occurring, Nationwide retained Donan as its origin and cause investigators to conduct its origin and cause investigation of the fire, and Donan assigned one of

its employees, Lacy, as the primary fire origin and cause investigator for Plaintiff's claim. On January 25, 2012, Lacy contacted Mr. Dimitrios Diamantopoulos ("Jimmy"), an officer of Plaintiff to meet him at the restaurant at 9:00 a.m. on the next morning for him to begin his fire investigation and Jimmy complied. (Ex. C – Lacy Dep. 30:23). On or about January 26 or 27, 2012, Lacy recommended that Defendant retain the services of an electrical engineer to review all electrical systems and appliances in the restaurant to determine whether or not it could have been a cause of the fire in Plaintiff's restaurant and he recommended Martini, who also worked for Donan. (*Id*. at 129:18-136:8).

The fire investigation by Lacy continued from January 26, 2012 through February 2, 2012. At the initiation of the investigation, Lacy, in no uncertain terms, informed Jimmy that he represented Defendant and that Lacy and Lacy alone was in charge of the Premises during the entirety of the investigation. (Ex. B – Jimmy's Dep. 130:13-131:19). During this period, Lacy collected samples to test for accelerants and these tests could not find any evidence of accelerants in the area of the supposed origin of the fire. (Ex. C – Lacy's Dep. 138:21-139:13). Jimmy has testified that, during this investigative period, he discussed the current video surveillance system (the "DVR") for the Premises with Lacy and discussed how to potentially access the information contained on the DVR. (Ex. B – Jimmy's Dep. 174:15-178:6). Lacy also documented and removed certain evidentiary exhibits from the Premises. (Ex. C – Lacy's Dep. 170:22-173:6).

Prior to Lacy investigating the fire, Special Agent Chad Royal ("Royal") of the North Carolina State Bureau of Investigations ("SBI") also investigated the fire and his report initially concluded that the fire was from an undetermined origin based in part to the presence of three electrical printed circuit boards (the "PCBs") in the vicinity where Mr. Royal determined the

4

origin of the fire to have occurred. (Ex. I- Royal Dep. 88:13-25, 89:1-25). Royal testified that, after he concluded his initial investigation, he had discussions with Lacy and discussed his findings with him, including the discovery of the PCBs. (Ex. I - Royal Dep. 90:8-11). Lacy admits that Royal told him about the PCBs. (Ex. C - Lacy Dep. 76:19-77.6).

It has since been determined that these PCB's were part of an electrical appliance now identified as an HME Ion IQ wireless transmitter (the "Ion IQ") used as part of the drive-thru system. (Ex. F - Martini Dep. 114:16-25, 115:1-10). The Ion IQ was on the wall to the upper right hand corner of the first drive-thru window before the fire occurred and after the fire occurred all that was left to indicate its location was a rectangular shaped pattern on the wall. (*Id*.)

Incredibly, while Lacy took custody of several evidentiary items during his investigation, he claims that he did not label or tag and did not take custody of the PCBs, and Lacy's initial pre-litigation report ("Lacy's Claim Report") did not mention the Ion IQ or the presence of these PCB's (nor the video surveillance system for that matter). (Ex. C – Lacy's Dep. 169:25-170:24). In fact, Lacy's Claim Report states the following: "The rear drive through window was not in active use; thus, no electrical appliances were located in that area. No electrical, mechanical, or otherwise heat processing equipment was located in that area" (Ex. D– Lacy's Claim Report, Pg 8-9; authenticated as Exhibit 35 in Lacy's Dep.). Lacy further declares that he there was nothing on the floor of any evidentiary value. (*Id*. at 9). Lacy goes on to state in his deposition that the first time that he ever saw the PCBs was on a table in the restaurant. (Ex. C- Lacy Dep. 209:14-210:3).

Lacy's investigative reports and his testimony are directly contradicted by Agent Royal's testimony that he found the PCBs in the rubble below the first drive-thru window, in the area of

the supposed origin of the fire, placed them against the baseboard below the window without moving them further and discussed the PCBs and their importance with Lacy. (Ex. I – Royal Dep. 88:12-15, 94:16-19, and 118:12-20). Lacy's testimony is further contradicted by Jimmy's testimony that that, on one of the occasions that he met Lacy at the Premises, Lacy placed a flashlight beam on the electrical component remnants below the drive-thru window near the supposed origin of the fire and which appeared to come from a come from something installed above the drive-thru window, as indicated by marks left on the wall. (Ex. B – Jimmy's Dep. 191:18-192:21).

As stated above and even though Lacy maintained that there were no electrical components in the area, Lacy, during his investigation, determined that he needed the services of an electrical engineer and asked Defendant to retain the services of Martini, who was and is also employed with Donan. (Ex. C – Lacy Dep. 129: 23, 130:1-10). Thereafter, Lacy met Martini at the premises on Monday, January 30, 2012, for the purposes of Martini conducting his analysis of electrical components in the restaurant. *Id*. Interestingly, Martini apparently did not take any notes during this initial examination, and he even had to later reconstruct sketches that he believed, but cannot prove, he made on January 30, 2012. (Ex. F - Martini Dep. 27:12-19). After concluding his examination, Martini detailed his findings and conclusions in his own letter report ("Martini's Claim Report") and stated that he had ruled out all electrical items but failed to specifically mention anything about the Ion IQ or the PCB's; however, the PCB's were shown, but not specifically described or named, in photograph #33 of Martini's Claim Report. (Ex. G– Martini's Claim Report, authenticated as Exhibit 46 and 46A in Martini's Dep. 68:8-17). Lacy and Martini further informed Royal of their findings, which prompted Royal to change his initial determination of an undetermined cause, with this original determination being a direct result of

6

finding the PCBs in the area of supposed origin, to a final determination of incendiary (i.e. arson) as a result of Martini presumably ruling out all potential electrical causes of ignition. (Ex. I - Royal Dep. 114:21-116:11).

Based upon the dates of Lacy's Claim Report and Martini's Claim Report, they were provided to Defendant in late May of 2012. Lacy, as the origin and cause investigator, found that all electrical causes were excluded, that, by means of the process of elimination, the cause of the fire was some sort of open flame and that the fire was intentionally ignited. (Ex. D – Lacy's Claim Report Pg. 10). Almost immediately thereafter, Defendant denied Plaintiff's claim through a letter (the "Denial Letter"), dated May 31, 2012. (Ex. A – Jimmys Aff. ¶ 8). The Denial Letter set forth two primary bases for allegedly excluding Plaintiff's claim from coverage under the Policy. (Id.). As the first basis, the Denial Letter states that "[a]s a result of this investigation [the investigation conducted, in part, by Lacy and Martini], it appears that the fire of January 24, 2012 was intentional, not accidental, in origin and that one of the owners of City Grill Hospitality Group, Inc. participated in the intentional setting of this fire" and thus the fire was the result of an intentional dishonest act by an agent of Plaintiff. (Id.). The Denial Letter goes on to declare that separate claims misrepresentation was the second basis for denial. (Id.).

After initiating this litigation, Plaintiff retained its own fire investigator, Steven C. Booth ("Booth") to examine Defendant' alleged evidence, to conduct his own independent fire investigation and to write a report with his findings and opinions ("Booths Federal Report"). (Ex. K – Booth's Federal Report, which was served on Defendant and included among Booth's files and materials which were generically identified and made exhibits to his deposition). After conducting his own examination, Booth's Federal Report took Lacy's investigation to task and directly contradicted Lacy's statement that there were no electrical components in the area

supposed origin of the fire. (*Id*.). Booth's Federal Report then clearly and conclusively identified the Ion IQ along with the PCBs as being in the area of origin. (*Id*.).

Booth further concluded that it was inappropriate for an investigator complying with the guidelines of NPFA 921, to which Lacy and Martini claimed to adhere, to determine that the fire resulted from an open flame (an incendiary cause) without ruling out the Ion IQ/PCBs as a potential ignition source. (*Id*.). NPFA 921 requires an investigator to rule out all potential causes before that investigator can utilize what is known as a process of elimination, which 921 generally discourage. *Id*. Lacy has now admitted that his report to Defendant on May 21, 2012 was not true. (Ex. C - Lacy Dep. 208:13-22 ). Nevertheless, was only after Plaintiff's experts proved the presence of the Ion IQ in the area of suppose origin of the fire that Defendant's experts even felt compelled to discuss its presence.

Upon the provision of proof of a electrical component being located in the area of supposed origin of the fire, Plaintiff, at Booth's request, retained a separate electrical expert, Steven Stone, ("Stone"). Thereafter, Stone prepared an expert report ("Stones Federal Report") and further stated that, in order for him to be able to rule out the Ion IQ device and the residual PCBs as an ignition source for the fire, he would need access to the actual devices and evidentiary remnants for purposes of an in depth analysis. (Ex. L, Stone Dep. 113:9, 114:9-21; see also Ex. M – Stone's Federal Report).[1]

Booth, as Plaintiff's origin and cause investigator and based upon information acquired from Stone and others, testified in his deposition that, unless Plaintiff and its experts have physical access to the PCBs for the purpose of further investigation and study [beyond examining the few photographs produced by Defendant and others), the Ion IQ and residual PCBs remain a potential electrical ignition source which cannot be eliminated and which

---

[1] Stone's Opinions are the subject of a pending motion to allow supplementation filed by Plaintiff.

precludes a finding of an incendiary fire. (Ex. J – Booth's Dep. 27:11-30:17 and 39:1-25; *see also* Booth's Federal Report). Unfortunately, after the Ion IQ electrical appliance was allegedly examined by Lacy and Martini, the Ion IQ and the PCBs disappeared. (*Id*.). For that reason Stone has been unable to give any other further definitive conclusions regarding the PCB's and their potential to have been the ignition source of the fire. Consequently, Booth cannot rule out the Ion IQ as a potential ignition source. (*Id*.).

Based upon their later federal reports ("Lacy's Federal Report" and "Martini's Federal Report," respectively), both Martini and Lacy appear to take the position that because this was a low voltage device the likelihood that it could be the ignition source of the fire was virtually nil. (Ex. E – Lacy's Federal Report and Ex. H – Martini's Federal Report). After being confronted with the reports of Booth and Stone, Lacy and Martini both miraculously "remembered" information regarding the ion IQ and the PCB's without ever having inquired about the existence of the ion IQ or its pre-fire location. (Ex. C - Lacy Dep. 146:1; 147:13). Inexcusably, Martini did not even make notes of his alleged investigation of the ion IQ (Ex F - Martini Dep. 28:9). Nevertheless, both Martini and Lacy appear to causally dismiss the Ion IQ and the PCBs as low voltage devices, which were unlikely to start a fire in the first instance and which were excluded via an on-site "naked-eye" visual examination allegedly performed by Martini. Martini, however, concedes that low-voltage electrical devices can be the ignition sources for fires. (*Id.* at 127:17-25). Martini further concedes that if the PCBs had been collected[2] by either himself or Lacy the normal and proper procedure would have been for the PCBs to have been sent to a lab and examined in a laboratory setting. (*Id.* at 100:2-10).

---

[2] Incredibly, it appears to be both Martini's and Lacy's argument that they did not "collect" (i.e. take custody) of the PCBs and send them off for testing because they were leaving them in place for further investigation and were concerned with spoliation [even though they readily removed other items without much concern]; nevertheless, Lacy testifies that he never discussed with Jimmy the PCBs or that they were allegedly being left in his possession. (Ex. C – Lacy's Dep. 170:4-24200:14-20; *see also* Ex. F – Martini's Dep. 96:20-97:4).

## ARGUMENT

### -Standard of Review-

The Court may grant summary judgment on the "Pleadings, Depositions, Answers to Interrogatories, and Admissions of Record, together with the Affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part is entitled to judgment as a matter of the law. *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 519 (4th Cir.2003) (quoting Fed.R.Civ.P. 56(c)). When a party files a motion for summary judgment, that party bears the initial burden of proof to demonstrate the absence of a material issue of act. *Celotex Co. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, then the burden the shifts to the nonmoving party to prove the existence of material issues of fact. *Bouchat,* 346 F.3d at 519. Nevertheless, in determining whether there is a genuine issue of material fact, the Court must use the facts, and all reasonable inferences to be drawn from them, in the like most favorable to the non-moving party. *Cleveland Const., Inc. v. Fireman's Fund Ins. Co.*, 819 F.Supp.2d 477, 480-481 (2011).

### -Plaintiff is entitled to summary judgment on the issue of coverage of the Nationwide Policy-

Plaintiff is not aware of any dispute between the parties as to whether or not there was initial coverage under the Policy which would have covered the loss sustained by Plaintiff by virtue of the fire which occurred on January 24, 2012. Under North Carolina law, an insurance policy is contract and the principals of contract apply to allege breaches. *Cleveland Const., Inc.*, 819 F.Supp.2d at 481 (quoting *Nelson v. Hartford Underwriters Ins. Co.*, 177 N.C. App. 595, 606, 630 S.E.2d 221, 229 (2006)). Pursuant to these principles, Plaintiff has the burden of

proving that there was indeed a policy in existence and that all the conditions precedent to coverage were complied with by Plaintiff, and, once said proof has been made, the burden then shifts to Defendant, as the insurance company, to prove that a "policy exclusion excepts the particular injury from coverage." *Nelson*, 177 N.C. App. at 606, 630 S.E.2d at 229. Attached to this Memorandum is an Affidavit of Jimmy Diamantopoulos in which he states that the Policy was in effect from January 12, 2012 until January 11, 2013, that all of the premiums have been properly paid on the policy up through the date of the loss and that he had complied with all other conditions precedent to insure coverage under the terms of the Policy. Moreover, attached Jimmy's affidavit also includes the pertinent portions of the Policy which define initial coverage and the exclusions. Therefore, Plaintiff is entitled to partial summary judgment on the issue of coverage and that issue should not be one to be litigated should the trial.

**-Defendant should not be allowed to offer testimony of it experts and/or from Royal as to cause and origin of the fire-**

It is well settled that "[a] litigant has a duty to preserve evidence that he knows or should know is relevant to imminent or ongoing litigation." J*ordan F. Miller Corp. vs. American AM. Eagle, Inc. Co*, 139 F.3d 912, 1998 WL 68879 (10th Cir 1998). The preservation cannot be "selective." *Workman v. AB Electrolux Corp.*, 2005 WL 1896246, at 5. The obligation to preserve evidence may arise with respect to potential litigation, *Id.* at 6, and indisputably arises upon notice of litigation, *Kronisch v. Young Estates*, 150 F.3d 112, 126 (2nd Cir. 1998).

In the case at bar, origin and cause investigator Lacy was retained by Defendant to investigate the fire which occurred at the Premises, and, upon the conclusion of that investigation stated that he concluded that the fire at Plaintiff's restaurant was incendiary in nature and not caused by any other ignition source. Moreover, Martini, an electrical engineer was retained by

Defendant to inspect electrical appliances and electrical outlets in Plaintiff's restaurant to rule in or rule out any of those appliances located in the area of the fire that might or could have been an incendiary cause of the fire in Plaintiff's restaurant, and, for the reasons set out, Plaintiff asks the Court to preclude the admission into evidence of the reports of Lacy, Martini and Royal, who admitted that his final conclusions were based upon the investigation of Lacy and Martini, together with their testimony or, alternatively, impose an adverse-inference instruction against Defendant, consistent with the common sense and well established principle that party who has notice that evidence is relevant to litigation and who fails to preserve and/or to destroy that evidence is more likely to have been threatened by that evidence than the party in the same position who does not destroy the evidence.

As shown the preceding facts, Defendant's agents violated the clear legal requirements to preserve relevant evidence. The Court has "inherent power" to impose sanctions to address the spoliation of evidence. *Miller*, 1998 WL 68879 at 3. "When deciding whether to sanction a party for the spoliation of evidence, Court have considered a variety of factors, two of which generally carry the most weight: (1) The degree of the culpability of the party who lost or destroyed the evidence,; and (2) he degree of actual prejudice to the other party. *Id*. at 4. In the light most favorable to Defendant, Lacy, who was investigating the Premises fire for Defendant and upon whose report, Defendant based its Denial Letter, probably failed to take proper care to prevent the accidental destruction of probative evidence, the PCBs, but Plaintiff has also raised the issue of whether or not Lacy deliberately destroyed probative evidence prior to the filing of its action and/or apparently made material misstatements in Lacy's Claims Report for the purpose of hiding the existence of the PCBs. If that be so, the facts of this case would establish the high degree of culpability on the part of Defendant.

In any event and whether or not Defendant authorized or sanctioned any actions by Lacy, Plaintiff would argue that Defendant should be precluded from offering the testimony of Lacy, Martini and Royal under either standard. All three experts ultimately base their conclusions that the fire was incendiary, due to a process of elimination, in that they cannot find any evidence of any other logical cause. This conclusion, in and of itself, is based upon the exclusion of the Ion IQ and the remnant PCBs as a potential ignition source. Royal and Lacy, after he admitted to the existence of the PCBs, base their cause determination upon the alleged examination of the PCBs on January 30, 2012, by Martini. After this examination, the PCBs have disappeared, and it is clear that the last persons to have knowledge of its location were Lacy and Martini.

This circuit has recognized its litigants have a duty to preserve material evidence not only during litigation but also in the period before litigation if the party should know that the evidence may be relevant to anticipated litigation. *Silvestri v. General Motors Corporation* , 271 F.3d 583, 590 (4th Cir. 2001). This circuit has also recognized a duty to notify potential parties of the existence of the evidence so that the party has an opportunity to investigate the matter and shape its defense. *Id.* Both of these duties would apply in this case, since Defendant, by and through Lacy had sufficient and primary access to the evidence. *See Hodge v. Walmart Stores, Inc.* 360 F.3d 446, 450 (4th Cir. 2004), ("quoting from *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995)"). Here Defendant's agents had access to the PCBS and failed to preserve the evidence and failed to Plaintiff any notice of the existence of the evidence and that they would not be preserving said evidence.

Additionally, Defendant had an affirmative duty to notify Plaintiff about the location of the PCBs and gives its investigators an opportunity to examine the PCB's to determine if there was indeed any defect in the circuit boards that could have caused the fire in Plaintiff's

restaurant. Lacy in his testimony acknowledged that he had responsibility to preserve the PCBs but he did not take them into possession nor tag them because he wanted to leave them for other investigators to examine. When Plaintiff retained its own experts, the PCBs were missing and Defendant's experts were the last to have had any knowledge of the whereabouts of the printed circuit boards. Apparently, Defendant takes the position that since the photographs were available that they should sufficient to make a proper examination of the PCBs; however, according to Plaintiff's experts they are not sufficient to make a determination of whether or not there was any defect in the PCBs and that only a determination in a laboratory setting could make that determination. Martini, in his deposition, agreed generally that a laboratory analysis would be appropriate.

National Fire Protection Association §921, which both Lacy and Martini followed in their investigation of this fire, defines spoliation as the ["loss, destruction, or material alteration of an object or a document that is evidence or is potential evidence in a legal proceeding by one who has responsibility for its preservation."] NFPA 921, §3.3162. A fire scene can be fairly described as a collection of "objects", all of which have at least the "potential" of evidentiary value in a case involving around the cause of the fire.

The importance of preserving the fire scene is also discussed in NFPA 921 §16.3.1 NFPA 921 also discusses how spoliation of the fire scene may occur. NFPA 921, §11.3.5 cautions that, "[s]poliation of evidence may occur when the movement, change or destruction of evidence, or the alteration of the scene significantly impairs the opportunity of other interested parties to obtain the same evidentiary value from the evidence as did any prior investigator." It would be extremely difficult in this case for Nationwide to argue that the investigators for Plaintiff, relying upon photographs, had the same ability to fully investigate the fire, and in this case the PCB's (a

component of the Ion IQ), as did Defendant's investigators, who were given the opportunity to visit the scene to review all of the available evidence, take photographs and measurements and to collect such evidence as it deemed necessary for their conclusions.

Finally, NFPA 921 offers a simple and clear method for avoiding claims of spoliation. NFPA 921, §11.3.4 instructs that again: "[c]laims of spoliation of evidence can be minimized by notices given to all known interested parties and investigation of the site is going to occur so as to allow all known interested parties the opportunity to retain experts and attend the investigation."  A spoliation motion in this case could have been avoided had agents for Defendant notified Plaintiff concerning information which they had concerning the PCB's found at the fire scene in the area of origin of the fire.  Instead, Lacy, in Lacy's Claim Report, initially denied the existence of the PCBs and/or the Ion IQ and Martini did not specifically mention them in his analysis.  It was only after Plaintiff hired its experts that it discovered that the PCBS were missing since Lacy and Martini's pre-litigation reports were devoid of any mention of them.

Defendant may also argue that NFPA 921 applies only to its fire investigators and not to their client; however, it is clear in the Denial Letter that Defendant relied upon Lacy and Martini in supporting its decision that the fire claim was excluded from coverage.  It would be highly inequitable to insulate Defendant from the repercussions of the actions of its agents while simultaneously allowing it to reap the benefit of these same acts.  Remedying the prejudice is the very essence of spoliation sanctions.  Moreover, Lacy was very attuned to the issue of spoliation and was very aware of the issue of spoliation guidelines on how spoliation can be avoided.

Another available option for spoliation is the issuance of jury instruction permitting the jurors to make adverse inference from a parties' destruction of evidence.  *See Silvestri v. General Motors Corporation* , 271 F.3d 583, 590 (4th Cir. 2001).  Evidence of bad faith or fraudulent

intent is not required to obtain this instruction. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995). Courts have held that three elements should be shown to warrant an adverse inference instruction for spoliation. [1] The party having control over the evidence had an obligation to preserve it when it was destroyed; [2] The destruction or loss was accompanied by "culpable state of mind," and [3] The evidence that was destroyed was relevant to the claims or defenses of the party that sought discovery of the spoliated evidence, to the extent that a reasonable fact finder could conclude that the lost evidence would have supported the claims or defenses of the parties that sought it. *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107-108 (2d Cir 2002). "A culpable state of mind" could include bad faith/knowing destruction; gross negligence, and/or nil or negatives. *Id* at 108.

If the Court finds in the present case that Defendant had an obligation to preserve the PCBS which it's agents recovered from the fire scene because they contained evidence relating to Plaintiff's claims that the Ion IQ from which the PCB's came could or might have been an ignition source for the fire that occurred at Plaintiff's restaurant on January 24, 2012, sanctions should be imposed as a matter of course. As admitted by Lacy in his deposition, he left the PCB's without tagging them or taking them into possession for safekeeping and left them on a table from which disappeared. At that point in time he and Defendant would have reasonably suspected that litigation might arise from Defendant's initial denial of Plaintiff's claims. Under those circumstances there is enough evidence that Defendant's agents discarded the PCB's with a "culpable state of mind" and any information that might have been obtained from the PCB's were clearly relevant to Plaintiff's claims and certainly to the defenses of the Defendant.

The facts in this case are somewhat similar to the facts in *King v American Power Conversion Corp.*, 181 Fed. Appx. 373 (2006) where Plaintiff operated a traveler's store and gas

station and owned a surrounding strip mall. Two employees of Plaintiff arrived at the store on the morning that the fire broke out. *Id*. Steve Booth, investigating the fire on behalf of Cumberland County Arson Task Force, determined that the fire began in the store office beneath the desk where a UPS unit was located. He concluded that the origin of fire was in the area of the UPS and concluded that he was unable to determine that the power supply caused the fire and turned the UPS power supply over to Mark Kissel of FTI/LWG Consulting at the request of Nationwide Insurance Company, the King insurer. *Id*. He also turned over the electrical outlet into which the UPS power cord was inserted and another UPS unit that was not damaged. Nationwide retained Mark Kissel and Christopher Elrod to investigate the fire and its cause and Elrod concluded that the exact source of ignition was unknown and concluded that probability of the ignition of the ordinary combustible materials due to the electrical malfunction of the location of the battery backup power pack could not be eliminated. *Id*. Kissel also reported to Nationwide that while the damage to the UPS "may indicate incendiary failure within the UPS, further investigation was needed." *Id*. Thereafter counsel for King visited Kissel's office where he took photographs of the UPS and learned that no one from APC had inspected the evidence. *Id*. It appears that the UPS unit remained at Kissel's facility until several months after the fire and then FTI/LWG sent a letter to Nationwide asking Nationwide to pay storage of the unit or authorize its destruction. *Id*.

Accordingly, a representative from Nationwide signed an authorization to destroy or dispose of the UPS unit and thereafter the evidence was destroyed without notice to Plaintiff or its attorneys. *Id*. Plaintiff then brought suit against APC and in that litigation two engineers at APC testified that an examination of the UPS unit would have enabled them to determine whether the fire started inside or outside of the unit but without notice of the fire or access to the

evidence they could not conduct an investigation and had no opportunity to investigate any crucial pieces of evidence in the case. After further discovery APC moved for summary judgment. The District Court agreed concluding that [without] the UPS (American Power) suffered irreparable prejudice in attempting to defend itself against Plaintiff's claim and a lesser sanction, such as excluding any reports or testimony of the Nationwide consultants would totally destroy Plaintiff's case. Id. The Court decided that the only appropriate remedy was dismissal and the Court of Appeals for the 4th Circuit affirmed.

In this case, as in *King*, attention was focused on the electrical components (i.e. the PCBs) almost immediately after the fire by SBI agent Royal, and Lacy, the independent investigator for Defendant also was aware of the PCBs. Nevertheless, no notice was given to Plaintiff of the presence of the PCBs at a time when it could have inspected the PCBs and the wiring for that unit. As in *King* and *Silvestri*, the Court stated that the failure of Plaintiffs in those case to notify potential Defendants of the availability of material evidence can also be a breach of the duty not to spoliate evidence. *Silvestri*, 271 F.3d 592.

In this case there is no question but that Defendant and its agents aware that litigation might ensue as a result of its denial of Plaintiffs' claim and *Silvestri* makes it clear that the duty is on the party who discovers crucial evidence, not law enforcement, not investigators, not insurance claim personnel; only the parties who discovers the evidence has a duty to notify the other party. *Id.* 271 F.3d, 595 and the quote went on to conclude that King was at least negligent for failing to notify APC of the fire to allow APC an opportunity to examine the fire scene and all of the accompanying physical evidence. The Court in *King* went on to observe that whether Plaintiffs failed to notify APC after learning that no one from APC had inspected the evidence in

18

January 2002 was intentional or really negligent need not be decided since that failure is a direct cause of APC's inability to construct a defense. *King*, 181 Fed. Appx. at 377-378.

The Plaintiffs in *King* did not actively destroy evidence [the destruction was actually performed by an independent 3rd party]; however, because of the extreme harm to Defendant and the fact they were in the position to at least give notice to the Defendant, the Court still found that the Plaintiffs were at some fault and allowed the extreme sanction of dismissal. *Id*. Whether a party acts intentionally or negligently, as in *Silvestri* and in this case, dismissal may be the appropriate sanction for spoliation." *Id*. Indeed, the court notes that even if dismissal may be extreme, lesser sanctions such as exclusion of evidence and adverse inferences can be considered. *Id*. at 376-378. Also, as in *King*, these remedies can be considered even if the adverse party argues that there is other evidence that can take the place of that which has been lost or irrevocably destroyed. *Id*. at 378.

Defendant's failure to preserve was so prejudicial that it is denied that Plaintiff had been able to defend the conclusion of Defendant's experts. To protect itself in this case the Plaintiff must defend against the conclusion of Plaintiff's electrical expert, Martini that he made a visual inspection of the PCBs and found nothing that would indicate that they could have been the cause of ignition for the fire. To prove that the conclusion of Martini's flawed and has no merit would be futile and the only evidence that he has to go on would be the incomplete investigation made by Lacy and Martini and Martini's visual impressions which, at best, would be unreliable. Both Lacy and Martini wrote pre-litigation reports to Defendant in which neither of them discussed the presence of the Ion IQ or PCBs having been present in the area where Lacy concluded was the origin of the fire and consequently did not specifically discuss them as being ruled in or ruled out as a potential ignition source for the fire. Martini admitted that he had no

Case 5:12-cv-00610-F   Document 32   Filed 09/15/13   Page 19 of 22

notes, other than a few photographs of his investigation and alleged examination of the PCBs and was simply relying upon memory that the fire that had consumed the Ion IQ unit appeared to have been from an outside source and not from the inside source. As stated by all of Plaintiff's experts, there is no way that Plaintiff can refute the testimony of Lacy and Martini without their experts having been given an opportunity to physically investigate the PCBs and not simply view Martini's pictures.. Now that the physical evidence is gone the only evidence left are the statements of Lacy and Martini and there is no question that the Plaintiff would be highly prejudiced by the PCB's not being produced for their experts to review.

## CONCLUSION

For the reasons herein stated, Plaintiff requests that the Court grant partial summary judgment on the initial applicability of the Policy. Plaintiff also respectfully maintains that the only appropriate sanction in this case is for the suppression of any evidence may be sought or offered by Defendant or its experts Lacy and Martini and/or even Royal in ruling out the PCB's as being a potential ignition source for the fire. Accordingly, if the Court so suppresses this evidence, Defendant no longer meets the requirements for a "process of elimination" conclusion that the fire is incendiary and therefore was ignited by a dishonest act of Plaintiff or its agents and the same, therefore, cannot be the basis of an exclusions. As such, Plaintiff would also be entitled to partial summary judgment on this issue as well.

**MCCOY WIGGINS CLEVELAND**
**& O'CONNOR PLLC**


/s/ Richard M. Wiggins

Richard M. Wiggins, Esq.
N.C. Bar No. 4722
James A. McLean, III
N.C. Bar No. 27966
*Attorney for Plaintiff*
*City Grill Hospitality Group, Inc.*
P.O. Box 87009
Fayetteville, NC  28304-7009
Telephone: (910) 483-8104
Facsimile: (910) 483-0094
Email: rwiggins@mccoywiggins.com
          jmclean@mccoywiggins.com

# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

### Civil Action No.:5:12-CV-610-F

| | | |
|---|---|---|
| **CITY GRILL HOSPITALITY GROUP, INC.,** | ) | **CERTIFICATE OF SERVICE** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **NATIONWIDE MUTUAL INSURANCE COMPANY** | ) | |
| **Defendant.** | ) | |

I hereby certify that on September 15, 2013, I electronically filed the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF MOTION FOR RELIEF DUE TO DEFENDANT'S SPOLIATION OF RELEVANT EVIDENCE with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following parties, addressed to:

Gemma L. Saluta, Esq.
Rachel E. Daly, Esq.
℅ Womble Carlyle Sandridge & Rice, LLP
One West Fourth Street
Winston-Salem, NC 27101

/s/Richard M. Wiggins
Richard M. Wiggins, Esq.
N.C. Bar No. 4722
James A. McLean, III
N.C. Bar No. 27966
McCoy Wiggins Cleveland & O'Connor PLLC
P.O. Box 87009
Fayetteville, NC  28304-7009
Telephone: (910) 483-8104
Facsimile: (910) 483-0094
Email: rwiggins@mccoywiggins.com
jmclean@mccoywiggins.com

22