# Exhibit L

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:12-CV-00610-F

C O P Y

CITY GRILL HOSPITALITY GROUP, INC.,    )
                                       )
                          Plaintiff,   )
                                       )
           vs.                         )
                                       )  D E P O S I T I O N
NATIONWIDE MUTUAL INSURANCE COMPANY,   )
                                       )
                          Defendant.   )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

STEPHEN EDWARD STONE

202 Fairway Drive
Fayetteville, North Carolina

Friday, July 19, 2013
1:37 o'clock p.m.

Atlantic Professional Reporters
Winston-Salem, NC  27116-1672

---

**Page 2**

NOTES

Page:Line    Subject Matter    Relates To    Action

---

**Page 4**

I N D E X

STIPULATIONS                              5

EXAMINATION
    Ms. Daly                              6


ADJOURNMENT                             119
CERTIFICATE OF TRANSCRIPT               120
CERTIFICATE OF OATH                     121
WITNESS CERTIFICATE                     122
WITNESS ADDENDUM                        123
CERTIFICATE OF MAILING                  124

E X H I B I T S

| Name | Offered By | Identified |
|------|-----------|-----------|
| Deposition Exhibit 1 | Defendant | 23 |
| Deposition Exhibit 2 | Defendant | 35 |
| Deposition Exhibit 3 | Defendant | 74 |
| Deposition Exhibit 4 | Defendant | 82 |
| Deposition Exhibit 5 | Defendant | 89 |
| Deposition Exhibit 6 | Defendant | 93 |
| Deposition Exhibit 7 | Defendant | 103 |

---

**Page 3**

APPEARANCES OF COUNSEL

Richard M. Wiggins, Esq.
McCOY WIGGINS CLEVELAND & O'CONNOR, PLLC
202 Fairway Drive
Post Office Box 87009
Fayetteville, North Carolina 28304-7009


Rachel E. Daly, Esq.
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One West Fourth Street
Winston-Salem, North Carolina 27101


OTHER APPEARANCES

Loryn Buckner

---

**Page 5**

1                    STIPULATIONS
2          Pursuant to notice and/or consent of the
3      parties, the deposition hereon captioned was
4      conducted at the time and location indicated before
5      Cassandra J. Stiles, Notary Public in and for the
6      County of Forsyth, State of North Carolina at Large.
7          The deposition was conducted for use in
8      accordance with and pursuant to the applicable rules
9      or by order of any court of competent jurisdiction.
10         Reading and signing of the testimony was
11     requested prior to the filing of same for use as
12     permitted by applicable rule(s).
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1      The witness, STEPHEN EDWARD STONE, being
2  first duly sworn to state the truth, the whole truth
3  and nothing but the truth, testified as follows:
4      (1:37 o'clock p.m.)
5          EXAMINATION
6  BY MS. DALY:
7      Q.  My name is Rachel Daly, and I have been
8  retained by Nationwide in this matter.
9      Have you had your deposition taken before?
10     A.  Yes, I have.
11     Q.  Just a few things.
12     If you need a break, let me know.  The
13  only thing that I ask is that you answer the question
14  that's on the table.
15     Other than that, if you don't understand
16  my question, please let me know and I'll rephrase it.
17     A.  Okay.
18     Q.  Will you state your full name for the
19  record.
20     A.  Stephen Edward Stone.
21     Q.  You provided us a copy of your CV.  Is
22  this your most up-to-date CV?
23     A.  It is.
24     Q.  Generally speaking, have you ever been
25  disciplined by any professional board?

Page 7

1      A.  No.
2      Q.  And have you ever been terminated from a
3  position?
4      A.  No.
5      Q.  Have you ever been laid off from a
6  position?
7      A.  No.  Of course we're going through
8  sequestration and furloughs right now, right, the
9  government.  Fridays are furlough days for 11 weeks,
10  but that's not a layoff.  That's a furlough.
11     Q.  Let's talk about your current position.
12     It states that you are the principal
13  engineer for Stone Engineering, Incorporated.
14     A.  Yes.
15     Q.  And do you have any other employment other
16  than being the principal engineer at Stone?
17     A.  Yes.
18     Q.  What is your other employment?
19     A.  I'm employed with the government.
20     Q.  Okay, and what do you do for the
21  government?
22     A.  In my current position, I'm the STOVL,
23  S-T-O-V-L, chief engineer for the F-35B aircraft
24  program.
25     Q.  And what are your duties on a day-to-day

Page 8

1  basis?
2      A.  I -- I lead the -- the technical team, the
3  engineering team responsible for design, validation,
4  qualification, of the STOVL propulsion system for
5  that aircraft.
6      Q.  And what is the STOVL?
7      A.  I'm sorry.  It's short takeoff and
8  vertical landing.
9      Q.  Are you more in an administrative role at
10  this point in your career, supervising others?
11     A.  No.  It's very much a hands-on design
12  validation effort.
13     Q.  What else do you do in that position on a
14  day-to-day basis?
15     A.  Well, let's see.  We're running a very
16  aggressive flight test program, so on any given day
17  I'm looking at airworthiness issues, signing the
18  flight test letters, the things that we need to do to
19  be able to go from flight testing the aircraft,
20  progressively pushing out the envelope until we can
21  verify the full flight test envelope.
22     So airworthiness is a big part of what I
23  do, as well as leading the design and validation
24  effort on the STOVL system.
25     I also, as you'll see in the CV, we've got

Page 9

1  aircraft fielded now so we're just standing up the
2  in-service engineering aspects of that, so I'm also
3  helping to lead that effort through the expansion of
4  limits, technical repairs and all that.  It all sort
5  of funnels back to me on the STOVL system for the
6  overall technical responsibility.
7      Q.  In that position, how often do you have to
8  look at a product to determine whether or not there
9  was an electrical failure that caused a fire?
10     A.  In that particular application, not very
11  often.  We have -- well, actually, not at all,
12  because we haven't had any electrical fires in the
13  F-35B in a propulsion system.
14     Q.  So in your entire time in that position
15  you've never looked at a product to determine whether
16  or not there was an electrical failure that caused a
17  fire?
18     A.  On the F-35B propulsion system, which I've
19  been involved with since 2010, yes, ma'am, that's
20  correct.
21     Q.  What were you involved in prior to 2010?
22     A.  Prior to that point I was the senior
23  in-service engineer for the Navy for STOVL
24  propulsion.
25     Q.  And how long were you in that position?

Page 10

1   A. I believe -- I'll just check my CV here.
2       I believe I started that position in 2006,
3   and then I transitioned out of that in 2010 to take
4   up the chief engineering position on the F-35 STOVL
5   system.
6       Q. And during that period of time, the
7   2006-2010, how often were you looking at a product to
8   determine whether or not there was an electrical
9   failure that caused a fire?
10      A. The only times I would have done that
11  would have been during aircraft accident
12  investigation, of which I did quite a few working on
13  a STOVL platform. Unfortunately, we crashed a few of
14  those.
15      So you're always looking back through the
16  wreckage, trying to work out sequence of events for
17  -- as you started to lose systems -- in-flight fires,
18  I've looked at stuff for that, too, in that position.
19  That's probably the gist of it there.
20      Q. How many did you look at? You said quite
21  a few.
22      Is that three, five, what ---
23      A. --- Oh, that's probably -- let's see.
24      As a senior in-service engineer from 2006
25  to 2010, probably more than five, less than 15,

Page 11

1   somewhere in that ballpark. Because as the senior
2   in-service engineer, even if the other guys were
3   doing the investigation, I would still ultimately get
4   rolled in for oversight.
5       Q. So does that mean you would not have
6   actually physically looked at the evidence yourself?
7       You would have looked over somebody else's
8   end product of their determination of the incident or
9   ---
10      A. --- No, typically I would be wading
11  through parts.
12      A big part of that is reconciling all of
13  the damage in failures that you have and work that
14  back to what you believe the most probable cause was.
15  So it's a lot of systems and things you have to work
16  through.
17      Q. And you believe there could have been
18  upward to 15 crashes during that four-year period of
19  time?
20      A. No, let's drop that down to 10. There
21  were probably under 10. So between five and 10 is
22  probably right for that four-year period.
23      Q. Prior to that period of time what were you
24  doing?
25      A. Let's see, before that I was the

Page 12

1   in-service engineering engine controls lead for the
2   Navy.
3       Q. And that's from 1987 to 2006?
4       A. From 1995 to 2006. I was the senior
5   in-service engineer for that time period. Prior to
6   that, the period you referred to, '87 to 2006, would
7   have been just the lead engineer for the T45 and the
8   AV8. I was dual-added for part of that. That may be
9   part of the confusion.
10      As I picked up the new in-service
11  engineering lead position, I also held the previous
12  as well.
13      Q. Let's do 1995 through 2006.
14      How often were you looking at a product
15  failure to determine whether there was an electrical
16  failure that caused a fire?
17      A. Again, it would just go back really to the
18  aircraft mishap investigations. But the exact
19  numbers, I don't have.
20      I mean, I was involved with the Harrier
21  program for 26 years, so -- you know, I've looked at
22  a lot of crashed Harriers. I don't know exactly how
23  many between '95 and 2006.
24      Q. Okay.
25      A. I'd have to go back and pull out my

Page 13

1   records.
2       Q. And other than crashes during that period
3   of time, would there have been any other scenario
4   when you would have been looking at a product to
5   determine whether there was an electrical failure
6   that caused a fire?
7       A. An actual fire in the aircraft, no.
8   Electrical failures, yes, but not fires.
9       Q. Since 1987 what would you approximate the
10  amount of crashes you worked on during your career
11  with the government?
12      A. Well, really, it would go back to 1984.
13      Q. Okay, 1984....
14      A. That's when I actually started with them.
15      Q. In crashes where you're looking at a
16  product to determine whether or not there was a -- an
17  electrical failure that caused a fire?
18      A. I don't know a number off the top of my
19  head.
20      And again, this is -- the context of this
21  would be looking at all of the wreckage, working back
22  through all the failed harnesses and components, and
23  trying to understand -- reconcile the damage that you
24  see.
25      For instance, lots of times there are

Page 14

1   post-impact fires, so you're always having to look
2   through that stuff to rule it out. But -- I don't
3   know -- certainly more than 20. And it also spans
4   other programs, too.
5       I've done other aircraft accidents as well
6   -- other platforms, F4's, T45's, things like that, so
7   it's quite a bit of exposure to forensic analysis.
8       Q. So would you say more than 20, less than
9   30?
10      A. No. Probably less than about 60 or so
11  would probably be a conservative number, over my
12  entire career.
13      Q. In conjunction with your position with the
14  government, it appears that you have your own company
15  as well, Stone Engineering?
16      A. I do.
17      Q. What types of companies typically hire you
18  in that role?
19      A. Predominantly insurance companies.
20      Occasionally I'll get a case through a
21  lawyer, or rarely, although it does occur, I'll have
22  a case directly from, you know, the general public.
23      Q. And what types of cases do you work on in
24  your capacity as the engineer for Stone Engineering?
25      A. A lot of failure analysis, some accident

Page 15

1   reconstruction, some involvement with, you know, fire
2   investigations.
3       And really, from that perspective, more of
4   a product liability, defect analysis perspective.
5       Q. So since 1999 how often have you been
6   retained to look at a fire investigation?
7       A. It's probably something on the order of
8   about 25 percent of my business.
9       Q. Okay, so in a given year, approximately
10  how many fire scene investigations do you do?
11      A. It -- it varies year to year.
12      Q. Okay, let's talk about this year.
13      Other than this case, how many fire
14  investigations are you doing?
15      A. This is the only one I have open at the
16  moment. I just finished one earlier. I'd say I've
17  probably done three or four this year.
18      Q. Last year, how many did you work on, not
19  including the three to four you just ---
20      A. I don't know.
21      Q. --- Accepted this year?
22      A. I'd have to look at my records.
23      Q. Can you give me a general idea? Are we
24  talking three to four, 20?
25      A. Probably three to four range.

Page 16

1       I mean, I obviously, you know, work
2   full-time for the government, and I try not to become
3   overly busy, so I can have some family time. So I
4   deliberately keep this to a reasonable, manageable
5   level.
6       Q. Have you given testimony in any of those
7   cases involving fire investigation?
8       A. For this year?
9       Q. No, in any of yours, since 1999.
10      A. Yes.
11      Q. Do you recall the names of those cases?
12      A. No.
13      Q. Were they located in Fayetteville?
14      A. I'd have to look at my records to see.
15      Q. Do you keep records regarding the types of
16  cases you work on?
17      A. I keep a -- a testimony log, and then it
18  just rolls -- of course, according to Rule 26, for
19  truncating it to four years. Right? But I keep
20  records.
21      Q. Do you actually keep records of the type
22  of investigation you were performing and....
23      A. I keep a record by case file number that I
24  can then look at and see what the subject was on it,
25  and then without having to go back and pull my

Page 17

1   reports and my case files, I can tell from that what
2   the nature of the work was.
3       Q. When you are hired to do a fire
4   investigation, do you typically go to the scene of
5   the fire?
6       A. Not always. Maybe 50 percent of the time,
7   if that.
8       Q. And if you're not at the scene of the
9   fire, how do you generally go about conducting your
10  fire investigation?
11      A. I actually conduct a fire loads and
12  effects based analysis on the items generated from
13  the fire scene by the cause and origin investigators.
14  So they bring that to me with a very specific
15  question about, you know, we think this might have
16  potential, you know, if you see any evidence of fire
17  causing failures or defects.
18      And then I work through the protocols with the
19  other parties as necessary and align on inspection
20  requirements and go from there. So I don't get into
21  the discussion of the fire vectors and the patterns
22  on the wall and all that. I focus strictly on the
23  hardware or the components.
24      Q. So you are not qualified to determine the
25  origin of the fire. Is that correct?

Atlantic Professional Reporters - 800-717-0001
Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 6 of 33

Page 18

1    A. Within a room or a structure, no.
2    Q. And you are not qualified -- strike that.
3    How often do you do your investigation
4  based solely on photographs?
5    A. Never. But I always have the hardware,
6  the evidence, in my possession, and I execute a full
7  failure modes and effects analysis on that component
8  and then drive an appropriate investigation, and then
9  use the evidence to rule in or rule out supporting or
10 refuting evidence as necessary.
11   In fact, I'm looking for the failure
12 effect, which, in this case, would be a fire causing
13 failure or defect. But never off of photographs.
14   Q. When were you retained for this case?
15   A. The 11th of April, 2013.
16   Q. And who contacted you?
17   A. Trey McLean.
18   Q. And what did Mr. McLean tell you about the
19 case?
20   A. Really, what we discussed was my role in
21 it. He said that there was some evidence that had
22 already been collected from the fire scene, and that
23 there was a joint examination that was going to take
24 place on the 17th of April, I believe it was.
25   So very specifically he asked me to go

Page 19

1  participate in that joint examination, look
2  specifically for evidence of a fire causing failure
3  or defect in the exhibits provided, and then to
4  support the investigation from that point forward if
5  any more hardware evidence came up.
6    Q. Anything else?
7    A. A brief overview of the nature of the
8  fire, that it was in a restaurant, just some of the
9  general things.
10   He also put me in touch with Steve Booth,
11 who was the cause and origin investigator. So of
12 course Steve gave me some background, which really
13 pertained to where the evidence came from.
14   Q. Okay, let's stick with what Mr. McLean
15 talked to you about.
16   Other than going to the evidence exam,
17 what else was your role in this investigation?
18   A. Well, I was told that this one particular
19 component, that there was an HME Ion IQ wireless
20 device that was there. I was asked to look and see
21 if it was there, and then to -- you know, to
22 determine if I could rule it in or out as a potential
23 contributor or cause.
24   Q. And he told you this on the initial
25 contact with you?

Page 20

1    A. No. I would say that probably flowed over
2  a couple of days. We talked a couple of times,
3  spanning the period from the 11th through to the
4  17th, from the time I was retained right up until we
5  went. So it was over that time frame.
6    Q. Anything else mentioned to you besides the
7  wireless device?
8    A. Not that I recall.
9    Q. Were you asked to look at any of the items
10 that were at the -- the exam to determine whether or
11 not there was an electrical failure with any of the
12 other items?
13   A. Yes. I was asked to look at all of the
14 evidence that was there, so I looked at everything
15 that was made available to me.
16   Q. And you said you had talked to Steve
17 Booth.
18   A. I did.
19   Q. Did you previously know Mr. Booth?
20   A. Yes.
21   Q. Did you work with Mr. Booth at some point
22 prior to this case?
23   A. Not in the same company. I mean, he works
24 for Langham & Associates. I rent office space from
25 them, so we're co-located, so I've worked other cases

Page 21

1  with Mr. Booth as well as other investigators from
2  Langham & Associates.
3    Q. How many times have you worked with Mr.
4  Booth?
5    A. I'd have to check my records.
6    Q. Give me an approximation.
7    A. Somewhere between five and 10, maybe,
8  ballpark.
9    Q. Have you ever worked a fire investigation
10 with Mr. Booth?
11   A. Yes.
12   Q. Were all of those fire investigations that
13 you've worked with Mr. Booth?
14   A. Yes.
15   Q. Have you ever worked with any attorney
16 from McCoy Wiggins prior to this case?
17   A. Not that I recall.
18   Q. And to date, have you ever been to the
19 scene of the fire?
20   A. No.
21   Q. Have you ever asked to go to the scene of
22 the fire?
23   A. No.
24   Q. You provided an invoice with your expert
25 report.

Page 22

1    Do you have a copy of that invoice with
2  you?
3    A. No, ma'am.
4    Q. It states that you researched the HME ion
5  IQ drive through system components.
6    What did you do to research?
7    A. I researched them online, trying to get
8  basic design specifications for the unit, as well as
9  the -- you know, the physical dimensions so that I'd
10 be able to recognize the hardware from that, or the
11 sub-components, as the case may be, if it was there
12 to be examined on the 17th.
13   Q. Did you contact the company directly?
14   A. No.
15   Q. Anything else, besides doing online
16 research?
17   A. No, that was it.
18   Q. It states that you reviewed the
19 photographs from Mr. Lacy and Mr. Martini.
20   Were you ---
21   A. --- Yes. The ones that were made
22 available to me, yes, I did.
23   Q. Approximately how many were made available
24 to you?
25   A. I don't recall. I've got a full CD of

Page 23

1  everything that's been made available to me. I can
2  find that if I need to.
3    Q. Well, that's one thing that I noted that
4  your report was deficient, is that the Federal Rules
5  require you to list everything you reviewed and you
6  were provided, and you did not do that.
7    Did you bring a list of those materials
8  and documents today?
9    A. I brought all of the materials and
10 documents today. I made a full CD of everything that
11 I reviewed.
12   Q. Let's mark this as an exhibit.
13     (* Exhibit 1 was marked *)
14   Q. It's been marked as Exhibit 1.
15   Is there a page, table of contents on
16 Exhibit 1, or is it simply just the documents?
17   A. Those are simply just the documents
18 individual files, like Martini photographs, etcetera,
19 etcetera, that were provided to me.
20   Q. Other than what's been listed on this
21 invoice, have you done anything else in regards to
22 this case?
23   A. Let me check my notes.
24   (Witness examined documents)
25   A. Yes, I reviewed -- I guess there were

Page 24

1  supplemental reports that were just made available to
2  me last night from Mr. Martini and Mr. Lacy. They
3  didn't make them available. They came, of course,
4  through counsel, but I did review those.
5    Q. And you received those last night?
6    A. I did.
7    Q. And have you spoken to anyone from McCoy
8  Wiggins regarding the expert reports?
9    A. Yes.
10   Q. And when did you speak with them?
11   A. A little bit last night, and then very
12 briefly today.
13   Q. Okay, we'll go through that in detail
14 later.
15   A. Okay.
16     MS. DALY: Before we do anything
17 else, if we can go off the record for a few minutes.
18     (2:02-2:08 p.m. - recess)
19   Q. (Ms. Daly) You mentioned having
20 discussions with Steve Booth leading up to the exam,
21 evidence exam.
22   What else do you recall discussing with
23 Steve Booth?
24   A. He gave me some of the background of the
25 fire from his cause and origin investigation. He did

Page 25

1  tell me that apparently everyone seemed to be in
2  general agreement with the general area of the fire
3  and that the -- the exhibits that we were going to
4  look at had all been recovered from that immediate
5  area of origin for the most part.
6    So we talked through, you know, where that
7  evidence came from, the condition of the fire scene.
8  He walked me through his photographs that he had
9  taken as well.
10   Q. Did he walk you through anybody else's
11 photographs?
12   A. I don't recall. I don't believe I
13 actually had any photographs available other than
14 from Booth to start with.
15   I mean, from the time frame of 11 through
16 17 April, so....
17   Q. I'm talking about between April 11th, when
18 you were retained, and April 17th.
19   A. Yes.
20   Q. The evidence exam.
21   A. Yes.
22   Q. So, to focus on that time period, anything
23 else you recall from Steve Booth?
24   A. Not anything that I thought was of
25 substance to the work I was going to do.

Page 26

1    Q.  That's kind of a vague answer and not very
2  helpful.
3    A.  Okay.  Sorry.
4    Q.  Let's focus on the origin of the fire.
5  What did he tell you about the origin of the fire?
6    A.  As I recall, it was in the corner next to
7  the drive-thru window, and we walked through the
8  photographs just of that very quickly.
9         And again the focus of the discussion we
10 had was on -- the context was, you know, here's this
11 -- here are the exhibits they recovered, here are the
12 receptacles they've recovered, here's the drive-thru
13 window and so on.
14   Q.  Did Mr. Booth, when looking at the
15 pictures, show you where he believed the origin of
16 the fire was located?
17   A.  Loosely.  I mean, he put it generally in
18 that corner.
19   Q.  Okay.
20   A.  I guess the right-hand corner if you're
21 facing the drive-thru window on the side of the
22 building.
23   Q.  How close to the floor did he put the
24 fire?
25   A.  I don't recall.

Page 27

1    Q.  Did he point to you on the fire where he
2  believed it started?
3    A.  We were talking over the phone.
4    Q.  Excuse me.
5         Okay, so he walked through the pictures
6  with you over the phone?
7    A.  Over the phone, yes, ma'am.
8    Q.  So did you have a copy as well as he had
9  his own copy, or did he literally just tell you what
10 his photos showed?
11   A.  No.  He actually uploaded the photos for
12 me in Dropbox and I could pull them down so we could
13 both look at the photos and talk through them
14 together.
15   Q.  So when he was talking to you about the
16 origin of the fire, what exactly -- where did he tell
17 you other than it was in the drive-thru window area?
18   A.  We had specific photographs that we were
19 going through, and there were quite a few of them, so
20 -- you know, I don't recall specifically exactly
21 where he's placing the origin.
22        And again, my focus was on looking at the
23 physical evidence available on the 17th.
24   Q.  So is the origin of a fire relevant to
25 your part of the investigation?

Page 28

1    A.  Only in the sense -- from the work that I
2  would do with it, to define the failure modes and
3  effect -- the effect that I'd be driving to look for.
4         I mean, the cause and origin investigators
5  have isolated x amount of exhibits for evidence that
6  they have pulled from the area of origin that through
7  their expertise they've narrowed down to.
8         In my case, I would drive the failure
9  modes and effects analysis for the effect of
10 potential fire causing failure or defect, and then I
11 would start looking at all the plausible modes or
12 mechanisms the particular exhibit or piece of
13 evidence we're talking about might have, and then
14 start looking at what supporting or refuting evidence
15 I would need from an investigative perspective on
16 that exhibit to be able to converge on probable or
17 improbable.
18   Q.  Okay, so other than the general area of
19 origin, did Steve Booth tell you anything else about
20 where this fire started?
21   A.  Well, he told me that -- I guess that the
22 client -- that there was some question, you know,
23 that people were suspecting involvement potentially.
24   Q.  And what did he tell you about that?
25   A.  That was really the gist of it.

Page 29

1    Q.  Did he tell you about any interviews that
2  were conducted?
3    A.  No.  We didn't get in to any of that.
4    Q.  Did Steve Booth tell you whether or not he
5  suspected the client, Mr. Diamontopoulos, caused the
6  fire?
7    A.  No, he did not, because again, it would
8  have no bearing on what I would be doing.
9    Q.  Okay.
10   A.  The evidence is what it is.
11   Q.  When Mr. Booth mentioned to you that there
12 was suspicion regarding whether Mr. Diamontopoulos
13 set the fire, who did he tell you thought that Mr.
14 Diamontopoulos set the fire?
15   A.  Well, he had told me that -- I guess that
16 his insurance company, that there was some dispute
17 over the cause of the fire, so I'm assuming that
18 that's who is suspecting him.
19   Q.  Did Mr. Booth ever mention Mr.
20 Diamontopoulos by name?
21   A.  Yes, because that's actually the client.
22 I mean, that's the name, you know, of the client that
23 I guess is your client, but we're working for Mr.
24 Wiggins, and so yes, I have heard that name.  He's
25 talked about that.

Page 30

1    He's talked about some time lines and
2 things about the evening of the fire, so I have heard
3 that name from Mr. Booth.
4    Q. Okay, but I have a specific question.
5    Did he ever mention Mr. Diamontopoulos as
6 the suspect who set the fire?
7    A. That was what I understood the suspicion
8 to be.
9    Q. Did he tell you why there was suspicion
10 surrounding Mr. Diamontopoulos?
11   A. I know he's referred to a time line that,
12 you know, he was there the evening of. I guess he
13 was the last person that was there that evening, so.
14   Q. Are you talking about the morning of the
15 fire?
16   A. The -- prior to the fire, he was the last
17 person in the restaurant, was my understanding.
18   Q. Did he go through the time line with you?
19   A. No, not in great detail.
20      I mean, he mentioned a couple of minutes
21 at Walmart or whatever, and just kind of talked
22 through it, but we didn't -- we didn't spend any
23 great detail on the time line because, again, it
24 would have no bearing on the context of the work I
25 was doing.

Page 31

1    Q. So, for your purposes, the cause of the
2 fire, of whether or not someone set the fire, has no
3 bearing on what your -- of your determination?
4    A. That's correct.
5       I mean, I specifically was asked to look
6 at the evidence for evidence of fire causing failure
7 defects and to be able to comment on this particular
8 item, this HME IQ wireless transmitter, as to whether
9 there's sufficient evidence for me to be able to rule
10 it in or rule it out, so....
11   Q. Let's go back to the time line.
12      So Mr. Booth walked through the time line
13 with you from the time that Mr. Diamontopoulos was at
14 the store and the time the fire started. Is that
15 correct?
16   A. No, that's not correct.
17   Q. Okay.
18   A. He didn't walk through the time line with
19 me in any sense of accuracy. He just said there was
20 some time line that placed him at the restaurant
21 prior to, he was looking at all of that.
22   Q. Prior to the fire?
23   A. Yes, ma'am.
24   Q. And then you mentioned Walmart. What did
25 he tell you about Walmart?

Page 32

1    A. He told me that -- in part of that
2 conversation that apparently there was some video of
3 his vehicle at a certain time that can help to fill
4 in points.
5       But again, we didn't spend a lot of time
6 on that because it's not helpful to me.
7    Q. But it was background information given to
8 you. Correct?
9    A. Yes, ma'am.
10   Q. And so you did have a discussion with Mr.
11 Booth regarding this information?
12   A. In no great detail, but yes.
13   Q. Okay, I understand it wasn't in great
14 detail, but I'm trying to get the details of the
15 conversation.
16   A. Right.
17   Q. So other than the couple of minutes that
18 -- at Walmart, what else did he tell you about the
19 background information of this case?
20   A. I really don't recall anything else
21 specific.
22   Q. Okay, was any financial issues surrounding
23 the business mentioned to you by Steve Booth?
24   A. Yes. I think that was mentioned on the
25 17th, on or right before.

Page 33

1    Q. Tell me about that discussion.
2    A. Well, not just -- just that there were
3 financial issues, and, of course, on the 17th part of
4 the -- part of the evidence that had been recovered
5 were actually like -- I don't think they were bank
6 statements. It was more like deposit slips and
7 things like that. So it was really in the context
8 of, you know, why would there be an interest?
9    Q. And what did Mr. Booth tell you about the
10 financial condition of Miami Subs?
11   A. Only that there were issues. We didn't go
12 into great detail.
13   Q. So did he just say they were having
14 financial problems with no details?
15      MR. WIGGINS: Objection.
16      MS. DALY: You can answer.
17      MR. WIGGINS: You can answer.
18      THE WITNESS: I don't know if he put
19 it that way, but that yes, there were financial
20 issues, financial concerns.
21      MS. DALY: Okay.
22      THE WITNESS: The exact words I
23 don't recall, because again, that's not relevant to
24 what I'm doing.
25   Q. (Ms. Daly) Did you walk away from that

Page 34

1   discussion with the impression that there were
2   financial problems with the company?
3        MR. WIGGINS: Objection.
4        MS. DALY: And you can answer.
5        MR. WIGGINS: Answer it if you can.
6        THE WITNESS: Yes.
7        Q. (Ms. Daly) Did he talk to you about the
8   fact that there were no dumpsters located on the
9   property?
10        A. No.
11        Q. Did he talk to you about the IRS visiting
12   Mr. Diamontopoulos the week of the fire?
13        A. No.
14        Q. Did he tell you about numerous employees'
15   checks bouncing the months leading up to the fire?
16        A. No.
17        Q. Did he mention any financial issue
18   specifically?
19        A. Not that I recall.
20        Q. Leading up to the evidence inspection, do
21   you recall any other discussions you had with Mr.
22   Booth?
23        A. No, I don't.
24        Q. Other than Mr. McLean and Mr. Booth, did
25   you have any other discussions with anyone between

Page 35

1   April 11th and April 17th about ---
2        A. --- Not that I recall.
3        Q. --- This case?
4        A. No.
5        Q. Did you do any evidence review of any type
6   of documents or photographs other than walking
7   through Mr. Booth's photos between 11th -- April 11th
8   and April 17th?
9        A. Can I check my notes real quick?
10        Q. Sure.
11        A. Okay.
12        (Witness examined documents)
13        A. No.
14        Q. Let me go ahead and mark your notes, Mr.
15   Booth (sic), as Exhibit 2.
16        (* Exhibit 2 was marked *)
17        Q. Other than the notes that you have
18   provided to us, do you have any other notes in this
19   case?
20        A. No.
21        Q. Looking at Exhibit 2, there's a date,
22   April 11, 2013, and it states, case review with Steve
23   Booth following receipt of assignment.
24        The case review with Steve Booth, are you
25   -- what are you referencing in that statement?

Page 36

1        A. Only that I talked to Steve Booth on the
2   11th about this case.
3        I know that he and Mr. McLean had talked
4   about whether or not to retain me, about whether or
5   not they were going to retain an engineer. I believe
6   Steve may have even given me a heads-up that I might
7   be getting a call. So it was really just a -- a very
8   brief background review.
9        Q. Do you recall now anything additional that
10   you spoke to Mr. Booth about other than what we've
11   just spoken about ---
12        A. --- No.
13        Q. --- In the last few minutes? You have
14   written, intercom system installed directly above
15   point of fire origin. Origin area not in dispute.
16        Who told you about the intercom and the
17   origin?
18        A. Booth.
19        Q. The next statement just discusses about
20   Mr. Wiggins, the attorney requesting service/client.
21        Have you had any issues being paid for
22   your services in this case?
23        A. No.
24        Q. And have the checks come directly from
25   McCoy Wiggins?

Page 37

1        A. I believe so, yes.
2        Q. Who told you about the April 17th joint
3   exam?
4        A. It could have been either Steve Booth or
5   Trey, because after I got the assignment we swapped
6   several emails and several phone calls to make sure
7   that we honed in on exactly what my role was going to
8   be in this.
9        Q. Were you told that your role was limited
10   in this case to looking at the evidence at the
11   inspection on April 17th?
12        A. No. It's -- the initial part of the
13   assignment was to go participate in that joint
14   examination and then to support, you know, further
15   findings and discussion as appropriate.
16        Q. Okay. I understand what you did at the
17   evidence inspection. You mentioned support further
18   findings.
19        Have there been any other further findings
20   that you've given opinion about since April 17th?
21        A. Only in discussion of this -- this one
22   ion, this HME wireless set.
23        Q. Other than that, anything else?
24        A. No.
25        Q. Why have you never gone to the fire scene?

Page 38

1       A. Because there is no need for me to go
2  within the context of what it is that I'm doing.
3       You know, if the exhibits -- they've
4  already been pulled out as they were and made
5  available on the 17th, and this -- this other device,
6  the wireless headset device, is no longer there, no
7  longer available, there wouldn't be much use for me
8  to go to the fire scene after it's already been
9  disturbed.
10      Q. Were you ---
11      A. --- Oh, sorry.
12      Q. No, go ahead, please.
13      A. And since there were no potential fire
14 causing failures or defects in the things that I did
15 look at on the 17th, again, there would be no reason
16 for me to go back there.
17      Now I'll just add to that, that if I felt
18 the need to go back there, I would have made the
19 request and gone.
20      MS. DALY: Let's take a five-minute
21 break.
22      (2:25-2:31 p.m. - recess)
23      Q. (Ms. Daly) Okay, so we finished
24 discussing everything you did between April 11th and
25 April 17th, the evidence exam. Is that correct?

Page 39

1       A. Yes.
2       Q. So let's talk about your evidence exam on
3  April 17th.
4       In your notes you have listed six items on
5  page one of seven, six items you examined.
6       A. Yes.
7       Q. And under that it states -- can you read
8  into the record your handwriting at the bottom
9  paragraph on page one.
10      A. Sure. It says x-ray inspection of debris
11 in paint can using low load portable system.
12      Operator is not NDI certified as an x-ray
13 inspector. NDI being non-destructive inspection.
14      Q. And the inspector you are referring to is
15 John Cavarock? Is that correct?
16      A. That's correct.
17      Q. Upon the completion of your inspection of
18 these six items listed on page one, was there any
19 evidence of potential fire causing failure or defect?
20      A. No.
21      Q. So after you -- what was your conclusion
22 after inspecting these six items?
23      A. I was just really acknowledging that they
24 were there, like the six plastic Pepsi cups.
25 Somebody took the time to collect them. I just

Page 40

1  acknowledged that I saw them there, and that we as a
2  group, that's what we looked at. And also that those
3  originated from Mr. Lacy, and that the other items in
4  those six, there were no fire causing failures or
5  defects.
6       There was nothing notable there.
7       Q. And the x-ray -- x-ray inspection of
8  debris in paint can.
9       A. Yeah. The discussion around that was that
10 Mr. Cavarock was proposing just x-raying the contents
11 of that can. I didn't know what was in that can, and
12 having spent a lot of time looking at x-rays and
13 non-destructive techniques, the type of x-ray machine
14 you have, the qualification of the operator, whether
15 he's level one, two, three certified and so on, goes
16 directly to the confidence in what you see portrayed
17 on the screen in the x-ray.
18      So once I found out that he didn't have
19 any certification as a non-destructive inspector, I
20 only had to push to have the can physically opened at
21 the end of our inspection. So that was a note to
22 myself just to say that I want to see what's in the
23 can.
24      Q. Okay, and did you get to see what was in
25 the can?

Page 41

1       A. I did.
2       Q. And what was your conclusion after you got
3  to see what was in the can?
4       A. It was mostly just debris. There was
5  nothing noteworthy in there, at least for the
6  purposes or the context of what I was doing.
7       Q. Was there any discussion between you and
8  Mr. Booth or Mr. Cavarock regarding any of these six
9  items that you haven't discussed with me already?
10      A. No.
11      Q. Did you ever have a discussion with Mr.
12 Wiggins or Mr. McLean or any attorney on behalf of
13 the plaintiff in this case regarding any of those six
14 items?
15      A. No.
16      Q. Page two of your notes. It says second
17 set of evidence collected by John.
18      Are you referring to John Cavarock?
19      A. I was.
20      Q. Okay.
21      A. To be honest, at that point I didn't
22 recall his name, so I just said John, but that's John
23 Cavarock.
24      Q. Let's walk through the items that you
25 reviewed at this evidence inspection.

Page 42

1        Item one ---
2     A.   --- Was the electrical meter, service
3  meter that John had pulled from the -- the
4  restaurant.
5        And also -- these are also -- the way
6  these are laid out, they follow with the layout of my
7  photos. I took quite a few photos during my exam,
8  so....
9     Q.   Okay.
10    A.   It's a very brief meter, but it calls my
11 attention back to my photos, which we'll see quite a
12 few of the meter, for example.
13    Q.   Okay. Thank you.
14    A.   Okay.
15    Q.   Was there anything significant with the
16 meter?
17    A.   No.
18    Q.   Was there any evidence of potential fire
19 causing failure or defect in the meter?
20    A.   We didn't open it, but no.
21    Q.   Items two and three, you have conduits and
22 receptors -- receptacles, excuse me.
23    A.   Receptacles, right.
24    Q.   Tell me about your findings with the
25 conduit and receptacles.

Page 43

1     A.   There were no findings. There was
2  unremarkable, no fire causing failures or defects.
3     Q.   I'm going to get you to read your
4  handwriting under that. It says item two.
5     A.   Okay, it says conduit/branch circuit
6  removed from wall between office area at first
7  drive-thru window.
8     Q.   Continue reading, please.
9     A.   Beneath that is receptacle box with
10 remnants of plugs attached was surface mounted to
11 office wall.
12    Q.   And what significance does that have to
13 you?
14    A.   Just giving me the orientation of where it
15 was and that it was on the surface of the wall.
16    Q.   And this paragraph that says item two in
17 it ends with attached was surface to the office wall.
18    A.   Mounted?
19    Q.   Mounted to the office wall.
20       Are you referencing the items two and
21 three that you previously noted?
22    A.   Ah, yes. And really, you know, again,
23 this was the first time I'd seen this evidence.
24       As you know, since you were there, it was
25 all bagged and tagged, so I'm relying on Mr. Cavarock

Page 44

1  and the descriptions, or the brief descriptions that
2  were on his tags identifying the origin.
3     Q.   Right. And you're relying on Mr.
4  Cavarock's identification because you were not at the
5  evidence collection. Correct?
6     A.   That's correct.
7        And also Mr. Booth, because there was
8  quite a bit of discussion amongst the engineers as we
9  were doing this, clarifying points of origin from
10 where these parts came from and so-on. So.
11    Q.   And was Mr. Booth and Mr. Cavarock ever in
12 disagreement over where any of these items came from?
13    A.   There was discussion more so for
14 clarification, but no, I wouldn't say disagreement,
15 no.
16    Q.   What does your next sentence state?
17    A.   Receptacle with blue number one, in
18 quotes, was located adjacent to drive-thru.
19    Q.   And go ahead and continue reading the next
20 paragraph, please.
21    A.   Partial disassembly of number one
22 receptacle revealed essentially uniform thermal
23 damage with no obvious ohmically induced distress.
24    Q.   And what is the significance with that
25 finding?

Page 45

1     A.   No evidence of a potential fire causing
2  failure or defect within that.
3     Q.   The next is the junction box.
4     A.   Yes.
5     Q.   What does it state in the parentheses?
6     A.   Parentheses, it states reportedly
7  installed in ceiling.
8     Q.   And did you examine the junction box?
9     A.   I did.
10    Q.   And what did you find?
11    A.   The paragraph below states, uniform
12 thermal damage, no ohmic -- it's the symbol for ohms
13 -- ohmic distress. Removal of conduit.
14    Q.   Before you go on, what's the significance?
15    A.   No electrical distress, no ohmically
16 induced heating.
17    Q.   All right, so go ahead and continue,
18 please.
19    A.   Removal of conduit, parentheses, blue zip
20 tie, is the way it was identified ---
21    Q.   --- Right.
22    A.   --- As an exhibit.
23       So removal of conduit, blue zip tie, to
24 expose three solid copper conductors to one of two
25 branches to top of junction box revealed uniform

1  thermal damage with no -- the symbol for ohms -- no
2  ohmically induced distress. And it also says below
3  that uniform oxidation.
4      Q. So again, what is the significance of that
5  finding ---
6      A. --- No evidence of ---
7      Q. --- To you?
8      A. --- Electrical distress or potential fire
9  causing failure or defect.
10     Q. On page three, can you read the first
11  paragraph.
12     A. Okay, it says side flex conduit
13  terminating at duplex with remnants of plugs still
14  retained. Exhibits evidence of aluminum alloying
15  right at side of box body.
16     Q. What was your findings?
17     A. Okay. There was some -- some localized
18  deformation of the copper conduit that's the result
19  of a eutectic melting process where it's effectively
20  contaminated the copper with molten aluminum to form
21  new alloy, and that's the reason that I believe the
22  distortion is there.
23         It is not indicative of electrical
24  distress or any potential fire causing failure or
25  defect. It simply explains the apparent melting and

1  deformation localized.
2      Q. Go ahead and read the next paragraph.
3      A. Removal of steel conduit with blue zip tie
4  revealed no localized thermal damage or, the symbol
5  for ohms, or ohmically-induced distress.
6      Q. Again, the significance of that finding?
7      A. No evidence of electrical distress or
8  potential fire causing failure or defect.
9      Q. Please read into evidence the next
10  statement. And I apologize I'm making you read
11  these, but there's no way in the world I'm going to
12  be able to go back and read your handwriting. But no
13  one could read mine, either.
14     A. I understand.
15         Removal of steel conduit from bottom of
16  junction box, parentheses, yellow zip tie, revealed
17  uniform thermal damage with no ohmic, symbol again,
18  ohms symbol, no ohmically induced distress.
19     Q. And what is the significance of that
20  finding?
21     A. No evidence of electrical distress or
22  potential fire causing failure or defect.
23     Q. What does the next paragraph state?
24     A. Decision not to expose conductors within
25  steel conduit connected to receptacle number one due

1  to consensus that receptacle box was in the wall.
2      Q. So why was that decision made?
3      A. Because the -- as installed, the box was
4  recessed into the wall, so it was protected from the
5  fire.
6      Q. Were you in agreement?
7      A. I was.
8      Q. What does the last paragraph on page three
9  state?
10     A. Orange zip tied segments of conduit was
11  attached to junction box but was empty.
12         So I'm just making the point that there
13  was one section of conduit that was -- there's
14  nothing in it, so no wires to look at.
15     Q. Anything else significant ---
16     A. --- No.
17     Q. --- About that piece of evidence?
18     A. (Witness indicated negatively)
19     Q. Okay. If you could read into evidence the
20  next paragraph, on page four.
21     A. Disassembly of duplex junction box with
22  remnants of plug revealed essentially uniform thermal
23  damage, parentheses, minimal, with combustible
24  materials present and existing only superficial
25  melting of plastic and discoloration.

1      Q. What was the significance of your finding?
2      A. Again, no electrical distress. Some
3  localized thermal -- thermal damage, but it was
4  superficial in nature, and consistent with exposure
5  to fire rather than from within the junction box as a
6  source of heat.
7      Q. The next paragraph, item three.
8      A. Item three, branch circuit. It says three
9  duplex receptacle outlets, branch circuit conductors,
10  slash, raceways, removed from service entrance, east
11  corner of building.
12     Q. And did you find any fire causing failure
13  or defect in item three?
14     A. No.
15     Q. Please continue reading.
16     A. Okay. Parentheses -- in parentheses under
17  that paragraph was the number two and number three as
18  they were identified were located near the origin in
19  wall to the right.
20     Q. You can continue reading.
21     A. Okay. Disassembly of receptacle marked as
22  number two, in quotes. Minimal thermal damage,
23  combustible materials intact.
24         No evidence of localized thermal damage
25  or, the symbol for ohms, ohmically-induced distress.

Page 50

1      Q.  Again, the significance of that is that
2  there was no potential fire causing failure or
3  defect?
4      A.  That's correct.
5      Q.  Please continue reading.
6      A.  Disassembly of receptacle marked as three,
7  in quotations, similar thermal damage to number two,
8  in quotations.  No evidence of localized damage or,
9  the ohm symbol again, ohmically-induced distress.
10     Q.  And what was the significance?
11     A.  No electrical distress, no fire causing
12 failures or defects in the exhibit.
13     Q.  And what is the next?
14     A.  Disassembly of unmarked receptacle located
15 in, quotation marks, office.
16     Q.  And what does the last sentence state?
17     A.  Similar thermal damage as in number two
18 and number three above.
19     Q.  And again, does that mean that there was
20 no potential fire causing failure or defect?
21     A.  Yes.
22     Q.  Items one through three that we just
23 discussed that were taken by John Cavarock, were
24 there any discussions between you and Mr. Cavarock
25 regarding those items?

Page 51

1      A.  Not specifically between us, but there was
2  just general discussion during the course of this
3  that we were talking about where the exhibits came
4  from.
5          There was some clarification, those sort
6  of things, but nothing of significance to my
7  findings.
8      Q.  How about with you and Mr. Booth?  Did you
9  explain to Mr. Booth -- first -- strike that.
10         Is Mr. Booth an electrical engineer?
11     A.  No.
12     Q.  Is he an engineer?
13     A.  No.
14     Q.  So when you were looking at items one
15 through three, did you discuss your findings with Mr.
16 Booth?
17     A.  I did that day.  As to whether or not we
18 stopped after item three or after every item and, you
19 know, had a caucus, no, we didn't.  I mean, we just
20 pressed through the inspection.
21     Q.  I understand that.  I'm talking about at
22 any point in time, did you discuss items one through
23 three with Mr. Booth?
24     A.  Oh, after the 17th?
25     Q.  Yes.  Or on or after.

Page 52

1      A.  Sure.
2      Q.  And what did you tell him?
3      A.  That there were no -- there's no evidence
4  of a fire causing failure or a defect within any of
5  those items examined.
6      Q.  And would you agree with me that Mr. Booth
7  would have to rely on your expertise as the
8  electrical engineer to determine whether or not there
9  was an electrical failure ---
10     A.  --- Well, I'm a ---
11     Q.  --- That caused the fire?
12     A.  --- Mechanical engineer ---
13     Q.  --- Right.
14     A.  --- With a lot of experience looking at
15 electrical things, but yes, he would rely on me for
16 the engineering opinion.
17     Q.  Right.  And that would be appropriate ---
18     A.  --- Yes.
19     Q.  --- For him to rely on you.  Is that
20 correct?
21     A.  For the engineering opinion, yes.
22     Q.  Right.  Okay, let's talk about item four,
23 the DVR and switch.
24         I'm going to get you to read the next two
25 sentences because I can't read it.

Page 53

1          MR. WIGGINS:  Page five.
2          THE WITNESS:  Yeah.
3          MR. WIGGINS:  Thank you.
4          THE WITNESS:  I lost it there.
5          It says beneath the statement DVR and
6  switch, it says, secondary exterior fire damage.
7      Q.  (Ms. Daly)  And what does that mean?
8      A.  That the thermal damage exhibited by the
9  DVR and the switch was consistent with exposure to
10 heat externally rather than internally.
11     Q.  Uh-huh.
12     A.  And that it's secondary.
13     Q.  And what does the next statement say?
14     A.  The next line says -- that says MFG --
15 that's abbreviation for manufacturer's details in
16 photos.
17     Q.  And what's the significance about your
18 finding with the DVR and the switch?
19     A.  There was no evidence of a potential fire
20 causing failure or defect.  It was -- all the damage
21 was as a result of exposure to the fire.
22     Q.  There was, during that examination, a
23 power supply that went to the DVR system, and there
24 was a point where everyone stopped and you and Mr.
25 Booth stepped away, and I believe Mr. Booth made a

Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 15 of 33

Page 54

1    phone call at that time and the two of you stepped
2    outside and had a discussion.
3           Do you recall what that discussion was
4    about?
5        A.  No.  A power supply?
6        Q.  Right.  A plug.
7        A.  Yes, I do recall that.
8        Q.  And ---
9        A.  --- The discussion was whether or not the
10   plug was -- was -- that the item was plugged in at
11   the time of the fire ---
12       Q.  --- And what was your finding?
13       A.  That that particular cord was not.
14       Q.  Was not plugged into the wall ---
15       A.  --- That's right.
16       Q.  --- At the time of the fire.  And how were
17   you able to determine that?
18       A.  By essentially uniform patterns of
19   oxidation and discoloration from exposure to the
20   heat.  If it had been plugged in, you would have seen
21   non-uniform patterns.
22       Q.  Tell me everything you recall about the
23   discussion with Mr. Booth regarding that plug.
24       A.  That was really the gist of it, the fact
25   that the plug wasn't plugged in, and I guess there

Page 55

1    was some discussion as to whether this was the --
2    part of the video security -- part of the security
3    system or not.
4        Q.  Where were you told that this item was
5    found?
6        A.  I don't recall.
7        Q.  And when you and Mr. Booth talked, did Mr.
8    Booth tell you the significance of the fact that the
9    surveillance equipment was unplugged at the time of
10   the fire?
11       A.  Only that if this was, in fact, the -- the
12   video system, that that was strange, or abnormal,
13   noteworthy.
14       Q.  Did you make a phone call after that item
15   was inspected on that date?
16       A.  No.
17       Q.  Did Mr. Booth?
18       A.  I don't know.
19       Q.  Did he tell you that he called anyone
20   after finding that piece of evidence?
21       A.  I don't recall specifically.
22       Q.  Do you recall Mr. Booth's reaction to the
23   plug?
24       A.  Surprise.  I think that was not a finding
25   he was expecting if that was in fact the security

Page 56

1    system video.
2        Q.  And you keep saying if.
3        A.  Well, I understand ---
4        Q.  --- Was there ever any evidence that it
5    wasn't?
6        A.  Not presented on the 17th.  I was told at
7    a later date that that wasn't, that that was an old
8    system.
9           But again ---
10       Q.  --- That it was an old surveillance
11   system?
12       A.  Or part of one, yes.  But again, it has no
13   bearing on ---
14       Q.  I understand that.
15       A.  --- My part in this.
16       Q.  --- But I still want to know everything
17   that's been told to you.
18       A.  I understand.  But I don't want you to
19   understand that I'm not listening all that hard when
20   I'm hearing it because it doesn't have any bearing on
21   what I'm doing.
22       Q.  I understand.  So let's stick with the
23   17th.
24       A.  Okay.
25       Q.  Anything else you can recall Mr. Booth

Page 57

1    saying to you about the plug that was not plugged
2    into the wall?
3        A.  Well, I mean, he -- he thought it was
4    important.  He thought it was relevant.
5           You know, he certainly wanted to -- to
6    document that and to make sure that he understood it.
7    As to how he was going to use that and how it fits
8    into his investigation, I don't know.
9        Q.  All right, I understand.
10          Were you ever told that there was evidence
11   that on the day of the fire the surveillance system
12   had been turned off, according to witness statements?
13       A.  I do know that the statement was made that
14   it was not operating, but I don't recall.  It may
15   have even -- I may have even read that in a report.
16       Q.  Okay.
17       A.  It may have been in Mr. Lacy's report, but
18   I've also heard that.
19       Q.  From Mr. Booth?
20       A.  I believe so.
21       Q.  How about from the attorneys?
22       A.  No, I don't recall that.
23       Q.  I appreciate you sticking to the day of
24   the August 17th, however, right now I would like to
25   talk about any discussions you have had after August

Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 16 of 33

Page 58

1  17th with anyone about the DVR system and the plug
2  that was inspected on April 17th.
3       So is it clear what I -- the topic of
4  discussion I want to stick to?
5       A. Yes.
6       Q. Okay, so let's ---
7       A. --- I see where you want to go. I'm
8  just....
9       Q. Okay, so let's first start with Mr. Booth.
10      A. Okay.
11      Q. What discussions have you had with Mr.
12  Booth about the plug that was not plugged into the
13  wall that you discovered at the April 17th
14  examination?
15      A. Only what I've already told you that we've
16  already gone over.
17      Q. If you don't mind -- and I apologize. I'm
18  not trying to ask a question you're already answered.
19  I must have missed it.
20      So exactly what was said to you about the
21  DVR system and the plug to that DVR system?
22      A. That he was surprised when that was found.
23      Q. Right.
24      A. Now, I understand from the discussions
25  that we've had since then that that's an old system,

Page 59

1  that there was another system, a newer system, a
2  replacement.
3       Q. So let's be clear.
4       Mr. Booth told you that there were two
5  systems, two surveillance systems located on the
6  property at Miami Subs on the date of the fire?
7       A. No. What he's told me -- or my
8  understanding of what he said was that what we had
9  there was part of an older system, that a newer
10  system had been installed. So that doesn't mean
11  there are two up and running systems.
12      Q. I understand.
13      A. That's not what I'm trying to imply,
14  so....
15      Q. I understand that.
16      A. Okay.
17      Q. But you are implying that there was an
18  older system just left in place in addition to this
19  newer system?
20      A. That's my understanding.
21      Q. Okay.
22      A. But again, I wouldn't hold to that because
23  ---
24      Q. --- I understand.
25      A. --- To get clarification.

Page 60

1       Q. I understand. And Mr. Booth told you
2  that?
3       A. That's my recollection, yes.
4       Q. And who told Mr. Booth that there was this
5  old system and new system at the property?
6       A. I don't know. As the cause and origin
7  investigator, he's doing a lot more legwork, you
8  know, working the background more so than I am, so --
9  but I don't know.
10      Q. So he never told you how he found out that
11  information?
12      A. No.
13      Q. Anything else that you recall that Steve
14  Booth told you about the DVR system?
15      A. No.
16      Q. Have you had a discussion with anyone
17  else, other than Mr. Booth, regarding the DVR system?
18      A. No.
19      Q. Did you have a discussion with Mr.
20  Cavarock?
21      A. Not that I recall, no.
22      Q. Did you have a discussion with anyone from
23  McCoy Wiggins?
24      A. Only that there was no evidence of a fire
25  causing failure or defect, which is what I was there

Page 61

1  to look for.
2       Q. I understand.
3       Anything about the DVR system specifically
4  that you recall discussing with anyone from McCoy
5  Wiggins?
6       A. No.
7       Q. Item five.
8       A. Okay. Electronics and cords removed from
9  southwest wall of office. Assorted electronic
10  components, power supplies and apparent routers with
11  secondary fire damage consistent with exposure to
12  external -- and I've got q with a dot over it for
13  heat rate, heat flux, or just external heat.
14      Two circuit boards loose in debris appear
15  to be remnants of router not believed to be part of
16  communication system, slash, headsets.
17      Q. How did you determine that it was not
18  believed to be part of the communication system
19  headsets?
20      A. The -- the makeup of the boards, the
21  physical size, was inconsistent.
22      Q. Anything else besides the physical size?
23      A. Also the makeup of the boards. I mean, it
24  was clear that they -- they had LAN interfaces that
25  would be part of a cable system for a router. It

Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 17 of 33

Page 62

1   looked consistent with the router.
2        I believe Mr. Cavarock stated he thought
3   they were router components as well as sort of a
4   consensus as we went through the components, for
5   where they came from and generally what the
6   identification was, right down to trying to find
7   manufacturers, identifiers, and so on on the stuff.
8        Q.  Were you able to find manufacturer
9   identifiers?
10       A.  On some components, but not on certainly
11  the circuit boards.
12       Q.  Right.  Anything else?
13       A.  No.
14       Q.  And what significance?
15       A.  Again, it was all exposure to -- the
16  thermal damage was a result of the exposure to
17  externally applied rather than internally or
18  ohmically-generated heating.  So no fire causing
19  failures or defects apparent.
20       Q.  Item six.
21       A.  Okay, that says alarm panel and URS
22  removed from ---
23       Q.  --- What does URS stand for?
24       A.  I'd have to look at my photos to get a
25  good look at what I abbreviated there.

Page 63

1        Q.  You can continue reading.
2        A.  Oh, okay.  I didn't know if you wanted me
3   to look at photos.
4        Q.  No.
5        A.  Okay.  All right, so removed from
6   southwest wall of office.
7        And then beneath that it says actually
8   determined to be the power supply for the security
9   camera system.
10       Trace of power ---
11       Q.  --- Is that what we've been discussing
12  today?
13       A.  That's what we were discussing earlier
14  rather than ---
15       Q.  --- In reference to item four?
16       A.  --- DVR and switch, yes.  Yeah.
17       Q.  Please continue.
18       A.  So it says trace of power cord, two power
19  strip, established the camera system was unplugged,
20  not powered, and cord blades were oxidized,
21  discolored, consistent with the exposure to fire in
22  the unplugged state.
23       Power switch housing for camera system was
24  compromised by thermal damage resulting in release of
25  one contact and the actuating spring, making switch

Page 64

1   position indeterminate.
2        Q.  Did you find any evidence of potential
3   fire causing failure or defect in item six?
4        A.  No.
5        Q.  And have we exhausted anything else you
6   recall about the plug?
7        A.  Yes, we have.
8        Q.  Item seven.
9        A.  It says monitor removed from southwest
10  wall.  It says unremarkable.
11       Q.  Again, any evidence of potential fire
12  causing failure or defect?
13       A.  No.
14       Q.  Item eight.
15       A.  HP printer.  And below that it says
16  secondary thermal damage.  And then, again, below
17  that it says unremarkable.
18       Q.  Again, any evidence of potential fire
19  causing failure or defect?
20       A.  No.
21       Q.  Item nine.
22       A.  Item nine was a deposit ticket book, and
23  then for me, again, underneath that it says
24  unremarkable.
25       Q.  How about item 10?

Page 65

1        A.  It says debris pile items recovered
2   between drive-thru windows.  And beneath that it says
3   monitor, keyboard and molten slag with two, quotation
4   mark, D cell batteries.
5        Q.  Were you able to determine where the two D
6   cell batteries came from, other than the pile of
7   debris?
8        A.  No.
9        Q.  What actual instrument they came from ---
10       A.  --- No.
11       Q.  --- At the time of the fire?
12       And was there anything significant about
13  item 10?
14       A.  No.
15       Q.  And again, was there any potential fire
16  causing failure or defect?
17       A.  No.
18       Q.  You have a telephone number on the back of
19  page six, 301-620-6758.
20       A.  Okay.
21       Q.  Can you tell me whose number that is?
22       A.  That's probably one of my engineers up at
23  Pax River, which has nothing to do with this case.  I
24  just wrote down a telephone number somewhere I
25  shouldn't have.

Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 18 of 33

Page 66

1    Q.  And are you the only engineer from your
2  company who has reviewed any of the evidence in this
3  case?
4    A.  Yes.
5    Q.  Item 11.
6    A.  End of fluorescent tube and strands of
7  wire.
8    Q.  Did you find anything significant about
9  item 11?
10   A.  No.
11   Q.  Was there any potential fire causing
12  failure or defect in item 11?
13   A.  No.
14   Q.  Item 12.
15   A.  Cover plate receptacle.
16   Q.  Again, any potential fire causing failure
17  or defect?
18   A.  No.  This was literally just the cover
19  plate for a receptacle, so -- but no.
20   Q.  Any evidence on that that there was ---
21   A.  --- No.
22   Q.  --- Any type of failure?
23    And what does your next paragraph say?
24   A.  The word underlined is Lacy's, and it
25  refers back to Terry Lacy's evidence, and it says,

Page 67

1  item one, paint can opened and sifted.  Nothing
2  remarkable.
3    Q.  And nothing remarkable, does that mean
4  there was no potential fire causing failure or
5  defect?
6    A.  Nothing that I could see that was there.
7  I mean, it was -- I know others probably took samples
8  and things like that, but from my perspective, no.
9    Q.  And tell me your conclusions?
10   A.  It says no evidence of a potential fire
11  causing failure or defect within the evidence
12  available in the exhibit provided, or exhibits
13  provided.  There's an S in there.
14    Item two is no evidence of remnants of
15  reported headset intercom system within exhibits
16  provided.
17   Q.  Before we continue further into your
18  notes, why did you review the photos of Booth, Mr.
19  Lacy and Mr. Martini?
20   A.  At which time?  Just in general?
21   Q.  In general.
22   A.  Well, specifically there was a question as
23  to the whereabouts of this headset or the remains of
24  it, and so I went through certainly Martini's
25  photographs and Lacy's photographs looking for any

Page 68

1  evidence that there might be something there.
2    Q.  And did you find evidence of the remnants
3  of the headset?
4    A.  The headsets, no, but of the circuit
5  boards for the....
6    Q.  Base station?
7    A.  The base station, yes.
8    But I was actually pointed to those by Mr.
9  Booth, I think, and Mr. McLean.  They -- you'll see
10  in the notes that come up.
11   Q.  And that was after your evidence
12  inspection on April 17th?
13   A.  Yes.  As far as when the photographic
14  evidence of the remains of the base station appeared,
15  yes.
16   Q.  Of the circuit boards?
17   A.  Yes.
18   Q.  Is that what you're referring to?
19   A.  Yes, ma'am.
20   Q.  I wanted to get your opinion regarding the
21  evidence inspection.
22    After inspecting all of the evidence that
23  was present on April 17th, 2013, did you find any
24  evidence of a potential fire causing failure or
25  defect at that inspection?

Page 69

1    A.  No, I did not.
2    Q.  Let's look at the last page of your notes.
3  There's not a page number on it.
4    It starts of with Troy McLean, phone call
5  May 17th, 2013.
6    A.  Yes.
7    Q.  Can you tell me -- are these your notes of
8  your understanding from the phone call that you had
9  from -- with Mr. McLean?
10   A.  They are.  It was really just a case
11  status for, you know, how I maintain my file, just so
12  I know where I left it.
13   Q.  Okay, will you read to me that paragraph.
14   A.  It says Trey McLean, phone call 5-17-13.
15  No need for report at this time.
16    I provided synopsis of findings and
17  observations during destructive exam on 4-17.  Quote,
18  no evidence of potential fire causing failures or
19  defects within evidence presented for examination,
20  end quote.  Excuse me.
21    Trey was going to try and locate technical
22  specifications for the transmitter in question for
23  analysis to identify potential fire causing failures
24  or defects.
25   Q.  And when he's talking about the

Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 19 of 33

Page 70

1  transmitter, is he referring to the base station?
2      A.  Really of the whole system.
3      Q.  The whole system.
4      A.  And I was asking for that, because I would
5  use that to drive my failure modes and effects
6  analysis if it was going to be pursued.
7      Q.  Did he locate the technical
8  specifications?
9      A.  He located pretty much a brochure on the
10  item which then gave me the model number and so-on.
11  Then I was able to do additional research to find the
12  information I needed, or some of the information I
13  needed.
14      Q.  You said some of the information you
15  needed.
16          What information were you able to find?
17      A.  What I found was just very basic operating
18  characteristics, you know, so many volts, so many
19  amps. It's big, you know, in terms of size, weight,
20  basic operating characteristics.
21          And then I was also able to find a couple
22  of manuals, one for this as well as one for a similar
23  system for the batteries, just to get a feel for the
24  construction of the battery charger and the base
25  station itself.

Page 71

1      Q.  What were you not able to find that you
2  needed?
3      A.  I certainly would have liked, if I were
4  going to derive that sort of analysis to identify
5  plausible failure modes and mechanisms in the unit,
6  then I would need to see the basic drawings or
7  schematics for the circuit cards so I could identify
8  component level board failures, that would be of
9  interest.
10      Q.  And without that information are you able
11  to -- strike that.
12          Would you have needed that information to
13  provide any more of an expert opinion on the base
14  station?
15      A.  No. I could take what I have and I could
16  still generate a high level of failure modes and
17  effects analysis, but it wouldn't go to the
18  individual component ---
19      Q.  --- Did you do that?
20      A.  No, I did not.
21      Q.  And why did you not do that?
22      A.  Because at this time -- the purpose of
23  doing that analysis would be to then identify
24  supporting and refuting evidence within the evidence
25  to, you know, drive each one of the plausible modes

Page 72

1  or mechanisms to ground or convergence.
2          I don't have any evidence to evaluate, so
3  -- an analytical analysis on its own isn't really
4  much help. It just tells you about the design. You
5  need the artifact to actually close the loop on it.
6      Q.  During your research on this specific base
7  station, the HME Ion IQ wireless drive-thru audio
8  system, did you find any evidence during your
9  research that there had been any type of
10  manufacturing defect in this product?
11      A.  No.
12      Q.  Did you find any evidence that there had
13  been a design defect in this product?
14      A.  No.
15      Q.  Did you find any evidence of any
16  electrical failures with this HME Ion IQ wireless
17  audio system?
18      A.  No.
19      Q.  Did you have a discussion with Mr. McLean
20  or Mr. Wiggins after April 17th, 2013?
21      A.  Well, yes. Perhaps you're referring to
22  May 17th, after May 17th?
23      Q.  Yes.
24      A.  Okay.
25      Q.  I apologize. I misspoke. Yes.

Page 73

1          Did you have a conversation between May
2  17th, 2013, and May 29, 2013, with either Mr. McLean
3  or Mr. Wiggins?
4      A.  I don't have notes on it. We may have
5  exchanged emails, because a lot of the communication
6  has been through email ---
7      Q.  --- Okay.
8      A.  --- As well.
9      Q.  You have provided to me two emails.
10          Have there been any other emails besides
11  the two emails?
12      A.  I would expect so, yes.
13      Q.  Will you provide all of the emails either
14  you have received or sent to Mr. Wiggins to provide
15  to me at the close of this deposition?
16      A.  Sure, yes.
17      Q.  Okay, and on the record, will you state
18  that you will not delete any communications from your
19  computer?
20      A.  Yes.
21      Q.  So the next documented communication you
22  have is an email dated May 29th, 2013, from Mr.
23  McLean?
24      A.  Yes.
25      Q.  I'll marked it as Deposition Exhibit 3.

Page 74

1                    (* Exhibit 3 was marked *)
2        Q.  Do you recall having a discussion with Mr.
3    McLean prior to him sending this May 29th email?
4        A.  I don't recall.
5        Q.  Did you have any discussions with Mr.
6    Booth prior to you writing your report, between the
7    evidence exam on April 17th and May 29th?
8        A.  I don't recall specifically, although I
9    would expect we probably did have conversations over
10   that span.
11       Q.  Did you ever talk to Mr. Booth about the
12   contents of your report?
13       A.  Not beyond what I've already conveyed here
14   today in terms of my findings and opinions.
15       Q.  In the email dated May 29th from Mr.
16   McLean, he asks you, could you also say that it is
17   possible that the circuit boards were represented in
18   the picture number 33 in Martini's report?
19           Do you see that question posed to you?
20       A.  I do.
21       Q.  Did Mr. Booth or Mr. McLean show you the
22   photograph 33?
23       A.  Yes.
24       Q.  And prior to them showing you photograph
25   33 of those circuit boards, did you find that photo

Page 75

1    on your own?
2        A.  No.  I -- up until Mr. McLean provided
3    that photo -- and this may very well be the email
4    that they provided.  I don't know.  You'll see the
5    email chain when you see them.
6            But I have not seen that photo before.
7    That -- and so then we went through a series of
8    exchanges about quality of the photo, because it
9    really is a poor quality PDF versus a raw image,
10   which normally people exchange.
11       Q.  Have you ever asked for the raw image?
12       A.  Yes, multiple times.
13       Q.  Who did you ask?
14       A.  Back through Trey McLean.  And you'll
15   probably see that in that exchange.
16       Q.  And did Mr. McLean tell you that he had
17   ever asked for the raw picture?
18       A.  He -- yes.  He said ---
19       Q.  --- What did he say?
20       A.  --- He was going to look for it.
21       Q.  Okay.
22       A.  That he was going to try to -- he's going
23   to make the request and get that for us.  I think
24   what he had sent me actually was buried in a power
25   point slide the first time around, and...

Page 76

1        Q.  And did he ever provide you a clear
2    picture?
3        A.  The next thing I got was a blown-up
4    version of the original just on a power point slide,
5    but it wasn't -- it didn't have any better fidelity
6    or granularity to it.  It was just a bigger blow up.
7    He tried.  Somebody tried.  But it wasn't what I
8    needed.
9        Q.  Did you tell him it's not what I need to
10   make the determination, can you get me a better
11   quality ---
12       A.  --- Yes.
13       Q.  --- Picture?
14       A.  I asked for better quality.
15       Q.  Okay.  And have you received anything from
16   Mr. McLean or anyone from McCoy Wiggins since then?
17       A.  I'd have to go back and look at my email
18   files, but eventually I did get photographs, and then
19   they're also in Mr. Martini's report.  I was able to
20   see what he had there as well, so....
21       Q.  Were those photos clearer than the ones
22   you had originally received?
23       A.  A little bit, but not much.  But it's
24   enough to where you can make it out.
25           At this point, you know, we were still

Page 77

1    going through the -- the effort of trying to pin down
2    exactly which version of the Ion IQ this was, what
3    the circuit boards really ought to look like, you
4    know, the actual dimensions and so on.  So I was
5    certainly having difficulty concurring that I could
6    positively identify that image as an image of those
7    boards at that time.
8        Q.  Can you read to me your last paragraph on
9    your last page of notes?
10       A.  Supplemental reports from Martini and Lacy
11   of Donan Engineering provided for review, 7/18/13, in
12   advance of 7/19/13 deposition.
13           My preparation for the deposition was
14   completed last night.
15       Q.  Exactly how many hours did you spend
16   preparing for the deposition?
17       A.  Total about five.  I had reports to review
18   that I wasn't aware of.
19       Q.  And we'll get to those reports in a
20   moment.
21           So that I understand your opinions in this
22   case, is it your opinion that there was not an
23   electrical failure at Miami Subs on January 24, 2012?
24       A.  No.
25       Q.  So is it ---

Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 21 of 33

Page 78

1    A. --- Well, wait. No, that's not my
2    opinion.
3    Q. So let's break that down.
4    A. Okay.
5    Q. Have you found any evidence to date that
6    there was an electrical failure at Miami Subs on
7    January 24th, 2012?
8    A. No, I have not.
9    Q. So even though you have not found any
10   evidence of an electrical failure, is it your opinion
11   that there was an electrical failure at Miami Subs on
12   January 24, 2012?
13   A. No.
14   Q. So tell me exactly what is your opinion
15   regarding the evidence that you have reviewed,
16   including photographs, any of the items that you've
17   seen regarding any evidence of failure at Miami Subs?
18   A. It's my opinion that for the items that
19   were made available to me for examination on the 17th
20   that there is no evidence of a potential fire causing
21   failure or defect within those items.
22       It's my understanding that the Ion ---
23   Q. --- I'm going to stop you right there
24   before you go further.
25   A. Okay.

Page 79

1    Q. You specifically limit it to the items
2    that you reviewed on April 17th.
3        You've also been provided hundreds of
4    pictures. Is that correct?
5    A. Yes.
6    Q. Going through those hundreds of pictures
7    that were taken at the scene, did you find any
8    evidence of a fire causing failure or defect?
9    A. No.
10   Q. Any other, either photographs, documents,
11   anything, items that you've reviewed?
12       Have I covered everything that you've
13   reviewed, then, to determine that there is no
14   evidence that you have seen that there was an
15   electrical failure at Miami Subs?
16   A. Okay. I'm not really sure I'm
17   understanding where you're going with that question.
18   Q. Well, you said that in the actual evidence
19   the items -- let's call that the items you inspected
20   ---
21   A. --- Yes.
22   Q. --- On April 17th, there was no evidence
23   of an electrical failure that could have caused a
24   fire. Correct?
25   A. That's correct.

Page 80

1    Q. And you went through hundreds of photos
2    and reviewed those and you found no evidence of an
3    electrical failure that could have caused the fire at
4    Miami Subs on January 24, 2012?
5    A. Yes.
6    Q. Is that correct?
7    A. That is correct.
8    Q. Is there anything else you reviewed that
9    you used to eliminate any other type of electrical
10   failure at Miami Subs?
11   A. I'm not sure what you mean by anything
12   else that I used.
13   Q. Any other documents ---
14   A. --- Are you asking me documentation ---
15   Q. --- Yes.
16   A. --- Or calculations or analysis ---
17   Q. --- Did anybody show -- you mentioned a
18   Power Point. That's the first time ---
19   A. --- Oh, okay.
20   Q. --- I've heard of a Power Point. So did
21   someone do a Power Point presentation to you of this
22   fire scene?
23   A. Oh, okay. No. That was simply one slide
24   that had this one image. I think it was 33, whatever
25   it was we just talked about earlier. That's all that

Page 81

1    was there.
2    Q. Okay.
3    A. It was just on a PowerPoint slide ---
4    Q. --- Okay.
5    A. --- But there wasn't a full PowerPoint.
6    Q. Okay, so anything else other than the
7    items, the photographs, anything else that you
8    reviewed or items that you held in your hand that you
9    used to determine there was not electrical failure at
10   Miami Subs on January 24, 2012?
11   A. No. There wasn't anything else that I
12   used to do that.
13   Q. Do you want a five-minute break? We've
14   been going for another hour.
15   A. I'm good.
16   Q. Okay. Your report spends a significant
17   time, as well as your invoice, on this Ion IQ
18   wireless drive-thru audio system.
19       Were you ever shown at the scene where
20   this wireless system was located prior to the fire?
21   A. In -- I've never been to the scene, but in
22   the photographs of the scene it's my understanding it
23   was in the upper right corner by the drive-thru
24   window.
25       And I've since also seen that -- I don't

Page 82

1  know if it's Martini's or Lacy's report -- I believe
2  it's Martini's -- actually has it highlighted as
3  well. So I'm aware of where it was.
4      Q.  And do you dispute that that was the
5  location where it was located?
6      A.  No.
7      Q.  Is the location of where it is located
8  relevant to your analysis?
9      A.  Only in the sense that we now have the
10 evidence that it had substantial thermal damage, and
11 it was at or within the area of origin.
12          And it was not available for -- for me to
13 take a look at on the 17th, so it's relevant in the
14 sense that there's something there that's
15 electrically energized that I am unable to -- to --
16 to exclude.
17     Q.  And are you qualified to determine whether
18 or not the location of this audio box and where it
19 was located, of the fire pattern that it would have
20 caused if it, the actual audio box, was the ignition
21 source for the fire?
22     A.  No.
23         (* Exhibit 4 was marked *)
24     Q.  I'm handing you what I've marked as
25 Exhibit 4.

Page 83

1          Is it your testimony to a reasonable
2  degree of certainty that the item located in
3  photograph 33, that is the second item from the left,
4  is the circuit boards from the HME Ion IQ wireless
5  device?
6      A.  Yes.
7      Q.  Tell me how you determined that that item
8  was from the audio system base station?
9      A.  By the approximate length and width
10 dimensions that were inferred, I guess, from the
11 other images and the document.
12         Also by the general construction or the
13 layout number of boards. It looked to be visually
14 consistent with what I would expect for the base
15 station.
16     Q.  So, at trial, is it your understanding
17 that one of your purposes is to tell the jury that,
18 in your opinion, this circuit board came from the
19 audio system?
20     A.  I will certainly tell them it is
21 consistent with the audio system.
22     Q.  Okay.
23     A.  Yes.
24     Q.  Okay, and do you plan to testify under
25 oath, that to a reasonable degree of certainty, that

Page 84

1  it's from the audio system?
2      A.  Yes.
3      Q.  Have you ever spoken to Mr. Martini
4  regarding his exam of those circuit boards?
5      A.  No.
6      Q.  Have you ever talked about -- to Mr. Booth
7  regarding his exam of those circuit boards?
8      A.  To my knowledge Mr. Booth has not had the
9  opportunity to examine those boards. So that's my
10 understanding.
11     Q.  And do you know what happened to the
12 circuit boards?
13     A.  I do not.
14     Q.  Were you ever told what happened to
15 anything that was located at Miami Subs after the
16 completion of the investigation in January of 2012?
17     A.  Well, I was told that Mr. Lacy had taken
18 into custody the exhibits that he had collected, and
19 then later Mr. Cavarock had done his inspection, at a
20 much later date, and had taken exhibits into custody
21 as well.
22         So my understanding was that all of the
23 exhibits were taken into the custody of either one of
24 those two gentlemen.
25     Q.  And how about all the other -- I mean,

Page 85

1  there was a great -- you've walked through the
2  evidence that was collected. Obviously, there was a
3  great number of things located in a restaurant.
4          Were you ever told what happened to all
5  the other items in the restaurant?
6      A.  No.
7      Q.  Did you ever ask?
8      A.  Well, I mean, no, because normally you
9  wouldn't worry too much about the things that were
10 not in the immediate area of origin or of interest to
11 the origin, so no, the rest of the things in the
12 restaurant, no.
13     Q.  How about the ballast to the fluorescent
14 lights?
15     A.  No.
16     Q.  Is there any evidence that the fluorescent
17 lights were an electrical -- had electrical failure
18 and caused the fire?
19     A.  No, but they were not available to me,
20 either.
21     Q.  Well, neither was the audio system, and
22 you've, you know, mentioned the audio system here
23 today.
24         So I'm asking you whether or not someone's
25 mentioned the fluorescent lights, either Mr. Booth or

Page 86

1  the attorneys for the plaintiff.
2      A.  I've seen it in -- I guess it's Martini's
3  report where he did talk about it on the scene, but
4  no.
5      Q.  Do you have any intention on testifying to
6  the jury that any component of the fluorescent
7  lighting caused this fire?
8      A.  No.
9      Q.  So we have your first opinion is that the
10  circuit boards were components of the base station.
11  Is that correct?
12     A.  Yes.
13     Q.  Okay.  So the next opinion, actually
14  observation, I should say, stated in your June 3rd,
15  2013, report states the boards were noted to display
16  severe thermal damage.
17         Do you see that?
18     A.  I'm sorry.  Which paragraph are you on?
19     Q.  The last page ---
20     A.  --- Yes.
21     Q.  --- Of your report.
22     A.  Yes, I see that.
23     Q.  Other than that one statement, the boards
24  were noted to display severe thermal damage, did you
25  find anything else of significance in reviewing the

Page 87

1  photos of the circuit boards?
2      A.  No.  I mean, the quality of the image
3  doesn't really support further -- further assessment.
4      Q.  And that's what you were referring to
5  earlier whenever you asked your attorneys to provide
6  you with a better quality photo?
7      A.  Exactly.
8      Q.  And you're still waiting for that photo?
9      A.  If there is one, yes.
10     Q.  So when you state that there was severe
11  thermal damage, tell me what you mean by that
12  statement.
13     A.  The combustible materials on the board
14  appear to be consumed.
15         Surface mounted components appear to be
16  gone, for the most part.  Looks like it's down to
17  substrate and maybe heat sink material.
18         What little bit of combustible material
19  that is there looks like there's carbonaceous residue
20  for the most part.
21         So severe thermal damage, consumption of
22  combustible materials.  Potential melting,
23  degradation of the -- you know, the circuit path and
24  substrate.
25         I really don't have enough detail in the

Page 88

1  photo to get beyond other than the fact that -- other
2  than the fact that it has obviously seen a lot of
3  heat.
4      Q.  Anything else?
5      A.  No.
6      Q.  So is it your opinion, to a reasonable
7  degree of certainty, that there was an electrical
8  failure with the base station?
9      A.  No.
10     Q.  Okay.  Is it your opinion, to a reasonable
11  degree of certainty, that there was an electrical
12  failure with the power supply to the base station?
13     A.  No.  That's not my opinion.
14     Q.  I'm trying to walk through these so I can
15  get exactly what your opinion is.
16         So do you have any evidence that there was
17  a potential fire causing failure or defect with this
18  base station?
19     A.  No.
20     Q.  So if you were called to the stand today
21  to testify to a jury regarding this base station,
22  what is your opinion to a reasonable degree of
23  certainty?
24     A.  That the condition of that or the
25  potential contribution of that to the fire is

Page 89

1  indeterminate.  There simply isn't -- I don't have
2  any evidence to look at, and I can't tell from the
3  images that I've been given.  So I can't -- I can't
4  effectively rule it out.
5          I can't reproduce the methodology or the
6  findings of Mr. Martini because I don't have access
7  to it.
8              MS. DALY:  Let's take a five-minute
9  break.
10         (3:44-3:53 p.m. - recess)
11     Q.  (Ms. Daly)  You reviewed the expert reports
12  from Terry Lacy and Henry Martini.  Is that correct?
13     A.  Yes.
14            (* Exhibit 5 was marked *)
15     Q.  I am showing you what has been marked as
16  Exhibit 5, the report of Mr. Martini.  I'd like to
17  walk through that report with you.
18         The first opinion is that the electrical
19  supply to the building did not cause or contribute to
20  the fire.  Do you have -- do you agree with that
21  finding?
22     A.  I didn't inspect that.
23     Q.  So do you have any evidence to refute Mr.
24  Martini's finding that the electrical supply to the
25  building did not cause or contribute to the fire?

Case 5:12-cv-00610-F  Document 33-4  Filed 09/16/13  Page 24 of 33

Page 90

1    A. No.
2    Q. Did anybody prevent you from going to the
3 building at Miami -- the Miami Subs building to
4 determine whether or not the electrical supply to the
5 building contributed to the fire?
6    A. No, but it was my understanding that the
7 exhibits, some of it had already been removed, but
8 there was no need for me to go there.
9    Q. Opinion number -- did you make any
10 comments to any -- anybody, Mr. Booth, the attorneys
11 from McCoy Wiggins, or anyone else regarding opinion
12 one in Mr. Martini's report?
13    A. Was that the opinion we just covered?
14    Q. Yes. If you want to look at it, it's
15 right in front of you.
16    A. Okay. Thank you.
17    Q. Oh, you're welcome.
18    A. So what page are you on?
19    Q. Number one.
20    A. And your question?
21    Q. Did you discuss opinion number one with
22 anyone?
23    A. No.
24    Q. And so the record is clear, do you have
25 any evidence to disagree with the statement that the

Page 91

1 electrical supply to the building did not cause or
2 contribute to the fire?
3    A. No.
4    Q. The second opinion is that the electrical
5 service from the electric meter to the circuit
6 breaker panels located within the building did not
7 cause or contribute to the fire.
8    Do you agree with Mr. Martini's finding?
9    A. I did not inspect any of that, other than
10 the meter, but I have no reason to dispute it.
11    Q. Number 3. No evidence of electrical
12 failure was identified in and around the area of fire
13 origin that could have served as an ignition source
14 for the fire.
15    Do you have any evidence to disprove Mr.
16 Martini's opinion number 3?
17    A. I have no evidence to refute that, no.
18    Q. Number four, the electrical components
19 consisting of wiring and receptacles that are located
20 within the structure and the area of fire origin at
21 the rear drive-thru window did not cause or
22 contribute to the fire.
23    Do you have any evidence to refute Mr.
24 Martini's opinion?
25    A. No.

Page 92

1    Q. Number five, the fluorescent fixtures
2 installed in the suspended ceiling at or near the
3 area of fire origin did not cause or contribute to
4 the fire.
5    Do you have any evidence to refute Mr.
6 Martini's finding?
7    A. No.
8    Q. Before we get to number six and number
9 seven, do you have -- other than the theory on this
10 audio system, do you have any other theories you have
11 given to anyone, Mr. Booth, the attorneys from McCoy
12 Wiggins, of any possible electrical failure that
13 could have caused the fire?
14    A. I don't have a specific theory on this
15 system. I simply don't have the evidence to be able
16 to evaluate the condition of that or the contribution
17 of it, so I don't have a working theory of this
18 particular part failed first and then subsequently
19 resulted in, you know, ignition and so on.
20    Q. Let's put aside anything to do with the
21 base station.
22    A. Okay.
23    Q. Do you have any other possible theories?
24    A. No.
25    Q. And in regards to the base station, am I

Page 93

1 correct in understanding that you don't have a
2 workable theory as to how the fire was caused by this
3 base station?
4    A. That's correct.
5    Q. If you would look at photograph 33 and 34
6 that are both found on Exhibit 4.
7    First, have you seen any other photographs
8 of the PCB's?
9    A. Yes. In Mr. Martini's report that I
10 reviewed last night, I believe he had front and back
11 views of the boards, where this is just pretty much a
12 one-sided view.
13    (* Exhibit 6 was marked *)
14    Q. I'm handing you what's also been marked as
15 Exhibit 6.
16    Paragraph -- excuse me, photograph 35, is
17 that the photograph you're referencing?
18    A. Yes.
19    Q. Were you ever given these three
20 photographs prior to you writing your report? I know
21 you were given photograph 33 because you referenced
22 it.
23    How about 34 and 35?
24    A. Certainly not 35. It doesn't look
25 familiar. I think what I saw was 33 and then

Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 25 of 33

Page 94

1  eventually 34.
2      Q.  When you say eventually 34, what do you
3  mean by eventually 34?
4      A.  Let me look back at the email that we
5  referred to earlier where I believe this was actually
6  -- no, I think it was only 33 initially.
7      Q.  And that was provided by the attorneys who
8  have retained you.  Correct?
9      A.  That's correct.
10     Q.  From the photographs you reviewed, so look
11 at 33, 34, and 35.
12         Is there any evidence of localized or
13 isolated heat damage to the print circuit board
14 material?
15     A.  The photographs are not adequate for me to
16 say.
17     Q.  So do you have any evidence that there was
18 localized or isolated heat damage to the print
19 circuit boards?
20     A.  --- Right.
21     Q.  Have you ever spoken to Mr. Martini
22 regarding his inspection of these boards?
23     A.  No.
24     Q.  Did you ask Mr. Martini at the evidence
25 inspection on April 17th anything about the PCB's?

Page 95

1      A.  No.  To be honest, I was expecting them to
2  be there.
3          I mean, because all the evidence had been
4  collected, so I expected it was going to -- that we'd
5  probably find them there as we sorted through.
6      Q.  And when you didn't, did you ever ask Mr.
7  Martini, the other electrical engineer, or the
8  electrical engineer on site?
9      A.  No.
10     Q.  And am I correct you're not an electrical
11 engineer?
12     A.  Mechanical.
13     Q.  You're mechanical?
14     A.  That's correct.
15     Q.  But my question is are you an electrical
16 engineer?
17     A.  No.
18     Q.  Do you have any evidence to refute Mr.
19 Martini's finding that the heat damage to the printed
20 circuit board is uniform and consistent with an
21 external source of heat?
22     A.  No, I don't have any evidence to support
23 that.
24     Q.  Do you have any evidence to refute it?
25     A.  No.  I can't tell with these images with

Page 96

1  any real degree of certainty.  So within the limited
2  capability with what's presented here, I mean, I have
3  no evidence to support or refute his comments.
4      Q.  If you were working with an electrical
5  engineer at your firm -- do you have anybody else
6  that works at your firm or are you the only engineer?
7      A.  Just me.
8      Q.  Do you ever work with electrical engineers
9  ---
10     A.  --- Umm ---
11     Q.  --- On cases?
12     A.  No.  Do you mean do I subcontract one or
13 hire one or consult one?
14     Q.  Or on the same case, if an attorney has
15 retained you and retained an electrical engineer.
16     A.  I have done, yes, now that I think about
17 it.
18         Yes, there have been cases where, I mean,
19 they've had quite a few engineers ---
20     Q.  --- Right.
21     A.  --- On all one side of a case.
22     Q.  --- Correct.
23     A.  --- As a large team working together.  So
24 in those cases, yes.
25     Q.  And if you were brought in as the

Page 97

1  mechanical engineer and you have an expert on the
2  same side as you that's brought in as the electrical
3  engineer, what would be your role typically in that
4  case as the mechanical engineer?
5      A.  Well, as -- from my experience and
6  background, I would imagine it would be looking
7  together at these things and talking about it and
8  sharing an opinion.
9      Q.  And if that electrical engineer was
10 actually on site and had the item in hand and
11 inspected the item in hand and made a determination
12 versus you reviewing the photograph and making a
13 determination, which opinion would you rely on, yours
14 or the electrical engineer's that had the item in
15 hand?
16     A.  When it comes to non-uniform patterns of
17 damage, oxidation, melting, things like that, I would
18 rely on mine.
19     Q.  Okay.
20     A.  My observations.  But if I was there with
21 him on site, we'd be discussing it.
22     Q.  Okay, so you would be able to rely on your
23 opinion based on a photograph.
24         You would rely more heavily on your
25 opinion based on a photograph than you would rely on

Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 26 of 33

Page 98

1   an electrical engineer who actually had an item in
2   hand ---
3         A.  --- No. I'm sorry.
4         Q.  --- Doing a determination ---
5         A.  --- I misinterpreted your -- I
6   misunderstood your question. I missed the photograph
7   part. I thought we were there together.
8         Q.  No.
9         A.  Okay.
10        Q.  So it's the exact same scenario that we
11  have here, where you have an actual -- an electrical
12  engineer who was on site who inspected the PCB's and
13  made a determination, would you rely on that opinion
14  more than you would rely on your own opinion based on
15  photographs?
16        A.  I wouldn't within the context of what I
17  was asked to do in this case, you know, can I rule
18  this in or out? I don't have the physical evidence
19  to be able to do that. I'd have to rely on someone
20  else's interpretation.
21              And even though Mr. Martini may be a fine
22  electrical engineer, I don't know, I'm not going to
23  rely on his interpretation of thermal damage,
24  oxidation patterns, and so on.
25        Q.  Would you want anyone else's, other than

Page 99

1   your own?
2         A.  If I was asked to form an opinion and rule
3   it in or rule it out, no, I would -- I would go with
4   mine.
5         Q.  And in your opinion ---
6         A.  --- And what he provides should be
7   reproducible by others. Right?
8         Q.  Right. And your opinion in this case is
9   you have no evidence either way?
10        A.  Yes.
11        Q.  When did you learn that these PCB's
12  potentially came from the audio system?
13        A.  At or about the time that is in that email
14  exchange where Mr. McLean had actually sent me an
15  image, because these images were not made available
16  to me early on. So up until that time I didn't know
17  that we had them in custody, or someone had them.
18        Q.  Do you know who identified the photos to
19  Mr. McLean?
20        A.  No, I don't.
21        Q.  Before I go further, on page three of Mr.
22  Martini's report you have written notes in the bottom
23  right-hand corner.
24              Please read those notes.
25        (Witness examined documents)

Page 100

1         A.  Okay. I've underlined certain text there
2   and in the margin.
3               Would you like me to read those notes?
4         Q.  Yes, please.
5         A.  There's a bracket that refers back to the
6   underlined section, and it says secondary severe
7   thermal damage exposing substrate and heat sink
8   material. Don't know what surface mounts and other
9   components look like. Needs a micro exam to support
10  or refute hypothesis.
11        Q.  What is a micro exam?
12        A.  Microscopic, or in this case, macroscopic,
13  five to 50x magnification, just to be able to go over
14  it.
15        Q.  Before we go to number seven, do you have
16  any evidence to refute anything stated in finding
17  six?
18        A.  No.
19        Q.  Did you discuss item six with anyone?
20        A.  No, because I only got this last night at
21  about, what, six o'clock. Actually, I did. We
22  talked for maybe five minutes this afternoon when I
23  got here.
24        Q.  Well, you told me earlier that you talked
25  to the attorneys last night and you talked to them

Page 101

1   today ---
2         A.  --- Yes.
3         Q.  --- About the reports.
4         A.  Yes.
5         Q.  Okay, so what did you talk about regarding
6   the reports?
7         A.  Still that I -- I don't have any evidence
8   that I can point to that would allow me to rule this
9   in or rule it out. So it still, to me, is an
10  open-ended question.
11        Q.  Anything else?
12        A.  No.
13        Q.  So, did they ask you questions back? That
14  took about 20 seconds. So what else was discussed on
15  the conversation last night and today?
16        A.  Well, the conversations last night were
17  really more focused on getting the reports to me so I
18  could do the review. And ---
19        Q.  So did you talk to them after the review?
20        A.  No.
21        Q.  Okay, so you only talked ---
22        A.  --- And that's what we did briefly ---
23        Q.  --- To them before the review?
24        A.  --- Here today.
25        Q.  Okay.

Case 5:12-cv-00610-F   Document 33-4   Filed 09/16/13   Page 27 of 33

Page 102

1   A. Yes.
2   Q. And other than how to get the reports to
3   you was there anything discussed in that conversation
4   prior to you receiving the reports?
5   A. No, not really.
6   Q. And then in your discussion today?
7   A. Very brief summary of an opinion, the same
8   one I just gave you, that I really can't tell, even
9   though these -- they have more photos here, they are
10  a little bit better than what I had gotten earlier.
11      Still, for me to be able to conclusively
12  rule out plausible modes or mechanisms with it, you
13  either need the exhibit, right, to stack up against
14  the analytical assessment, or you need better
15  documentation of it, which Mr. Martini may very well
16  have. It's just not available to me.
17  Q. Prior to you coming here today, did you
18  ever ask your attorneys to ask me or anyone on
19  Nationwide's side to bring to you any additional
20  photographs?
21  A. Certainly in the time frame that the email
22  refers to where image 33 came to me, we had
23  discussions back and forth about, you know, gee, this
24  is a PDF image.
25      I think I even allude to that in my

Page 103

1   summary letter here, about it just being a low
2   quality ---
3   Q. --- Uh-huh.
4   A. --- PDF image. Right?
5       But yes, I mean, I did make those requests
6   and they said they were going to -- going to ask for
7   it. But I never did get anything further to look at,
8   or a better quality to look at. Put it that way.
9   Q. Okay, let's turn to page four, and it's
10  finding seven, marked Mr. Martini.
11      (* Exhibit 7 was marked *)
12  Q. I'm going to show you what is marked as
13  Exhibit 7. Do you -- strike that.
14      First, have you ever read Mr. Booth's
15  report?
16  A. I have not.
17  Q. Have you been provided a copy of Mr.
18  Booth's report?
19  A. I have not.
20  Q. In Mr. Booth's report he states that the
21  protected area on the wall is the location where the
22  base station was installed.
23      Do you agree with Mr. Booth?
24  A. That's my understanding, that that's where
25  it was installed. I have no reason to dispute it.

Page 104

1   Q. In looking at photograph 16, do you agree
2   that that was a protected area?
3   A. Yes, it appears to be.
4   Q. Generally speaking, do you agree that a
5   well-defined area of fire origin would result in an
6   area of greater fire or heat damage rather than a
7   protected area?
8   A. That would make sense, yes. I guess I
9   would -- I want to add to that, though, that
10  depending upon where the actual point of origin
11  within a device that's mounted there actually is,
12  right.
13  Q. So get -- explain to me any theory you may
14  have of how this base station had an electrical
15  failure and caused -- strong enough to cause the
16  fire.
17      How did it create a protected area if it
18  was the actual electrical component that caught on
19  fire?
20  A. Well, again, this is Mr. Booth's idea, but
21  ---
22  Q. --- And we've already established that.
23  A. Yeah.
24  Q. But you don't have any evidence refuting
25  that this is where ---

Page 105

1   A. --- Yeah.
2   Q. --- The base station was located.
3   Correct?
4   A. Correct.
5   Q. Okay. So I want you -- what I'm asking
6   from you as the mechanical engineer, give me your
7   theories on how it could have come about that the
8   base station, the electrical components of the base
9   station, caught on fire, was the point of origin, and
10  caused a protected area on the wall where it was
11  mounted.
12  A. Okay. I guess off the top of my head,
13  right? You don't know what ---
14  Q. --- Well, you knew -- being ---
15      MR. WIGGINS: --- Well, let him
16  answer, Rachel.
17      Objection.
18      MS. DALY: I agree. Go ahead.
19      MR. WIGGINS: Okay.
20      THE WITNESS: I don't know which
21  part of the base station, right, is actually up
22  against that back surface.
23      For all I know of the base station, since
24  I haven't seen one taken apart, there could very well
25  be a metal backing plate that could have been there.

1    And then the circuit boards and the rest of the
2    component could have melted and fallen away. For all
3    I know, that -- that -- that pattern is a metal base
4    plate.
5         I don't know what the internal design
6    features of this are. All I have to look at are
7    remains of circuit cards. Where the rest of the base
8    station is, I don't know. If there's a metal base
9    plate on the back of that, then you may very well be
10   looking at that. So I don't know.
11        Q. (Ms. Daly) Anything else other than if
12   there's a metal base plate there's a possibility that
13   could have provided a protected area?
14        A. Without knowing where within the unit a
15   failure has occurred, and then how that would
16   actually compromise the integrity of the housing
17   holding this up -- and again, without the details of
18   the design constraints for the design features of
19   this -- but I could visualize losing just the lower
20   part of the base station.
21        I mean, I don't know how this is going to
22   come apart. It depends on where within the confines
23   of the housing you start the ignition or start the
24   fire, and then how that thing then comes apart.
25        But, you know, I understand where you're

1    going, but I'm not sure that I necessarily need to
2    defend the pattern on the wall for the focus of what
3    I'm actually looking to do. I feel like this is more
4    Mr. Booth and the cause and origin guys that would
5    ---
6         Q. --- So are you saying that the pattern of
7    fire on the wall is not within your expertise?
8         A. No. I'm saying that ---
9         Q. --- Because I thought you said earlier you
10   would have -- you would look at yours over an
11   electrical engineer's when you're looking at patterns
12   of fire.
13        A. You didn't say on the wall. At that time
14   we were talking about temper, discolorations,
15   oxidation patterns, and damage on a circuit board.
16   That's different than showing me a soot stain on a
17   wall.
18        Oxidation, temper, discolorations, are
19   definitely different things.
20        Q. Okay, so for the shadows and the pattern
21   on the wall you would not give an opinion as an
22   expert to the jury?
23        A. No. I wouldn't necessarily ---
24        Q. --- Okay.
25        A. I would not give them opinion defending

1    that.
2         Q. Other than if there was a metal base
3    plate, or I believe you mentioned if something in the
4    bottom of this audio system fell to the ground and
5    caught on fire, any -- any other theory you could
6    think of that would have caused a protected area as
7    opposed to what you would generally find ---
8         A. --- Well ---
9         Q. --- If that was the point of origin?
10        A. Just to be clear, before -- I'm just
11   saying that I don't know how this housing would
12   necessarily come apart as, you know, depending on
13   where you start the fire.
14        But no, I don't have any other thoughts as
15   to how you would leave a protected area behind this
16   unit and still have that be the point of origin.
17        Q. Generally, whenever you've gone into fire
18   scenes ---
19        A. --- Yes.
20        Q. --- Is the point of origin the most
21   damaged area at a fire scene?
22        A. Well, typically that's where your highest
23   heat intensity is or seems to be in the ones that
24   I've been on, yes.
25        Q. Have you ever seen the point of origin

1    provide a protected area and there be a higher fire
2    and heat damage located somewhere else?
3         A. I don't know so much about it being a
4    protected area, but depending on the fuel loads in
5    the room after the fire initiates, I have seen higher
6    intensities elsewhere.
7         Q. If there's like a ventilation system
8    somewhere?
9         A. Sure. I mean, or if there's something
10   that's highly combustible in another part of the room
11   that catches large fuel loads, you get higher heat
12   intensities.
13        Q. Did you have a discussion with anyone
14   regarding this protected area?
15        A. Steve Booth told me that he saw that that
16   was there.
17        Q. And what did he tell you about it?
18        A. After the 17th. It would have been well
19   after.
20        Q. What did he tell you about it?
21        A. Oh, I'm sorry. I thought you said when.
22        Q. Oh, no. That's okay.
23        A. Okay. Just simply that there was a
24   protected pattern on the wall.
25        Seems to be pretty much reciprocal to the

Page 110

1  dimensions of the base of the unit, so suspects that
2  pretty well confirms where it was installed.
3      Q.  Did you ever have a conversation with Mr.
4  Booth about it being unusual that there would have
5  been a protected area of the wall at the point of
6  origin?
7      A.  No.
8      Q.  Did the two of you discuss anything about
9  that, other than the fact that it was a protected
10 area?
11     A.  Relative to...
12     Q.  Anything.  I want to know any conversation
13 you've ever had regarding this point of origin.
14     A.  No.  I mean, the only -- the only
15 discussions we've had have been focused on really
16 making sure that they understood or -- you know,
17 they're making sure that I knew what -- what this
18 component was and helping me get to the
19 manufacturer's information, discussing whether or not
20 there was enough evidence given as close proximity to
21 the point of origin to be able to rule it in or rule
22 it out as a potential cause, and recognizing that we
23 have nothing but photos, you know, could you
24 conclusively, you know, work through what we do have
25 to be able to say one way or another.

Page 111

1      Q.  Do you agree that the fact that this was a
2  protected area makes it less likely that the audio
3  system was the point of origin of the fire?
4      A.  No.  What this tells me is that there was
5  something there to give you that protected area and
6  it's likely going to be the back of the unit.  As far
7  as what the back of the unit is, whether that's a
8  metal base plate or plastic housing or what, I don't
9  know.
10         So without knowing the construction of the
11 box, where within the box you think the fire may have
12 started and occurred, and then how you would
13 subsequently degrade or lose the integrity of the
14 box, no.  All that tells me is that that's a
15 protected area on the wall.
16     Q.  And you've never purchased one of these
17 audio systems to do any type of destructive testing?
18     A.  No.
19     Q.  Have you ever purchased one to take it
20 apart to determine the specifications ---
21     A.  --- No.
22     Q.  --- Of the design?
23     A.  We discussed it, but we did not do that.
24     Q.  Do you have any intentions on doing this
25 before trial?

Page 112

1      A.  Not that I'm aware of, no.
2      Q.  And without doing that, are you able to
3  testify to a reasonable degree of certainty the
4  specifications of this audio system?
5      A.  You mean the board level specifications
6  that would allow a detailed failure modes and effects
7  analysis?
8      Q.  Yes.
9      A.  No.
10     Q.  Are you aware of any screws or holes from
11 the screws found in the protected area of the wall?
12     A.  No.
13     Q.  Do you know how this was mounted on the
14 wall?
15     A.  Just a minute.  Let me think.
16         When Booth and I talked about this, he
17 actually did tell me that it was mounted on the wall
18 using screws, but I don't recall whether the screws
19 were there or not.
20         And as for your question just now, I have
21 seen in the images -- I think it was in Martini's
22 report that shows the back side of the base unit, and
23 it shows four holes, I believe, for a screw mount
24 location.
25     Q.  Did you speak with anybody regarding Henry

Page 113

1  Martini's finding in number seven?
2      A.  No.
3      Q.  Do you have any evidence to refute any of
4  the statements found in Martini's Exhibit 7 -- excuse
5  me, finding seven?
6      A.  No.  Recognizing also, of course, that I
7  haven't seen Mr. Booth's report to see the context of
8  what he's saying, but no.
9      Q.  On page five of Mr. Martini's report, at
10 the bottom right-hand corner, can you read to me what
11 you have written.
12     A.  It says, extensive secondary damage may
13 have destroyed primary patterns.  This should have
14 been recovered.
15     Q.  And what are you referring to in that
16 statement?
17     A.  Well, there was obviously extensive
18 thermal damage to this device that was in the area of
19 the origin, and that what Mr. Martini is talking
20 about here are the heat damage.
21         And the point I'm making is that this
22 thing has been exposed to a lot of secondary heat
23 damage as a result of the fire, and so it's hard to
24 infer, certainly from pictures, primary versus
25 secondary potentially.  It could potentially mask

Page 114

1   some of the primary thermal patterns.
2        So I'm saying it should have been
3   recovered so that we could get a better look at this
4   under magnification and get better -- better
5   photographs, which, again, he may have. But for me,
6   I need more than that.
7        Q.  Is it your opinion that Mr. Martini could
8   not make this finding, or is it your opinion that you
9   can't make this finding on the photographs?
10       A.  It's my opinion that I cannot reproduce
11  his finding. I cannot look at his photographs and
12  concur with his observation.
13       Q.  Is it your opinion, though, that Mr.
14  Martini made the wrong determination based on his own
15  inspection of the actual item?
16       A.  No. I'm not opining that he made the
17  wrong observation. I just simply don't know his
18  background and ability to infer thermal patterns and
19  oxidation patterns and so on. It's something you
20  need to look at to be able to draw your own
21  conclusion. I should be able to ---
22       Q.  --- But you're not saying his conclusion
23  is wrong. Is that correct?
24       A.  That's correct.
25       Q.  So on page six you have handwritten notes.

Page 115

1   Will you read those to me, please.
2        A.  Sure. It's in reference to the class two
3   power supply comments that he's got in his reports,
4   and I said that class two -- you know, class two
5   assumes dry indoor use, non-hazardous locations.
6        NEC, national electrical code. But it
7   comes from -- straight from that. There are some
8   caveats on class two and their ability to
9   successfully minimize the potential for a fire.
10       Q.  And why did you take those notes? What's
11  the significance?
12       A.  The area it's installed in, certainly
13  there is potential for it to have been contaminated.
14       I mean, just because he says it's class
15  two, that doesn't mean that it can't cause a fire.
16       There are some caveats that are called out
17  in the NEC. You know, it's got to be indoors, it's
18  got to be dry, non-hazardous locations. You don't
19  want to contaminate the thing because of -- the
20  boards and components are exposed.
21       Q.  Do you agree with these two sentences in
22  this paragraph that begins, class two power supplies
23  are energy limited and are intended primarily to
24  provide power to low voltage electrical devices?
25       Do you agree with that statement?

Page 116

1        A.  I do, yes.
2        Q.  And do you agree with the statement, the
3   energy loading characteristics of a class two power
4   supply are intended to minimize fire initiation
5   potential and provide acceptable protection from
6   electric shock?
7        A.  I do, and it's that last sentence that my
8   comments in the margin are really geared towards.
9        Q.  But you do agree with that statement?
10       A.  I do, yeah.
11       Q.  You said that you also reviewed Mr. Lacy's
12  report.
13       A.  I did.
14       Q.  It's still in your file, I believe, if you
15  want to take a look at it.
16       A.  Sure.
17       Q.  I did not note any notes taken on Mr.
18  Lacy's. Am I correct?
19       A.  Yes. That's correct. It was more
20  informational than anything, my read of it was.
21       Q.  And Mr. Lacy is a fire scene investigator.
22  Correct?
23       A.  Yes.
24       Q.  And you are not. Is that correct?
25       A.  That's correct.

Page 117

1        Q.  Is there anything contained in Mr. Lacy's
2   report that you have evidence to refute?
3        A.  No.
4        Q.  Did you discuss Mr. Lacy's report with
5   anyone?
6        A.  No.
7        Q.  Is the cause and origin of a fire outside
8   of your expertise?
9        A.  The -- the cause and origin investigation,
10  yes.
11       Q.  Is outside of your expertise?
12       A.  Yes. My focus is strictly in the defect
13  investigation, product liability, failure analysis.
14       Q.  Let me go back to Mr. Lacy's report, and
15  on page five, number seven, is it outside of your
16  expertise to comment on whether or not the theory put
17  forth by Mr. Booth is plausible?
18       A.  I haven't seen Mr. Booth's report to know
19  his theory.
20       Q.  Reading number seven, the -- the subject
21  matter and the opinion in number seven, is that
22  outside of your expertise?
23       A.  No.
24       Q.  It's not outside your expertise?
25       A.  No. I mean, I've got quite a -- quite a

30 (Pages 114 to 117)

Page 118

1  bit of background in heat transfer. Certainly the
2  heat transfer aspects of that, combustion is basic
3  mechanical engineering.
4      Q. And have you ever discussed -- and that
5  was not included in your expert report. Correct?
6      A. That's correct.
7      Q. And is that outside of the scope of your
8  testimony in this case?
9      A. Yes.
10     Q. Okay. And at trial do you have any
11 intention on testifying regarding heat transfer,
12 whether or not the theory set forth in finding seven
13 is plausible?
14     A. Based on what's on the table today, no.
15         If we come back with a specific failure
16 mode or mechanism that's plausible up inside of this
17 box, for example, and start talking about heat
18 transfer characteristics for how you can communicate
19 that out through the box, then yes, if that were
20 asked.
21     Q. Okay.
22     A. And if the information was made available
23 to me to form basis.
24     Q. But that was not included in your expert
25 report?

Page 119

1      A. It's not. I don't have the information in
2  front of me today to -- to do that.
3      Q. Do you have any opinions other than what's
4  contained in your expert report?
5      A. No.
6          MS. DALY: I don't have any other
7  questions.
8          Thank you for your time.
9          THE WITNESS: Okay.
10         MR. WIGGINS: I have no questions.
11         WHEREUPON,
12 at 4:44 o'clock p.m. the deposition was adjourned.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 120

1          CERTIFICATE OF TRANSCRIPT
2      I, Cassandra J. Stiles, Notary Public in
3  and for the County of Forsyth, State of North
4  Carolina at Large, do hereby certify that there
5  appeared before me the foregoing witness;
6      That the testimony was duly recorded by
7  me, reduced to typewriting by me or under my
8  supervision and the foregoing consecutively numbered
9  pages are a complete and accurate record of the
10 testimony given at said time by said witness;
11     That the undersigned is not of kin nor
12 associated with any of the parties to said cause of
13 action, nor any counsel thereto, and that I am not
14 interested in the event(s) thereof.
15     IN WITNESS WHEREOF, I have hereunto set my
16 hand this the 12th day of August, 2013.
17         Cassandra J. Stiles, CVR
18         Certified Court Reporter
19         Atlantic Professional Reporters
20         Post Office Box 11672
21         Winston-Salem, NC 27116-1672
22
23
24
25

Page 121

1          CERTIFICATE OF OATH
2      I, Cassandra J. Stiles, Notary Public in
3  and for the County of Forsyth, State of North
4  Carolina at Large, do hereby certify that there
5  appeared before me the foregoing witness;
6      That the witness personally appeared
7  before me at the date, time and location hereon
8  captioned and was personally sworn by me prior to the
9  commencement of the proceeding in the matter hereon
10 captioned.
11     IN WITNESS WHEREOF, I have hereunto set my
12 hand this the 12th day of August, 2013.
13         Cassandra J. Stiles, CVR
14         Certified Court Reporter
15         Atlantic Professional Reporters
16         Post Office Box 11672
17         Winston-Salem, NC 27116-1672
18
19
20
21
22
23
24
25

Atlantic Professional Reporters - 800-717-0001

Page 122

```
1              WITNESS CERTIFICATION
2        I, STEPHEN EDWARD STONE, hereby certify:
3        That I have read and examined the contents of
4   the foregoing testimony as given by me at the time
5   and place hereon indicated, and;
6        That to the best of my knowledge and belief,
7   the foregoing pages are a complete and accurate
8   record of all the testimony given by me at said time,
9   except as noted on the Attachment A hereto.
10  I have ___ have not ____
11  made changes/corrections _____
12              Stephen Edward Stone
13       I,_____, Notary Public for the
14  County of _____, State of _____,
15  hereby certify:
16       That the herein-above named appeared before me
17  this the _____ day of _____, 19____, and;
18       That I personally witnessed the execution of
19  this document for the intents and purposes as herein-
20  above described.
21       _____
22              Notary Public
23  My Commission Expires:
24  _____         (SEAL)
25
```

Page 124

```
1             CERTIFICATE OF MAILING
2        I, Cassandra J. Stiles, CVR, do hereby certify
3   that a true copy of the transcription of the matter
4   hereon captioned was served on the party named below
5   by the placement of said transcript copy in the
6   United States Mail, Priority Mail delivery, with
7   proper postage affixed, addressed as follows:
8
9
10       Stephen Edward Stone
11       Post Office Box 2368
12       Morehead City, NC  28557
13
14
15       This the 12th day of August, 2013.
16
17
18       _____
19              Cassandra J. Stiles, CVR
20
21
22
23
24
25
```

Page 123

```
1              ADDENDUM A
2        Upon reading and examining my testimony as
3   herein transcribed, I make the following additions,
4   changes and/or corrections, with the accompanying and
5   corresponding reason(s) for the same:
6
7   Page  Line      Is Amended to Read
8   ___|____|___|_____
9   ___|____|___|_____
10  ___|____|___|_____
11  ___|____|___|_____
12  ___|____|___|_____
13  ___|____|___|_____
14  ___|____|___|_____
15  ___|____|___|_____
16  ___|____|___|_____
17  ___|____|___|_____
18  ___|____|___|_____
19  ___|____|___|_____
20  ___|____|___|_____
21
22       _____
23              Stephen Edward Stone
24
25
```