IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:12-CV-00610-F

| | | |
|---|---|---|
| CITY GRILL HOSPITALITY GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF LAW IN** |
| v. | ) | **SUPPORT OF DEFENDANT'S** |
| | ) | **MOTION FOR PARTIAL SUMMARY** |
| NATIONWIDE MUTUAL INSURANCE | ) | **JUDGMENT** |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant, Nationwide Mutual Insurance Company ("Nationwide"), through counsel,

respectfully submits this Memorandum in Support of its Motion for Partial Summary Judgment.

## SUMMARY OF THE NATURE OF THE CASE

On January 24, 2012, a fire occurred at a Miami Subs location in Fayetteville, North

Carolina. The Miami Subs was owned by Plaintiff-Insured, City Grill Hospitality Group, Inc.

("City Grill" or "Plaintiff"). After Nationwide conducted an investigation and review, coverage

was denied for two reasons. First, one of the owners of City Grill appeared to have intentionally

set the fire. Thus, the fire arose out of a dishonest or criminal act, which excludes coverage

under the policy. Second, coverage was denied because one of City Grill's owners made

material misrepresentations during the presentation of the insurance claim to Nationwide. On

August 16, 2012, City Grill filed this lawsuit claiming breach of contract, declaratory judgment,

bad faith, breach of the unfair and deceptive practices act, and conversion. In addition,

Plaintiff's allegations indicate possible claims for breach of fiduciary duty and infliction of

emotional distress.

## STATEMENT OF FACTS

City Grill owned and operated a Miami Subs franchise located at 552 North McPherson Church Road, Fayetteville, North Carolina, which is at the intersection of two busy roads, McPherson Church Road and Skibo Road. (Royal Dep. 20-21). Across the street from the Miami Subs is a Wal-Mart. (House Dep. 64). City Grill's owners are Dimitrios Diamantopoulos ("Owner Diamantopoulos") and Takis Michalos ("Owner Michalos"). Both owners worked at the Miami Subs location.

### A. *Owner Dimantopoulos' Whereabouts before the Fire*

On January 24, 2012, Owner Diamantopoulos arrived at the Miami Subs in the morning. Miami Subs has an alarm system. (Diamantopoulos Dep. 86). At 8:15:30 a.m., upon arriving at the Miami Subs, Owner Diamantopoulos set off the alarm and the alarm company called the store. (Diamantopoulos EUO Vol. 1 107). At 8:17:22 a.m., Owner Diamantopoulos spoke to the alarm company. Initially, he provided the incorrect password, but was able to identify himself and change the password at 8:21:44 a.m. *Id.* According to Owner Diamantopoulos, after he finished the conversation with the alarm company, he went to the office to get the bank deposit of the previous night's cash out of the safe and left Miami Subs within five minutes of ending the call with the alarm company. *Id.* at 111.

Mr. Zachary Lapene is a manager at Cycle Gear, which neighbors City Grill. Mr. Lapene testified that he saw Owner Diamantopoulos' truck, which only Owner Diamantopoulos drives, parked in the Cycle Gears parking lot when he arrived at work at 8:35 a.m. on the morning of the fire. (Lapene Dep. 27; House Dep. 72). Mr. Lapene could see no reason why Owner Diamantopoulos would park in the Cycle Gear lot instead of the Miami Subs lot. (Lapene Dep. 15). Mr. Lapene stated that Owner Diamantopoulos would typically park his truck in a different

2

space.  *Id.* at 12, 42-43.  In his deposition, Mr. Lapene identified Owner Dimantopoulos' usual parking spaces as being closer to the road and in the Miami Subs' parking lot.  *Id.* at 15, Ex 1.

Between the time Owner Diamantopoulos left the Miami Subs location and the first 911 call reporting the fire at 8:40:53 a.m., there are differing accounts as to Owner Diamantopoulos' location.  (House Dep. Def. Ex. 1 p. 2).  In his examination under oath taken on April 2, 2012, Owner Diamantopoulos testified that he left Miami Subs to meet a friend, John Pavlikianidis, for breakfast at either Pizza Palace or J.K.'s Restaurant. (Diamantopoulos EUO Vol. 1 87-93).  He drove to both restaurants and then got a call that Miami Subs was on fire.  *Id.* at 111-19.  Later in his same examination, Owner Diamantopoulos testified that before going to Pizza Palace, he crossed Skibo Road to put gas in his vehicle at the Sam's Club.  He then stated that he left the area by 8:35 a.m.  *Id.* at 119-125.  This contrasts with Mr. Lapene's testimony that he saw Owner Diamantopoulos' truck in the parking lot at 8:35.

In his deposition, Owner Diamantopoulos stated that he left Miami Subs to get gas at Sam's Club.  When he realized that he did not have his debit card, he drove through the Wal-Mart parking lot to Yadkin Road and turned right on Skibo Road.  (Diamantopoulos Dep. 88-89, 94-95, 99-101).  Owner Diamantopoulos stated that he received the phone call about the fire before he reached Pizza Palace.  *Id.* at 110.  Thus, he never reached either restaurant.  This contradicts his earlier testimony.

Detective James House with the Fayetteville Police Department investigated this fire.  In the course of his investigation, Detective House obtained the surveillance videos from Wal-Mart for the morning of the fire.  (House Dep. 64)  In the Wal-Mart video, Owner Diamantopoulos is seen driving through the Wal-Mart parking lot, minutes before the first fire engine arrives.  (Booth Dep. 110-11).  From the police report, the 911call reporting the fire was at 8:40:43 a.m.;

the first responder to the scene arrived at 8:44 a.m.; and, according the to the fire department report, the first fire engine arrived at 8:45.54 a.m. (House Dep. 131-32, Ex. 90 p. 12; Def. Ex. 1 p.2; Lacy Dep. 214-15). The Wal-Mart video is inconsistent with Owner Diamantopoulos' testimony above. Since Wal-Mart is only across the street from Miami Subs, the video raises issues as to the timing of when Owner Diamantopoulos left the restaurant, how much time he spent in the restaurant before leaving, as well as the possibility of whether he could have driven to the other restaurants before receiving the call that his restaurant was on fire.

In addition, this video was also inconsistent with Owner Diamantopoulos' statements to Detective House that Owner Diamantopoulos went to the bank to make a deposit. *Id.* at. 88.

> Q.  Is that what you -- you know, you've expressed your opinion that you think Jimmy had something to do with the fire.  Is that true?
> A.  That would be my opinion ---
> Q.  --- That's your opinion.
> A.  --- But I don't have enough to charge on.
> Q.  Okay.
> A.  So that don't -- that don't let me be able to charge him.
> Q.  Yeah.
> A.  But that's my opinion.
> Q.  And what do you base your opinion upon? What factors do you use in making that opinion?
> A.  The -- the lie.
> Q.  I'm sorry?
> A.  The lie, or the oversight, whatever you want -- of telling me that he went to the bank when he's showing a minute from the time the fire was called in and from the Wal-Mart, telling me that he's not behind on taxes and I pull up all these taxes where he's behind.

(House Dep. 123-24).

Even Plaintiff's ***own*** cause and origin expert, Steven Booth ("C&O Expert Booth"), noticed a discrepancy in Owner Diamantopoulos' testimony.

> Q.  Okay.  What other significance did the video have for you?
> A.  That I thought that it was interesting that Mr. Diamantopoulos was in front of Wal-Mart within minutes of the fire engine arriving.
> Q.  And why is that significant to you?
> A.  Because he said he was elsewhere.

4

Q. Does that -- did you ever have a discussion with anyone -- other than the email -- with anyone about the Wal-Mart video and what you saw in it?

A. Yes. I told Mr. Wiggins and Mr. McLean that that -- I thought that it was odd that he was in front of the building within minutes of the engine arriving.

Q. Anything else?

A. Maybe ---

Q. --- Was that your choice word, was that it was odd?

A. Uh-huh.

Q. That's a....

A. I think I said that. I think I said odd. But it's -- it -- it would be contrary to his testimony.

Q. Okay, so you explained that it'd be contrary to his testimony.

A. Uh-huh.

(Booth Dep. 112-13).

Q. Okay. Did you ever tell anyone that the statement given to you by Mr. Diamantopoulos was different than the statement he said under oath?

A. We -- yeah, I talked about that with Mr. Wiggins.

Q. And what did you tell him?

A. I said that there were some discrepancies in his statements in the EUO's and in my conversation with him.

(Booth Dep. 159).

In fact, C&O Expert Booth stated that "I think that [Owner Diamantopoulos] has not said the same story every time." (Booth Dep. 115). Thus, there are varying accounts from Owner Diamantopoulos himself of his whereabouts on the morning of the fire.

### B.      The Fire on January 24, 2012 and Subsequent Investigation

Both the Fayetteville Police Department and the Fayetteville Fire Department responded to the fire. (House Dep. 131). After the fire was extinguished, the investigation about the cause of the fire began. Because the Fayetteville Police Department does not have the specialized training to determine the cause and origin of suspicious fires, it relies on the expertise of the State Bureau of Investigation and its Agents. *Id. at* 33. Thus, Special Agent Chadwick Royal with the State Bureau of Investigation was called to investigate the fire on January 24, 2012. (Royal Dep. 15). Special Agent Royal determined the area of origin for the fire was the drive through window area closest to the rear of the building. *Id.* at 39. At the end of his initial

5

investigation, Special Agent Royal could not definitely determine the source of the fire until electrical sources were ruled out. *Id.* at 114, 116.

On January 25, 2012, Nationwide retained Donan Engineering to conduct a cause and origin investigation. (Jezierski Dep. 18; Lacy Dep. 28). Donan Engineering is a company that provides fire investigation services. (Lacy Aff. ¶ 2). Cause and Origin Investigator Hunter Lacy ("C&O Investigator Lacy") was a salaried employee with Donan and was assigned to conduct the cause and origin investigation. *Id. at*. ¶¶ 3, 7. C&O Investigator Lacy began his fire scene examination on January 26, 2012. (Lacy Dep. 30). As a part of his investigation, he interviewed witnesses, took samples and had them tested, took photographs, examined the evidence, and discussed the case with Detective House and Special Agent Royal. *Id. at*. 63, 103-06, 95-96, 110. After beginning his investigation, C&O Investigator Lacy determined that an electrical engineer should be hired to help eliminate the possibility of the fire being caused by electrical equipment. *Id. at*. 129-30, 134-39. Thus, he recommended that Henry Martini of Donan Engineering also be allowed to participate in the investigation. Nationwide agreed that C&O Investigator Lacy could use Electrical Engineer Martini. (Jezierski Dep. 139).

C&O Investigator Lacy interviewed Miami Subs General Manager Victoria Moon. Manager Moon stated that when she left the Miami Subs the night before, a large bread rack was near the front drive thru window. (Moon Dep. 79-80). At the time of the fire, the bread rack had moved near to the rear drive thru window, closer to the origin of the fire. (*Id.*; Royal Dep. 39, 54-57; Lacy Dep.64-65, 46-48, 197-99; Booth Dep. 57). Plaintiff's own cause and origin expert believed that the cart "would have blocked a significant amount of view into the interior of the building" and the origin of the fire for anyone passing by the restaurant. (Booth Dep. 55).

### C.    Miami Subs' Surveillance System

The Miami Subs restaurant had a sixteen camera video surveillance system. (Diamontopoulos Dep. 159). On the night before the fire, Manager Moon noticed that the video surveillance system monitor was turned off. (Moon Dep. 25). Manager Moon, who has worked at City Grill restaurants on-and-off since 2008, could remember only one other time when the surveillance monitors were off, which was before April 2010. (Moon EUO 7-8, 20, 23).

In their investigation, Detective House and Special Agent Royal became aware of the fact that the restaurant had a surveillance system. (House Dep. 78; Royal Dep. 70). After discussing the surveillance system with Owner Diamantopoulos, Detective House and Special Agent Royal were under the impression that the surveillance video feed was housed in the hard drives of a computer tower. (Royal Dep. 70, 131-34; House Dep. 78). Detective House took two hard drives from a computer recovered at the scene as evidence. (House Dep. 59-61). Because the Fayetteville Police's IT Department had a back-log of requests, Detective House decided to allow C&O Investigator Lacy to take the hard drives to have them reviewed. (House Dep. 60). C&O Investigator Lacy had the hard drives reviewed by a third-party vendor, and no videos were on the hard drives. (Lacy Dep. 125-27). The hard drives contained information from Miami Subs' point-of-sale system. *Id. at*.126-28. The hard drives were returned to Plaintiff's counsel, and point-of-sale system documents were retrieved from them. (*Id. at*. 127-30; Royster Dep. 24-26).[1]

### D.    Investigation by Nationwide Employees and Advance Payment

If a Nationwide adjuster needs additional help investigating a claim, Nationwide has a Special Investigation Unit that investigates claims such as motor vehicle accidents, fires, or

---

[1] Defendant has objected to these POS documents as they were produced to counsel after the close of the fact discovery period. (Royster Dep. 25).

bodily injury claims. (Locklear Dep. 12-14). Nationwide employee Bonnie Locklear of Nationwide's Special Investigation Unit was assigned to this case. *Id.* Unlike Mr. Lacy who is an independent contractor, Ms. Locklear is an employee of Nationwide. *Id.*

Her assignment was to interview witnesses and investigate any leads related to the claim that occurred outside the cause-and-origin or electrical examination. *Id.* at 25. During the course of her investigation, Ms. Locklear interviewed a number of witnesses: Owner Michalos, Manager Moon, John Pavlikianidis, Cycle Gear Manager Lapene, Detective House, and several Miami Subs employees. (Locklear Dep. 66-68, 72, 79, 80, 86, 87). While Nationwide eventually decided to conduct an examination under oath of Owner Diamantopoulos, Ms. Locklear did meet him on the first day of her investigation. *Id.* at 67-69.

The witnesses described their interactions with Nationwide employees positively. Manager Moon, Owner Michalos, and Owner Diamantopoulos agreed that Nationwide employee Locklear was "very professional" and "friendly." (Moon Dep. 14; Michalos Dep. 137; Diamantopoulos 145). Owner Diamantopoulos even described Nationwide Adjuster Jezierski as "very good." (Diamantopoulos Dep. 145).

During the course of the investigation by Nationwide, City Grill requested that an advance payment be made from the policy proceeds. (Jezierski Dep. 142). In February, Adjuster Jezierski determined that a $50,000 advance payment would be paid to City Grill; however, that advance payment was delayed because, on the same day, Nationwide "received a letter indicating that any payments made to them would be paid to the sheriff because there was a court order." *Id*. at 143. It took several months before the issue was resolved, and Nationwide made the $50,000 payment. Nationwide employees kept a log of activity in this case to record their efforts to timely process and investigate the claim. *Id.* at 44-45, Ex. 26.

8

### E.      City Grill's Financial Status Before the Fire

Both City Grill owners admit that they did not keep track of the business's finances well. (Diamantopoulos Dep. 56; Michalos Dep. 16).   Both owners acknowledge in the six months before the fire, City Grill was continually receiving overdraft charges from the bank. (Diamantopoulos Dep. 56-65; Michalos Dep. 59-60, 74-75).   At the time of the fire, Owner Michalos had already invested over $120,000 of his savings in the company. (Michalos Dep. 29). However, he was not taking a salary, and he was completely living off of his wife's salary of $18,000 per year, his savings, and some bills paid by City Grill. (Michalos Dep. 47).

Miami Subs Employee Paul McKinnon recalls that at least three of his paychecks from City Grill bounced.  (McKinnon Dep. 17).  After that experience, he only cashed his paycheck at the bank City Grill used.  "I would never take one of their checks to my bank." *Id.*  As the Manager of Miami Subs, Manager Moon would receive complaints from employees who claimed that their paychecks would bounce.  (Moon Dep. 94-95).  Mr. McKinnon also recalls that the gas was cut off at the restaurant at least twice.  (McKinnon Dep. 18).   At the time of the fire, the property was listed for sale or lease by City Grill. (Michalos Dep. 79; Diamantopoulos 222-23).   While City Grill did make a rent and property tax payment to its landlord one week before the fire, City Grill's rent was still in arrears for $15,956.88 on the date of the fire. (Royster Dep. 40).

### F.      Determination That the Fire was Incendiary in Origin

Electrical Engineer Martini examined the fire scene on January 30, 2012. (Martini Dep. 23-24, 61). He took pictures and examined the electrical appliances.  After his investigation, he concluded that the fire was not a result of the failure of the structural electrical components or of an appliance in the building. *Id.* at 89-90, 123.  There was no evidence of an electrical failure

9

identified in or around the area of the fire origin that could have served as an ignition source for the fire. *Id.* at 100. After an electrical cause was ruled out by Mr. Martini, C&O Investigator Lacy discussed the possibility that the fire was incendiary with Adjuster Jezierski. (Jezierski Dep. 114). A preliminary report by Donan Engineering was submitted to Nationwide on February 22, 2012 with the finding that the fire was incendiary in nature. *Id.* at 145. Incendiary in this context means a fire set by human hands. *Id.* Messers. Lacy and Martini submitted detailed reports, explaining their findings, to Nationwide on May 21, 2012 and May 23, 2012 respectively. (Jerzierski Dep. 158; Lacy Dep. 206; Martini Dep. 85, 109).

Once electrical sources were ruled out, Special Agent Royal, who was investigating the case at the request of the Fayetteville Police Department, also determined through his own investigation that the fire was incendiary. (Royal Dep. 116). Special Agent Royal uses the term incendiary synonymously with arson. *Id.* at 16.

Plaintiff's own cause and origin expert, Steven Booth, also admits that there is a possibility that the fire could be incendiary and set by Owner Diamtopoulos:

> Q. After going through all the evidence in this case, have you had any thoughts that Mr. Diamantopoulos started this fire?
> A. Like I said in the beginning, it was a consideration from the beginning. I just don't know that there's enough data to say either way. And then we have two potential possibilities that are equally weighted and they should -- if that's the case, then it should be an undetermined fire.
> Q. Is it your opinion that it is more likely than not that Mr. Diamantopoulos did not start this fire?
> A. No.
> Q. Is it your opinion that the wireless device started -- strike that. Is it your opinion that it is more likely than not the wireless device was the ignition source for this fire?
> A. No.
> Q. Have you ever spoken to anyone, including the attorneys in this case, regarding whether or not Mr. Diamantopoulos was involved in the setting of this fire?
> A. Well, I mentioned to them that it was a possibility, but other than that, no.
> Q. Did they talk to you about whether or not they considered it to be a

10

possibility?

A.   I think that -- that at the time we discussed it I -- I mentioned that it -- they needed to be -- in the beginning I told them that they needed to be aware that if I felt like it was a set fire, I was going to tell them that.

I also told them that -- that the timeframes and the circumstantial information that was there were -- -- were -- weren't great. And that -- that it is a possibility that we have two possible potentials.

Q.   Can you rule out the fact that Mr. Diamantopoulos started this fire?

A.   No, ma'am.

(Booth Dep. 208-09).

### G.    *Nationwide's Denial*

On May 31, 2013, Adjuster Jezierski sent a letter to Plaintiff's counsel denying the insurance claim on two grounds. (Jezierski Dep. 65). First, there is an exclusion in the policy for dishonest or criminal acts. In particular, the policy states:

B.    EXCLUSIONS ...

2.   We will not pay for loss or damage caused by or resulting from any of the following: ...

f. Dishonesty

Dishonest or criminal acts by you, anyone else with an interest in the property, or any of your or their partners, "members", officers, "managers", employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

(1) Acting alone or in collusion with others; or
(2) Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employee (including leased employees); but theft by employees is not covered.

(Stancil Declaration, Ex. A p. 47). After considering the Donan Engineering reports, the information received from the SBI and Detective House, the proximity of Owner Diamantopoulos to the fire, the examinations under oath, SUI Investigator Locklear's findings, and the Wal-Mart videos, Adjuster Jezierski determined that Owner Diamantopoulos participated in the intentional setting of the fire. (Jezierski Dep. 65-68, 77).

11

The second reason for the denial was the material misrepresentations of Owner Diamantopoulos. The policy states:

> C.     CONCEALMENT, MISREPRESENTATION OR FRAUD
>
> (1) This policy is void in its entirety in any case of fraud, at any time, by you or your representative as it relates to this policy.
>
> (2) This policy is also void if you, your authorized representative or any other insured, at any time, conceal or misrepresent any material fact, or violate any material warranty, concerning:
>     a. This policy, including your application for this policy;
>     b. The Covered Property;
>     c. Your interest in Covered Property; or
>     d. A claim under this policy
>
> (3) We also have the right to rescind this policy based upon any other grounds provided by law.

(Stancil Declaration, Ex. A p. 90). Adjuster Jezierski also denied coverage for this claim based on the misrepresentations Owner Diamantopoulos made regarding his whereabouts on the morning of the fire, as well as misrepresentations regarding financial matters such as whether the land was for sale or lease. (Jezierski Dep. 70-75, 78-81).

## ARGUMENT

### A.     Legal Standard

Parties seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A defendant is entitled to summary judgment if he can show that the plaintiff cannot prove the existence of an essential element of his claim or cannot surmount an affirmative defense that would bar the claim. *Berkeley Fed. Sav. & Loan Ass'n v. Terra Del Sol, Inc.*, 111 N.C. App. 692, 706, 433 S.E.2d 449, 457 (1993) (citing *Walker v. Durham Life Ins. Co.*, 90 N.C. App. 191, 368 S.E.2d 43 (1988)).

**B.      Plaintiff's Emotional Distress Claim Should Be Dismissed.**

In its third claim for relief, Plaintiff asserts that Owner Diamantopoulos suffered severe emotional distress.  Plaintiff's emotional distress claim fails, however, because Plaintiff is a North Carolina corporation, and corporations are incapable of experiencing emotions, much less severe emotional distress.  Thus, Plaintiff is incapable of proving the existence of an essential element of either a claim for negligent infliction of emotional distress or intentional infliction of emotional distress – that Plaintiff in fact experienced severe emotional distress.[2]  Furthermore, even if Plaintiff could count Owner Diamantopoulos's alleged emotional distress as its own, Owner Diamantopoulos's alleged emotional distress is insufficient to sustain a claim for either negligent infliction of emotional distress or intentional infliction of emotional distress, given that Owner Diamantopoulos has never sought treatment for any mental health condition.

1.      Plaintiff's Emotional Distress Claim Fails Because Corporations Do Not Experience Emotions.

As stated above, to succeed on either a negligent infliction of emotional distress claim or an intentional infliction of emotional distress claim, Plaintiff must be able prove that it in fact experienced severe emotional distress.  However, since "a corporation 'lacks the cognizant ability to experience emotions, a corporation cannot suffer emotional distress and no claim for [negligent or] intentional infliction of emotional distress lies.'"  *Interphase Garment Solutions, LLC v. Fox TV Stations, Inc.*, 566 F. Supp. 2d 460, 466 (D. Md. 2008) (quoting *FDIC v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994)); *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34,

---

[2] The elements of a claim for negligent infliction of emotional distress are: (1) that Nationwide negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause and did cause; (3) Plaintiff's severe emotional distress.  *Hollman v. Aiken*, 193 N.C. App. 484, 502, 668 S.E.2d 579, 591 (2008).  Similarly, the elements of a claim for intentional infliction of emotional distress are: (1) Nationwide engaged in extreme and outrageous conduct; (2) its behavior was intentional; and (3) the behavior caused severe emotional distress.  *Id.* at 501, 668 S.E.2d at 590.

13

37 (1st Cir. 2000) ("Because corporations, unlike natural persons, have no emotions, they cannot press claims for intentional infliction of emotional distress.").  Although research failed to uncover a North Carolina case directly on point, this Court should follow the well-accepted rule that corporations cannot experience emotional distress, especially since North Carolina courts have recognized that corporations are incapable of feelings.  *See McNeill v. Railroad, Co.,* 135 N.C. 682, 700, 47 S.E. 765 (1904) (a corporation is "incapable of such relations or the reciprocation of such feelings").

      2.    <u>Plaintiff's Emotional Distress Claim Fails Because Owner Diamantopoulos Has Never Sought Treatment for Any Mental Health Condition.</u>

Even if Plaintiff could count Owner Diamantopoulos's alleged emotional distress as its own, Owner Diamantopoulos's alleged emotional distress is insufficient to sustain a claim for either negligent infliction of emotional distress or intentional infliction of emotional distress. There is simply no evidence in the record that Owner Diamantopoulos actually suffered from "severe emotional distress" as contemplated by North Carolina courts as being sufficient to support an emotional distress claim.

Under North Carolina law, "severe emotional distress" means "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.  *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).  In *Waddle v. Sparks*, 331 N.C. 73, 414 S.E.2d 22 (1992), the North Carolina Supreme Court held that a plaintiff's intentional infliction of emotional distress claim failed as a matter of law because she failed to carry her burden of establishing "severe and disabling psychological problems."  *Id.* at 85, 414 S.E.2d at 28.  The

*Waddle* court emphasized that a plaintiff carries a high burden of proof in establishing a severe and disabling emotional or mental condition – the plaintiff must show she has suffered emotional distress "so severe that no reasonable man could be expected to endure it." *Id.* at 84, 414 S.E.2d at 27-28; *Dunn v. Town of Emerald Isle*, 722 F. Supp. 1309, 1314 (E.D.N.C. 1989), *aff'd*, 918 F.2d 955 (4th Cir. 1990) (affirming trial court's granting of defendants' motion for summary judgment); *Frazier v. First Union Nat. Bank*, 747 F. Supp. 1540, 1554-55 (W.D.N.C. 1990) (granting summary judgment on plaintiffs' intentional infliction of emotion distress claims because, although plaintiffs presented affidavits stating that defendant's conduct caused depression, personality change, embarrassment, minor physical pain, sexual problems, and social conflict with fellow employees, none of the plaintiffs were treated by doctors for physical ailments or received psychological counseling).

Like the plaintiffs against whom summary judgment was granted in *Frazier,* Owner Diamantopoulos never sought treatment from any medical provider for any mental health condition after the fire, much less one capable of being described as "severe emotional distress."

> Q. There is an allegation that you suffered severe . . . emotional distress.
> A. Yes.
> Q. Were you ever diagnosed with any mental illness after the fire?
> A. No.
> Q. Did you ever seek treatment from any medical provider ---
> A. --- No.
> Q. --- For mental distress?
> A. No.
> Q. For any emotional issue?
> A. No, I never contacted no doctor.

(Diamantopoulos Dep. 151-52).

Further, for a defendant to be liable on an emotional distress claim, North Carolina requires the defendant to have engaged in "extreme and outrageous conduct," which is so "'outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Groves v. Travelers Ins. Co.,* 139 N.C. App. 795, 79-800, 535 S.E.2d 105, 107-08 (2000), *rev'd per curiam on reasoning of dissent*, 354 N.C. 206, 552 S.E.2d 141 (2001) (quoting *Briggs v. Rosenthal*, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (1985) (internal quotations omitted).

Nationwide's alleged conduct in this case is not sufficiently extreme or outrageous to support an emotional distress claim. *See Groves*, 139 N.C. App. at 800-01, 535 S.E.2d at 108-09 (defendants' conduct was not sufficiently extreme and outrageous despite allegations that defendant presented the plaintiff's doctor with a videotape showing only a select portion of plaintiff's job duties to change the doctor's opinion that plaintiff's condition was job-related). At his deposition, when asked if there was anything that Nationwide employees, Mr. Jezierski or Ms. Locklear, did to him that caused him emotional distress, Owner Diamantopoulos responded, "I don't know. I don't know -- directly, no, that I know of." (Diamantopoulos Dep. 152).

When asked to describe the facts he contends support his emotional distress claim, Owner Diamantopoulos responded, "What facts? I woke up one morning and I was – I have no restaurant." Owner Diamantopoulos further stated: "And so that's – you lose sleep over what you worked for a long time to fix and you – you – somebody tells you you did something wrong, obviously, and you didn't, and you don't even have your restaurant or nothing." *Id.* Thus, to the extent Owner Diamantopoulos experienced any emotional distress at all, he admits that it resulted from the fire itself and Nationwide's good faith denial of coverage – not the sort of extreme and outrageous conduct sufficient to support an emotional distress claim.

**C.** **Plaintiff's Breach of Fiduciary Duty Claim Fails Because No Fiduciary Duty Exists Between an Insurer and its Insured.**

In its third claim, Plaintiff seems to assert that Nationwide breached its fiduciary duties to Plaintiff. However, Plaintiff is incapable of proving an essential element of this claim because,

as Plaintiff's first-party insurer, Nationwide was not in a fiduciary relationship with Plaintiff. The existence of a fiduciary relationship is essential to the success of a breach of fiduciary duty claim. *See Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). First-party insurance actions arise when an insured sues his insurer because of the insurer's treatment of the insured's claims. *In re Eurospark Indus., Inc.*, 288 B.R. 177, 183 (Bankr. E.D.N.Y. 2003) (citing Stephen S. Ashley, <u>Bad Faith Actions Liability & Damages</u> § 2:14 (2d ed. 1998 & Supp.2001)). The instant lawsuit is clearly a first-party insurance action.

> First-party actions are distinguishable from third-party actions, wherein the insured sues its insurer over the insurer's treatment of the claims of a third party against the insured. This distinction is important because an agency/fiduciary relationship is created in third-party actions between the insurer, who controls the disposition of the third party's claims, and the insured. No such relationship is created in the first-party context, which simply involves the contractual obligation to pay claims or benefits.

*Id.* (internal citations omitted). This distinction makes perfect sense, given the adversarial nature of the relationship between an insured and his insurer in the first-party insurance context.

> The relationship between a first-party insurer and its policyholder is ill-suited for fiduciary controls. Indeed, fiduciary theory simply does not work here for at least two reasons. First and foremost, an insurer's interests and an insured's interests are not aligned when the insured is claiming on his own behalf, as they are in third-party cases where insurer and insured face a common adversary. The insurer is never cast as the insured's agent. The insurer and insured do not deal in trust when a first-party claim is made; here they are adversaries. Even when a claim is clearly covered, the insurer and insured may disagree over the amount due or the nature of the benefits to be paid. This inherent conflict, which is well-recognized in insurance law, cannot be reconciled with the existence of a fiduciary relationship.

Douglas R. Richmond, <u>Trust Me: Insurers Are Not Fiduciaries to Their Insureds</u>, 88 Ky. L.J. 1, 20 (2000).

Thus, "[a]s a general matter, '[m]ost States treat the relationship between insurer and insured as a matter of contract, not a fiduciary relationship.'" *Fireman's Fund Ins. Co. v. CTIA,*

480 F. Supp. 2d 7, 15 (D.D.C. 2007) (quoting *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 119 (1993)); 1-2 <u>New Appleman Insurance Law Practice Guide</u>, 2.09[2][a] ("[T]here is generally considered to be no fiduciary relationship between an insurer or its agents and an insured or applicant for coverage."); *Kanne v. Connecticut Gen. Life Ins. Co.*, 607 F. Supp. 899, 908 (C.D. Cal. 1985), *judgment vacated in part by* 867 F.2d 489 (9th Cir. 1988), *cert. denied*, 492 U.S. 906 (1989) ("An insurance policy is a contract. As such, there is implied within every insurance policy a duty of good faith and fair dealing. While this duty is fiduciary in nature, it does not create a fiduciary relationship.").

North Carolina is no different and does not treat insurers as their insureds' fiduciaries. *See, e.g., Cash v. State Farm Mut. Auto. Ins. Co.*, 137 N.C. App. 192, 206, 528 S.E.2d 372, 381 (2000) (holding that while an insurance agent may be a fiduciary for an insured for certain purposes, the insured's insurer is not). Thus, Plaintiff's claim for breach of fiduciary duty fails because no fiduciary relationship exists between Plaintiff and Nationwide.

### D. **Plaintiff's Claim for Breach of the Covenant of Good Faith and Fair Dealing Should Be Dismissed Because It Is Subsumed in Plaintiff's Breach of Contract Claim**.

In its third claim, Plaintiff also asserts that Nationwide breached the covenant of good faith and fair dealing. This is not a proper independent claim under North Carolina law because a claim for breach of the covenant of good faith and fair dealing is "part and parcel" of a claim for breach of contract and must be "considered simultaneously with [a] claim for breach of contract." *Shalford v. Shelley's Jewelry, Inc.*, 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000); *see also Stephen Dilger, Inc. v. Meads*, No. 5:11–cv–42, 2011 WL 1882512, at *14 (E.D.N.C. May 17, 2011) (dismissing plaintiff's claim for breach of the covenant of good faith and fair dealing on the basis that plaintiff's breach of contract claim failed). Thus, Plaintiff's claim for breach of

the covenant of good faith and fair dealing fails because it is duplicative of Plaintiff's breach of contract claim. *See Rezapour v. Earthlog Equity Grp., Inc.,* No. 5:12–cv–105-RLV, 2013 WL 3326026, at * 4 (W.D.N.C. July 1, 2013) (dismissing breach of duty of good faith claim as duplicative of breach of contract claim); *Performance Sales & Mktg., LLC v. Lowe's Cos., Inc.*, No. 5:07 –cv-140, 2010 WL 2294323, at *11 (W.D.N.C. June 4, 2010) (same).

> ### E. Nationwide is not Liable for the Allegedly Wrongful Acts Committed by Donan Engineering Company or C&O Investigator Lacy and is Therefore Entitled to Summary Judgment on Plaintiffs' Conversion and Associated Chapter 75 Claims.

Plaintiffs' conversion and related Chapter 75 claims rest on the doctrine of *respondeat superior*.[3] [D.E. 1-1, pp. 12-23 ¶¶ 35, 39]. While the doctrine of *respondeat superior* may be used to impute liability for acts committed by an employee to his employer, *Barnes v. McGee*, 21 N.C. App. 287, 289, 204 S.E.2d 203, 205 (1974), "[t]he general rule is that a company is not liable for the torts of an independent contractor committed in the performance of the contracted work." *Cameron Hospitality, Inc. v. Cline Design Assocs., PA*, 735 S.E.2d 348, 351-52 (N.C. App. 2012) (internal citation omitted). [4] Furthermore, even if he is considered an employee, Nationwide still is not liable.

> #### 1. C&O Investigator Lacy is an Independent Contractor, not Nationwide's Employee

Whether C&O Investigator Lacy was an independent contractor or Nationwide's employee turns on whether Nationwide exercised sufficient control over Mr. Lacy and his

---

[3] Plaintiff's Complaint styles its Unfair and Deceptive Trade Practices claims as arising under Chapters 58 and 75 of the North Carolina General Statutes. [D.E. 1-1, ¶¶ 35-36]. Because Plaintiff may not maintain a private action under N.C. Gen. Stat. § 58-63, *see* N.C. Gen. Stat. § 58-63-11, this brief addresses Plaintiff's claim under Chapter 75. *See Gray v. N. Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 69, 529 S.E.2d 676, 682 (2000).

[4] The only two exceptions to this general rule—where the work is either (1) ultrahazardous or (2) inherently dangerous, and the employer knows or should know the employment is of either type—are inapplicable here. *See Kinsey v. Spann*, 139 N.C. App. 370, 374, 533 S.E.2d 487, 491 (2000); *Reynoso v. Mallard Oil Co.*, ___ N.C. App. ___, 732 S.E.2d 609, 611-12 (2012).

investigation. *MGM Transp. Corp. v. Cain*, 128 N.C. App. 428, 431, 496 S.E.2d 822, 824 (1998). Mr. Lacy could only properly be characterized as Nationwide's employee if Nationwide had "the right to control *both the means and the details of the process* by which [Mr. Lacy was] to accomplish his task[.]" *Cameron Hospitality, Inc,* 735 S.E.2d at 351. By contrast, Mr. Lacy was an independent contractor if he "exercise[d] an independent employment and contract[ed] to do certain work according to his own judgment and method, without being subject to [Nationwide] except as to the result of his work." *Gordon v. Garner*, 127 N.C. App. 649, 658, 493 S.E.2d 58, 64 (1997), quoting *Youngblood v. N. St. Ford Truck Sales*, 321 N.C. 380, 384, 364 S.E.2d 433, 437 (1988). The North Carolina Supreme Court has identified several non-exclusive factors to evaluate a putative employer's level of control:

> [Whether] [t]he person employed (a) is engaged in an independent business, calling, or occupation; (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work; (c) is doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis; (d) is not subject to discharge because he adopts one method of doing the work rather than another; (e) is not in the regular employ of the other contracting party; (f) is free to use such assistants as he may think proper; (g) has full control over such assistants; and (h) selects his own time.

*McCown v. Hines*, 353 N.C. 683, 687, 549 S.E.2d 175, 177–78 (2001) (quoting *Hayes v. Bd. of Trs. of Elon Coll.*, 224 N.C. 11, 15, 29 S.E.2d 137, 140 (1944)). Additionally, a worker's own provision of any necessary equipment to do the job for which he or she is retained is evidence of the independence that characterizes independent contractors. *Youngblood*, 321 N.C. at 384-85, 364 S.E.2d at 438.

Determining Mr. Lacy's status as an independent contractor is a mixed question of law and fact— the terms of the agreement are a question of fact, but once those terms are established, the status determination is a question of law. *Rhoney v. Fele*, 134 N.C. App. 614, 616, 518 S.E.2d 536, 538 (1999). As such, summary judgment is appropriate where, as here, the

undisputed facts enable a court to determine the nature of the relationship. *See Gordon*, 127 N.C. App. at 658, 493 S.E.2d at 64. In *Gordon,* for example, a trucking company maintained a pool of independent truck owner-operators who could be engaged to deliver sand. One of these pool truckers was involved in an accident. The *Gordon* court concluded that summary judgment in favor of the trucking company was appropriate because the pool driver (Garner) was an independent contractor rather than an employee. The court applied the *Hayes* test set out above, reaching its conclusion because: (1) Garner was engaged in an independent business, (2) Garner had independent use of his special skills and training in the execution of his work, (3) the purported employer trucking company "exercised no direct control over the particular daily activities of Garner," (4) no representative of the purported employer ever instructed Garner on the particulars of the operation of his affairs other than directions to his destination at the customer's business, (5) Garner was free to decide when and how long he wanted to work and when he would take breaks, and (6) Garner had the right to seek other employment. *Id.* at 659-60, 493 S.E.2d at 63-64.

Not all factors need be present to properly find that Mr. Lacy is an independent contractor, and no one factor is controlling of the analysis. *McCown*, 353 N.C. at 687, 549 S.E.2d at 177–78. In *Rhoney v.Fele*, 134 N.C. App. at 618-619, 518 S.E.2d at 540-541, the court of appeals again affirmed a grant of summary judgment on the independent contractor issue. There, the court considered whether a supplier of nursing personnel ("Nursefinders") could be held liable for the negligent acts of one of its recruited nurses ("Fele"). *Id.* The court stated that the following factors supported a finding that Fele was an independent contractor:

> (1) as a registered nurse, Fele was engaged in an independent profession; (2) Fele could and did provide nursing services through other placement services; (3) Fele exercised his duties and responsibilities as a nurse at the hospital, free from supervision by Nursefinders; (4) Fele's work through Nursefinders was sporadic

rather than regular; (5) Fele was able to accept or reject a job assignment offered by Nursefinders; and (6) Nursefinders did not provide Fele with valuable equipment.

*Id.* (internal citations omitted). The court noted that summary judgment was appropriate, even though there were some factors that potentially weighed in favor of a determination that Fele was an employee: (1) Fele was paid an hourly rate with overtime and incentive pay, rather than a lump sum for a particular assignment; (2) Fele was not free to select his assistants; (3) Fele was not able unilaterally to choose his own time to work under Nursefinders' auspices; (4) Nursefinders could terminate its relationship with Fele; and (5) Nursefinders provided Fele with a work packet and directions to the assigned place of work. *Id.* But the court emphasized the North Carolina Supreme Court's instruction that the key factor is "control," and held that, on balance, those facts demonstrated that while Nursefinders exercised control over extraneous aspects of Fele's work, it exercised no control over Fele's nursing, the function for which hospitals sought him. *Id.* Thus, the court of appeals upheld the trial court's summary judgment determination that Fele was an independent contractor. *Id.*

In this case, like in *Rhoney* and *Gordon*, the undisputed facts demonstrate that Donan Engineering, and Mr. Lacy by extension, was an independent contractor retained by Nationwide. Donan Engineering operates approximately 50 offices in 37 states, and Mr. Lacy worked out of its Charlotte office. (Lacy Aff. ¶ 2). Mr. Lacy, through Donan Engineering, performed cause and origin investigative services for many different companies and insurers since May 2009. *Id.* at ¶¶ 2-4. This work was assignment-based, and sporadic in nature, as there was no guarantee from any of the entities that retained Donan Engineering that it or Lacy would be engaged to work on any specific number of cases in any given time frame. *Id.* at ¶ 5.

Nationwide contracted with Donan Engineering to investigate the cause and origin of the fire at the Miami Subs located at the corner of McPherson Church Road and Skibo Road in Fayetteville, North Carolina. *Id.* at ¶ 2, Ex A. Apart from providing necessary details as to location and the assignment, Nationwide provided no guidance or instruction to Donan Engineering or Mr. Lacy on how to conduct this investigation. *Id.* at ¶¶ 6-8; Lacy Dep. 28-30.

Nationwide provided no day-to-day supervision over Mr. Lacy's investigative activities. (Lacy Aff. at ¶ 8). Instead, Donan Engineering and its employees were expected to use their own independent judgment as to how to conduct the investigation. *Id.* at. ¶ 7. This included the discretion to determine how to examine the scene of a fire, whom to interview, what evidence to collect and how to collect it, determining when and how to work with local law enforcement, and what materials to submit for testing. *Id.* at. ¶¶ 6-7.

Additionally, Nationwide did not directly compensate Lacy. *Id.* at ¶ 3. Mr. Lacy drew a salary from Donan Engineering, which was in no way tied to reaching any particular conclusion regarding the cause or origin of a fire. *Id.* at. ¶¶ 3, 8. Donan Engineering submitted invoices to Nationwide for the time and services rendered by Donan Engineering employees—including Mr. Lacy—in furtherance of the job Nationwide had retained Donan Engineering to perform. *Id.* at ¶ 2, Ex. A. Mr. Lacy's work pick-up truck was imprinted with Donan Engineering's logo. *Id.* at ¶ 9. Nationwide also provided no tools or equipment to Lacy to perform his investigation, as those materials were provided to him by Donan Engineering. *Id.*

Further, Nationwide did not provide Mr. Lacy with any training necessary to do his specialized function. Mr. Lacy is a Certified Fire Investigator with the North Carolina State Fire & Rescue Commission. *Id.* at. ¶ 10. This certification requires that Lacy undergo a battery of training conducted by, *inter alia*, the International Association of Arson Investigators, the North

Carolina Chapter of International Association of Arson Investigators, and the National Fire Protection Association, and that he participate in additional training on an annual basis. *Id*. Nationwide played no part in either providing such training, or in ensuring that Lacy's certifications remained up to date. *Id*.

On balance, these undisputed facts demonstrate that Nationwide did not have control over the central function for which Mr. Lacy and Donan Engineering were engaged—to investigate the cause and origin of the fire. As a result, Mr. Lacy was not Nationwide's employee, and Nationwide cannot be liable for the torts allegedly committed by Mr. Lacy. *Barnes*, 21 N.C. App. at 289, 204 S.E.2d at 205. This includes Plaintiff's conversion claim and any Chapter 75 claims stemming therefrom.

Plaintiff may try to analogize this case to *Dailey v. Integon Gen. Ins. Corp.*, 75 N.C. App. 387, 331 S.E.2d 148 (1985), but such reliance is misplaced. In *Dailey*, a *jury* determined that Bill Charnock, who was hired by Integon to investigate a fire, was Integon's agent when he committed various torts. *Id*. at 390, 331 S.E.2d at 152. In reviewing the challenge to the jury's finding,[5] the court cited an Integon interrogatory response as dispositive of the agency question:

> Before trial plaintiff submitted an interrogatory requiring defendant to list the name, address, and dates of investigation of 'all individuals employed or hired by the defendant corporation and all of defendant's *agents* and *employees* that investigated the fire that caused the damage to the plaintiff's dwelling...' [Emphasis in original]. In response thereto defendant listed Bill Charnock . . . **The interrogatories and answers, received into evidence, were sufficient to establish Charnock's agency during the investigation that he conducted for the defendant**.

*Id*. at 399-400, 331 S.E.2d at 157. (emphasis added). Because the court deemed that Integon had

---

[5] The procedural posture in *Dailey* was a review of a grant of a judgment notwithstanding the verdict. If the court finds a scintilla of evidence to support what *the jury ultimately found*, a motion for JNOV should be denied. *Gray v. Hoover*, 94 N.C. App. 724, 728, 381 S.E.2d 472, 474 (1989). Courts are generally loathe to overturn jury verdicts. *See Ledford v. Gibson,* 648 F. Supp. 326 (M.D.N.C. 1986).

24

admitted that Charnock was Integon's agent-employee, it did not undertake the standard independent contractor—employee analysis set out *supra*. *See id.*

Additionally, the court also noted that Integon's Chief Claims Examiner testified that he instructed Charnock on how to do essential portions of his investigative work—namely, that he instructed Charnock to personally conduct a background investigation of the plaintiff in the New Bern area. *Id.* at 400, 331 S.E.2d at 157. This type of control over the details of how an investigation is performed was not present in the instant case.

Thus, *Dailey* is not controlling or probative in this case. North Carolina does not appear to have another published case analyzing whether a fire cause and origin investigator is an independent contractor. Looking outside of North Carolina, however, reveals case law analyzing facts similar to those at issue here.

In *Oliver v. State Farm Gen. Ins. Co.*, 572 So. 2d 1234, 1235-38 (Ala. 1990), the plaintiff sued State Farm for, *inter alia*, bad faith refusal to settle a claim made for fire damage under a homeowners policy. The insured alleged, in part, that State Farm—through a fire investigator ("Bartig")—had planted evidence indicating the home had been intentionally burned. *Id.* at 1239. The trial court entered summary judgment for State Farm, on the grounds that the fire inspector was not State Farm's employee. *Id.* In affirming the trial court, the court considered affidavits setting out, *inter alia*, the following facts: 1) other than retaining the cause and origin expert to investigate the cause of a fire loss, State Farm provided no specific instructions to Bartig on how or when to investigate the fire; 2) no one from State Farm supervised Bartig during his investigation; 3) no one from State Farm provided Bartig materials or equipment to perform the investigation; 4) Bartig was paid in a lump sum based upon a final bill submitted by him reflecting his time and services rendered in the case; 5) no federal tax witholdings were ever

made on monies paid to Bartig; and 6) Bartig was expected to use his own independent judgment as to how to proceed in conducting his investigation. *Id. at* 1235-39. On these facts, the court found that there was no genuine issue of material fact that Bartig was an independent contractor, and that State Farm could not be held liable for his allegedly tortious acts. *Id.*

The facts in *Oliver* are strikingly similar to those at issue in this case. The North Carolina cases discussed *supra*—which identify and use essentially the same factors discussed in *Oliver*—support a holding in this case that Mr. Lacy was not Nationwide's employee. Because Mr. Lacy was an independent contractor, any torts he allegedly committed may not be imputed to Nationwide, and Plaintiff's conversion and Chapter 75 claims predicated on his conduct fail as a matter of law.

> 2. Even if Mr. Lacy is Determined to be an Employee, Nationwide is not Liable for his Intentional Torts

Even if Mr. Lacy were deemed to be Nationwide's employee—an assertion which has no basis in fact, as set out above—Nationwide is not liable for his alleged intentional torts. An employer is only liable for the intentional torts of an employee if they are (1) expressly authorized by the employer; (2) committed within the scope of the employee's employment and in furtherance of the employer's business; or (3) ratified by the principal. *See B.B. Walker Co. v. Burns Int'l Sec. Servs., Inc*., 108 N.C. App. 562, 565, 424 S.E.2d 172, 174 (1993), citing *Medlin v. Bass*, 327 N.C. 587, 398 S.E.2d 460 (1990).

The first prong of this test imposes no liability on Nationwide for any of Mr. Lacy's purported intentional torts, because there is absolutely no evidence in this case that Nationwide authorized Lacy to convert the surveillance tape as Plaintiff claims, or otherwise instructed him to do so. On the contrary, there is affirmative evidence that Nationwide provided no instructions of any kind to Lacy about hiding, destroying, or otherwise converting the tape. (Jezierski Dep.

44-45, Ex. 26). In fact, the evidence shows that Nationwide wanted to obtain the surveillance data and even paid for the data recovery on the hard drives. *Id.* at 147-48.

For the second prong, "[t]o be within the scope of employment, an employee, at the time of the incident, must be acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment." *Id*. at 566, 424 S.E.2d at 174. Where the "employee departs from the purpose of accomplishing the duties of her employment to accomplish a private purpose, the employer is not liable." *Matthews v. Food Lion, LLC*, 205 N.C. App. 279, 282-83, 695 S.E.2d 828, 831 (2010). "[I]ntentional tortious acts are rarely considered to be within the scope of an employee's employment." *Brown v. Burlington Industries, Inc*., 93 N.C. App. 431, 437, 378 S.E.2d 232, 235 (1990).

Mr. Lacy's purported conversion of surveillance footage that might assist Nationwide in making a proper decision about the validity of Plaintiff's claim is a wholesale departure from the task he was retained to perform—namely, to investigate the cause of the fire. Any action Mr. Lacy allegedly took that hampered Nationwide's ability to determine the validity of a claim does not "accomplish the duties of his employment."

Similarly, the third prong of this test imposes no liability because there is simply no evidence that Nationwide "ratified" Mr. Lacy allegedly converting the tape. In order to prove ratification, Plaintiff must establish that Nationwide "had knowledge of all material facts and circumstances relative to the wrongful act," and "by words or conduct, show[ed] an intention to ratify the act." *Brown,* 93 N.C. App. at 437, 378 S.E.2d at 236 (quoting *Hogan,* 79 N.C. App. at 492, 340 S.E.2d at 122). There is no evidence that Nationwide "showed an intention to ratify" any conversion of the tape.

**F.** **Punitive Damages May not be Imposed on the Basis of Vicarious Liability**.

Punitive damages are generally not available on the basis of vicarious liability. N.C. Gen. Stat. § 1D–15(c). The only exception provided under North Carolina law—where the employer actually participates in the conduct constituting the aggravating factor giving rise to punitive damages—is inapplicable here. *Id*. As discussed in the preceding sections, Nationwide independently engaged in no activity that could properly constitute the aggravating conduct necessary to sustain an award of punitive damages. Thus, even if Mr. Lacy's allegedly tortious conduct was imputed to Nationwide, Plaintiff has produced no evidence that would allow for a finding of punitive damages against Nationwide based on its own independent conduct. Given that Plaintiff's claim for punitive damages rests with the conduct of Mr. Lacy, any claim for punitive damages should be dismissed

**G.** **Plaintiff's Claim for Bad Faith Refusal to Settle Should be Dismissed, as Nationwide's Denial was Reasonable.**

In order to recover punitive damages for the tort of bad faith refusal to settle, Plaintiff must prove (1) Nationwide's refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct. *Dailey,* 75 N.C. App. at 331 S.E.2d at 148.

A finding of bad faith would require that Nationwide's refusal to pay Plaintiff's claim was "not based on honest disagreement or innocent mistake." *Id*. at 396, 331 S.E.2d at 155, citing *Newton v. Standard Fire Ins. Co*., 291 N.C. 105, 229 S.E.2d 297 (1976). In this case, Nationwide has denied City Grill's claim on two separate grounds. First, Nationwide concluded that Owner Diamantopoulos committed a dishonest or criminal act, which was also a determination made by the investigating law enforcement officers (House Dep. 97, 123; Royal Dep. 16, 114-16) and supported by the Donan Engineering employees (Lacy Dep. 161-62; Martini Dep. 135-36). Even more telling, Plaintiff's own cause and origin expert stated that

there is an equal chance that Owner Diamantopoulos intentionally set the fire or a wireless system started the fire. (Booth Dep. 207-09). "Given plaintiff's lack of credibility, the conclusion as to how the fire started showed more than an honest dispute between plaintiff and defendant. Coverage for an intentionally set fire was clearly excluded from defendant's policy." *Schaffner v. USAA Cas. Ins. Co.,* 172 N.C. App. 592, 616 S.E.2d 692 (2005) (Table) (granting summary judgment dismissing the bad faith claim when the insurer's and investigating law enforcement's conclusion as to how the fire started matched).

Second, Nationwide also denied this case because Owner Diamantopoulos made material misrepresentations of fact regarding the property and the claim. In particular, Owner Diamantopoulos gave differing accounts of where he was on the morning of the fire. Detective House believed that Owner Diamantopoulos was lying. (House Dep. 114). Further, Plaintiff's own expert also noted that Owner Diamantopoulos "has not said the same story every time." (Booth Dep. 115). Thus, Nationwide's determination that Owner Diamantopoulos made material misrepresentations was a reasonable conclusion reached by others as well as Nationwide.

Even if a jury finds that there is coverage in this case, Nationwide's error in denying coverage cannot, as a matter of law, constitute bad faith. An incorrect application of an insurance policy is not bad faith, where the insurer's interpretation is neither strained nor fanciful. *Olive*, 76 N.C. App. at 189, 333 S.E.2d at 46; *Central Carolina Bank & Trust Co. v. Security Life of Denver Ins. Co.*, 247 F.Supp.2d 791, 801 (M.D.N.C. 2003). Given the evidence in this case, Nationwide's determination that Owner Diamantopoulos participated in setting the fire was neither strained nor fanciful.

Nor is there any support for Plaintiff's contention that Nationwide engaged in any "aggravated conduct" in denying Plaintiff's claim. "Aggravated conduct may be shown by

fraud, malice, gross negligence, insult, rudeness, oppression, or wanton and reckless disregard of plaintiff's rights." *Lovell v. Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 422, 424 S.E.2d 181, 185 *aff'd.* 334 N.C. 682, 435 S.E.2d 71 (1993). Because Plaintiff's claim was reasonably in dispute, as discussed above, Nationwide did not engage in any "aggravated conduct" in denying the claim. *Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd.*, 11 Fed. App'x. 225, 239 (4th Cir. 2001) (affirming the district court's grant of summary judgment on bad faith and aggravation when coverage was reasonably in dispute). For these reasons, summary judgment on Nationwide's bad faith claim is appropriate.

## CONCLUSION

For the foregoing reasons, Nationwide respectfully requests that this Court grant summary judgment in favor of Nationwide and dismiss with prejudice Plaintiff's claims for: (1) infliction of emotional distress, (2) breach of fiduciary duty, (3) breach of good faith and fair dealing, (4) conversion, (5) unfair and deceptive trade practices, (6) Plaintiff's claims for punitive damages, and (7) bad faith refusal to settle.

Respectfully submitted, this the 13th day of September, 2013.

/S/ Gemma L. Saluta
Gemma L. Saluta
N.C. State Bar  No. 37032
Rachel E. Daly
N.C. State Bar No. 27777
Womble Carlyle Sandridge & Rice, LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone:  (336) 721-3600
Facsimile:  (336) 721-3660
Email:  GSaluta@wcsr.com
            RDaly@wcsr.com

*Attorneys for Defendant Nationwide Mutual Insurance Company*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 13th day of September, 2013, she filed and served a copy of this **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** by using the CM/ECF system which will send notification of such filing to the parties below.

> Richard M. Wiggins
> James A. McLean, III
> McCoy Wiggins Cleveland & O'Connor, PLLC
> Post Office Box 87009
> Fayetteville, NC 28304
> rwiggins@mccoywiggins.com
> jmclean@mccoywiggins.com
>
> *Attorneys for Plaintiff*

> */S/ Gemma L. Saluta*
> Gemma L. Saluta
> N.C. State Bar No. 37032
> Rachel E. Daly
> N.C. State Bar No. 27777
> Womble Carlyle Sandridge & Rice, LLP
> One West Fourth Street
> Winston-Salem, NC 27101
> Telephone: (336) 721-3600
> Facsimile: (336) 721-3660
> Email: GSaluta@wcsr.com
> RDaly@wcsr.com
>
> *Attorneys for Defendant Nationwide Mutual Insurance Company*

31