IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:12-CV-00610-F

C O P Y

CITY GRILL HOSPITALITY GROUP, INC.,  )
                                     )
                        Plaintiff,   )
                                     )
        vs.                          )
                                     ) D E P O S I T I O N
NATIONWIDE MUTUAL INSURANCE COMPANY, )
                                     )
                        Defendant.   )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)


_____
STEVEN CLAY BOOTH
_____



202 Fairway Drive
Fayetteville, North Carolina

Friday, August 16, 2013
10:13 o'clock a.m.


_____
Atlantic Professional Reporters
Winston-Salem, NC  27116-1672

**EXHIBIT 8**

NOTES

Page:Line        Subject Matter        Relates To        Action

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

APPEARANCES OF COUNSEL


Richard M. Wiggins, Esq., and
James A. McLean, III, Esq.
McCOY WIGGINS CLEVELAND & O'CONNOR, PLLC
202 Fairway Drive
Post Office Box 87009
Fayetteville, North Carolina  28304-7009


Rachel E. Daly, Esq.
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One West Fourth Street
Winston-Salem, North Carolina  27101


OTHER APPEARANCES


Justin Mann
Peter Gillen

I N D E X

STIPULATIONS                                               5

EXAMINATION
     Ms. Daly                                         6, 219
     Mr. Wiggins                                         209

                   _____


ADJOURNMENT                                              219
CERTIFICATE OF TRANSCRIPT                                220
CERTIFICATE OF OATH                                      221
WITNESS CERTIFICATE                                      222
WITNESS ADDENDUM                                         223
CERTIFICATE OF MAILING                                   224

E X H I B I T S

| Name | Offered By | Identified |
|------|------------|------------|
| Deposition Exhibit 1 | Defendant | 36 |
| Deposition Exhibit 2 | Defendant | 36 |
| Deposition Exhibit 3 | Defendant | 47 |
| Deposition Exhibit 4 | Defendant | 124 |

1                          STIPULATIONS

2               Pursuant to notice and/or consent of the

3    parties, the deposition hereon captioned was

4    conducted at the time and location indicated before

5    Cassandra J. Stiles, Notary Public in and for the

6    County of Forsyth, State of North Carolina at Large.

7               The deposition was conducted for use in

8    accordance with and pursuant to the applicable rules

9    or by order of any court of competent jurisdiction.

10              Reading and signing of the testimony was

11   requested prior to the filing of same for use as

12   permitted by applicable rule(s).

13

14

15

16

17

18

19

20

21

22

23

24

25

1          The witness, STEVEN CLAY BOOTH, being

2    first duly sworn to state the truth, the whole truth

3    and nothing but the truth, testified as follows:

4          (10:13 o'clock a.m.)

5                          EXAMINATION

6    BY MS. DALY:

7          Q.   Good morning, Mr. Booth.

8          A.   Good morning.

9          Q.   My name is Rachel Daly and I've been

10   retained by Nationwide.

11               Just a few rules, since you've been

12   deposed before.

13               If you need a break, let me know.  If you

14   don't understand my question, please let me know and

15   I'll rephrase it.  Okay?

16         A.   Okay.

17         Q.   Will you state your full name for the

18   record?

19         A.   Steven Clay Booth.

20         Q.   I have a copy of your CV.  And I'm going

21   to ask you just to quickly take a look at it to tell

22   me if this is your most recent version.

23               It is the one I will tell you that was

24   submitted to us along with your expert report.

25         A.   Okay.  I think there's an updated version.

1   I don't think that it has anything other to do --

2   yeah, I -- no.  That's -- this is updated.

3        Q.   Okay.

4        A.   This is updated.

5        Q.   Perfect.  Let's quickly walk through your

6   background.

7             After high school it looks like you went

8   to Elon College?

9        A.   Uh-huh.

10       Q.   Did you graduate with any type of degree

11  from Elon?

12       A.   No, ma'am.

13       Q.   Did you -- how long did you attend Elon

14  College?

15       A.   It was a -- a year.

16       Q.   And then when you left after a year, it

17  looks like you went to the Police Academy ---

18       A.   --- Uh-huh.

19       Q.   --- For Fayetteville.  Is that correct?

20       A.   That's correct.

21       Q.   Okay.  It looks like your training -- when

22  did your training for fire investigations start?

23       A.   I believe it was in 1997.

24       Q.   And was that on-the-job training at the

25  Fayetteville ---

1        A.    --- That and ---

2        Q.    --- Police department?

3        A.    That and in various law enforcement

4   training that we had as far as from the Justice

5   Academy or the National Fire Academy.

6        Q.    Will you go through your training

7   specifically to fire investigation for me?

8        A.    Okay.  It's outlined in my CV.  Have you

9   got a copy of it?  I'll go through it with that.  I

10  can't remember exactly every one of them.  They're

11  all in there.

12       Q.    Okay.  Were any of these training for fire

13  investigation -- did any of them deal with electrical

14  failure?

15       A.    I think several of them did discuss ---

16       Q.    --- Okay.

17       A.    --- Excuse me -- electrical failures.

18       Q.    Okay, they discussed it.  But did you

19  actually have training in electrical failure?

20       A.    As far as?

21       Q.    Specific to electrical failures.

22       A.    Electrical sources of ignition?

23       Q.    Uh-huh.

24       A.    I don't think I've had a class that

25  specifically related to electrical failures other

1    than on-the-job training with the engineers that I

2    work with.

3            Q.    Okay.  And so that we're clear, you're not

4    an engineer.

5            A.    No, ma'am.

6            Q.    And you're not a mechanical engineer.

7            A.    No, ma'am.

8            Q.    You're not an electrical engineer.

9            A.    No, ma'am.

10            Q.    Am I correct that you are not qualified --

11    that -- strike that.

12                  Was Mr. Stone retained by plaintiff in

13    this case to determine whether there was an

14    electrical failure?

15            A.    He was retained to examine the evidence

16    that was re -- recovered or was present.

17            Q.    And was he specifically to focus on

18    whether or not there was an electrical failure in

19    this case?

20            A.    If there was an electrical failure there,

21    yes.  If there was some other type of issue ---

22            Q.    --- Okay.

23            A.    --- Then he would be looking at that.  But

24    it was specifically to examine the evidence that was

25    collected.

1          Q.    Okay.  And are you qualified to determine

2    whether or not there was an electrical failure?

3          A.    I'm qualified to determine the origin and

4    cause of a fire.  And if there's a source of

5    electrical ignition that I believe is the cause, then

6    I would hire someone else to do that.

7          Q.    Okay.  You would make -- not make that

8    determination.

9          A.    No, ma'am.

10          Q.    Is that correct?

11          A.    I would not make the final determination,

12    no.

13          Q.    Okay.  And so in this case would Mr. Stone

14    make that final determination?

15          A.    Yes.  If he was the engineer that we had

16    hired to do that, he would be the one to make the

17    final determination, yes.

18          Q.    Well, not if.  He was.

19          A.    He was one of them, yes.

20          Q.    Okay.  Are you saying ---

21          A.    Well, and ---

22          Q.    --- There's another?

23          A.    There's -- there was a article that we

24    found, a -- a ---

25          Q.    --- Now, let's answer my question first

1    and then we can get to that.

2              Was Mr. Stone the expert who was retained

3    in this case to determine whether or not there was an

4    electrical failure?

5         A.    Yes.

6         Q.    Okay.  And if you want to add something to

7    it -- you were talking about an article.

8         A.    There was an article, a report that we

9    found.  And it was my understanding that that expert

10   that wrote that report was consulted by the counsel.

11        Q.    Okay.

12        A.    And that there is a report that he wrote

13   that is included in these documents here.

14        Q.    Okay, and what is the name of -- you're

15   saying two different things.  You're saying that

16   someone wrote an article and someone wrote a report.

17        A.    There is a study that was an article that

18   I found.  The individual that wrote that, his name is

19   Jim Small.  And it's my understanding from the

20   documents that I have in there a report -- or a

21   letter was written to counsel for this case in

22   regards to that report and low-voltage ignition of

23   electronics.

24        Q.    Okay, a letter written to counsel

25   regarding the report or a letter written to counsel

1    regarding the article?  You just said regarding the

2    report, so I'm wondering what you're saying.

3           A.    There's -- there's two actually.  There's

4    a letter in there that was regarding his report and

5    then there's also questions answered about photos

6    that he reviewed from this case.

7           Q.    Okay, and when were you given that letter?

8                 Is this your original file here?

9           A.    This is, yeah.

10          Q.    Okay.

11          A.    All of this is.  These are documents that

12   I was provided during discovery.  They're all things

13   that you all had provided.  And this is stuff here

14   that is already in the documents that were provided,

15   the fire report, the CAD report, the emails.

16   Everything that's in here from this has already been

17   copied and included.  It's not in that.

18          Q.    Okay.

19          A.    It is in those doc ---

20          Q.    --- Then let me go ahead and have this,

21   please.  Thank you.

22                Okay, so let's finish up with this

23   question and then I'll go through these documents.

24                So you said there was a letter written to

25   counsel.

1          A.    Uh-huh.

2          Q.    Okay, and it references first an article

3    that was written by Mr. Small.  Is that correct?

4          A.    Yeah.  It's a report that he did about

5    electrical -- it's low-voltage electrical ignition.

6          Q.    Okay.  A report for this case or a report

7    that he has written for another case?

8          A.    Mr. Small did a study ---

9          Q.    --- Uh-huh.

10         A.    --- On electrical ---

11         Q.    --- Okay.  You keep calling it an article

12   and a report.  So I'm trying to differentiate.  A

13   report has a specific meaning under the federal

14   rules.  So it's a federal expert report.  So if we

15   can call -- if he did a federal expert report in this

16   case, it has not been produced to us, if we can

17   reference that as a report.  If we can reference a

18   letter that was simply a letter written to either you

19   or to counsel, or if it's a article that was written

20   on a study that he did -- so that I am clear as to

21   what you're referencing.

22         A.    There is a study that he did for another

23   organization.

24         Q.    Okay.

25         A.    Okay.

1          Q.    And what was the name of that

2     organization?

3          A.    I'd have to look at the report to tell

4     you.

5          Q.    Okay, and do you have a copy of the report

6     in your file?

7          A.    It's in that right there.

8          Q.    It's in this one.  Okay.

9          A.    Okay.  What was your next question?

10         Q.    You said -- okay, so he did an arti -- he

11    wrote an article.  And that's what's in here.  And so

12    that's how you found his name.  You came across this

13    individual's name in an article.

14         A.    Yes.

15         Q.    Okay, and so you read this article.  And

16    what did you do after you read the article?

17         A.    I consulted with counsel and told them

18    what I had found.

19         Q.    Okay, and what did you tell them that you

20    found?

21         A.    I told them that I found a document on the

22    Internet that was written by Jim Small from Kodiak

23    Consulting that was specifically about low-voltage

24    electrical ignition.  And I provided them a copy of

25    the document.

1          Q.    And when did you do this?

2          A.    I'd have to go back through my emails

3     exactly to tell you.  But it was within the past

4     couple of weeks ---

5          Q.    --- Okay.

6          A.    --- Before this deposition.

7          Q.    So it was in the past couple of weeks.

8          A.    Yes.

9          Q.    Okay.  What made you search for this

10    article?

11         A.    The reports, the rebuttal reports written

12    by Mr. Martini and Mr. Lacy.

13         Q.    Okay.  Well, do you mean their federal

14    expert report?

15         A.    Their second report that they wrote, yes.

16         Q.    Okay.  Well, they've only filed one

17    federal expert report in this case.

18         A.    Okay.  Well, there are two reports, one

19    submitted to Nationwide ---

20         Q.    --- Okay.

21         A.    --- And then another one that's submitted

22    for this.

23         Q.    Right.  Okay, so their federal expert

24    report would have been the report that was submitted

25    in this litigation ---

1          A.    --- That's the one that I got that

2    information off of, yes.

3          Q.   Okay, so they submitted that report.  And

4    then after -- and then at that point in time was Mr.

5    Stone already retained?

6          A.   Yes.

7          Q.   Okay.  Okay, and what are the credentials

8    of Mr. Small?

9          A.   He's an electrical engineer.

10          Q.   Okay.  Okay, and so within the past couple

11    of weeks you were searching the web and you found

12    this article.

13          A.   It may have been three weeks ago ---

14          Q.   --- Okay.

15          A.   --- But yes.

16          Q.   And what caught your eye is that it was an

17    article written about low-voltage electrical engine

18    -- ignition.

19          A.   Yes.

20          Q.   Okay, and then you brought that to Mr.

21    Wiggins' attention.

22          A.   That's right.

23          Q.   Is that correct?  Okay, and so what did

24    you tell Mr. Wiggins?

25          A.   I told him that I had found an article

1    that related to low-voltage ignition of printed

2    circuit boards and that I thought that it would be

3    interesting for him to take a look at it.

4          Q.   Okay, and then what happened?

5          A.   And then he read it and we talked about

6    consulting with Mr. Small.

7          Q.   And where is Mr. Small located?

8          A.   I believe he -- it's Illinois.

9          Q.   Okay.  And when you say you consulted with

10   him, did you actually go to Illinois or did you meet

11   him in person?

12         A.   No, I did not.

13         Q.   Okay.  So what happened after -- did you

14   actually make the phone call?  Were you with counsel

15   when you made the phone call?

16         A.   No.  I called him to talk to him about the

17   study and find out what it was all about as far as

18   the -- you know, how he -- whether it was peer

19   reviewed first.

20         Q.   Uh-huh.

21         A.   And then, second, to find out what it is

22   that he did, that I didn't understand, and to kind of

23   get it in layman's terms as to what it was that he

24   had done.  And that was about it.  And then I

25   contacted counsel and let them know and let them go

1    from there with it, to contact him themselves.

2          Q.    Okay.  So when you read the article, so

3    that I'm clear, you had to contact him and to get a

4    clarification of exactly what he was talking about in

5    this article.

6          A.    Yeah.  It -- it ---

7          Q.    --- Is that correct?

8          A.    Yes.  My understanding was is that it was

9    discussion of class-two power supplies which had been

10   referenced in Mr. Martini's report.

11         Q.    Uh-huh.

12         A.    That's how I found it, was with -- by

13   searching that.  And the title of the report was

14   Low-Voltage Ignition.  The -- it's -- what -- what

15   did he say -- the -- the incompetent ignition source

16   and common misconception, or something like that.  I

17   don't remember exactly what the -- the title of it

18   was.  But that's how I found it.  And then I

19   contacted them, contacted him, and they went from

20   there.

21         Q.    Okay.  So before we get into any more

22   discussions with him, did you also let Mr. Stone, who

23   is the engineer that's already retained in this case

24   -- did you already let -- did you let him know about

25   this article?

1           A.    I did.

2           Q.    Did he speak with Mr. Small?

3           A.    No, not that I'm aware of.

4           Q.    Did you have Mr. Stone explain to you the

5    article?

6           A.    We talked about it but he didn't go into

7    any further detail about it.  He actually suggested

8    at that point that we consult with Mr. Small.

9           Q.    Okay, and why did he suggest you consult

10   with Mr. Small?

11          A.    I don't know.  You'll have to ask him.

12   That's what he suggested.  I didn't ask him why.

13          Q.    Okay.  And that's all I'm asking, is your

14   conversations with Mr. Stone about this article.

15              So what exactly was said about this

16   article?

17          A.    What I have said or what he have said?

18          Q.    Both of you.

19          A.    Umm, that it was an interesting arti --

20   article, it may have had some merit, that we needed

21   to talk with the actual person that wrote it.

22          Q.    Okay.  And you mentioned earlier you

23   wanted to find out if it was peer reviewed.  Was the

24   article peer reviewed?

25          A.    Not in the -- not in the fire community,

1    not that I'm aware of.  But it was written for an

2    organization or manufacturer of small electronics.

3         Q.   Okay, so to your knowledge, it has not

4    been peer reviewed.

5         A.   To my knowledge.

6         Q.   Okay.  Any other discussion with Mr. Stone

7    regarding ---

8         A.   --- No.

9         Q.   --- This article?

10        A.   No.

11        Q.   And did you ever talk to Mr. Stone after

12   you contacted Mr. Small?

13        A.   Yes.  I believe we've talked about ---

14        Q.   --- And....

15        A.   I believe we've talked about my

16   conversation with Mr. Small and Mr. Small indicating

17   that -- that a class-two power supply and the PCB

18   don't always operate in the parameters that are

19   outlined and that there is a potential for ignition.

20   And that's all that I got from Mr. Small.

21        Q.   Okay.  So when you say there's a potential

22   for ignition -- have you read Mr. Stone's report?

23        A.   Mr. Stone's?  I don't actually think that

24   I have a -- a copy of his report, to tell you the

25   truth.  I don't -- I don't have a copy of that.  It

1    -- it's not in my -- I don't -- I don't think I have

2    a copy of his report.

3          Q.   Okay.  So it's your testimony that you've

4    never read Mr. Stone's report?

5          A.   No, I haven't read his report.

6          Q.   Okay.  Have you talked to Mr. Stone about

7    his opinions in this case?

8          A.   I have.

9          Q.   Okay, so are you aware of his opinions in

10   this case?

11         A.   Yes.

12         Q.   Okay.  So -- and what did Mr. Stone tell

13   you that his opinions were in this case?

14         A.   That we didn't find any source of ignition

15   on the branch circuitry or any of the evidence that

16   we were -- we examined at Mr. Cavarock's office.

17         Q.   Okay, let's stop there and I'm going to --

18   I'll break it up.

19         A.   Okay.

20         Q.   Do you have any evidence or any reason to

21   disagree with Mr. Stone's finding?

22         A.   No.

23         Q.   With what he just said.  Okay, so continue

24   to your next....

25         A.   Okay.  After the evidence exam, anything

1    outside of that would include the overhead branch

2    circuitry that was not included, meaning the lights,

3    the fluorescent lights ---

4         Q.    --- Uh-huh.

5         A.    --- And the circuit board, printed circuit

6    board that is in some of the photographs.  He had

7    indicated that he could not eliminate it because he

8    could not examine it.

9         Q.    Okay.  Have you read Mr. Stone's

10   deposition?

11        A.    I have not.

12        Q.    Okay.  If Mr. Stone testified that he

13   ruled out the lighting as a potential source of

14   ignition ---

15        A.    --- Uh-huh.

16        Q.    --- Do you have any reason to disagree

17   with his testimony?

18        A.    No, ma'am.

19        Q.    And really what I'm trying to do right now

20   is try to figure out kind of where your bucket is and

21   where Mr. Stone's bucket is.  So if Mr. Stone has an

22   opinion regarding an electrical source of ignition

23   for this fire, do you have any evidence to disagree

24   with Mr. Stone's findings or would you rely on Mr.

25   Stone's findings for anything regarding an electrical

1    failure, an electrical source of ignition?  Would

2    that be what -- would you use Mr. Stone's opinions to

3    rely on?

4            A.   I would.

5            Q.   Okay.  Then that will cut out a whole lot

6    of questioning, then, today.

7                 Okay, so please continue with what else

8    Mr. Stone told you regarding his opinions, if

9    anything.  You might have covered it.

10           A.   I think I've covered it.

11           Q.   Okay.

12           A.   However, just to -- to recap, we've

13   already -- we've just discussed the overhead

14   lighting.

15           Q.   Uh-huh.

16           A.   We've discussed this -- the collection --

17   their collected items at Mr. Cavarock's office.

18           Q.   Uh-huh.  And that was all ruled out.

19           A.   Yes, ma'am.

20           Q.   That there was -- that was not a source of

21   ignition.

22           A.   None of the items ---

23           Q.   --- Correct?

24           A.   --- That we looked at there.

25           Q.   Okay.

 1          A.    That's correct.  And ---

 2          Q.    --- Continue.

 3          A.    And we discussed the presence of the

 4    printed circuit board that belonged to -- or what we

 5    believe belonged to the Ion IQ intercom system.

 6          Q.    Uh-huh.  Okay, I'm going to ask you to

 7    take a moment and read Mr. Stone's report ---

 8          A.    --- Okay.

 9          Q.    --- Since you've not done so thus far and

10    tell me if there is anything in Mr. Stone's report

11    that you disagree with.

12          A.    Okay.

13          Q.    Okay.

14          (Witness examined document)

15                    MS. DALY:  We can go off the record.

16          (10:33-10:36 a.m. - recess)

17                    MS. DALY:  Okay, we can go back on

18    the record.

19          Q.    (Ms. Daly)  Mr. Booth, did you have an

20    opportunity to read Mr. Stone's report in this case?

21          A.    Yes, ma'am.

22          Q.    Is there anything contained in this report

23    that you disagree with?

24          A.    No.

25          Q.    Okay.  So Mr. Stone testified that the

1    printed circuit boards were visually consistent with

2    an appearance with a base containing multiple circuit

3    boards comprised of a single large board and several

4    smaller boards.  I assume you agree with that.

5         A.   Yes.

6         Q.   And that that -- those shapes and

7    dimensions were consistent with the HME Ion IQ.

8         A.   Yes.

9         Q.   Okay.  And for ease today, if we can call

10   that the wireless device during this deposition, if

11   that works for you.

12        A.   You name it and that will be fine.

13        Q.   Okay.  So Mr. Stone's first opinion is

14   that the circuit boards were consistent with this

15   wireless device.  Correct?

16        A.   Yes.

17        Q.   And then his second was -- one of his

18   other opinions was that his examination of the

19   electrical wiring components contained with exhibits

20   presented did not reveal any discernible evidence of

21   a potential fire-causing failure or defect.  And you

22   agree with that.

23        A.   Yes.

24        Q.   And Mr. Stone said -- testified that the

25   wireless device -- well, actually, strike that.

 1          In his report Mr. Stone did not state

 2    anything about whether or not this wireless device

 3    caused the fire.  Is that correct?

 4          A.   Yes.

 5          Q.   Did Mr. Stone ever talk to you about

 6    whether or not he believed the wireless device caused

 7    the fire?

 8          A.   No.

 9          Q.   Did you ever ask him?

10          A.   Yes.

11          Q.   Okay, and what did he tell you?

12          A.   He said that he could not say whether or

13    not it started the fire.

14          Q.   Okay.  Are you able to testify that the

15    wireless device caused the fire?

16          A.   No.

17          Q.   Okay.  Are you able to testify that the

18    wireless device -- strike that.

19          Are you able to testify that it is more

20    likely than not that the wireless device caused the

21    fire?

22          A.   No.

23          Q.   If you are asked under oath to testify

24    regarding the wireless device, what is your opinion

25    regarding whether or not it was the ignition source

1   for this fire?

2        A.   Now you're -- okay, just to be clear,

3   you're asking me to answer that question as to

4   whether or not I believe it could be the cause of the

5   fire or could not?

6        Q.   No.  I'm asking you as the

7   cause-and-origin expert -- right now what I'm trying

8   to figure out is where does your testimony end and

9   Mr. Stone's pick up.

10       A.   Oh.

11       Q.   So for you, as the cause-and-origin

12  expert, when you are called to testify in this case,

13  what is your testimony regarding whether the wireless

14  device was the ignition source for this fire?

15       A.   I would say that I don't know whether it

16  was or not.

17       Q.   Okay.  And is that because you would rely

18  on Mr. Stone's evaluation of whether or not the

19  wireless device was the ignition source or is it

20  because based on your own experience you can't

21  determine whether or not the wireless device was the

22  ignition source for the fire?

23       A.   It would be both.

24       Q.   Both.  Okay, is it your opinion that it is

25  more likely than not that there was an electrical

1    failure that was the ignition source to this fire?

2         A.    No.

3         Q.    Other than the wireless device, do you

4    have any other theory regarding a possible electrical

5    fire that was the -- failure that was the ignition

6    source for this fire?

7         A.    No.

8         Q.    I'd like to go through each of your

9    theories regarding how this fire started and to talk

10   about your supporting evidence to each of these

11   theories.

12        A.    Okay.

13        Q.    And before that I'd like to just kind of

14   walk through just a few short questions.

15              First, is it your opinion that there was

16   an electrical failure with the base station?

17        A.    No.  I don't -- no.

18        Q.    Is it your opinion that there was an

19   electrical failure with its power supply?

20        A.    I don't know.

21        Q.    Is it your opinion that there was an

22   electrical failure with the power supply?

23        A.    I don't know.

24        Q.    Okay.  So if you don't know, then you're

25   -- are you going to testify in front of the jury that

1    there was a power failure ---

2         A.    --- I can't ---

3         Q.    --- Excuse me -- electrical failure.

4         A.    I can't, because we don't have it to look

5    at and I just don't know.

6         Q.    Okay.  Is it your opinion that there was

7    any electrical failure?

8         A.    Outside of the base station or ---

9         Q.    --- Yes.

10        A.    No, I don't have an opinion to that

11   effect.

12        Q.    So is it your opinion that this wireless

13   device was a potential for ignition?

14        A.    Yes.

15        Q.    And is it your understanding that that is

16   Mr. Stone's opinion, that the wireless device was a

17   potential source for ignition?

18        A.    That's my understanding.

19        Q.    Is there anything different from what you

20   just told me, that there's this poten -- that this

21   wireless device is a potential for an ignition source

22   -- is there anything different between your opinion,

23   Mr. Stone's opinion, and Mr. Small's opinion?

24        A.    Is there any different between those?

25        Q.    Right.

1          A.    No.

2          Q.    Because I wrote down earlier that when you

3     spoke with Mr. Small ---

4          A.    --- Uh-huh.

5          Q.    --- He told you that the wireless device

6     is a potential for ignition.  Did I write down that

7     correctly?

8          A.    Yes.

9          Q.    Okay.  Other than that, did Mr. Small tell

10    you anything else regarding his opinion?

11         A.    No.  I read his -- read his report but I

12    -- we haven't talked about it other than the first

13    conversation.

14         Q.    Okay, and in his report is there anything

15    different besides the fact that there was a potential

16    for ignition?

17         A.    No.

18         Q.    Thank you for going through those

19    questions.  Now, I'd like to go back to a question I

20    asked you earlier.

21              I'd like you to talk to me about all the

22    possible theories you have or you have discussed ---

23         A.    --- Uh-huh.

24         Q.    --- Regarding how the fire started.

25         A.    Discussed that we had a missing potential

1   source of ignition that I can't eliminate, and we

2   have discussed the potential that this fire was

3   incendiary.

4        Q.   Okay.  Let's first start with this missing

5   source of ignition.

6        A.   Uh-huh.

7        Q.   Okay, so that we can exhaust that topic.

8   And you can go ahead and tell me everything that --

9   all the evidence that you have regarding the missing

10  source of ignition and then we'll get to your second

11  theory.  Okay?

12       A.   Okay.

13       Q.   What are you referencing when you state

14  that there was a missing source of ignition?

15       A.   The surveillance photographs taken by the

16  Fayetteville police department, the photographs taken

17  by Mr. Lacy, and the photographs taken by Mr. Henry

18  Martini, as well as the documents that the insured

19  provided for electronic equipment that was installed

20  in the building.

21       Q.   And when you say the photographs, are you

22  specifically referencing the photographs that show

23  the printed circuit boards?

24       A.   Yes, ma'am.

25       Q.   Okay.  I just want to make sure that the

1    record's clear.

2             When were you first contacted about this

3    case?

4         A.    November of 2012.

5         Q.    And in November of 2012 did you go to the

6    scene of the fire?

7         A.    I did.

8         Q.    And what did you find when you went to the

9    scene of the fire?

10        A.    I'm -- the scene had been changed

11   tremendously since the -- the fire.  There were

12   missing furniture.  There's cooking equipment that

13   was no longer there.  There was a small debris pile

14   in the back.  There were metal -- some metal

15   components were missing.  All the contents of the

16   freezer and refrigerator were gone.  So any --

17   anything that you can imagine that would be

18   perishable or -- or cleaned up ---

19        Q.    --- Or salvageable.

20        A.    --- Or salvageable was taken out,

21   including the overhead fixtures that were in those

22   photographs and so forth.

23        Q.    Did you ask anyone where all the contents

24   went to?

25        A.    I asked Mr. -- our insured, Mr. ---

```
 1        Q.    --- Diamantopoulos?

 2        A.    Diamantopoulos.  Excuse me.  I can't

 3   pronounce his name.  Sorry.

 4        Q.    Uh-huh.

 5        A.    Where it was and he -- he -- he understood

 6   that it had been collected for salvage and that it

 7   had been moved out.

 8        Q.    By whom?

 9        A.    I don't know.

10        Q.    Was it by him?

11        A.    I don't know.

12        Q.    Okay.

13        A.    I didn't ask him.

14        Q.    So that's your limited knowledge ---

15        A.    --- Yeah, that -- that was it, yeah.

16        Q.    --- Of where all of that went to.

17        A.    Yes, ma'am.

18        Q.    Did you ever ask to see if, for example,

19   the light fixtures, if they were still ---

20        A.    --- I actually ---

21        Q.    --- In existence?

22        A.    I actually thought that they were

23   collected by the -- at the -- the experts.  And

24   that's when -- I was looking forward to seeing all

25   that evidence when we came for the joint exam,
```

 1    because I ex -- expected those to have been collected
 2    by them.
 3              Q.   Okay.  That wasn't my question.
 4              A.   Okay.
 5              Q.   My question is did you ever ask your
 6    client ---
 7              A.   --- Uh-huh.
 8              Q.   --- Mr. Diamantopoulos, whether or not any
 9    of the stuff that was collected from or removed from
10    the fire scene, if that was still in existence.
11              A.   I asked him if he had taken any of it and
12    he said no.
13              Q.   Okay.
14              A.   But I don't know whether or not it was
15    still in existence.  I -- I ---
16              Q.   --- Okay.
17              A.   --- I -- he said that it had been
18    collected by -- for salvage or that it had been
19    removed by someone.  And -- and as a matter of fact I
20    think he told me that he didn't know where some of it
21    had gone.
22              Q.   Okay.
23              A.   Okay.
24              Q.   Did you ever ask Mr. Wiggins, the attorney
25    who has retained your services, to find out where all

1    of the items that were collected were taken to?

2          A.    No.

3          Q.    Okay.

4          A.    It was a year afterwards.  I just didn't

5    think that it was still in existence at that point.

6    Most of my experience is that once the -- the metal

7    and things like that are collected, they're salvaged

8    and gone.

9          Q.    Okay.

10          A.    After -- especially after a year.

11          Q.    I understand that.  But specifically in

12    this case you did not ask.

13          A.    No.

14          Q.    Okay.  So in November of 2012 you went

15    into the building, and it had been cleaned out, for

16    lack of a better term.

17               What else did you do besides going into

18    the building and looking around the building?

19          A.    I photographed -- or examined the branch

20    circuitry that was in the area of origin, which I

21    identified as the area around the rear drive-thru

22    window.

23          Q.    Uh-huh.

24          A.    I also went through what was left of the

25    debris pile in that area to see if I could locate any

1    items in there that would be of interest.  And I

2    diagramed the building.  And I, of course, discussed

3    the loss facts with Mr. Diamantopoulos on the -- that

4    day.

5         Q.   Okay, so photographed -- are all your

6    photographs in -- on one of these two disks?

7         A.   Yes, ma'am.

8         Q.   Okay.

9              MS. DALY:  If we can mark this as

10   Exhibit 1 and 2.

11              (* Exhibit 1 was marked *)

12              (* Exhibit 2 was marked *)

13        Q.   (Ms. Daly)  Did you interview anyone?

14        A.   Just Mr. Diamantopoulos.

15        Q.   And is he the only person you've

16   interviewed relating to this case?

17        A.   Yes.  I wasn't asked to interview anyone

18   else.

19        Q.   Were you asked to interview Mr.

20   Diamantopoulos?

21        A.   I was.

22        Q.   And who asked you to do so?

23        A.   Mr. Wiggins.

24        Q.   Okay.  And so I understand how your

25   services work, you are asked to do certain tasks by

 1    Mr. Wiggins.  And are those the only tasks that you

 2    do?

 3              A.   Yes, ma'am.

 4              Q.   Okay.  When did you first interview Mr.

 5    Diamantopoulos?

 6              A.   My first day on the scene at the

 7    restaurant.

 8              Q.   Okay.

 9              A.   I'd have -- to tell you the exact date

10    I'll have to go and look at my notes.  But you have

11    those.

12              Q.   Okay.  Did you interview Mr.

13    Diamantopoulos again after this November 2012 date?

14              A.   No, ma'am.

15              Q.   Okay, so the record is clear, you've only

16    interviewed Mr. Diamantopoulos one time?

17              A.   Yes, ma'am.

18              Q.   Is that correct?

19              A.   That's correct.

20              Q.   Okay.  Anything else that you did

21    regarding your investigation of this fire?

22              A.   As far as that day or overall?

23              Q.   Overall.

24              A.   Well, we did the joint scene exam -- or --

25    joint scene exam the one day.  We did the evidence

1    exam at Mr. Cavarock's office.  And I've done some

2    Internet research on the power supply that we found

3    at the joint exam that was unplugged.  I checked on

4    that.

5                 And I -- once I got the two expert

6    reports, I -- once I read those and they indicated

7    that a class-two power supply and that low-voltage

8    circuit board could not ignite, I did some research

9    on that.  And that's when I found the document that

10   Mr. Small had written.

11        Q.    Well, is it your understanding that he

12   said that it could not or that in this specific case

13   it did not?

14        A.    It -- Mr. Lacy -- I -- my understanding,

15   in his report said that it's not possible because

16   it's -- it -- it can't generate enough energy.

17        Q.    Okay.  And you've read Mr. Martini's

18   report as well?

19        A.    I have.

20        Q.    Okay.

21        A.    And in his it indicates that it's -- that

22   it was -- the class-two power supply was designed to

23   lessen or minimize the potential for ignition.

24        Q.    Okay, so let's back up to the original

25   question.

1          Your one theory is that it surrounds this

2    base station wireless device?

3          A.    It's a potential possibility, yes.

4          Q.    Okay.  And so that it's very clear, you

5    are not testifying that it was the ignition source.

6    Correct?

7          A.    That's correct.

8          Q.    And you are not testifying that it was

9    more likely than not the ignition source.

10         A.    That's correct.

11         Q.    So your testimony is solely that the

12   wireless device is a potential source of ignition.

13         A.    Yes.

14         Q.    Tell me everything that you base that

15   statement on.

16         A.    I base it on its presence, its location

17   and orientation to the fuel load or fuel package

18   there.

19         Q.    Uh-huh.

20         A.    And the fact that it -- it's not available

21   to be eliminated forensically by anyone else other

22   than Mr. Lacy and Mr. Martini, and that I believe it

23   is potential -- it could potentially ignite because

24   of the information that I read and discussed with Mr.

25   Stone and Mr. Small.

1        Q.    Okay.  And when you say that it could

2   potentially ignite and that's what you've discussed

3   with Mr. Stall -- Small and Mr. Snow -- Stone.

4        A.    Yes.

5        Q.    Did you discuss that aspect, the fact that

6   it could potentially ignite, with Mr. Small and Mr.

7   Stone because they are both engineers?

8        A.    Yes.

9        Q.    Anything else that supports your opinion

10  that the wireless device is a potential source of

11  ignition?

12       A.    No.

13       Q.    Okay.  So I'm going to walk through these

14  statements.  So you said based on its presence alone,

15  it's your testimony that it's a potentially source of

16  ignition.  So what do you mean by based on its

17  presence?

18       A.    Any -- if it's an electrical device that

19  could conceivably fail and produce heat, it must be

20  con -- included in the potential theories or

21  hypotheses that are developed.  And that's why it's

22  in there on its mere presence.

23       Q.    Anything else?

24       A.    About its mere presence?

25       Q.    Correct.

 1          A.    No.

 2          Q.    Okay, and second, you said that the

 3    location of it ---

 4          A.    --- Yes.

 5          Q.    --- Supports your opinion that it could be

 6    a potential ignition source.

 7          A.    Right.

 8          Q.    What are you referring to when you say its

 9    location?

10          A.    Its proximity to the fuel package, the EUO

11    by ---

12          Q.    --- If you -- if you'll just -- forgive

13    me.

14          A.    No problem.

15          Q.    When you say proximity to fuel package,

16    are you basically saying its proximity to the origin

17    of the fire?

18          A.    To the fuel package or -- and when I say

19    fuel package I'm talking about ---

20          Q.    --- Because what are you referring to when

21    you say ---

22          A.    --- The ---

23          Q.    --- Fuel package?

24          A.    The metal shelves ---

25          Q.    --- Okay.

1          A.    --- Which included the plastic plates,

2    plastic cups ---

3          Q.    --- Uh-huh.

4          A.    --- And foam containers.

5          Q.    Okay.  I didn't mean to interrupt you ---

6          A.    --- No.

7          Q.    --- But thank you for explaining that to

8    me.

9          A.    No problem.

10         Q.    You were getting ready to say something

11   about an EUO.

12         A.    Yes.  Mrs. Moon ---

13         Q.    --- Uh-huh.

14         A.    --- Her EUO.

15              In her EUO she indicated that the top

16   shelf or the upper section of that shelf contained

17   foam products, foam carry-out containers and so

18   forth, which are easily ignitable.

19         Q.    Okay.  The third factor you mentioned to

20   support your opinion is that it's not available to be

21   eliminated.

22         A.    Yes.

23         Q.    And what do you mean by the fact that it's

24   not available to eliminate at first?

25         A.    Well, I haven't been able to look at it

1   other than in photographs.  Mr. Stone hasn't been

2   able to look at it, nor has Mr. Small, only by the

3   photographs that we've been provided.  They're

4   limited photographs.

5          Q.   What do you mean, they're limited?

6          A.   I think I counted a total of 10

7   photographs of this particular item.  That's all that

8   I've seen.

9          Q.   Okay.

10         A.   Four -- four by Fayetteville police

11  department, two that are included in Mr. Lacy's that

12  are of where the item originally was left by Chad

13  Royal.

14         Q.   Uh-huh.

15         A.   And then the -- I think there's four that

16  Mr. Martini has, two from a distance showing up a

17  table with other items on it, and the front and back

18  of the printed circuit board on the table.

19         Q.   Okay, and you've seen all of those

20  photographs.  Correct?

21         A.   I have.

22         Q.   Okay.  Since you have read the reports of

23  Mr. Martini and Mr. Lacy ---

24         A.   --- Uh-huh.

25         Q.   --- You are aware that Mr. Martini

1    inspected these printed circuit boards.  Correct?

2          A.    Yes.

3          Q.    And that he eliminated these printed

4    circuit boards as a potential source of ignition for

5    this fire.

6          A.    Yes.

7          Q.    Do you have any evidence to contradict Mr.

8    Martini's finding?

9          A.    No.

10         Q.    Okay.  Have you ever spoken to Mr. Martini

11   regarding his examination and elimination of the

12   printed circuit boards ---

13         A.    --- No.

14         Q.    --- As an ignition source?

15         A.    No.

16         Q.    So that I understand your bucket and Mr.

17   Stone's bucket, if you were going to examine printed

18   circuit boards for an electrical failure, would you

19   have Mr. Stone present to inspect and eliminate the

20   printed circuit boards as a potential source of

21   ignition?

22         A.    He or another electrical engineer or

23   another engineer, yes.

24         Q.    Okay, but in this case -- I understand we

25   could have a hundred people come in and look at it.

1    I'm talking about in this case.

2          A.    Yes, I would have.

3          Q.    Would that be your -- what you would do?

4          A.    That's exactly what I would do.

5          Q.    Okay.  And is there something that Mr.

6    Small could do in his evaluation and elimination of

7    the printed circuit boards that Mr. Stone would not

8    be able to do?

9          A.    I don't know.  I can't answer that

10   question.

11         Q.    Are you testifying that the fluorescent

12   lighting is a potential source of ignition?

13         A.    No.

14         Q.    How did you rule that out?

15         A.    I ruled it out by the photographs in the

16   origin area.  It did not -- the fire did not appear

17   to have originated above ceiling level and it did not

18   appear that there was a fuel load for ignition above

19   ceiling level.  And I didn't see anything on the

20   lights that would indicate either way, and I don't

21   think that Mr. Stone did either.

22         Q.    Anything else about your first theory that

23   the wireless device is a potential source of ignition

24   that we haven't covered today?

25         A.    Not that I'm aware of.

1          Q.    Okay.  But as you sit here right now, is

2    there any evidence that you have that we haven't

3    covered?

4          A.    No.

5          Q.    And is there anything about your theory

6    that we have not discussed?

7          A.    Not about my theory, no, or in the

8    potential hypothesis, no.

9          Q.    Okay.  And have you spoken to anybody

10   regarding this theory about the base station?  Have

11   you spoken to anyone?

12         A.    Mr. Stone and Mr. Wiggins ---

13         Q.    --- Okay.

14         A.    --- And Mr. Small.

15         Q.    Anyone else?

16         A.    No.  I think I mentioned to Chad Royal

17   when I talked to him that that -- that that circuit

18   board was there and it looks pretty hard to

19   eliminate.  I think that's all I said to him.

20         Q.    Okay.  Anything else you remember about

21   the discussion with Chad Royal?

22         A.    Umm, that it was -- that he identified

23   that -- the circuit board as being in the origin

24   area, in that corner.

25         Q.    Anything else?

1          A.    Not that I can recall at the moment.  My

2    notes have more information about my discussion with

3    Chad.  And that's -- that's all that I can recall at

4    the moment.  He -- we discussed other things in

5    relation -- relation to the case but not ---

6          Q.    --- What are the other things, just while

7    we're discussing your conversation with Mr. Royal?

8          A.    May I review my notes?

9          Q.    Sure.

10         A.    Okay.

11         Q.    Of course.

12    (Witness examined document)

13         A.    It looks like I spoke to him on November

14    13th.  I think we had an appointment at three

15    o'clock.

16         Q.    Give me one moment to get there, please.

17         A.    I think it's on my fourth page of notes.

18         Q.    Mr. Booth, can you look at these notes and

19    make sure that I'm not missing any pages of your

20    notes?

21    (Witness examined document)

22         A.    No, ma'am.

23                    MS. DALY:  Please mark this as

24    Exhibit 3.

25                    (* Exhibit 3 was marked *)

 1                    THE WITNESS:  Are you ready?

 2                    MS. DALY:  Yes.

 3                    THE WITNESS:  Ready to go?  Okay.

 4         Q.   (Ms. Daly)  November 13th, 2012, page ---

 5         A.   --- It's the ---

 6         Q.   --- Four of your handwritten notes?

 7         A.   Yes, ma'am.

 8         Q.   And this relates to your discussion with

 9    Mr. ---

10         A.   --- Chad Royal.

11         Q.   --- Chad Royal -- or Agent Chad Royal?

12         A.   Uh-huh.

13         Q.   Walk me through your notes so that I can

14    have a better understanding of what you discussed

15    with Agent Royal.

16         A.   Sure.

17         Q.   I'm not saying ---

18         A.   --- I'm sorry.  Well, it's ---

19         Q.   --- Your writing is terrible.

20         A.   It's not great.  I apologize.

21              He said -- first of all, I have on here

22    that he was unaware of who or if the window was

23    broken on the drive-thru window.

24         Q.   Uh-huh.

25         A.   He talked about the dumpsters being

1    missing.  He said that he had received a call from

2    the IRS in regards to the insured, something about

3    not being able to pay for the water bill or gas and

4    it was cut off.  He also discussed a sewage runoff

5    issue.

6               I -- this is -- my notes following this

7    are my -- my review of the photographs that he had.

8    He let me view his CD of photographs.

9         Q.    Uh-huh.

10        A.    I noted that there was heavy soot on the

11   drive-thru window with a little bit of heat on the

12   frame of the window.

13        Q.    And what is the significance of that fact?

14        A.    Umm, my first determination or my thought

15   on it was is that it broke during the fire and that

16   it was sooted for that reason.

17        Q.    Any other significance or potential

18   significance to the fact that there was heavy soot on

19   the drive-thru window?

20        A.    No.  That -- I mean, it was -- it was cool

21   on the outside and soot accumulated on the window

22   because the fire was on the inside of it.

23        Q.    Okay.  And the fact that there was heat on

24   the frame ---

25        A.    --- That it vented at some point.

1       Q.    --- What is the significance?

2       A.    That it vented ---

3       Q.    --- Okay.

4       A.    --- Or the window broke at some point and

5    that we had heat escaping from the window.

6       Q.    Okay.

7       A.    He said they were using the front

8    drive-thru as opposed to the rear.

9       Q.    Have you ever had anyone tell you

10   differently, that they were using the back drive-thru

11   window?

12      A.    Umm, I believe Mr. Diamantopoulos said at

13   one point they had used it but they weren't at the

14   time, not at the time of the fire.

15      Q.    Okay.

16      A.    It says something about a camera was over

17   the vent for the bread oven, bread storage to the

18   left of the rear drive-thru window.  And we talked

19   about that rack -- storage rack that was there.

20      Q.    Did you ever ask Mr. Diamantopoulos if he

21   moved the bread storage rack from the front

22   drive-thru window to the back drive-thru window on

23   the day of the fire?

24      A.    No.  I found out about the -- the

25   discussions about that after my initial interview

1    with him by reading the EUO's.

2          Q.    Okay.

3          A.    And I -- so I haven't spoken to him about

4    that since.

5          Q.    Have you asked Mr. Wiggins or talked to

6    Mr. Wiggins about that fact?

7          A.    I have.  I discussed that with him.  And

8    -- and my understanding is is that -- that he didn't

9    move them, is my understanding.  But I don't know.

10   Mrs. Moon says that it wasn't there in that location

11   the night before.

12         Q.    Right.  Anything else regarding the bread

13   storage rack?  Any other discussions?

14         A.    Huh-uh.

15         Q.    So your only discussion is limited to Mr.

16   Wiggins when you mentioned the bread storage rack.

17         A.    Yeah.  I think I discussed with him that

18   there was a -- there was a demarcation line that

19   appeared in the photographs that -- and at the scene

20   that indicated that the bread storage rack was very

21   close, if not right in front of the drive-thru

22   window.

23         Q.    Okay.  When you spoke with Mr. Wiggins, I

24   want to know everything that was discussed regarding

25   either the significance that it had been moved, the

Page 52

1  significance of where it was located.

2      A.   I don't recall discussing anything about

3  the significance of whether or not it had been moved

4  or not.

5      Q.   Okay.

6      A.   It didn't -- I did not use it for my cause

7  determination.

8      Q.   Okay.  Especially since you are a former

9  detective with the police department ---

10     A.   --- Uh-huh.

11     Q.   --- So obviously your brain is going to

12 work in a -- you know, having thoughts run through

13 it.

14     A.   Right.

15     Q.   So I'd like to know your thoughts when you

16 were putting together this -- you know, how this

17 piece of evidence -- what were your thoughts

18 regarding this piece of evidence, the fact that it

19 was moved.

20     A.   Well, if it had been moved -- and that's

21 what I don't know.

22     Q.   Okay.

23     A.   Okay, if it ---

24     Q.   --- If it had been moved.

25     A.   If it would -- had -- had been moved, I --

1    you know, I really can't say, because I don't know

2    whether it had been moved or not.

3              Q.    I understand that.

4              A.    Okay.  If ---

5              Q.    --- Let's assume the jur -- how about

6    this?  The jury believes the testimony from Ms. Moon

7    and Ms. Ravere -- I believe was her name -- the other

8    manager on duty -- that when they left at four a.m.

9    the bread rack was in drive-thru window one.

10             A.    Uh-huh.

11             Q.    And they locked up.

12             A.    Uh-huh.

13             Q.    They did not go back into the premises.

14   And when the fire started the bread rack was at

15   drive-thru window two.

16             A.    Uh-huh.

17             Q.    What were your thoughts -- what are your

18   thoughts regarding the fact that it was moved to

19   drive-thru window two?  And I understand you're not

20   accepting it had been moved to drive-thru window two.

21   Be very clear for the record that if the jury finds

22   that it was moved between four a.m. and the time this

23   fire started, what were your thoughts as a

24   cause-and-origin expert ---

25             A.    --- Well, if they didn't ---

1          Q.    --- And former detective.

2          A.    If they didn't move it, and the only

3    person that had occupied that structure before the

4    fire, then I would have thought that maybe Mr.

5    Diamantopoulos may have moved it.

6          Q.    Okay, and what would be the significance

7    of its location if Mr. Diamantopoulos moved it?

8          A.    It would be speculative.  And I don't know

9    that I can answer that.  It is -- it is blocking the

10   window.

11         Q.    Okay, that -- so that's not speculative.

12   It was blocking the window.  Correct?

13         A.    There's -- there is physical evidence to

14   support that, yes.

15         Q.    Okay, so that's not speculative.  The one

16   is that the location of this bread rack was blocking

17   the window from the -- and when you say blocking the

18   window, you mean someone from the outside could not

19   see into the restaurant?

20         A.    See, that's -- that I don't know, exactly

21   how much it was blocking it.

22         Q.    Okay.

23         A.    In fact there is -- there is an area on

24   the wall that's a demarcation line ---

25         Q.    --- Uh-huh.

1          A.    --- That suggests that that's where it

2     was.

3          Q.    Right.

4          A.    I don't know how much it would have

5     blocked view.

6          Q.    Okay.

7          A.    It does appear that it would have blocked

8     a significant amount of view into the interior of the

9     building, yes.

10         Q.    Okay.  So that's one significant point of

11    it.

12               The other -- what other significance does

13    it have?

14         A.    It could have blocked view.

15         Q.    Okay.  Would it also have had the fuel

16    source?

17         A.    Oh, no, I don't believe it would have been

18    fuel source.

19         Q.    Okay.

20         A.    It's -- it's an aluminum, very difficult

21    to ignite.

22         Q.    I'm not talking about the aluminum bread

23    rack.  I'm talking about the contents on the aluminum

24    bread rack.

25         A.    I don't know.

1        Q.   Okay.  Well, you said earlier -- this was

2   your ---

3        A.   --- Uh-huh.

4        Q.   --- Your statement, that it was the

5   proximity to the fuel package.

6        A.   Uh-huh.

7        Q.   And I said what do you mean by fuel

8   package.

9        A.   Uh-huh.

10        Q.   And you said, well, there was this bread

11   storage rack ---

12        A.   --- I -- no, I did not ---

13        Q.   ---  With the ---

14        A.   --- No.

15        Q.   --- With the plastic foam plates that Ms.

16   Moon testified to.

17        A.   It was not the bread rack.

18        Q.   Okay.  So tell me, then, what was the fuel

19   package?

20        A.   The -- the metal shelves, the slatted

21   shelves ---

22        Q.   --- Uh-huh.

23        A.   --- That were located along the wall ---

24        Q.   --- Uh-huh.

25        A.   --- In that corner that stored those

1    items.

2         Q.    Okay, so you're talking about two

3    different, then, shelves.

4         A.    Yeah.  There's a set of shelves ---

5         Q.    --- Uh-huh.

6         A.    --- That were in that corner and then

7    there was the bread rack.

8         Q.    Okay, so the bread rack, the significance

9    of the bread rack, if it was located in the

10   drive-thru window, the only significance to you is

11   that it could have potentially blocked the view.

12        A.    Yes.

13        Q.    Okay.  Did it have anything on it that

14   could have fueled the fire?

15        A.    I don't know what was in it.

16        Q.    Okay.

17        A.    I don't know what was in it.  I'd -- it

18   was adjacent to the origin.  It was -- in other

19   words, if you have a corner ---

20        Q.    --- Uh-huh.

21        A.    --- You know, use a piece of paper for the

22   corner, you have a window, and you have the bread

23   rack, and then you have the shelves here, and this is

24   your origin area, it was adjacent to that.

25        Q.    Okay, thank you.

1           Anything else regarding this bread rack?

2      A.   Not that I can think of.

3      Q.   Okay, thank you.  You can go -- continue

4 down your notes.

5      A.   I noticed -- noted in the photographs that

6 there was heat damage to the DVR that was located on

7 the upper corner of that office shelf.  I noted that

8 Mr. Royal said he believes that it was corrupted,

9 according to Mr. Lacy.

10     Q.   Did Mr. Royal tell you his discussions

11 with Mr. Diamantopoulos about their surveillance

12 system?

13     A.   I don't have any notes to that effect.

14     Q.   Okay.  And have you read Mr. -- Agent

15 Royal's deposition?

16     A.   I have not.

17     Q.   Okay.

18     A.   Just to be clear, I haven't read any of

19 those depositions.

20     Q.   Okay, thank you.

21           Before we continue, while I think about

22 it,  have you ever worked with Agent Royal?

23     A.   On other fires, yes.

24     Q.   On other fires.  And is there anything

25 regarding Agent Royal's reputation -- as a

1    cause-and-origin expert, is there anything about his

2    history that you would say would support you

3    contradicting anything that Agent Royal says or you

4    questioning his credibility?

5          A.    Credibility, no.

6          Q.    Okay.

7          A.    Questioning a cause determination, that

8    happens on a -- on a, you know, fairly -- not

9    consistent basis, but it happens.  I mean, when two

10   different experts look at something, there -- there's

11   times when we don't -- we differ on opinion.

12         Q.    Uh-huh.

13         A.    But his credibility, no.  He's a great

14   guy.

15         Q.    Okay.  And if Agent Royal testifies that

16   Mr. Diamantopoulos told him that the surveillance

17   system fed into two computer towers, would you have

18   any reason to refute what Agent Royal testified to?

19         A.    Only that the installer of the video

20   surveillance system said that it did not.

21         Q.    Okay.  I understand that -- let me --

22   first I want to talk about what Mr. -- Agent Royal's

23   credibility.  Would you have any reason to -- or any

24   evidence to refute what Agent Royal testified to that

25   Mr. Diamantopoulos told him?

1          A.    No.

2          Q.    Okay.  And, then, now you can -- you had a

3    follow-up statement regarding a conversation that you

4    had with Mr. Dowlat.  Is that correct?

5          A.    Yes.

6          Q.    Okay.

7          A.    My understanding is is that they're the

8    ones who installed the system, that ---

9          Q.    --- Mr. Dowlat.

10         A.    Yeah, yes.  That -- that it was located in

11   that upper corner ---

12         Q.    --- In the office?

13         A.    --- In the office.  It's photograph -- it

14   -- it has been photographed, and that there are other

15   -- the feeds for the cameras go to that location.

16         Q.    Okay.

17         A.    Now, whether or not Mr. Royal and the

18   local police department believed they had the DVR

19   hard drives or not I can't say.  They may have

20   believed that they had them.

21         Q.    Okay.  Did you ever have a conversation

22   with Mr. Diamantopoulos about the DVR hard drives?

23         A.    Yes.  We discussed that the first day.

24         Q.    Okay.  We'll get to everything you

25   discussed with Mr. Diamantopoulos when we go through

1    your notes.  So we'll just put that to the side.  And

2    let's go ahead and continue going down your notes and

3    what you talked to -- discussed with Mr. Royal.

4           A.   Okay.  There was a -- in his photographs

5    there was a container labeled gas, a plastic

6    container -- the CO2 bottles in the photographs.  He

7    said that ---

8           Q.   --- What was the significance for you

9    writing ---

10          A.   --- That there was ---

11          Q.   --- That statement down?

12          A.   There was a photograph of a container

13   that's labeled gas.

14          Q.   Okay.  Did you find any significance about

15   that?  I mean ---

16          A.   --- Well, I would be ---

17          Q.   --- Was it a potential ---

18          A.   --- I would be surprised that it was in a

19   restaurant.  And I think that that was of interest to

20   me and that's why I noted that.

21          Q.   Okay, and why was it in the restaurant?

22          A.   Well, there would be follow-up to that at

23   that day.  I mean, he -- I was told that it was there

24   because he had ran out of gas and they filled up gas

25   for him and brought him the container and it was

1    brought back.  And it was labeled that way so nobody

2    would do anything with it.

3            Q.    Okay.

4            A.    That's what I was told.

5            Q.    And who told you that?

6            A.    Mr. Wiggins.  And I believe that it's in

7    Ms. -- Ms. Moon's EUO.

8            Q.    Okay.  Did you ever ask Mr. Diamantopoulos

9    ---

10           A.    --- Like I said ---

11           Q.    --- The veracity ---

12           A.    --- I didn't know about that until after

13    that ---

14           Q.    --- Okay.

15           A.    --- Interview, my first interview with

16    him.

17           Q.    And so is it your understanding that Mr.

18    Wiggins went and asked Mr. Diamantopoulos why there

19    was this container labeled gas and then he reported

20    back to you?

21           A.    Yes.

22           Q.    Okay.  Did he already have the answer when

23    you asked him or did he have to go talk to Mr.

24    Diamantopoulos and report back to you?

25           A.    He had the answer already is my

1    understanding.

2            Q.    Okay.

3            A.    Yeah.  That's what I recall.

4            Q.    Anything else significant about that

5    statement?

6            A.    About which statement?

7            Q.    The statement that we're talking about ---

8            A.    --- That there was gas there?  You -- you

9    know, I -- like I said, I thought it was unusual that

10   it was in a restaurant.

11           Q.    Right.  And did you have any other

12   discussions regarding it?

13           A.    With?

14           Q.    Anyone.

15           A.    Not that I'm aware of, no.

16           Q.    Okay.

17           A.    I -- I -- I -- I think I told Mr. Wiggins

18   that I thought it was odd that it was in a

19   restaurant.

20           Q.    Okay.

21           A.    I didn't get ---

22           Q.    --- Anything else?

23           A.    No.

24           Q.    Okay.  Did you have a discussion with

25   Agent Royal about it?

```
 1          A.    I told him that I thought it was odd that

 2    it was in a restaurant.

 3          Q.    And did he have any comment?

 4          A.    I asked him if he collected it and he said

 5    no.

 6          Q.    Okay.  Anything else?

 7          A.    I asked him if he took samples and he said

 8    no.

 9          Q.    Anything else?

10          A.    No.

11          Q.    Okay.  You're next -- you can go on to the

12    next ---

13          A.    --- Okay.  It says safety glass inside the

14    drive.  Debris on top of the glass was what he was

15    explaining to me.  What -- and my significance for

16    that was that it -- that it broke earlier in the fire

17    and debris fell on top of it.

18          Q.    Okay.

19          A.    There were pictures of the circuit board

20    heavily damaged discovered by Chad during excavation

21    of the origin area.  And so I -- circuit board may

22    have been from the headset communication system.  And

23    I knew about that because of my initial interview

24    with Mrs. -- Mr. Diamantopoulos.

25          Q.    Okay.  So I want to break this down.  You
```

1    saw the pictures of the circuit board.  Correct?

2          A.    Uh-huh.

3          Q.    Had you already seen pictures of the

4    circuit board prior to going to Agent Royal's office?

5          A.    No.

6          Q.    Okay.  Had you had discussions regarding

7    the wireless device prior to going to Agent Royal's

8    office?

9          A.    One moment.  I'm going to read some of my

10   notes at the beginning when I spoke to Mr.

11   Diamantopoulos, because if I recall correctly, there

12   was a mention of it on that first day.

13         (Witness examined document)

14         A.    Yeah, I have it noted in my first diagram.

15   When I was talking to Mr. Diamantopoulos, he noted --

16   I was asking him what was in the area and he noted

17   that the drive-thru wireless headset system was

18   there.  And that's on my second page of my notes.

19         Q.    Second page of Exhibit 3.

20               How did this wireless headset come up in

21   discussion?

22         A.    I asked him what was in the area of fire

23   origin.  And that's why we drew this diagram.  I

24   wanted to know what was where at the time of the

25   fire.

1          Q.    Okay.   Anything else?

2          A.    No.   The next item on there is I said that

3     I needed to identify the brand, model, age, and check

4     for recalls on the headset system.

5          Q.    Okay, and were you able to do that?

6          A.    Yes.

7          Q.    Okay.   How were you able to identify the

8     brand?

9          A.    It was documented in the documents that --

10    exhibits that were provided for items that were

11    destroyed during the fire is my understanding.

12    That's -- that's what I think those documents were.

13    It's listed in there as the -- as an HME Ion IQ on

14    the -- on a receipt or a bill of -- a bill of sale or

15    a PO that's in the documents.

16         Q.    Okay.   So that I understand what you're

17    referencing, is this something that Mr.

18    Diamantopoulos provided?

19         A.    It -- all I can tell you is is it's in the

20    documents that I was provided by Nationwide as -- I

21    -- and I believe they're Mr. Jezierski's --

22    Jezierski's documents.

23         Q.    Uh-huh.   I'm a -- it -- I'm a little

24    unclear.   How was it determined what brand the

25    wireless device was?   Did you ever talk to Mr.

 1    Diamantopoulos and ask him ---

 2         A.    --- No.  I asked ---

 3         Q.    --- The brand?

 4         A.    I asked Mr. Wiggins following the

 5    discovery of the circuit board ---

 6         Q.    --- Okay.

 7         A.    --- And knowing that it was there ---

 8         Q.    --- Uh-huh.

 9         A.    --- I asked what brand it was.  I later

10    found in the discovery documents a ---

11         Q.    --- Okay.  Well, first, did Mr. Wiggins

12    tell you what brand it was?

13         A.    Yeah.

14         Q.    Okay, so he told you.  So you talked to

15    Mr. Wiggins ---

16         A.    --- Uh-huh.

17         Q.    --- And he told you what brand it was?

18         A.    That's right.

19         Q.    And how did Mr. Wiggins know the brand?

20         A.    I believe he was told by the installer.

21         Q.    Okay.  And that's what I'm trying to

22    figure out ---

23         A.    --- Mr. Dowlat.  That ---

24         Q.    --- Is if -- so Mr. Dowlat supposedly told

25    Mr. Wiggins the brand.

1        A.    Yes.

2        Q.    Okay.  And, then, please continue.

3        A.    And then after that it was -- I found in

4   those documents a --  it's either -- it's a receipt

5   that indicates on there HME Ion IQ.

6        Q.    And were you able to determine the age?

7        A.    I believe it was installed that date.  I

8   don't know what -- if the date is on the -- on the

9   piece -- on the receipt.  But I don't know how old it

10  was prior to installing it, no.

11       Q.    Is it your understanding that was

12  installed after the alleged vandalism?

13       A.    Yes.

14       Q.    Okay.  You also mention in here about

15  checking recalls.  Did you check the recalls?

16       A.    I did.

17       Q.    And what did you find?

18       A.    None, no recalls and no complaints.

19       Q.    What were you looking for when you were

20  checking for recalls or complaints?

21       A.    The HME Ion IQ.

22       Q.    Okay.  Were you looking to see

23  specifically whether or not this device had ---

24       A.    --- I checked with ---

25       Q.    --- Been in a fire?

1          A.    I'm sorry.  I checked with the CPSE,

2    Consumer Products Safety Commission ---

3          Q.    --- Uh-huh.

4          A.    --- To find out if there were any recalls.

5    And if there were any recalls, I would have checked

6    to see why.

7          Q.    Okay.

8          A.    I also searched the Internet and

9    specifically fire-related problems or complaints and

10   found none.

11         Q.    Anything else?  Did you have any

12   discussion with Agent Royal regarding the wireless

13   headset?

14         A.    I told him that it was in the area of

15   origin and that -- that I wondered how it had been

16   eliminated.  And he said, well, that was specifically

17   the reason that he felt uncomfortable making the

18   initial call and why he initially called it as an

19   undetermined fire.

20         Q.    And Agent Royal is not an electrical

21   engineer.  Correct?

22         A.    No.

23         Q.    So he is like you.

24         A.    No.

25         Q.    He's solely a cause-and-origin expert.

1        A.    That's right.

2        Q.    Correct?

3        A.    That's right.

4        Q.    So he would not be qualified to eliminate

5   an electrical ---

6        A.    --- No.

7        Q.    --- Fire source.

8        A.    --- He made a good choice.  No.

9        Q.    Is that correct?

10       A.    That's correct.

11       Q.    Okay.  And did he -- well, you haven't

12   read his testimony.

13            Did he tell you that he relied on Henry

14   Martini's -- who is an electrical engineer -- his

15   determination regarding whether or not there was an

16   electrical failure in order to determine whether the

17   fire was incendiary or undetermined?

18       A.    I recall Chad saying that -- that he

19   discussed it with Terry Lacy.  And I would -- based

20   on that I would have been under the im -- impression

21   that Martini had relayed -- through Mar -- through

22   Lacy, he had been under the impression that Martini

23   had eliminated electrical sources of ignition and

24   that was why he changed his determination.

25       Q.    To?

1          A.    Incendiary.

2          Q.    Okay.  Okay, we can go on to the next

3    statement.

4          A.    Okay.  It says that I discussed with Mike

5    Winesette and advised he re -- I reviewed the

6    photographs.  I asked him to check on the headset

7    system for an exemplar and discussed getting

8    assistance on examination of the evidence by an

9    electrical engineer.

10         Q.    Okay.

11         A.    And then I said ---

12         Q.    --- And so that we're clear, Mike

13   Winesette, is he an attorney?

14         A.    Yes.

15         Q.    For plaintiff?

16         A.    He was -- he was the attorney that I was

17   initially contacted by, yes.

18         Q.    Okay.

19         A.    For this case.

20         Q.    Okay.  Were you ever provided an exemplar?

21         A.    No.

22         Q.    What was told to you when you asked about

23   obtaining a headset system for an exemplar?

24         A.    That they would discuss that.

25         Q.    And what was the outcome?

1        A.    We have not purchased an -- an exemplar.

2        Q.    Why?

3        A.    I don't know why.  I didn't ask.

4        Q.    Were you told that they were not going to

5   purchase an exemplar?

6        A.    No, ma'am, huh-uh.

7        Q.    Has the discussions ever come back up?

8        A.    It -- yes.

9        Q.    And what was said then?

10       A.    We just didn't buy one.  We didn't -- they

11  didn't buy one.  So I don't know why they de --

12  determined not to purchase one.  It was my

13  recommendation that we purchase one and examine it.

14       Q.    Okay.  And then you state discuss getting

15  assistance of examination of evidence by an

16  electrical engineer.

17       A.    I did.

18       Q.    And why did you discuss getting assistance

19  of an examination of evidence by an electrical

20  engineer?

21       A.    Because I'm not qualified to eliminate it.

22       Q.    How did it come about that Mr. Stone was

23  retained?

24       A.    I spoke with one engineer and he declined

25  the case.

```
 1          Q.    Why?

 2          A.    Because it was a Nationwide case.

 3          Q.    Okay.  And what was the name of that

 4   engineer?

 5          A.    Mark Cassell with LWG Consulting.

 6          Q.    Okay.

 7          A.    Okay.

 8          Q.    Anything else?

 9          A.    And then I tried ---

10          Q.    --- Was there any other discussion with

11   Mark Cassell?

12          A.    No, no.

13          Q.    Okay, so you called him?

14          A.    Uh-huh.

15          Q.    You said I have a case, it's against

16   Nationwide, and he said I'm going to decline?

17          A.    He did.

18          Q.    Anything else?

19          A.    No.  That's all.

20          Q.    Okay.  Go ahead.

21          A.    And then I called John Cavarock, and he

22   had already been retained by PWC.

23          Q.    Okay.

24          A.    And at that point, since Randy Down, who

25   is with ---
```

1          Q.     --- And what else did you discuss with Mr.

2     Cavarock?

3          A.     He said he has already been retained by

4     PWC, and I let it go at that.

5          Q.     Okay.  Did he tell you how it came about

6     that he was retained by PWC?

7          A.     I didn't ask.

8          Q.     Okay.

9          A.     I just cut it -- cut it at that, because I

10    didn't want to discuss any more -- thing more with

11    him.

12               I -- I -- at that point when -- because

13    Mark had declined, Randy Down, who is also employed

14    with LWG Consulting, which is another engineer I use,

15    I couldn't use him.  And Steve Stone is another

16    engineer that I find highly qualified and reputable

17    and so forth.  So I contacted him and he agreed to

18    take the case.

19         Q.     Okay, so you contacted Mr. Stone directly.

20         A.     I did.

21         Q.     What did you tell him about the case?

22         A.     I told him that there was a case involving

23    a -- at a restaurant fire, and that I had been hired

24    by a law firm in Fayetteville to take a look at it,

25    and that I wondered if he would be willing to be --

1    be involved and take a look at the evidence.

2         Q.    Okay.

3         A.    Because -- I didn't ask him to go to the

4    scene.  I had already been to the scene and I had --

5    at that point was highly hopeful that this particular

6    circuit board was going to be present at the joint

7    scene exam -- or joint evidence exam, I should say.

8    And that's why he was hired, was to look at that, the

9    evidence including the circuit board.

10        Q.    Okay.  And then did he also look at the

11   photographs as well?

12        A.    He did.

13        Q.    Okay.  Did you supply all the documents to

14   Mr. Stone or did Mr. Wiggins do that?

15        A.    Umm, I provided to Mr. Stone anything --

16   anything that I found, in other words, the -- the

17   document from Mr. Small, anything that I found on the

18   Internet that -- I think everything that I supplied

19   to him he provided to you, but nothing as far as

20   discovery documents.  All of those documents would

21   have been provided by Mr. Wiggins.

22        Q.    So your Internet researches you supplied

23   to Mr. Stone.

24        A.    Yes.

25        Q.    Anything else?

1        A.    No.

2        Q.    Okay.  How about your photographs?

3        A.    Umm, yes, yes, he has got my photographs.

4        Q.    How about any of the other photographs

5   from any other expert in this case?

6        A.    Anything that Mr. Wiggins had provided

7   him.  I don't -- I don't know exactly ---

8        Q.    --- But you didn't provide it to him?

9        A.    No, no, no.

10        Q.    Okay, so just your photographs and

11   anything that you found on the Internet.

12        A.    Right.  I think that I -- I think at one

13   point he didn't have a set of photographs.  And I did

14   -- and I provided him a link to download those

15   photographs.  In other words, I had them, and I had

16   them on my computer in a cloud server, and I provided

17   him a link to download them just to make sure that he

18   had those photographs.

19        Q.    And did you recommend using Mr. Stone

20   because you -- in your opinion he was competent to

21   give an opinion regarding whether or not there was an

22   electrical failure or the source of ignition for this

23   fire was electrical?

24        A.    Yes.  His background includes small

25   circuitry in airplanes and -- and so forth.  And I

1    felt like that he was perfectly capable of rendering

2    an opinion on that if we had the evidence.

3          Q.    The rest of these notes, is this still

4    relating to your discussion with Agent Royal?

5          A.    Umm, the only thing that's left of my dis

6    -- discussion with Chad Royal was this phone call on

7    November 16th ---

8          Q.    --- Uh-huh.

9          A.    --- At 9:35 at the bottom of the page.

10         Q.    Uh-huh.

11         A.    I discussed the DVR hard drive with Chad

12   Royal, asked if he was told by Terry Lacy it had been

13   collected -- a DVR.  And he says he's not sure but he

14   believes not.

15         Q.    Okay.  Anything else?

16         A.    No, ma'am.  At that point I don't think I

17   spoke to Chad Royal again about this case.

18         Q.    So anything else regarding your first

19   theory that the wireless headset was a potential

20   source of ignition?

21         A.    No, ma'am.

22         Q.    Okay.  So your second theory is that it

23   was incendiary in nature.

24                MS. DALY:  And before we get on

25   that, let's go ahead and take a break.

 1          (11:36-11:45 a.m. - recess)

 2                    MS. DALY:  We can go back on the

 3     record.

 4          Q.   (Ms. Daly)  So let's talk about the second

 5     theory that it was incendiary in nature.

 6               If it is determined that there was no

 7     electrical ignition source to the fire, then would

 8     the fire be classified as incendiary in this case?

 9          A.   It's my opinion that it's difficult to

10     make a cause determination on the absence of

11     accidental causes unless the -- the origin is clearly

12     defined, as far as very clearly defined.

13          Q.   Okay.

14          A.   I'm -- I'm going to answer your question,

15     I promise.

16               In -- in this case, I'm not -- I do not

17     believe that the origin is as clearly defined as --

18     in other words, a clearly defined origin to me might

19     be different than a clearly defined origin to an

20     individual unfamiliar with fire patterns and so

21     forth.

22               In my opinion, the origin, like I said in

23     my report, could be from an upper level to lower

24     level in the same area that Mr. Lacy has identified.

25     If we could eliminate all potential sources of

1    ignition then, yes, it would be an appropriate

2    determination.

3         Q.    What would be an appropriate ---

4         A.    --- An incendiary fire cause would be an

5    appropriate determination.

6         Q.    Okay, so you just said if you could

7    eliminate all sources of ignition ---

8         A.    --- Uh-huh.

9         Q.    --- Then it would be appropriate to

10   determine the fire was incendiary.

11        A.    Yes, ma'am.

12        Q.    Okay, so what are all the sources of

13   ignition that you would need to eliminate before you

14   ruled that it was incendiary?

15        A.    The branch circuitry including the lights

16   from above ---

17        Q.    --- Okay.

18        A.    I'm including all of the things that would

19   have been there, not the things that we've already

20   discussed that have been eliminated.

21              The branch circuitry, the lights from

22   above, and the Ion IQ.

23        Q.    So you've read Mr. Stone's report where he

24   eliminated the branch circuitry.  Correct?

25        A.    Yes.

1        Q.    And do you agree with his opinion that the

2   branch circuitry was not the ignition source?

3        A.    Yes.

4        Q.    Do you agree that the lights were not the

5   ignition source?

6        A.    Yes.

7        Q.    Okay, so the only thing that we are left

8   with is this wireless device.  Correct?

9        A.    Yes, ma'am.

10       Q.    Okay, so if the wireless device is

11  eliminated, then the fire would be classified as

12  incendiary in nature.  Is that correct?

13       A.    It could be, yes.  I don't know that I

14  would make that determination.

15       Q.    Okay.  Would it be reasonable for a cause

16  and origin expert and an SBI agent to determine that

17  the cause was incendiary after the ION IQ has been

18  eliminated?

19                    MR. WIGGINS:  Objection.

20              Go ahead and answer if you can.

21                    THE WITNESS:  The -- the

22  determination of an incendiary fire based on the

23  elimination of potential ignition sources, all

24  potential ignition sources, is an appropriate

25  determination under certain circumstances.  I agree

1    with that.

2         Q.    (Ms. Daly)  Is it your testimony that in

3    this case there would be circumstances that exist

4    that would make it inappropriate for a cause and

5    origin expert to determine the fire incendiary after

6    the Ion IQ wireless system was eliminated?

7         A.    If it was competently eliminated, yes.

8    Yes, it would be appropriate if it was competently

9    eliminated.

10        Q.    Okay.  Well, we're assuming everybody --

11   you said competently.

12             Is there any evidence that you have that

13   you're saying someone did something incompetently in

14   this case?

15        A.    My answer to that would be that I don't

16   believe that all of the steps that were necessary to

17   eliminate that were taken.

18        Q.    Okay, so let's walk through those steps

19   ---

20        A.    --- Okay.

21        Q.    --- You're testifying were not taken.

22        A.    Okay.

23        Q.    Okay, so in general -- let's talk general

24   and then we'll go specific.  In general what steps

25   would need to have been taken to determine that the

1    printed circuit boards was not the ignition source?

2         A.    It would need to be visually inspected.

3         Q.    Okay.

4         A.    Which it was.  It would need to be

5    collected and inspected under magnification.  At

6    least in -- I would not be doing this.

7              You understand that?

8         Q.    Right, exactly, and that was -- is my

9    point.

10        A.    Okay.

11        Q.    You would not be doing this.  Correct?

12        A.    Right.  That's correct.

13        Q.    So you are not the expert that is

14   qualified to determine what is the competent

15   evaluation of the PCB -- B's.

16             That would have been Mr. Stone.  Correct?

17        A.    That's right.

18        Q.    And if Mr. Stone testified that he had no

19   evidence that they were -- that they were not

20   examined in a competent way, would you have any

21   reason to disagree with Mr. Stone?

22        A.    Are you asking me do I believe that Mr.

23   Stone thinks that it was not competently eliminated?

24        Q.    Well, no, but I can ask you that.

25             Did Mr. Stone ever tell you that the PCB's

1    was not competently eliminated?

2         A.    He said to me that he didn't believe all

3    the steps that should have been taken to eliminate it

4    were taken.

5         Q.    Okay, and what steps did he tell you were

6    not taken?

7         A.    It should have been collected and examined

8    under magnification for -- and I think he talked

9    about color distemperation or something of that

10   nature, but I'm -- that's his ball of wax, not mine.

11        Q.    Okay, so under -- when you're testifying

12   in front of the jury, you are not qualified to

13   testify regarding the appropriate steps that should

14   have been taken to eliminate the PCB's.  Is that

15   correct?

16        A.    I would not agree with that statement.

17        Q.    Okay, and why not?

18        A.    Because in my experience, the process is

19   to determining a fire -- let's say -- when you make a

20   cause determination that a fire is incendiary ---

21        Q.    --- Uh-huh.

22        A.    --- And you have other potential sources

23   of ignition that you've eliminated, an investigator

24   that does this job knows that there are the potential

25   for alternative theories.

1          When we have the potential for alternative

2    theories, meaning that evidence or items need to be

3    eliminated, that someone else may ask to see those

4    items, it's incumbent upon me to make sure that those

5    items are in safe keeping so that they can be

6    eliminated by someone else if necessary because

7    inevitably an alternative theory will come up

8          Q.    Okay, so -- so that I understand your --

9    your complaint, is it -- are you actually ---

10                    MR. WIGGINS:   --- Objection.

11          That's not a complaint.

12                    MS. DALY:  Oh, okay.

13          Q.    (Ms. Daly)  Let me understand what you are

14    saying was done inappropriately.

15          Are you saying that -- because there's two

16    different things.

17          A.    Uh-huh.

18          Q.    One thing is that the evidence, when it

19    was collected by Agent Royal and set aside ---

20          A.    --- Uh-huh.

21          Q.    --- For a further evaluation by an

22    electrical engineer.  Correct?

23          A.    Well, he set it aside because he couldn't

24    eliminate it.  He didn't know what was coming,

25    whether it be an electrical engineer or not.  But he

1  set it aside because he could not eliminate it.  Yes.

2      Q.    Okay, and then Mr. Martini inspected that

3  evidence that had been collected.

4      A.    Uh-huh.

5      Q.    Right?

6                  MR. WIGGINS:  Object.

7              He said he inspected it.  He doesn't know

8  what kind of inspection he did.

9                  MS. DALY:  Okay.

10                  MR. WIGGINS:  That's his point, I

11  think.

12      Q.    (Ms. Daly)  To your knowledge, Mr. Martini

13  inspected -- or to your understanding, what you've

14  been told, Mr Martini inspected the PCB's.  Correct?

15      A.    His report indicates his -- his first

16  report to Nationwide indicates that all electrical or

17  mechanical source -- potential sources of ignition

18  were examined and eliminated.

19      Q.    Okay.

20      A.    And in his second -- his expert report, he

21  indicates that the circuit board was examined and

22  eliminated.

23      Q.    So let's stop there.

24              In general, what is your opinion that an

25  electrical engineer should have done, what steps

1    should an electrical engineer have done, in order to

2    inspect the PCB's ---

3              A.    --- In my ---

4              Q.    --- To eliminate?

5              A.    In my experience ---

6              Q.    --- No, in your -- I want to know, in your

7    expert opinion, what you are going to testify to

8    under oath and what you are qualified to testify to

9    under oath, I want to know that list that you are

10   qualified to give to the jury of what should be done

11   in an inspection for electrical failure of PCB

12   boards.

13             A.    We've discussed the fact that I'm not an

14   electrical engineer.

15             Q.    Okay, I understand that.

16             A.    Okay.

17             Q.    But are you testifying that you are

18   qualified to give, in your expert opinion, what needs

19   to be done in order to inspect for the electrical

20   failure?

21             A.    No.

22             Q.    Okay, so under oath, do you plan on

23   testifying to the jury what steps should have been

24   done in order to inspect the PCB's for an electrical

25   failure or is that something Mr. Stone would be

1    testifying to?

2         A.    Certainly Mr. Stone ---

3         Q.    --- Okay.

4         A.    --- Would be the one.

5         Q.    Are you qualified to testify in your

6    expert opinion, what steps need to be done to inspect

7    the PCB's for electrical failure?

8         A.    I'm only qualified or able to testify

9    about my experience with other processes that I've

10   been through.

11        Q.    Okay, and when you say other processes,

12   are you testifying what other experts need to do, but

13   not what you're qualified to do?

14        A.    I'm just telling you what I have

15   experienced from other experts.

16        Q.    Okay, what you've experienced other

17   experts to do?

18        A.    Yes, ma'am.

19        Q.    But not what you're qualified to do?

20        A.    No, ma'am.

21        Q.    Okay, and are you qualified to determine

22   that an electrical engineer did not perform his or

23   her duties as an expert, as an electrical engineer

24   expert?

25        A.    I'm only qualified to say that I don't

1    know whether or not a person has done their job other

2    than by my experience with other people, other

3    experts.

4              And you know, whether or not there's a set

5    way that every engineer does their job or not, I

6    can't testify to that.  I can only testify to what my

7    experience has been in the past.

8         Q.   Okay, maybe so that we're not talking past

9    each other -- so let's give the example.

10             If a cardiac surgeon is being sued for

11   medical malpractice ---

12        A.   --- Uh-huh.

13        Q.   --- Lawsuit, and the attorney hires

14   another cardiac surgeon to say that that cardiac

15   surgeon didn't do X, Y, Z, so that cardiac surgeon

16   would be an expert and qualified to testify because

17   he or she would be able to do the exact tasks that

18   the cardiac surgeon is being sued.

19             So in your situation, I'm trying to be --

20   have you be clear as to what your testifying to

21   because you're not an electrical engineer.

22        A.   No.

23        Q.   So you're not, in this case, the cardiac

24   surgeon that's being sued or that -- and you're not

25   the cardiac surgeon who's being retained to say that

1   this person did something incorrect.  And so I'm

2   trying to figure out where -- what you are qualified

3   to testify to in front of the jury.

4              So you're not an electrical engineer and

5   you're not a mechanical engineer.  So you would not

6   be qualified to look at these PCB's and determine

7   whether there was an electrical failure or that it

8   was the source of ignition.  Is that correct?

9         A.   Yes.

10        Q.   Okay, so what is your testimony today that

11  you are qualified to do in regards to whether or not

12  the PCB's were inspected and eliminated as the

13  ignition source of the fire?

14        A.   I would have to leave that up to Steve

15  Stone.

16        Q.   Okay, thank you.  That's all I was trying

17  to be clear about.

18             So in your experience, watching other

19  experts do the elimination of electrical sources,

20  what has been your experience watching others?

21        A.   My experience with others is that even

22  branch circuitry in the area of origin that may be

23  easily eliminated is still recovered and stored for

24  further examination.

25             We spoke about Mr. ---

1          Q.    --- Okay, and you're saying further

2    examination.  Are you saying further examination by

3    someone else ---

4          A.    --- No.

5          Q.    --- Or further -- further examination by

6    the electrical engineer?

7          A.    No.  I was going to finish that.

8          Q.    Okay.

9          A.    I was going to say we just spoke about Mr.

10   Cassell.

11         Q.    Uh-huh.

12         A.    And in my experience with him, he has

13   taken branch circuitry that we have examined at the

14   scene that has been eliminated at the scene and gone

15   back and gone over under magnification, and has been

16   unable to eliminate it following those exams.

17               Mr. Cavarock, and I have worked before on

18   other cases either together or on separate sides and

19   he's collected items that even he believed could be

20   eliminated at the scene but have kept them and gone

21   back and examined them in the office.

22         Q.    And you spoke with Mr. Stone about this

23   case specifically?

24         A.    Yes, ma'am.

25         Q.    And did he identify to you any -- the

1    steps that he said should have been taken regarding

2    the PCB's?

3         A.    Yes, ma'am.

4         Q.    And what were those steps?

5         A.    He said that they should have been

6    collected and looked at under magnification for ---

7         Q.    --- Anything -- okay.

8         A.    --- For the items that he did -- that he

9    felt like were necessary.  He discussed temper

10   discoloration, and with an exemplar, the heat flux or

11   transfer of heat inside the -- the board and the

12   enclosure.

13             And other than that, I don't recall what

14   other -- what else he said but he did say that it

15   would be -- he should -- if -- he would have

16   collected it and examined it under magnification.

17        Q.    Anything else?

18        A.    No.

19   (12:01-12:03 p.m. - recess)

20                  MS. DALY:  We can go back on the

21   record.

22                  MR. WIGGINS:  Back on the record.

23        Q.    (Ms. Daly)  So let's go back to the second

24   theory, that it was incendiary in nature.  What facts

25   did you consider that would lead a cause-and-origin

1    expert to determine that this fire was incendiary?

2         A.   Well, that if all of the electrical

3    sources of ignition were eliminated.

4         Q.   Right.

5         A.   And the time frame.  And that was all that

6    there is there as far as evidence.

7         Q.   Okay, and what do you mean by time frame?

8         A.   The time in which the insured last left

9    the building until the time the fire was called in.

10        Q.   And what about that is relevant to you?

11        A.   It's relevant -- there's a time frame

12   between 8:25 and 8:41 and when -- when the call came

13   in.

14        Q.   Okay.  In general, if the fire started

15   sometime between 8:25 and 8:41 -- and 8:25 is roughly

16   the time that Mr. Diamantopoulos left the restaurant?

17        A.   Uh-huh.

18        Q.   Is that the time frame you're using?

19        A.   Yes, ma'am.

20        Q.   And then 8:41 is the first time that it

21   was called in.

22        A.   Uh-huh.

23        Q.   So that means that the smoke was visible

24   enough ---

25        A.   --- Uh-huh.

1        Q.    --- Or the fire was visible enough ---

2        A.    --- Uh-huh.

3        Q.    --- For a passerby to call it in.  Is that

4    correct?

5        A.    Yes, ma'am.

6        Q.    In general, if there was an electrical

7    failure and there was -- the ignition source was

8    electrical, would you expect there to be smoke or a

9    scent associated with an electrical failure detected

10   prior to 16 minutes?

11       A.    I don't know.  In circum -- the -- this --

12   the -- there are ultimate -- there are many variables

13   on that.

14       Q.    Okay.

15       A.    There's ventilation.  There's -- there's

16   ---

17       Q.    --- Well, let's talk about the variables

18   as it relates to this restaurant.

19       A.    Okay.

20       Q.    Okay.  If there was an electrical failure,

21   or the source of ignition was this wireless device.

22       A.    Uh-huh.

23       Q.    What theories do you have that make it

24   plausible that Mr. Diamantopoulos was in the

25   restaurant until at least 8:25 ---

1          A.    --- Uh-huh.

2          Q.    --- Without detecting any type of scent or

3    smoke prior to leaving the restaurant?

4          A.    Food odors, cleaning supplies.  I don't

5    know -- ventilation.

6          Q.    Did you check the ventilation to this

7    building?

8          A.    For?  If -- if there's -- I mean, it has

9    an AC system.  I would imagine that it was

10   functioning.

11         Q.    Okay.

12         A.    Or a heating system that would circulate

13   the air.

14         Q.    So are you saying because of the specific

15   ventilation system in this building, that would have

16   masked any odor of ---

17         A.    --- No, only -- only that it would

18   circulate.

19         Q.    Well, if it would circulate -- and this is

20   just someone speaking from common sense.  I mean, if

21   it would circulate, then it would have circulated it

22   throughout the building and then it would have been

23   more detected.

24              Is there....

25         A.    I don't know that that's necessarily true.

1      Q.   Okay.  So that's what I'm trying to get

2  you to explain to me.  What about this specific

3  building would have masked any odor or smoke if there

4  was this electrical failure of this wireless device?

5      A.   There are food odors.  There are cleaning

6  supplies odors that could mask it.  I don't know

7  what's ---

8      Q.   --- Which ones?  What ---

9      A.   --- We're cooking break.

10     Q.   Okay.  Were -- was there anything being

11 cooked at this time?

12     A.   I -- I don't know if there was or not.

13     Q.   So I'm assuming you did not ask Mr.

14 Diamantopoulos.

15     A.   I did not ask.

16     Q.   If there was nothing being -- if he has

17 testified that there was nothing being cooked at this

18 time, would that eliminate the potential of food odor

19 masking the odor from the electrical failure of this

20 wireless device?

21     A.   I don't know if it would not -- mask it or

22 not.

23     Q.   Okay.

24     A.   What -- I'm just -- no, he did not dis --

25 he did not smell anything.  He said that.

1          Q.    Right.

2          A.    And I don't know why he didn't smell it if

3    it was happening.  Whether it was happening or not I

4    don't know.  I don't know what could have masked it

5    other than the potential that there was a food

6    product that masked it.  I walked in -- I -- I worked

7    in a restaurant as a kid.  There were always odors in

8    a restaurant.  I don't know if it was enough to -- to

9    mask a -- a -- smoke or not, or the odor.  I just

10   don't know.

11         Q.    Okay.  So if there was a food odor, then

12   that would have masked the odor.  What would mask

13   smoke?

14         A.    Visual smoke?

15         Q.    Uh-huh.

16         A.    I don't know that you could mask visual

17   smoke.

18         Q.    Okay.  And did you ask Mr. Diamantopoulos

19   if he saw ---

20         A.    --- Yes.

21         Q.    --- Any smoke?

22         A.    No.

23         Q.    And what did he say?

24         A.    He said no.

25         Q.    In general, if there was an electrical

1    failure, would you have expected there to be smoke?

2           A.    If there was -- if -- if pyrolysis was

3    incurring and -- yes, I would expect there to be some

4    smoke.  I don't know how much.  I have had -- I have

5    personally set fires in -- in cars which have -- and

6    in the beginning of them there's very, very little

7    visible smoke.  I just don't know what would have

8    been there.

9           Q.    Okay.

10          A.    Or what....

11          Q.    Have you ever set fire -- have you ever

12   purposefully had an electrical fire?

13          A.    Yes.

14          Q.    Okay, and when you purposefully set an

15   electrical fire, did you see smoke?

16          A.    Yes.

17          Q.    So you said food odor and the ventilation.

18          A.    Or cleaning supplies.  I just don't know.

19          Q.    Okay.  What cleaning supplies, in your

20   experience, masks ---

21          A.    --- I don't know that they're masking ---

22          Q.    --- An electrical ---

23          A.    --- I don't know that they mask them or

24   not.  I just know that they're there and that

25   cleaning supplies have odors.  I know that people

 1    have sensitive noses for certain things and not

 2    others.  And I just don't know what he could or could

 3    not have detected.  I just don't know.

 4          Q.   Well, so that we're clear on your

 5    testimony, is it your testimony that -- it's not your

 6    testimony that this wireless device was on fire.

 7    Correct?

 8          A.   That's right.

 9          Q.   Okay.  It's just one of your

10    hypotheticals.

11          A.   It's a hypothesis, yes, that -- it's my hy

12    -- it is a hypothesis, that it could be potentially

13    failing, yes.  I don't know whether it did or not.

14          Q.   Uh-huh.

15          A.   But it is part of something that I needed

16    to consider.

17          Q.   Okay.  So in considering whether or not

18    this wireless device caught on fire, one common-sense

19    thing would be to ask was there smoke ---

20          A.   --- Uh-huh.

21          Q.   --- Was there an odor.  Correct?

22          A.   Yes.

23          Q.   Okay.  So you asked Mr. Diamantopoulos if

24    there was an odor.

25          A.   Uh-huh.

1        Q.    And he said no.  Correct?

2        A.    That's right.

3        Q.    And you asked him if there was smoke and

4   he said no.  Correct?

5        A.    That's right.

6        Q.    And it's not your testimony that cleaning

7   supplies eliminated the odor of an electrical

8   failure.  Is that correct?

9        A.    No, it's definitely not.

10        Q.    And it's not your testimony that the food

11   odor masked the odor from an electrical failure.

12        A.    No.

13        Q.    And it's not your testimony that the

14   ventilation system masked any smoke or odor from an

15   electrical failure.

16        A.    No.  It's only something that I would

17   consider ---

18        Q.    --- Okay.

19        A.    --- As to whether or not it was or could

20   be detected.

21        Q.    Okay, so you considered it.

22        A.    Uh-huh.

23        Q.    And so what did you find about the food

24   odor?

25        A.    I don't know that it could or could not

1    have masked the odor.

2          Q.    And what did you find about the cleaning

3    supplies?

4          A.    The same.  I don't know whether or not it

5    could or could not have masked the odor.

6          Q.    And what did you find about the

7    ventilation system?

8          A.    I don't know whether it could or could not

9    have masked the odor.

10         Q.    So when you say that you don't know

11   whether or not it could or could not have masked the

12   odor ---

13         A.    --- Uh-huh.

14         Q.    --- Are you testifying that it's more

15   likely than not that the food odor masked the odor

16   from the electrical failure?

17         A.    No.  I'm only testifying that it was not

18   detected.  And I don't know whether or not it could

19   have been detected or not.

20         Q.    Okay.  So you say the time frame.  Have

21   you -- you said that he left at 8:25.

22         A.    Uh-huh.

23         Q.    If there is testimony that he left at 8:35

24   ---

25         A.    --- Uh-huh.

1        Q.    --- And the fire was called in at 8:41 ---

2        A.    --- Uh-huh.

3        Q.    --- Does -- if you accept that fact as

4    true ---

5        A.    --- Uh-huh.

6        Q.    --- That he left at 8:35 and the fire was

7    called in at 8:41 ---

8        A.    --- Uh-huh.

9        Q.    --- Does that increase the likelihood that

10   Mr. Diamantopoulos set this fire?

11       A.    It increases the likelihood that he was

12   very intimate to the ignition, yes, ma'am, in other

13   words, very intimate at the inception of the fire,

14   very close, or would have known that it was ignited,

15   yes, ma'am.

16       Q.    Okay.

17       A.    Does that make sense?  That's a -- that's

18   a phrase that we've used in the past, very intimate

19   to -- and has intimate knowledge of the ignition of

20   the fire.  Does that make sense?

21       Q.    Yes, it does.

22       A.    Okay.

23       Q.    So that I can break it down to my terms,

24   instead of saying that he was very intimate with the

25   fire -- I'm going to repeat my question.

1            If the testimony that Mr. Diamantopoulos

2    was seen at the restaurant at 8:35 and the fire was

3    called in at 8:41 ---

4            A.    --- Uh-huh.

5            Q.    --- Does that fact make it more likely

6    that Mr. Diamantopoulos was present when the fire was

7    started?

8            A.    It would increase the likelihood, yes,

9    ma'am.

10           Q.    Would it make it more likely than not that

11   Mr. Diamantopoulos was present when the fire started?

12           A.    Yes, ma'am.

13           Q.    So you mentioned the time frame.

14           A.    Uh-huh.

15           Q.    The fact that the fire started at 8:25 --

16   excuse me.   I apologize.

17               The fact that the fire -- that Mr.

18   Diamantopoulos was in the restaurant at 8:25 ---

19           A.    --- Uh-huh.

20           Q.    --- And the fire was called in at 8:41 ---

21           A.    --- Uh-huh.

22           Q.    --- If you take Mr. Diamantopoulos'

23   version of the facts as true ---

24           A.    --- Uh-huh.

25           Q.    --- That there was no odor, there was no

1   smoke, there was no detection of a fire at the time

2   that he left the building ---

3           A.    --- Uh-huh.

4           Q.    --- What is the probability that Mr.

5   Diamantopoulos was in the restaurant at the time of

6   the inception of the fire?

7           A.    Well, it's either probable or not.  And I

8   don't know whether or not that time frame is

9   sufficient for him -- for a fire to develop to that

10  point or not.  His time frame allows a little bit

11  more time.  I don't know whether it's sufficient

12  enough to develop that fire to the point that -- when

13  it was discovered or not.  It's possible.  But I

14  don't know that it's probable.

15          Q.    Is it more likely than not that the fire

16  was started before Mr. Diamantopoulos left the

17  building at 8:25?

18          A.    I don't know.  It's either -- it -- it's

19  possible or probable.

20          Q.    Right.

21          A.    And it's -- I don't have enough data to

22  say that it's probable.

23          Q.    So if we start at 50-50, is it a 50-50

24  shot that Mr. Diamantopoulos was in the building at

25  the time the fire was started if he left at 8:25?

1          A.    Yes.   There's two theories.   One is that

2    and one is the other.

3          Q.    Okay.

4          A.    And we're at 50-50.

5          Q.    We're at 50-50.

6          A.    Uh-huh.

7          Q.    Okay.   So we have a 10-minute window.   Mr.

8    Diamantopoulos claims he left the building at 8:25 --

9    or roughly -- I mean, he has testified, so we can use

10   whatever he says.   But let's go with 8:25, which

11   seems to be -- is that from your notes ---

12         A.    --- It's from my notes, yeah.

13         Q.    --- Of what he told you?   Okay.

14         A.    And from the -- I -- I believe the EUO

15   says that ---

16         Q.    --- Okay.

17         A.    --- Yeah.

18         Q.    Okay.   And 8:35 is the testimony from a

19   witness that puts Mr. Diamantopoulos at the

20   restaurant.

21         A.    Yes.

22         Q.    Okay.

23         A.    And Mr. Lacy's notes from his

24   investigation as well.

25         Q.    Okay, have you interviewed, Mr. Lapene,

1    the manager of Cycle Gears?

2         A.    No, ma'am.

3         Q.    Were you aware that Mr. Lapene has

4    testified that Mr. Diamantopoulos was at the

5    restaurant at 8:35?

6         A.    I was aware initially that he was

7    interviewed.  And then after seeing Mr. Lacy's expert

8    report I did -- I was aware that he was deposed, yes.

9         Q.    Okay, and did you see that it was at 8:35

10   that he said that Mr. Diamantopoulos -- excuse me.

11   Strike that.

12            So if Mr. Diamantopoulos left the

13   restaurant, the scene of the fire, at 8:25 and the

14   fire was such that a passerby could see it from the

15   road at 8:41 ---

16        A.    --- Uh-huh.

17        Q.    --- You said it's about a 50-50 shot that

18   Mr. Diamantopoulos was in the building at the set of

19   the fire.

20        A.    I -- that's not exactly what I ---

21        Q.    --- Start of the fire.  Okay.

22        A.    What I meant was is that they're 50-50

23   between two different potential ignition sources.

24        Q.    And the two different potential ignition

25   sources, what would they be?

1          A.    They would be an incendiary fire or the

2    Ion IQ, which has not been eliminated, or which I

3    have not -- or the electrical on -- or excuse me --

4    which I have not or Steve Stone has not been able to

5    eliminate.

6          Q.    Okay.  If Mr. Diamantopoulos was in the

7    building at 8:35 ---

8          A.    --- Uh-huh.

9          Q.    --- And left the building at 8:35, is it

10   more likely than not that the fire was incendiary in

11   nature?

12         A.    Yes.

13         Q.    And explain to me why that is.

14         A.    Because it's unlikely that the fire would

15   develop within the time frame that it would take to

16   be observed by passersby.

17         Q.    And when you say it's unlikely that it --

18   the fire would have been developed for a passerby to

19   notice ---

20         A.    --- Uh-huh.

21         Q.    --- If it was from the Ion IQ.

22         A.    I think any ignition source.

23         Q.    Or any ignition source.

24         A.    Right.

25         Q.    Okay.  Other than incendiary.

1          A.    No.  I think that if -- if -- I think the
2    fire could not have developed in that seven minutes.
3          Q.    Okay.  Without Mr. Diamantopoulos noticing
4    it if he was in the building.
5          A.    Yes, ma'am.
6          Q.    Okay.  So I want to step -- I want to walk
7    back minute by minute ---
8          A.    --- Uh-huh.
9          Q.    --- And you explain to me where -- at what
10   point in time could Mr. -- could this fire have
11   started and Mr. Diamantopoulos not been aware of it
12   and him get out of the building.  If it's 50-50 at
13   8:25, once he leave -- once -- if it's 8:26, it's
14   obviously more likely than if it was at 8:25.  Is
15   that....
16         A.    My answer to that is is that how quickly
17   this fire developed is subjective ---
18         Q.    --- Uh-huh.
19         A.    --- Because of the fuel packages and their
20   orientation.  I don't know how long it would take
21   from the actual ignition of the first fuel package to
22   the secondary fuel package -- would take.  They're
23   very high-heat-release-rate fuels.  They could
24   produce a fire that developed very quickly.
25                    Christmas trees -- very -- you know, I

1    don't know if it's similar or not to the heat release

2    rate, because I can't answer that question.  But I

3    have seen in studies of Christmas trees a room going

4    to full-room involvement and flashing over in 90

5    seconds.

6              So I don't know how quickly that fire

7    progressed.  All I -- all I have said is is that we

8    have two potential ignition sources that could

9    develop a fire with -- and it would be very difficult

10   for it to develop in seven minutes.  It's not

11   impossible but it would be very difficult for it to

12   develop within seven minutes to where it would be

13   visible by the outside.  We don't -- it's not

14   ventilation limited and it's not fuel limited.  So it

15   would have been a free-burning fire.

16        Q.   Even if Mr. Diamantopoulos left at 8:25,

17   would it have still been very difficult for the fire

18   to get to the point that it was visible to passerbys

19   between 8:25 and 8:41?

20        A.   I don't know that that's the case, no.

21        Q.   Okay.  How about between -- okay, so you

22   say in six minutes, 8:35 to 8:41, it would be very

23   difficult.

24        A.   It'd be difficult, not ---

25        Q.   --- How about -- I know not impossible ---

1          A.    --- Uh-huh.

2          Q.    --- But difficult.  I get that.

3                So how about between 8:30 and 8:41?  In 10

4    minutes to 11 minutes, would that be difficult?

5          A.    I don't know.

6          Q.    Okay.

7          A.    I'm ---

8          Q.    --- So your opinion changes sometime

9    between 8:30 and 8:35?

10         A.    It's not an opinion change.  I'm just

11   telling you that it's more difficult with the less of

12   a time frame.

13         Q.    Okay.

14         A.    Okay.  The shorter the time frame gets,

15   the more difficult it is.

16         Q.    Okay.

17         A.    The longer the time frame, the greater the

18   possibility that something else occurred.  The reason

19   that I feel the way that I do is because I don't know

20   the exact time frame.  And we have something that the

21   engineer that I dealt with and myself have not been

22   able to look at and eliminate.  And we have a time

23   frame that is short but we have a poss -- we have

24   possibilities of something else.  And that is all I

25   can say.

1          Q.    Did you ever watch the Walmart video?

2          A.    I did.

3          Q.    And you watched it since you wrote your

4     report?

5          A.    Yes, ma'am.

6          Q.    Okay.  What did you find significant about

7     the Walmart video?

8          A.    That the engine arrived as described at --

9     what was it?  It was 8:46.

10          Q.    Uh-huh.

11          A.    And I noticed that at 9:07, which was

12     listed in Ms. Locklear's notes, that I can't see any

13     emergency vehicle arriving at that time.  So I don't

14     know where she came up with that.  But -- but the

15     engine did arrive at 8:46.  And it is consistent with

16     the CAD report.  It is consistent within a short

17     period of time in the video's time stamp.

18          Q.    And what else was significant about the

19     Walmart video to you ---

20          A.    --- That Mr. ---

21          Q.    --- As an investigator?

22          A.    That Mr. Diamantopoulos drove in front of

23     the building at -- I believe it was 8:42.

24          Q.    Had Mr. Diamantopoulos ever told you

25     during his interview that he had driven in front of

1    the Walmart ---

2            A.    --- No, ma'am.

3            Q.    --- At 8:42?

4            A.    No, ma'am.

5            Q.    Did you ever see in any of his testimony

6    under oath that he had driven in front of the Walmart

7    building ---

8            A.    --- Not that ---

9            Q.    --- At 8:42?

10           A.    Not that I recall.

11           Q.    Are you familiar with that -- the

12   geographical location?

13           A.    Oh, yeah.

14           Q.    Okay.

15           A.    I'm from here.

16           Q.    Okay.  In the video were you able to see

17   the smoke or fire from the building?

18           A.    I was not, no.

19           Q.    Okay.  When you saw the video, what did

20   you do after watching the video?

21           A.    I think I sent an email to Mr. Wiggins and

22   Trey McLean indicating that the time frame on Mr.

23   Lacy's report and the time stamps were correct.

24           Q.    Okay.  Did you ever have a discussion with

25   Mr. Wiggins?

1      A.    Actually, I think that after I sent the

2   emails I did not get a return call, which I was

3   pretty surprised about.  But other than that ---

4      Q.    --- Okay.

5      A.    --- I don't -- I -- I did discuss the fact

6   that I felt like that the times were right on and

7   that narrows the time frame from my report with the

8   time discrepancy that appeared to be there.  It

9   eliminated that.

10     Q.    Okay.  What other significance did the

11  video have for you?

12     A.    That I thought that it was interesting

13  that Mr. Diamantopoulos was in front of Walmart

14  within minutes of the fire engine arriving.

15     Q.    And why is that significant to you?

16     A.    Because he said he was elsewhere.

17     Q.    Does that -- did you ever have a

18  discussion with anyone -- other than the email --

19  with anyone about the Walmart video and what you saw

20  in it?

21     A.    Yes.  I told Mr. Wiggins and Mr. McLean

22  that that -- I thought that it was odd that he was in

23  front of the building within minutes of the engine

24  arriving.

25     Q.    Anything else?

1       A.    Maybe ---

2       Q.    --- Was that your choice word, was that it

3  was odd?

4       A.    Uh-huh.

5       Q.    That's a....

6       A.    I think I said that.  I think I said odd.

7  But it's -- it -- it would be contrary to his

8  testimony.

9       Q.    Okay, so you explained that it'd be

10  contrary to his testimony.

11      A.    Uh-huh.

12      Q.    Because obviously in your report you said

13  something different.

14      A.    Yes.

15      Q.    Okay.  So what you're saying today is more

16  accurate because you reviewed the video yourself.

17      A.    Yes, ma'am.

18      Q.    Okay.  So I'm not going to go through your

19  report.

20            And your choice word was that it was odd?

21      A.    Uh-huh.

22      Q.    And interesting.

23      A.    Uh-huh.

24      Q.    Anything else?

25      A.    I don't think I said anything else.

1          Q.    Did you say anything else?

2          A.    I don't think that I did.

3          Q.    Okay.   What was the comments back to you?

4          A.    I think Trey said something like I don't

5    know why he was in front of the building either.   And

6    I felt like that we needed to have an answer to that.

7          Q.    Did you ever talk to Mr. Diamantopoulos?

8          A.    I did not.   I was not asked ---

9          Q.    --- Do you know whether or not the

10   attorneys ever talked to Mr. Diamantopoulos?

11         A.    I don't know.

12         Q.    Did you ask them to talk to him?

13         A.    I told them that it would be a good -- a

14   good idea to talk to him and find out why he was in

15   front of the building, yes, ma'am.   I think -- I

16   think we discussed that earlier on, was to find out

17   why he had been in front of the building, because it

18   was pretty -- I think it was absolutely clear from

19   the beginning that there was a video of the Walmart

20   parking lot and we needed to have the information as

21   to what that included.

22         Q.    What is the significance of the time frame

23   that Mr. Diamantopoulos was at the Walmart parking

24   lot at 8:42?   What's significant of that fact?   What

25   is the -- strike that.

1          What is the significance of that fact to

2    you as an investigator?

3          A.    That he was in close proximity to the

4    building when the fire was called in, and that it

5    would support the fact that he had been in the area

6    since he left as opposed to driving away immediately.

7    I don't know where he went, but it would suggest

8    that.

9          Q.    Does it also support -- strike that.

10          Does it make it more likely -- that fact

11   make it more likely that the fire was incendiary?

12         A.    I don't think it makes it more likely that

13   it was.  I think it makes it more like -- I think it

14   makes -- I think it makes it likely that he has not

15   communicated this -- I'm -- well, that's -- excuse

16   me.  Let me step back.  I think that he has not said

17   the same story every time.'

18         Q.    Uh-huh.  Are you aware of -- strike that.

19   I'll get back to that when I get to your report.

20          Okay, what other facts were significant in

21   your investigation when you were trying to determine

22   whether or not the cause and origin of this fire was

23   incendiary versus the electrical wireless device?

24         A.    Any other circumstantial ---

25         Q.    --- Catching on fire.

1          A.    Any other circumstantial facts or evidence

2    would be considered following a cause determination.

3          Q.    Okay, and what -- and that's what I want

4    to get from you.

5          A.    Uh-huh.

6          Q.    What other circumstantial facts were

7    important to you?

8          A.    Financial information would be -- if I was

9    doing the entire investigation, which I did not -- I

10   did a origin-and-cause investigation.  I did not do

11   the follow-up investigation.  In other words ---

12         Q.    --- Can -- yeah.  Can you explain that to

13   me?

14         A.    In other words, I isolated my

15   investigation to the examination of the evidence at

16   the scene and the collected evidence and the EUO's to

17   determine the time frame, to determine what he had

18   done in the building prior to leaving, and how long

19   he was there.  And that was the scope of my

20   investigation.

21         Q.    Would it have been appropriate for you to

22   do a follow-up investigation into financials or any

23   other circumstantial evidence that could help in

24   determining the cause and origin of the fire?

25         A.    I think that that's outside of the

1    forensic evidence and it's not part of the actual

2    cause determination.  It's only supportive of a cause

3    determination.

4            Q.    Okay.  And it's supportive but it's ---

5            A.    --- It's an indicator.

6            Q.    An indicator.

7            A.    It's an indicator.

8            Q.    Okay.  But you did not do that part of the

9    investigation.  Correct?

10           A.    No, ma'am.

11           Q.    And was that because of financial reasons

12   based on the plaintiff's financial status?

13           A.    I have no idea.  I was not asked to do it.

14           Q.    Okay.  And you would have only done it if

15   -- if they would have asked you to have done it,

16   would you have done it?

17           A.    Absolutely.

18           Q.    Okay.  So if they would have asked you to

19   do a full investigation into the cause and origin of

20   this fire, what is everything else you would have

21   done if you were asked to do so?

22           A.    I would have -- I would have checked

23   records.  I would have checked the ---

24           Q.    --- What records?

25           A.    Criminal records, civil records.  I would

1    have checked the -- followed -- I would have followed

2    up on any complaint that had been made.

3              Q.   By whom?

4              A.   By Mr. Lapene, in other words, his

5    statement.  I would have interviewed him.  I would

6    have interviewed the employees.  I would have -- I

7    would have checked on -- or I would have gone to

8    interview every fire official that was involved.  I

9    would have interviewed Chad Royal.  I would have done

10   a more -- I would have done more as far as the video

11   goes.  I would have attempted to review that earlier

12   on.  I would have done a -- a number of things to --

13   to just collect data.

14             Q.   Talked to the IRS?

15             A.   I would have.

16             Q.   Talked to the waste services?

17             A.   I would have.

18             Q.   Anything else?

19             A.   Not that I can think of at the moment, but

20   I'm sure there something.  It depends on what I was

21   told by each one of those individuals, how -- if they

22   told me something that I needed -- that I felt like

23   was important and I needed to follow up on, I would

24   have.

25             Q.   For a lay person's -- you know, not a lot

1    of people have heard of cause-and-origin experts but

2    they have heard of detectives.

3              A.    Uh-huh.

4              Q.    You know, that's a common term.

5              A.    Uh-huh.

6              Q.    Common thing you see in movies.

7                    Your investigation as a -- a fire

8    investigation, is it similar to what you did as a

9    detective when you were investigating the cause and

10   origin of a fire?

11             A.    The origin and cause portion ---

12             Q.    --- Uh-huh.

13             A.    --- Is very similar.

14             Q.    Uh-huh.

15             A.    The rest of it is not.

16             Q.    Okay.  So what rest of it's not?

17             A.    In other words, the follow-up that I've

18   just discussed there.

19             Q.    Okay.

20             A.    That is only done at the request of my

21   clients.

22             Q.    Right.  And so that's your limitation.

23             A.    Yes, ma'am.

24             Q.    Is only if you are requested.

25             A.    That ---

1        Q.    --- Because then you won't get paid for it

2    if you do it without the request.

3        A.    Well, yeah.  I ---

4        Q.    --- Okay.

5        A.    But, I mean, I'm -- I do what I'm told.

6        Q.    Right.  And I get that.

7        A.    Okay.

8        Q.    Okay.  Why didn't you review the

9    depositions?

10        A.    I wasn't given the depositions.

11        Q.    Have you ever been told any of the

12    testimony given by Mr. Diamantopoulos in his

13    subsequent deposition?

14        A.    No, ma'am.

15        Q.    Were you aware of any of the statements

16    Mr. Diamantopoulos gave outside of his EUO?

17        A.    To whom?

18        Q.    To anyone.

19        A.    No.

20        Q.    Have you ever read his statement to the

21    investigating police officer on the scene?

22        A.    No, ma'am.

23        Q.    Did you see the police report in this

24    case?

25        A.    Yes.

1          Q.    Okay.  But you have not seen the interview

2    with Mr. Diamantopoulos.

3          A.    No, ma'am.

4          Q.    Did you ever have a conversation with

5    Detective House in this case?

6          A.    No.  I called and left a message and he

7    didn't return my call.

8          Q.    Any other facts about this case or

9    circumstantial evidence that would lead a

10   cause-and-origin expert to determine the fire to be

11   incendiary?

12         A.    Any other facts about this case?

13         Q.    Uh-huh.

14         A.    Not that I can think of that we haven't

15   discussed.

16         Q.    I know we discussed earlier the fact that

17   Ms. Moon testified about the relocation of the bread

18   rack.

19         A.    Uh-huh.

20         Q.    Would that have been something you would

21   have considered?

22         A.    I would have considered it as a -- as

23   contrary to Mr. Diamantopoulos' statement, yes.

24         Q.    And so that the record's clear, did you

25   ever talk to Mr. Michalos, the other owner of the

1    building?

2          A.    No, ma'am.

3          Q.    Okay.  And did you ever look into the

4    financial records of this company?

5          A.    No.  Only what was discussed in the EUO's.

6    I just read that.

7          Q.    Okay.  I just have a few questions about

8    your report.

9          A.    Okay.

10         Q.    Did you talk to any of the firefighters

11   who were present at the scene of the fire ---

12         A.    --- No.

13         Q.    --- Regarding the origin of the fire?

14         A.    No.

15         Q.    Why?

16         A.    I wasn't asked to interview them.

17         Q.    Do you know where the firefighters

18   determined the origin of the fire to be located?

19         A.    In the area of the rear drive-thru window.

20         Q.    And is that all you know ---

21         A.    --- Yes.

22         Q.    --- About the placement?

23         A.    Uh-huh.  The -- Mr. Lacy's report

24   describes clearly what they saw coming in and I have

25   no reason to dispute that.

1        Q.    We'll go through Mr. Lacy's report ---

2        A.    --- Okay.

3        Q.    --- In detail to determine what you do

4    dispute ---

5        A.    --- Okay.

6        Q.    --- And what you don't dispute.

7        A.    All right.

8        Q.    Let's start with your summary of cause and

9    origin on page two of your expert report.

10              You state that the fire originated in the

11   area around the set of metal shelves located along

12   the wall separating the restaurant office and the

13   hallway connecting the two drive-thru windows.

14              Is that still your opinion?

15       A.    Yes, ma'am.

16       Q.    The set of metal shelves you're

17   referencing, are those the metal shelves that housed

18   the styrofoam plates and cups that you referenced

19   earlier?

20       A.    Yes.

21       Q.    Okay.  How did you determine that that was

22   the origin of the fire?

23       A.    Based on the patterns and fire progression

24   in that -- from that area.

25       Q.    Okay.  Were you able to determine from the

1    fire patterns whether or not the fire -- where along

2    the wall, the spectrum of the wall the fire started?

3          A.   I don't feel like there was enough data to

4    make that determination based on the fuel package.

5          Q.   So it's your opinion you cannot determine

6    where on the wall the fire started.

7          A.   I don't believe that I can determine

8    whether it was floor level or above.  It could have

9    been above.  It could have been at floor level.  I

10   just don't know that there's enough data to tell

11   that.

12         Q.   Okay.  So that I'm clear, when you say

13   above, are you saying above floor level?

14         A.   Uh-huh.

15         Q.   Okay.

16         A.   Yes, ma'am.

17              MS. DALY:  I'm going to mark this as

18   Exhibit 4.

19              (* Exhibit 4 was marked *)

20              MS. DALY:  Do you need me to go

21   through this and get you a copy, Mr. Wiggins?

22              MR. WIGGINS:  No, that's okay.

23         Q.   (Ms. Daly)  So we're looking at Exhibit 4,

24   which is photograph 16.

25              When you say that the origin was in this

1  rear drive-thru window, can you mark with this blue

2  pen the possibility of where it started.

3          You say it's above floor level, so it's at

4  floor level or above.  And you testified earlier that

5  it was below the ceiling.

6          A.    Uh-huh.

7          Q.    So mark on this picture where you believe

8  the origin of the fire was.

9          A.    I can give you an ---

10         Q.    --- The ---

11         A.    --- I can give you an area.

12         Q.    Okay.

13         A.    And that's the best I can do.

14         Q.    Then give me the area.

15     (Witness marked document)

16         Q.    So in your opinion it's -- it could not

17  have started anywhere above the wireless device.

18         A.    Don't believe so.  There wasn't even any

19  fuel above that.

20         Q.    Okay.  And it didn't start under the

21  floor.

22         A.    No, clearly not.  You're right.

23         Q.    Okay.  So you -- well, you have it on the

24  floor.

25         A.    I do.

1          Q.    So I want to be very clear.

2          A.    Okay.

3          Q.    So can you write what this area is

4     indicating?  And if it's okay, I'm going to go over

5     this area with a black marker so that we can see it a

6     little better.

7                And write on the side what that box

8     indicates.

9          A.    Okay.  And -- well, it's only a portion of

10    the area of origin but I'm going to write area of

11    origin because that depicts a portion of it.  The

12    area of origin includes that shelf.

13         Q.    Okay.

14         A.    Okay.

15         Q.    Well, then you can circle the shelf as

16    well if you ---

17         A.    --- I can't see the shelf.  It's only a

18    vertical picture.

19         Q.    Okay.

20         A.    So if we had an -- you know, if you had a

21    picture showing the wall from the other direction, we

22    would ---

23         Q.    --- Okay.

24         A.    It -- it -- what I'm trying to explain is

25    this -- the area includes the entire shelf.

1        Q.    Okay.

2        A.    Okay.

3        (Witness marked document)

4                     MR. WIGGINS:  Let me see what you've

5    got on here.

6        Q.    (Ms. Daly)  So that we are clear, the fire

7    could have started on the shelf itself.

8        A.    Could have.

9        Q.    Or it could have started on the floor, or

10    it could have started anywhere along that wall, all

11    the way up above the wireless device.

12        A.    Yes, ma'am.  To the wireless device.

13        Q.    To the wireless device.

14              I want you to explain to me what about

15    this fire pattern supports -- the first support I

16    want you to give me is what supports that this fire

17    started at the floor level.

18              What about this fire pattern in all the

19    pictures that you've looked at in addition to this

20    picture?

21              And if you need to look at your pictures,

22    please feel free to do so.

23              Give me all the evidence that supports,

24    based on the fire pattern and anything else that you

25    would use, to determine where this fire started.

1        A.    There's a fire pattern of fire damage from

2   floor level upward to include the dimensions of the

3   shelf in that area and patterns on the floor of pla

4   -- what appears to be plastics that puddled on the

5   floor.

6        Q.    Okay, and why does that support that the

7   fire started on the floor?

8        A.    Okay.  What it supports is is that we had

9   a fire at floor level of great intensity.

10       Q.    Okay.

11       A.    That's what it supports.

12       Q.    In general, is the intensity level of the

13  fire greater at its ignition source or somewhere

14  else?

15       A.    Sometimes it is.  Sometimes it's not.  It

16  de ---

17       Q.    --- Okay.

18       A.    Okay.  Sometimes it is.  Sometimes it's

19  not.  It depends on what the secondary fuel package

20  is and how it develops from there.

21       Q.    Okay.  So in this picture explain -- you

22  say that -- or at this fire scene -- that the --

23  there's great intensity at the floor level.

24       A.    Uh-huh.

25       Q.    Based on your review of the scene, what

1    area had the greatest intensity?

2        A.    Right in the corner.  And the -- the only

3    -- the only way ---

4        Q.    --- Okay.  When you say right in the

5    corner, I want you to be very precise.

6        A.    Okay.

7        Q.    Where in the corner?

8        A.    The corner of the wall separating the

9    office from the drive-thru area and the exterior

10   wall, so in other words, the exterior wall where the

11   drive-thru window is, headed towards the rear of the

12   building and the office -- office wall, that corner.

13       Q.    Okay, and is that as precise as you can

14   be?

15       A.    That's as precise as I can be.  And that's

16   based on the degree of damage -- well, the fact that

17   the tile grout was so loose in that area and I was

18   able to remove so much more of the tile in that area

19   would indicate that it had a higher heat

20   concentration in that area.  And that's why I would

21   say that received the most amount of heat.

22       Q.    Okay.

23       A.    The walls were -- excuse me -- were

24   covered with -- with fiberglass board and sheetrock.

25   So a majority of the combustible materials in the

1    wall were -- were undamaged ---

2         Q.    --- Uh-huh.

3         A.    --- Because they were protected.

4         Q.    So going back to my original question,

5    what other evidence from the fire scene supports that

6    the fire started at floor level?

7         A.    The evidence that I'm describing doesn't

8    necessarily say that it started at floor level.  It's

9    saying that we had a fire on the floor level of great

10   intensity.  I don't know -- I don't have enough data

11   to say that it started at floor level.

12        Q.    Okay.  My question to you is I want to

13   know what about the fire pattern and any other

14   evidence would -- from your investigation supports

15   the fire starting at floor level.

16        A.    The fact that it's in that corner, in that

17   area, and that we have eliminated the electrical

18   sources of ignition midway up on the wall.  In other

19   words, the -- the receptacles and the branch circuits

20   in that area that are potential sources of ignition

21   have been eliminated.  That would indicate that it

22   would either be below that or above that.

23             And so my evidence would be the degree of

24   damage and heat intensity at floor level and the fact

25   that we've eliminated the electrical sources of

1    ignition midway in the wall.

2          Q.    Anything about the fire pattern itself ---

3          A.    --- The fire ---

4          Q.    --- That would indicate that the fire

5    started at floor level?

6          A.    The majority of the fire patterns were

7    destroyed by overhaul.  The -- the -- the fiberglass

8    wall covering was taken away from the wall.  So -- so

9    the intensity that it received on the base of the

10   floor was -- was -- it was removed.  Now, the

11   aluminum cart shows damage at floor level, or lower

12   level, I should say, and -- and that would be where

13   it received its most heat.

14            Now, whether or not that indicates that

15   the fire started at floor level or that that's where

16   the greatest heat occurred I can't say.

17         Q.    All right.  But that's a piece of

18   circumstantial evidence that you would have to

19   consider.

20         A.    It -- well, it's physical evidence.

21         Q.    Right.  I'm sorry.

22         A.    And it's that ---

23         Q.    --- Physical evidence.

24         A.    It's physical evidence that's there and

25   it's observable and it would have to be taken into

1    account.  But also the fuel load would have to be

2    taken into account and how the fuel load would have

3    burned.

4         Q.   Okay, and what about the fuel load and how

5    it burned would support that the fire started at

6    floor level?

7         A.   I don't know that there's enough data to

8    say.

9         Q.   Okay.  What would you consider?

10        A.   I don't -- I don't have anything that I

11   would consider.  There's not enough data to make a

12   determination on that, the reason being is is because

13   there are plastics and they're -- when they combust,

14   when they -- they melt, they melt and puddle.

15        Q.   Uh-huh.

16        A.   And this is an open shelf with a lot of

17   ventilation and slats in it which can -- that just

18   drip right through, which means that once it starts

19   to drip right through, everything can ignite.  And at

20   that point the greatest heat development will be at

21   low level whether the fire started up higher or not.

22   And that's why I don't have enough data to say one

23   way or another.

24        Q.   And then what evidence -- anything else?

25   Anything else you considered to -- in your

1    determining -- because -- and correct me if I'm

2    wrong.  You do consider whether or not the -- the --

3    where the fire started, not just the general

4    location.

5          A.   Yes, ma'am.

6          Q.   You're looking to see did it start on the

7    wall, did it start above ceiling, did it start below

8    ground.

9          A.   Yes, yes.

10         Q.   That's something you do consider.

11   Correct?

12         A.   Yes, ma'am, yes.

13         Q.   Okay, so I want to know every single fact

14   you considered when you were trying to determine

15   whether -- where this fire started.  And so I'm going

16   to break it up because I'm going to get -- I'm going

17   to keep going higher.  So I want to start at the

18   floor level.

19              What facts, physical evidence, anything

20   that you looked at did you put under, okay, the

21   origin of this fire started at ground level?

22         A.   I considered whether it had started at --

23   at floor level.  I did not believe there was enough

24   data to support that determination because of the

25   fuel package and what it could do during its fire

1  progression.

2          Q.    But what data did you look at?

3          A.    I looked at the floor patterns and I

4  looked at the wall.  And there wasn't enough data to

5  support that.

6          Q.    Anything else?

7          A.    No.

8          Q.    So you just looked at those and then you

9  moved on.

10         A.    I looked at the branch circuitry.

11         Q.    Okay.

12         A.    And we eliminated that.  I didn't see

13 anything that would say that the fire started there.

14         Q.    Okay.  Anything else when you were trying

15 to determine did the origin of the fire start at

16 ground level?

17         A.    No, I don't think so.

18         Q.    Okay.  How about the metal shelf?

19         A.    Uh-huh.

20         Q.    Did you consider whether or not the fire

21 started on this metal shelf?

22         A.    I did.

23         Q.    Okay, and tell me what evidence you

24 reviewed and how you were either able to eliminate it

25 or how you were not able to eliminate it.

1          A.    I was not a label -- I -- I was not able

2     to eliminate it, because it was not there at the time

3     of my examination.  And it is only photographed.  And

4     it is not in such an orientation to -- to examine the

5     fire patterns on the shelf itself.

6          Q.    So on the metal shelf, you were not able

7     to do any -- do a forensic examination of the

8     photographs to determine whether or not the origin of

9     the fire was on the metal shelf.  Is that correct?

10          A.    I was not able to determine that at all,

11     because there wasn't enough data to do so.

12          Q.    Okay.  So in your opinion, did the fire

13     either start at floor level, on the metal shelf, or

14     at the wireless device?

15          A.    Could have, yes, ma'am.

16          Q.    Okay.  Is there anywhere else that you're

17     saying it could have?

18          A.    No.

19          Q.    Okay, so it's these three specific origins

20     that you're saying are potential.

21          A.    When you say specific are you ---

22          Q.    --- That -- the three I'm looking at are

23     ground level, the -- or floor level, the bread shelf,

24     or the wireless device.

25          A.    I haven't said that the bread shelf was an

1    origin area.

2         Q.   Okay, so -- but you're saying it could --

3    it could have been.

4         A.   No.

5         Q.   Okay, so you're saying there's no way that

6    the fire started on that bread shelf.

7         A.   I'm saying that ---

8         Q.   --- Or on the metal shelf.  Excuse me.

9    The metal shelf.  Strike the question.

10             There are three potential origins for this

11   fire, in your opinion.

12        A.   Well, okay.  Well, let me just understand

13   your question, because we're talking about points of

14   origin ---

15        Q.   --- Uh-huh.

16        A.   --- Or areas of origin?

17        Q.   No.  I'm talking about the point of

18   origin.  I want to know specifically ---

19        A.   --- Well, a point of origin would -- when

20   -- when I define a point of origin ---

21        Q.   --- Okay.

22        A.   --- We're talking about a -- a point.

23        Q.   Okay.

24        A.   An item.  Okay?

25        Q.   Uh-huh.

1          A.    And a floor level, if it's -- if -- if you

2     have a puddle ---

3          Q.    --- Uh-huh.

4          A.    --- Or a large area of origin, it is an

5     area of origin ---

6          Q.    --- Okay.

7          A.    --- Whether it's -- and -- and what we're

8     talking about when you talk about a point of origin

9     is where the first fuels ignited in that position.

10         Q.    And that you cannot determine.

11         A.    I cannot determine.

12         Q.    Okay.  So then let's broaden it up for --

13    and can you even give a hypothetical about the point

14    of origin?

15         A.    Not about a point, no.

16         Q.    Okay.

17         A.    I don't have enough data to do so.

18         Q.    Okay, so can you give a hypothetical about

19    the area of origin?

20         A.    And -- and what I had said earlier was is

21    that the area of origin in my report could be from

22    floor to ceiling, anywhere between that area

23    involving that shelf or surrounding components.

24         Q.    Okay, and that's what I'm trying to narrow

25    down so I am very precise about where you think the

1    potential or possibility of the area of origin.  So

2    you've mentioned the wireless device.

3          A.    Uh-huh.

4          Q.    So that's one.

5          A.    Uh-huh.

6          Q.    You mentioned at floor level.

7          A.    And now, let's clarify.

8          Q.    Okay.

9          A.    You asked me what evidence there was ---

10         Q.    --- Right.

11         A.    --- To say that it was at floor level.  I

12   have never said that it started at floor level or ---

13         Q.    --- I understand that.

14         A.    Okay.  What I have said is it could start

15   anywhere in that shelf area and create the patterns

16   that are developed on the floor.  I can only tell you

17   that that's my area.  I do not have a point other

18   than that.

19         Q.    Okay.  I want you to tell me all the

20   evidence based on your investigation that supports

21   that it was the wireless device that had an

22   electrical failure and caught on fire.

23         A.    There is no direct physical evidence that

24   the -- the Ion IQ actually failed and caused that

25   fire.

1          Q.    Okay.  Tell me about the fire pattern that

2     supports your testimony that the wireless device

3     could have caused this fire.

4          A.    It is in the area of origin.

5          Q.    Okay, and ---

6          A.    --- I -- I'm going to elaborate.  It's in

7     the area of origin and there is an easily-ignitable

8     fuel in close proximity.  And because the fuel

9     package orientation and the shelf itself would allow

10    burning material to reach the bottom level, the

11    floor, I can't tell you whether or not it started at

12    the Ion IQ level or anywhere between that and the

13    floor.

14         Q.    Is there anything about this pattern, the

15    burn pattern that supports your theory that the

16    wireless device is what caught on fire?

17         A.    No.

18         Q.    Other than the area of origin, the fact

19    that there was this wireless device in the area where

20    the fire started, and that there was an

21    easily-ignitable fuel source in close proximity.

22         A.    Uh-huh.

23         Q.    Other than those two facts, do you have

24    any other evidence that supports your theory that the

25    wireless device was the ignition source to this fire?

```
 1          A.   I don't have any other evidence at all.
 2   We -- and as I mentioned earlier, we don't have it.
 3   I haven't been able to look at it nor has Steve
 4   Stone.  So developing a theory as to how it failed or
 5   whether or not it failed for sure we can't do.
 6          Q.   Right.  But I'm talking about everything
 7   else that you would do ---
 8          A.   --- Uh-huh.
 9          Q.   --- As a cause-and-origin expert,
10   everything else would -- that you would look at.  So
11   you said you looked at the -- you would look at fire
12   patterns.
13          A.   Uh-huh.
14          Q.   Or burn patterns.  What else would you
15   look at?
16          A.   I would look at the -- the -- clearly, you
17   -- this is the protected area where this item was.
18   Okay?
19          Q.   Right.
20          A.   And you keep put -- pointing to that.  So
21   where you're headed with that is is this protected
22   area.  That's what you want to know about.  Right?
23          Q.   Well, actually I'll get to that question.
24          A.   Okay.
25          Q.   But right now I'm trying to figure out the
```

 1    evidence that supp ---

 2          A.    --- Well, that's one of the things that I

 3    would ---

 4          Q.    --- That supports this theory.

 5          A.    Well, that's one of the things that I

 6    would look at, is to determine whether or not another

 7    item was there.  And that was there.

 8          Q.    You said another item that ---

 9          A.    --- Yeah.  Any other electrical source of

10    ignition being present in that or any other potential

11    source of ignition, that's what I would look for.

12    And that was physical evidence that there was

13    something there.

14          Q.    Right.

15          A.    That was ---

16          Q.    --- That the wireless device was on the

17    wall.

18          A.    Yes.  That would be what I would consider.

19          Q.    Okay, so you would look at that.  Is there

20    evidence that there was an item on the wall?

21          A.    Yes.

22          Q.    Okay.

23          A.    If I had been there originally in the

24    beginning, I would have considered that and its

25    location and I would have sifted through the debris

1    to find anything else that was a potential source of

2    ignition.  I would have considered that with the fuel

3    package that was present and the fire patterns.

4         Q.   Do you know whether or not there was any

5    type of metal base plate on the wall?

6         A.   I don't.

7         Q.   Is there any evidence that there was a

8    base plate on the wall?

9         A.   Not that I'm aware of.  I don't know.

10        Q.   Okay.  Anything else besides fire patterns

11   and evidence of an item on the wall?

12        A.   No.

13        Q.   Nothing else you would look at as a

14   cause-and-origin expert.

15        A.   I would look for the associated

16   peripherals for that to find out if they were

17   present, in other words, a power cord for it and its

18   power supply if it had one.

19        Q.   Okay.

20        A.   To make sure that all of that was

21   available for inspection.

22        Q.   By an electrical engineer.

23        A.   Yes.

24        Q.   What was this power supply to this

25   wireless device?

1          A.    I don't know.  I haven't seen it.

2          Q.    Okay

3          A.    All I know is is what the specs ---

4          Q.    --- Were you told?

5          A.    Yeah.  The specs in the reports provided

6     by Mr. Martini and the -- the specs of the item

7     provide that it's the class-two, 24-volt power

8     supply.

9          Q.    And did you find that during your research

10    on this wireless device?

11         A.    Yes.

12         Q.    Okay, so do you have any reason to refute

13    that evidence that it was -- of what Mr. Martini

14    found?

15         A.    That that's what it requires, no.

16         Q.    Okay, so you're both saying the same

17    thing.

18         A.    I'm saying that that's what it requires,

19    yes.

20         Q.    Okay, and did you ask Mr. Diamantopoulos

21    about it -- the power supply?

22         A.    No.  He -- I asked him if he had that

23    thing there and he said yes.

24         Q.    And did you ask Mr. Dowlat, the person who

25    installed it?

1          A.    He said that the power supply was above

2    the ceiling level.

3          Q.    And did he tell you what type of power

4    supply it was?

5          A.    That it was a 24-volt power supply.

6          Q.    Okay, so the evidence is consistent in

7    this case.

8          A.    The statements are all consistent about

9    what it had, yes, ma'am, absolutely.

10          Q.    Anything else you would have considered?

11          A.    As far as?

12          Q.    To determine that it was the -- that the

13    fire started at this wireless device up on the wall.

14          A.    I would have inspected it.  I would have

15    had it inspected.  That's all ---

16          Q.    --- Okay.

17          A.    --- That I can say.

18          Q.    Okay.

19          A.    I mean, it -- because -- because it is in

20    the origin area it would absolutely have to be

21    inspected.

22          Q.    Okay.  But as I understand, an electrical

23    engineer would have -- or a mechanical engineer would

24    have inspected it.  But I'm talking about with you as

25    the cause-and-origin expert who looks at fire

1    patterns, and you said evidence on the wall.

2                Anything else that you would do?

3          A.    No.

4          Q.    Okay.  So let's start with the fire

5    patterns.  Can you tell me what about the fire

6    pattern, based on looking at the photographs ---

7          A.    --- Uh-huh.

8          Q.    --- And your visit to the scene, supports

9    your theory that it was the wireless device that was

10   the origin of the fire?

11               MR. WIGGINS:  I object, because he

12   hadn't said that.

13         Q.    (Ms. Daly)  Or that it could have been.

14               MR. WIGGINS:  There you go.

15         Q.    (Ms. Daly)  Could have been the origin.

16         A.    It could have been the origin, because

17   there's not enough data to support that the fire

18   originated anywhere else on that rack.  There's not

19   enough data to support that it's below that or above

20   -- or it -- or at that level on that shelf.  I do not

21   have enough data to support any of those.  So it

22   would have to have been included as a potential.

23         Q.    So am I accurate in saying you do not have

24   any evidence based on the fire pattern that the

25   ignition source was the wireless device?

1        A.    No, no.

2        Q.    Is that correct?

3        A.    That is correct.

4        Q.    Okay.  Because I think I did a double

5   negative, I'm going to make sure that I have this

6   clear.

7              Isn't it true that there's nothing about

8   the fire pattern that supports the theory that the

9   wireless device was the ignition source of the fire?

10       A.    The fire pattern itself only says that it

11  was present and that it was within a column or an

12  area that I believe could be the origin.  There is no

13  evidence on the wall that supports that it failed.

14       Q.    And there's -- there is no evidence based

15  on the fire pattern that it failed.  Is that correct?

16       A.    I see no evidence on there that says that

17  it failed.

18       Q.    You state in the last sentence of your

19  report under summary of cause and origin that without

20  the examination and elimination of this potential

21  source of ignition, referring to the wireless device,

22  and the absence of evidence supporting ignition

23  sequence, no forensically-based cause determination

24  can be made and the cause classification is

25  undetermined.

 1              If the wireless device is ruled out as a

 2    potential source of ignition, if the jury finds that

 3    Mr. Martini's inspection and elimination of the

 4    wireless device was competent, then what would your

 5    classification of the fire be?

 6         A.    That it was most probably incendiary.

 7         Q.    On the second page of your report you talk

 8    about your examination and you mention that you had a

 9    meeting with several people.  One is Mr.

10    Diamantopoulos.  Did you take notes from your meeting

11    with him?

12         A.    Uh-huh, yes.

13         Q.    And are those notes included in Exhibit 3?

14         A.    On the top page and the second page.

15         Q.    You mention a Mr. Lewis Hardin.  Who's Mr.

16    Hardin?

17         A.    He was the contractor that was hired to do

18    the remodel.

19         Q.    After the vandalism ---

20         A.    --- Yes, ma'am.

21         Q.    --- Or for after the fire?

22         A.    It was my understanding after the

23    vandalism.

24         Q.    Okay.  Did you have a -- did you interview

25    Mr. Hardin?

 1          A.    No.    He was just there.    And I documented

 2     who was there.

 3          Q.    Okay.    Did you have a conversation with

 4     him?

 5          A.    Huh-uh.

 6          Q.    Okay.    Is he significant to your

 7     investigation at all?

 8          A.    No, ma'am.

 9          Q.    Okay.    Mr. Bob Dowlat ---

10          A.    --- Uh-huh.

11          Q.    --- Of Creative Computers.

12          A.    Uh-huh.

13          Q.    Did you have a discussion with Mr. Bob

14     Dowlat?

15          A.    Yeah.    The -- at the scene that day we

16     discussed the DVR system and he was indicating where

17     the DVR was and that he had talked to Mr.

18     Diamantopoulos about the DVR and -- and they -- they

19     had indicated that they had talked -- or that Mr.

20     Diamantopoulos had contacted him on the day that

21     Terry was out there doing his scene exam.    And that's

22     the limit.    That was what it was all about.

23          Q.    Okay.    Did you make notes of your

24     discussion with Mr. Bob Dowlat?

25          A.    No.    It was in -- that was just a very,

1    very short comment about that.  And it was -- it was

2    immaterial at the time to the ---

3            Q.    --- Okay.  On page three you have some

4    handwritten notes that mention Bob Dowlat and his

5    telephone number.  Did you ever follow up with him?

6            A.    No, I did not.

7            Q.    And then you have some stuff underneath

8    that, install memory ---

9            A.    --- Just ---

10           Q.    --- Menu board, etcetera.

11           A.    Uh-huh.

12           Q.    Is that taken at the time that you ---

13           A.    --- Yeah, I think that was ---

14           Q.    --- Were present with Bob Dowlat?

15           A.    That was with Mr. Diamantopoulos.

16           Q.    Okay.

17           A.    He identified Bob Dowlat and was telling

18   me what he had done.

19           Q.    Okay.  I would like for you to walk me

20   through your initial interview -- actually your only

21   interview with Mr. Diamantopoulos and walk me through

22   your notes, only because I'll never be able to read

23   these later.

24           A.    Okay.  On January 24th, at 8:42 in the

25   morning, I spoke with Mr. Diamantopoulos.

```
 1          Q.    Okay, and can I stop you there?
 2          A.    No, that's not correct.  I apologize.
 3    That was 11-9.  He was telling on January 24th at
 4    8:42 in the morning.  Let's see.  That's when he was
 5    -- the fire was.  He opened the -- opened the day
 6    before.  They closed at three a.m.  Assistant manager
 7    Tori Moon was -- was there.  She -- she closed.
 8          Q.    Before you go, it says 8:42 Tuesday
 9    morning.
10          A.    Uh-huh.
11          Q.    So is that what time ---
12          A.    --- That's when the ---
13          Q.    --- He's telling you the fire ---
14          A.    --- No.  That's when the fire occurred,
15    yeah.
16          Q.    That's what he's telling you?
17          A.    Uh-huh.
18          Q.    And then what is the next word?
19          A.    Umm, it says vehicle.  But I don't know
20    what that means.  It says open the day before.  I
21    don't re -- recall what that is.
22          Q.    Okay.
23          A.    I think we star -- very likely we started
24    on -- on something else and -- and headed down
25    another direction.
```

1          Q.    Okay.  Please continue.

2          A.    It says they were open the day before and

3     closed at three a.m.  Assistant manager Tori Moon

4     closed.  She has been working for him for seven to

5     eight years.  He said he couldn't remember what

6     employees were there at that time to -- it says they

7     turn off the equipment, the cooking equipment.

8     Nothing done in the breaker panel to shut it off.

9     The exhaust is off.  Tori's job is to turn off the

10    exhaust, which was the -- the cooking exhaust.

11             He said there was no problems with the

12    electrical system.  The breakers weren't tripping.

13    No one was allowed to smoke on the property.  They

14    used to be required to smoke outside the back door

15    but then they moved off the lot because of trash.

16         Q.    What did he tell you about why he had no

17    dumpsters?

18         A.    Umm, I don't -- well, I recall reading

19    about it.  And it's not in -- it's not there in the

20    notes.  You kind of caught me off guard.  I was

21    headed down -- let's see here.

22         Q.    Did you find it odd or interesting that a

23    restaurant wouldn't have dumpsters in the back?

24         A.    I thought it was interesting that that one

25    didn't have dumpsters in the back.  I would be

1    surprised if Fayetteville would allow them to do

2    that.  I -- I was -- I was told that an employee was

3    picking up the trash.  But, yes, I found it odd that

4    there weren't any dumpsters there.

5            Q.   Did you ever ---

6            A.   --- The -- the -- see, the -- the day that

7    I went out there originally, it was a year

8    afterwards.  So at first I didn't think about the

9    dumpsters.  It was only after reading the EUO's that

10   it was of interest.

11           Q.   And did you learn why the dumpsters had

12   been ---

13           A.   --- I ---

14           Q.   --- Removed from the property?

15           A.   I don't know exactly why.  There was some

16   speculation it was because of -- of -- of payment.

17   But -- but I don't know.

18           Q.   You can continue.

19           A.   Okay.  They ---

20           Q.   --- Was there anything else about that

21   paragraph that was significant to you?

22           A.   Which paragraph?

23           Q.   The one you just finished reading.

24           A.   Umm, they moved off the lot because of

25   trash.  That was because of the cigarettes at the

1    back door or the trash at the back door.

2         Q.    Okay.

3         A.    Okay.  He said they did not clean their

4    own linen.  That was shipped out to clean.  PWC had

5    the power.  Time Warner had the cable, phones, and

6    Internet.  Piedmont Natural Gas did the -- had the

7    gas.  And no work had been done recently on the

8    building.

9              He said there -- he was not aware of any

10   storms in the area.  He said during construction a --

11   a power pole caught fire.  The fire department had to

12   call PWC to shut it off before -- and they ended up

13   shutting off the power to the block.  He changed the

14   computer system also.  The AC was damaged after this.

15   And a bunch of light bulbs were replaced apparently.

16             I asked him about problems with the

17   employees.  He said he had a problem with one

18   employee that was fired but then he rehired the

19   individual.  He said he had five stores at the time

20   of the fire.  He said that no one stands out from the

21   other stores as being fired.  No issues with the

22   family.  There weren't any other general con --

23   contractors involved.

24             He said the business was -- business was

25   all secured at the time of the fire and the alarm was

1    set and it never went off.  He said Crossroads

2    Security did not log the set -- the setting of the

3    alarm or deactivation.  But clearly we know that --

4    that it -- it -- when it -- it -- it goes off that it

5    -- it's recorded.

6              Q.    And you've seen those recordings?

7              A.    Yes -- well, not the recordings.  I've

8    seen the paperwork.

9              Q.    Okay.

10             A.    But not on the phone recordings.

11             Q.    Okay.

12             A.    It says on the date of the loss he took

13   his son to school, to Terry Sanford, dropped him off

14   at approximately eight o'clock, drove straight to the

15   restaurant, opened D side doors, which would be the

16   -- the side closest to the -- the motorcycle shop,

17   went in to deactivate the alarm.  The number one was

18   hard to push, may not have hit it hard enough, and

19   the alarm activated.  The alarm company called.  He

20   gave them their code and deactivated the alarm and

21   went about business, went to the table full of bread,

22   got in the office and ---

23             Q.    --- What did he say about going to the

24   table full of bread?

25             A.    You know, I don't -- I -- it says that,

1    but I don't recall exactly what he -- what he meant

2    on that.  I don't know if he was telling me that he

3    moved something or not.

4                But I -- at -- at the time, in the

5    beginning I was not aware of any of the information

6    about the -- the bread being moved, having been

7    moved.  That would have been something I would have

8    followed up on later after finding that out.

9          Q.    It -- but you didn't follow up ---

10         A.    --- No, I did not.

11         Q.    --- On that.  Right?

12         A.    No, I did not.

13         Q.    Okay.

14         A.    He said he got ---

15         Q.    --- Did you ever talk to Mr. Wiggins or

16   anybody else about it?

17         A.    I did, yes.

18         Q.    And what did you say to him?

19         A.    And he said that they were unaware that it

20   -- that it -- how -- how it had been moved, that it

21   was just there.

22         Q.    Okay.  And you don't have any other

23   recollection of what you meant by went to table full

24   of bread.

25         A.    I don't recall.  I'm sorry.

1          Q.    You can continue.

2          A.    And then at the next page it says that he

3    left about 8:25 and the fire was discovered at 8:42.

4    It says through -- the fire was discovered through

5    the drive-thru window -- the window of the

6    drive-thru.

7               And then I had him show me where

8    everything was located in that corner.  He describes

9    the bread rack, the bread table, the drive-thru

10   wireless headset, and the rack with plates, glasses,

11   and maybe some employee clothing.

12         Q.    Did he tell you where he went after he

13   left the building?

14         A.    If I recall, he said that he went to -- he

15   was going to go to the -- the bank.  But he also

16   talked about going to JK's -- or to Pizza Palace.

17   Excuse me.

18         Q.    He told you that?

19         A.    It's not in my notes.  I believe we

20   discussed it that day, that he had left at -- but I

21   -- I really thought that he said he went to the bank

22   first and that that was it.  But I don't have that in

23   my notes.

24         Q.    And then went to JK's -- or Pizza Palace

25   ---

1        A.    --- Or Pizza Palace.  Yes, ma'am.

2        Q.    I'm sorry.  Pizza Palace.

3              Okay, so you've read the EUO since then.

4        A.    Uh-huh.

5        Q.    What was different about his statement to

6    you and his testimony under oath at the EUO?

7        A.    Well, there was some discussion in one of

8    the EUO's about his son being sick that day.

9        Q.    Uh-huh.

10       A.    And that was different than what he had

11   told me, because he said he took his son to school.

12   He also -- there was some discussion as it -- to

13   whether or not he had gone over to Sam's or not prior

14   to.

15       Q.    And in the discussion with you during your

16   initial interview of Mr. Diamantopoulos, did he tell

17   you that he went to Sam's?

18       A.    No.

19       Q.    Okay, so when was the first time you

20   learned that he was saying that he went to Sam's?

21       A.    In the EUO.

22       Q.    In the EUO.  Okay, and then in your -- in

23   his statement to you he said he went to the bank

24   first, then to meet his friend for coffee, which is

25   different from what he said ---

1        A.    --- Well, he was on the way to go but he

2   didn't make it to the bank.

3        Q.    Okay.  He didn't make it to the bank

4   because of why?

5        A.    Because he got a call about the fire.

6        Q.    Okay.  That he was on the way to the bank

7   is what he told you.

8        A.    Uh-huh.

9        Q.    And what is different about what he said

10   to you during the initial interview and what he said

11   under oath at the EUO?

12        A.    My recollection is that he left and went

13   to get gas, didn't have his debit card with him.  He

14   left there and he went making calls to find out

15   whether or not he was going to Pizza Palace or JK's

16   to go and have coffee with his friend.

17        Q.    Did he ever mention to you during your

18   initial interview that he went to Pizza Palace?

19        A.    No.

20        Q.    No.  Did he ever mention to you that he

21   was -- went to JK's during his initial interview with

22   you?

23        A.    I don't recall if he did or not.

24        Q.    Okay.  The only thing you do recall about

25   that initial meeting was the bank.  Is that correct?

1        A.    Yes, ma'am.

2        Q.    Okay.  Did you ever tell anyone that the

3   statement given to you by Mr. Diamantopoulos was

4   different than the statement he said under oath?

5        A.    We -- yeah, I talked about that with Mr.

6   Wiggins.

7        Q.    And what did you tell him?

8        A.    I said that there were some discrepancies

9   in his statements in the EUO's and in my conversation

10  with him.

11       Q.    What else did you tell him?

12       A.    I don't think I told him anything else

13  other than there were discrepancies.

14       Q.    And what was his comments back to you?

15       A.    I don't recall exactly what he said back

16  to me.

17       Q.    Roughly, what did he say?

18       A.    I don't remember.  I -- I don't remember

19  what he said back.

20       Q.    Okay.  Has he ever discussed with you any

21  other different stories given by Mr. Diamantopoulos

22  ---

23       A.    --- No, ma'am.

24       Q.    --- About his whereabouts that morning?

25       A.    No.  I did discuss with him that he was at

1    Walmart and that had not been, you know, mentioned in
2    his statements.
3          Q.   Have you ever been told that his story
4    that he gave under -- in the EUO was different than
5    even his testimony he gave in the deposition?
6          A.   I haven't read the deposition.  No, I
7    haven't been told that.
8          Q.   That's what I want to understand.
9          A.   Yeah.
10         Q.   Has anyone told you?  Has anyone talked to
11   you about it?
12         A.   No, ma'am.
13         Q.   Okay.  And it's your testimony that you do
14   not remember anything that Mr. Wiggins said to you
15   about the discrepancies when you told him.
16         A.   I would -- I -- I would be wrong if I told
17   you, because I just can't remember.
18         Q.   Okay, that's fair.
19              Let's talk about you -- all your
20   conversations with Mr. Dowlat and what he told you.
21         A.   I -- I've already said the only time that
22   -- that he was present was that -- that day and all
23   he did was tell me that he installed the camera
24   system and the micro -- the -- the menu boards and
25   the computer system for that.

1      Q.    Okay.  Anything else?

2      A.    No.

3      Q.    Well, you said earlier that he mentioned a

4   conversation ---

5      A.    --- Oh, yes.  I apologize.  He mentioned

6   -- he was there the first day and he mentioned a

7   telephone conversation between he and Mr.

8   Diamantopoulos.  He said that Mr. Diamantopoulos had

9   spoken to him over the phone while Mr. Lacy was

10  there.  At least Mr. Diamantopoulos had indicated

11  that Mr. Lacy was there.  All he recalls is is that

12  Mr. Diamantopoulos called him to discuss the camera

13  system.

14     Q.    And what did Mr. Diamantopoulos want to

15  know from Mr. Dowlat?

16     A.    How to recover data from it.  That's my

17  understanding.  And that's all that I know.

18     Q.    Anything else?

19     A.    No.

20     Q.    Did he, Mr. Dowlat, speak with Mr. Lacy?

21     A.    I don't know.  All I know is is that --

22  that I was told that he heard Mr. Diamantopoulos

23  speaking to Mr. Lacy.  But I -- I don't know that

24  that's accurate or not.

25     Q.    But anything else about the conversation

1    with Mr. Dowlat that's important?

2            A.    No, ma'am.

3            Q.    You mentioned the surveillance system.    I

4    want to know everything you have heard or discussed

5    with anyone regarding the surveillance system.

6            A.    I was initially under the impression or

7    told that Mr. Lacy had recovered the DVR for the

8    surveillance system.

9            Q.    Did -- were you told that he recovered the

10   DVR or recovered the hard drives?

11           A.    The re -- the hard drives.    I was told

12   that two hard drives were recovered.

13           Q.    Okay, and who told you that Mr. Lacy had

14   recovered two hard drives?

15           A.    Mr. Diamantopoulos.

16           Q.    Did Mr. Diamantopoulos tell you anything

17   else about the recovery of those two hard drives?

18           A.    That they -- that he -- they were later

19   did -- that they did not include the surveillance

20   system hard drive.

21           Q.    Okay.    Anything else?

22           A.    No.

23           Q.    Did Mr. Diamantopoulos tell you that there

24   were detectives from the Fayetteville Police

25   Department present at the scene who initially took

1    the two hard drives?

2         A.   Yes.

3         Q.   Okay, so tell me everything about that

4    topic of conversation.

5         A.   I asked him if they had provided him with

6    a receipt and what they had given him and he said

7    that he had signed a receipt for the two hard drives

8    but he did not recall anything that included the DVR.

9         Q.   And so Mr. Diamantopoulos told you that he

10   signed the receipt for the two hard drives.

11        A.   Uh-huh.

12        Q.   Correct?

13        A.   Yes.

14        Q.   And that the detectives took the two hard

15   drives.

16        A.   Uh-huh.

17        Q.   Correct?

18        A.   Yes.

19        Q.   And then did he tell you that Mr. Lacy got

20   the two hard drives from the Fayetteville Police

21   Department?

22        A.   Yes.

23        Q.   Did he tell you anything else about the

24   hard drives?

25        A.   That they did not include what was on the

 1    DVR, that they were for the POS system.

 2            Q.    Okay.  Did he explain to you that those

 3    hard drives were reviewed by a company to determine

 4    what was on those hard drives?

 5            A.    That was my understanding, is that he knew

 6    that at that time they had been reviewed and all that

 7    was on them was the point-of-sale data.

 8            Q.    Okay, and what did he tell you about that?

 9            A.    I didn't go into depth with him about that

10    other than to know that the data from those two hard

11    drives had been transferred to something else.

12            Q.    Did you ask to review those hard drives?

13            A.    No.

14            Q.    Did you ask to review the data from the

15    hard drives?

16            A.    No.  I don't know that I could have

17    understood it.  I don't know anything about it.

18    So....

19            Q.    Did you go with Mr. Diamantopoulos to the

20    police department to ask about the hard drives?

21            A.    No.

22            Q.    Do you know whether Mr. Diamantopoulos

23    went to the police department to ask about the hard

24    drives?

25            A.    I don't know.

1          Q.    Is there anything else you know about the

2    hard drives that I haven't asked you about?

3          A.    Not that I'm aware of.

4          Q.    Going further down your report, you state

5    that Mr. Diamantopoulos left the building and drove

6    to Sam's Club on 401 bypass, and after pulling into

7    the parking lot he decided not to get gas and then

8    drove to Pizza Palace to meet a friend for coffee.

9    Where did you get that information?

10         A.    From the EUO's.

11         Q.    Now we're getting to the topic you

12   mentioned earlier when we were looking at Exhibit 4.

13   There's a red circle around the protected area where

14   the wireless device was located on the wall.  Explain

15   to me your theory regarding how there was a protected

16   area on the wall if the wireless device was the

17   source of ignition for this fire.

18         A.    Why there's a protected area there?

19         Q.    Uh-huh.

20         A.    I don't know how it came apart.  I don't

21   know whether or not the -- the PCB stayed on the wall

22   attached to the back half of this assembly or not.

23         Q.    So are you saying the PCB could have

24   created a protective area?

25         A.    That and its back cover on the back side.

1   There's a -- it's just clam shell.  It has one side

2   and then a front side ---

3        Q.   --- Uh-huh.

4        A.   --- And then a PCB in the middle.  I don't

5   know how it came apart.  I mean, and -- and there's a

6   potential that something could have been left on the

7   wall for -- in longer duration than the fire.

8        Q.   Okay, and when you say something else

9   could have been left on the wall, what are you

10  referring to?  What ---

11       A.   --- The back -- the back of ---

12       Q.   --- Okay.

13       A.   --- The assembly itself.

14       Q.   What would the back of the wireless device

15  -- what would it have to have been made out of in

16  order to create a protected area?

17       A.   I think the unit itself.  I mean, if the

18  fire started elsewhere and created that pattern, it's

19  still the same -- same product.  Whether there -- I

20  don't know that there was a plate behind it.  I -- I

21  don't know if that's correct or not.  All I know is

22  is that it's that product.  If the fire attacked it

23  from the front side, it could leave a pattern.  If

24  the fire originated there and it came apart, leaving

25  a portion of it on the wall, it could create that

 1    pattern.

 2              The shelves were right beside it.  I don't

 3    know how the shelves interacted with it once it --

 4    once it was damaged by the fire.  That's why it would

 5    need to be examined further.

 6         Q.   Okay.  I guess -- and maybe you've

 7    answered it and I'm not clear on your answer.

 8              What I want to know is every possible

 9    scenario that -- or theory that you have that

10    supports your theory that there is a protected area

11    on the wall and that was where the fire started.

12         A.   Again, I didn't say that is where the fire

13    stated.

14         Q.   Right.  I'm saying but if -- if -- let's

15    go with that theory.  So your theory is the wireless

16    device caught on fire.

17         A.   Okay.

18         Q.   So explain to me every scenario that you

19    believe could support -- or theory that you believe

20    could support the hypothetical that this wireless

21    device was the ignition source, it was what caught on

22    fire, and it created this protected area on the wall.

23         A.   Well, I will try and rephrase it from what

24    I've already said.  What I said was is that its

25    appliance, the appliance itself ---

1          Q.    --- Uh-huh.

2          A.    --- Is on the wall.  If it's attacked from

3    the outside, from somewhere else, it could create a

4    protected pattern.

5          Q.    Yeah, I get that.

6          A.    If it's on the wall and it comes apart on

7    the wall, in other words, the front falls off, and

8    the front is ignited, and it leaves remaining

9    material on the wall that stays there throughout the

10   longer time frame, you could get a protected area.

11         Q.    Okay.  So that I am clear with this

12   theory, so are you saying that in order for there to

13   be a protected area on the wall, that the wireless

14   device would have had to have fallen off the wall and

15   then caught on fire?

16         A.    No.

17         Q.    Okay, so your testimony is that the

18   wireless device could have caught on fire, created

19   this protected area on the wall, and then caught the

20   fuel source, the styrofoam and paper plates on fire.

21         A.    What I'm saying is that we don't know

22   where the fire could have started inside the unit,

23   whether it's on the front side of the board or the

24   back side of the board.  If it started on the front

25   side of the board and progressed to the front cover,

1    the front cover or portions of the front cover could

2    fall.  It could leave por -- a portion of the

3    appliance on the wall, which could create a protected

4    area.

5           Q.   And have you ran that theory by Mr. Stone?

6           A.   I have.

7           Q.   And what did Mr. Stone tell you about the

8    likelihood of that happening?

9           A.   He said it's a possibility.

10          Q.   Okay, it's a possibility.

11          A.   Uh-huh.

12          Q.   It's possible.  Did he tell you the

13   likelihood?

14          A.   I don't think we discussed the likelihood

15   one way or another.

16                     MR. WIGGINS:  When you get to a

17   breaking spot, we've got lunch here.

18                     MS. DALY:  Sure.  Off the record.

19        (1:34-1:56 p.m. - Luncheon recess)

20          Q.   Is it more likely than not that a

21   protected area on a wall would be created at the

22   ignition source of a fire?

23          A.   It's -- it's more likely it that would

24   not.

25          Q.   That it would not create a protected area?

1        A.    That's right.  Yes.

2        Q.    Are you able to give a percentage of the

3    likelihood, like a 70 percent chance that it would

4    create a protected area or -- excuse me.  That it

5    would not create a protected area or are you just

6    able to say it's more likely than not that it would

7    not create a protected area?

8        A.    I can't say.  I -- I don't feel like I can

9    give you a percentage.

10       Q.    Okay.  I believe you've already asked --

11   answered this question, but I would -- just want to

12   make sure that I've covered it.

13            Is it your opinion that the IQ wireless

14   device suffered some type of heat producing event and

15   catastrophic failure?

16       A.    It's not my opinion that it did.

17       Q.    Okay.  And did you ever ask why you were

18   retained -- strike that.

19            Were you -- did you ever ask why you were

20   not retained earlier than November of 2012?

21       A.    No, ma'am.

22       Q.    Do you know whether there was another

23   expert who looked at the scene or the evidence prior

24   to you?

25       A.    I don't know.

1          Q.    I'd like to walk through Mr. Lacy's

2     report.  Let's start with his opinions.

3               I'm going to ask you to read the first

4     opinion in Mr. Lacy's expert report and tell me

5     whether or not you disagree with it.  And if you just

6     do disagree, I'd like to know the evidence that you

7     base your disagreement upon.

8          (Witness examined document)

9          A.    Are you just talking about number one

10    right now?

11         Q.    Correct.

12         A.    No.

13         Q.    You do not disagree?

14         A.    No.

15         Q.    I'd like you to read opinion number two

16    and tell me whether or not you agree with that

17    statement.

18         A.    (Witness examined document)  The only

19    thing -- the only thing in that opinion that I would

20    question, the last sentence says Mrs. Moon stated the

21    cameras had not been working from her arrival at the

22    restaurant on January 23rd, 2012, through her

23    departure on January 24th, 2012.

24               If I can recall correctly it was only the

25    monitor that she was aware wasn't working, not the

 1    camera system.

 2         Q.    Did you interview Ms. Moon?

 3         A.    I did not, but that was from the EUO.

 4         Q.    Okay.  And have you read her deposition

 5    that was taken after the EUO?

 6         A.    No.  I mentioned that already.

 7         Q.    Oh, sorry.  So the -- so the only basis

 8    that you are relying on to question that statement is

 9    Ms. -- your recollection of Ms. Moon's examination

10    under -- under oath?

11         A.    Yes, ma'am.

12         Q.    Did you ever talk to anyone about whether

13    or not the surveillance system was working that day?

14         A.    No, ma'am.

15         Q.    Did you find it odd or interesting that

16    suddenly the monitors were not working on the day of

17    the fire?

18         A.    I thought that it was odd.

19         Q.    Did you talk to anybody about it being

20    odd?

21         A.    I mentioned it to Mr. Wiggins.

22         Q.    And what was that discussion?

23         A.    That discussion was we don't have the

24    recording.  I don't know whether they were working or

25    not.

1          Q.   Okay.  While we're on the topic of the

2     surveillance system, we were both present at the

3     inspection ---

4          A.   --- Yes ---

5          Q.   --- Of the evidence.  There was a power

6     supply that was recovered from the scene.  Correct?

7          A.   Yes, ma'am.

8          Q.   And that power supply was examined at the

9     office of John Cavarock.  Correct?

10          A.   Yes, ma'am.

11          Q.   And during that examination it was

12     determined that the power supply that was examined at

13     the examination was unplugged at the time of the

14     fire.  Correct?

15          A.   Yes, ma'am.

16          Q.   Do you have any evidence to refute that it

17     was unplugged?

18          A.   Oh, no.

19          Q.   Okay.  So what have you discussed about

20     the unplugged power supply?  With whom have you

21     discussed it with and any discussions that followed.

22          A.   Immediately following the evidence exam I

23     contacted Trey McClean and Mr. Wiggins.  Told them

24     that we had found a power supply that indicated that

25     it may have been for a -- a video camera system.

1          He indicated that it was unplugged and

2   appeared to be have been turned -- it was also turned

3   off.  And I said we needed to find out what that was

4   all about.

5          And I got a return call stating that they

6   had spoken with Mr. Dowlat, and that that was not a

7   power supply for the system that he had provided.

8   But what -- but was more than likely an old component

9   left in the building.  That the camera system that he

10  had installed has it -- had its own power supply.

11       Q.  Did Mr. Dowlat inspect the actual power

12  supply?

13       A.  No.

14       Q.  What was his basis in saying that that was

15  to the old surveillance system?

16       A.  The photographs.

17       Q.  And what about the power supply that was

18  examined, was the determining factor that it was not

19  for the new surveillance system, it was for the old

20  surveillance system?

21       A.  That the new surveillance system had its

22  own power supply.  It was all self-contained.

23       Q.  Anything else?

24       A.  No, ma'am.

25       Q.  Anything else -- any other discussions

1    regarding this power supply?

2         A.   No.  I -- I found a -- I used the model

3    number on it and found a photograph of one.  And it

4    was made by COP USA.  And I sent them a -- a -- a

5    screen shot or a -- a photograph of it from the

6    Internet that's all.

7         Q.   And what did that show you?

8         A.   That it ranged in between -- let's see

9    here.  I'll tell you.

10        (Witness examined document)

11        A.   Not much other than it was made by them

12   and it ranged -- the prices that I found in between

13   $69, $62 or $80 a piece for those.  It had an

14   18-channel multiple -- it was an 18-channel power

15   supply.

16        Q.   And how did what you discovered prove that

17   the power supply that was recovered at the scene of

18   the fire was not the power supply for the new

19   surveillance?

20        A.   Nothing that I discovered proved that.  I

21   was just told that the one that was there was

22   self-contained and had its own power supply.

23        Q.   All right.  So other -- but anything that

24   you found didn't either prove that it was the power

25   supply to the new surveillance system or disproved

1    that it was the power supply to the surveillance

2    system?

3            A.   No.   There was a -- a -- just like with

4    the Ion IQ, there's documentation of what was

5    installed and it doesn't include a COP USA power

6    supply.

7            Q.   Anything else?

8            A.   No.

9            Q.   Thank you.  Have you ever been told what

10   happened to the actual surveillance system?  Not the

11   hard drive.  I'm talking about the actual

12   surveillance system.

13           A.   The DVR?

14           Q.   Yes, and the cameras and everything.

15           A.   I have no idea what happened to it.  I

16   asked about it and I was told that it was collected

17   by Mr. Lacy.  However, it's not in the document -- or

18   any of the documentation or in the evidence, and so I

19   don't know what happened to it.

20           Q.   Who told you that Mr. Lacy collected the

21   actual surveillance system?

22           A.   Mr. Diamantopoulos said he had it in his

23   hand and that it was his understanding that when he

24   inspected it, they were collecting it.  That's why he

25   had asked about how to retrieve the data off of it.

1          Q.    Okay.  And so that we're clear, did Mr.

2     Diamantopoulos tell you that Mr. Lacy took down the

3     DVR system that was melted up on the shelf, the

4     actual system, or did he tell you he had the hard

5     drive?

6                         MR. WIGGINS:  We'll I'll object to

7     melted.

8                      There's no evidence it melted on the

9     shelf.

10          Q.    (Ms. Daly)  Have you seen the photographs

11     of the DVR system?

12          A.    The one that's left on the shelf, yes.

13          Q.    Yes.  And was that melted?

14          A.    Yes, ma'am.

15          Q.    Okay.  So you know what I'm talking about

16     when I say the melted DVR system that was up on the

17     shelf?

18          A.    Yes.

19          Q.    Okay.  So did Mr. Diamantopoulos tell you

20     that Mr. Lacy took down the melted DVR system and had

21     that in his hands?

22          A.    What he said was is that he had the DVR

23     component in his hands at the -- at the front desk or

24     the -- the -- where the registers were at the

25     restaurant.  And he was talking on the phone with Mr.

1    Dowlat about how to recover the data.

2            Q.    Okay.

3            A.    That's what I was told.

4            Q.    Okay.  So he didn't specify whether or not

5    it was the hard drives from it or if it was the

6    system, or he just said the DVR system?

7            A.    My understanding was that it was the DVR

8    component, meaning like your VCR.

9            Q.    Uh-huh.

10           A.    You have a VCR with the -- a disc drive in

11   it.  It was the whole component.

12           Q.    Okay.  So it would have been that melted

13   system that was up on the shelf?

14           A.    That was my understanding.  Yes, ma'am.

15           Q.    And that's what Mr. Diamantopoulos told

16   you at your initial investigation?

17           A.    Initial -- initial interview.  Yes, ma'am.

18           Q.    Anything else you were told about their

19   surveillance system?

20           A.    No.

21           Q.    Were you told what happened to all the

22   cameras that were on and around the building?

23           A.    I wasn't told anything about the cameras.

24           Q.    Do you know what happened to them?

25           A.    I didn't know anything did happen to them.

1        Q.    Are they still inside the building?

2        A.    There were quite a few of them still

3   there.

4        Q.    Okay.

5        A.    I don't know if they were all there.

6   There were still some there when I went.

7        Q.    Okay.  Anything else about the

8   surveillance system that you can recall that you

9   discussed with either Mr. Diamantopoulos, Mr. Wiggins

10  or anyone else associated with this case?

11       A.    No.  I think in my notes there's someplace

12  in there where I talked to Mr. -- I know we talked

13  about it already -- Chad Royal.  He said that he

14  wasn't sure if he collected it or not.  And there was

15  a comment from Mr. Lacy, I think, when we were at the

16  joint scene exam -- or evidence exam that's noted in

17  my notes.

18            And he said that he didn't know if

19  Detective House had it or not.  He was unorganized

20  and he didn't know if it was still in their evidence

21  or not.  He made that comment.

22            I don't know if that -- I don't recall

23  whether or not that's -- that -- that's what I have

24  in my notes, but I don't know whether he has it or

25  not, Mr. House or Detective House's -- they -- my

1    understanding provided all of the evidence that they

2    had.

3             Q.    Anything else?

4             A.    No.

5             Q.    I'd like you to look at number three, the

6    opinion on Mr. Lacy's report.

7             (Witness examined document)

8             A.    All right, what did you want me to answer

9    that -- on that one?

10            Q.    Do you agree with the -- opinion three in

11   Mr. Lacy's report?

12            A.    I agree that it could be that the fire

13   originated at floor level.  But I do not agree that

14   it's the only possibility based on the patterns that

15   I observed.

16            Q.    And when you say based on the patterns

17   that you observed, earlier you testified that there

18   was not enough data for you to determine the -- where

19   the fire originated.

20            A.    Uh-huh.

21            Q.    Is that what you're relying on?

22            A.    That's -- that's what I'm relying on.  And

23   when I say that, the patterns were not sufficient for

24   that determination.  The patterns that remained were

25   not sufficient for that determination.

1          Q.    Is one of the reasons why there is not

2    enough data for you to make that determination, is it

3    because the scene -- the fire scene has -- was

4    changed between January and November?

5          A.    I've looked at the photographs and whether

6    or not they fully depict exactly what was there, I

7    don't know that -- that -- I don't know that the

8    photographs are clear enough for -- for me to have

9    made any other determination.

10               I've looked at them pretty extensively.

11   And I don't -- I don't believe that there was any

12   other pattern that was present at the time of the

13   first exam that was all that different from when I

14   looked at it.

15         Q.    Have you reviewed the pictures located --

16   excuse me -- identified in Mr. Lacy's report under

17   opinion three?

18         A.    I have reviewed all of the photos that I

19   was given.

20         Q.    Okay.  So let's walk through number four

21   together, and let's stop after the second sentence.

22         A.    Okay.  Do you mind if I hold onto that ---

23         Q.    --- Sure ---

24         A.    --- So I can read it better?

25         (Witness examined document)

1          A.    Okay, I read the first sentence.

2               The pattern that he's referring to on the

3     aluminum cart, is that the one you're ---

4          Q.    --- Yes.

5          A.    Okay.

6          Q.    It says the fire pattern on the side of

7     the wheeled aluminum storage rack indicates a fire

8     originating at floor level and spreading horizontally

9     and vertically in an expected manner.

10              What evidence do you have to contradict

11    that statement or to disagree with that statement?

12         A.    Again, I don't know that there's enough

13    data to actually support that because the primary and

14    secondary fuel sources I can't identify, except for

15    the fact that we know we have foam at the top and

16    plastics along the shelf.

17              And once they burn and melt, we can have a

18    very high heat release rate fire at the base of the

19    cabinet which could create enough heat to melt that

20    cabinet at its base.  And that would be my

21    explanation for that.

22         Q.    Of why you disagree with that statement?

23         A.    Uh-huh.  Yeah.  I don't -- it's possible.

24    What he's stating is possible.  I don't believe that

25    there's -- that it's the only possibility based on

 1    the fuel package.

 2         Q.   Is it more likely than not that the fire

 3    pattern on the side of the wheeled aluminum storage

 4    rack indicates a fire originating at floor level and

 5    spreading horizontally and vertically in an expected

 6    manner?

 7         A.   I do not believe that it's more likely

 8    than not, no.

 9         Q.   Do you believe that it's about a

10    fifty-fifty shot chance?

11         A.   It could go either way.  Yes, ma'am.

12         Q.   So if I -- if that sentence read it is my

13    opinion that there's a 50 percent probability that

14    the fire pattern on the side of the wheeled aluminum

15    storage rack indicates a fire originating at floor

16    level and spreading horizontally and vertical in an

17    expected manner, would you agree with that statement?

18         A.   It's possible.  I can't -- probable is

19    greater -- with a greater weight.  And I don't know

20    that there's enough data to say that there's a

21    greater weight on that.

22         Q.   Okay.  I didn't say greater.  I said 50

23    percent, so it would be equal.

24         A.   It -- it could be either or, yes.

25         Q.   Okay.  So an equal?

1          A.    Uh-huh.

2          Q.    It's your opinion that ---

3          A.    --- You -- you asked me if it was more

4    likely than not, and I don't think that it's more

5    likely than not.

6          Q.    Right.  I understand you said it's not

7    more likely than not.  I said is it a 50 percent,

8    saying equal?

9          A.    I would say that it's equal.

10         Q.    All right.  Mr. Lacy goes on to state that

11   the fire pattern progresses from the wheeled aluminum

12   storage rack to the stainless steel wall covering,

13   between the rear drive-thru window and the front

14   drive-thru window.

15         A.    Okay.

16         Q.    What evidence do you have that refutes

17   that fire pattern?

18         A.    Can I read it real quick?

19         Q.    Sure.

20         (Witness examined document)

21         A.    If I understand what he's stating here,

22   he's stating that the fire progresses from the origin

23   to the vertical storage rack, aluminum storage rack,

24   and then continues down the stainless steel wall

25   covering.

1             Is that -- that's my understanding.  If

2     that's correct then I agree with that.

3             Q.   So you agree with the third sentence in

4     opinion four?

5             A.   That the fire would progress from that

6     corner to the storage rack to the wall covering, yes.

7             Q.   The next statement is had the fire

8     originated on the upper wall to the right of the rear

9     drive-thru window, the developing fire would not have

10    caused these patterns.

11            What evidence do you have to contradict

12    that opinion?

13            A.   Like I said earlier, it's the fuel

14    package, orientation and the secondary fuel package.

15    And it's -- the heat development from that.  It could

16    create the pattern that he's seeing and that is there

17    from an ignition source higher than floor level.

18            As far as evidence to support that, the

19    only evidence is is that there is an item there that

20    is a potential ignition source, and a fuel source

21    that's in close proximity.  And I believe that it

22    could have originated anywhere on that -- anywhere in

23    that level.

24            Q.   Okay.  So that I'm clear, is it your

25    testimony that Mr. Lacy's finding that had the -- had

1    the fire originated on the upper wall to the right of

2    the rear drive-thru window, the developing fire would

3    not have caused these patterns?

4              Is it your opinion that he is wrong?

5         A.   I'm saying that they could have created

6    those patterns, but it's also possible that they

7    wouldn't have created those patterns.  I don't know

8    how it came apart.

9              I don't know -- all I know is is that we

10   have a fuel package that if it started up high, that

11   it could create a fire pattern that he's seeing.

12             I'm not saying that he's wrong.  I'm

13   saying that it's a possibility that something else

14   could have happened.

15        Q.   So is it accurate that you're not agreeing

16   or disagreeing with Mr. Lacy's finding?

17        A.   Yes.

18        Q.   Mr. Lacy states that a fire originating at

19   or near the ceiling would have caused drop-down fire,

20   and that did not occur here.  Do you -- first, do you

21   agree that a fire originating at or near the ceiling

22   would cause drop-down fire?

23        A.   Yes.

24        Q.   Do you agree with Mr. Lacy's finding that

25   a fire originating in or near the ceiling would have

1    caused drop-down fire, and that did not occur here?

2         A.    I don't think there's enough data to say

3    that.  And the reason why is the shelves are slatted

4    and they were open, and there's plastics which grip.

5    And fall-down would not be kept in one level -- in

6    other words, on the top shelf.  It would have

7    continued to fall and could -- it reached the floor.

8         Q.    What evidence do you have to support that

9    it -- that the pattern was that it dropped down onto

10   the top rack and then continued to fall?

11        A.    The evidence that I have is the fuel

12   package itself and the shelves themselves.  The fuel

13   can drip through the shelves.  There's a fire pattern

14   at floor level which is puddled plastics.  That's

15   what they are.  That's what was on the -- in the

16   shelves, and that would be the evidence that I have

17   that would support that.

18        Q.    Anything else?

19        A.    No.

20        Q.    Okay.  I'd like you to read opinion five

21   of Mr. Lacy's.

22        (Witness examined document)

23        Q.    Is there anything that you disagree with

24   about opinion five?

25        A.    I disagree with the fact that it's limited

1    -- limited energy.  I don't know that there's enough

2    information to determine that if he doesn't know what

3    the -- what amount of energy that particular

4    appliance would produce if it was burning.

5                 It doesn't have to ignite the fiberglass

6    reinforced wall panels to have a fire with other

7    secondary fuel package.

8         Q.    And you're talking about the -- if it

9    would have fallen off and ---

10        A.    --- Well, the -- they were right next door

11   to it or next to it -- the foam.

12        Q.    The foam.  Right?

13        A.    The foam, or it could have fallen and

14   ignited other materials.

15        Q.    So is it your theory that it could have

16   fallen off the wall and hit this fuel source, the --

17   you know, paper plates, the Styrofoam cups, or that a

18   fire shot out from this wireless device?

19                Like what is your theory of how -- if you

20   were -- if you were going to do a model of like, you

21   know, like a computerized model -- modeling of how

22   this fire started, what would be your -- this theory?

23        A.    My first thought would be that if the --

24   if the Ion IQ ignited, that radiant heat may ignite

25   something next to it.  That would be my first

1    thought.

2              My second thought would be that

3    potentially it could have fallen and ignited

4    something else.  But I don't have enough information

5    to say either/or.

6         Q.   So you disagree that the bay station

7    operates on a limited energy system?

8         A.   No, it operates on a limited energy

9    system, but I don't believe that -- I can't testify

10   to whether or not a limited energy system can ignite

11   that material.  And I don't think that Mr. Lacy is an

12   engineer either.

13        Q.   Okay.  So the bay station operates on a

14   limited energy system.  You agree with that.

15   Correct?

16        A.   Uh-huh.

17        Q.   It is consistent that the limited energy

18   potential would not be sufficient to ignite the

19   fiberglass reinforced plastic wall panels as the

20   first fuel ignited.  Do you agree with that

21   statement?

22        A.   I don't know.  I don't know how much

23   energy is produced by that particular appliance when

24   it burns.

25        Q.   So you're neither agreeing or disagreeing

1    with the statement that the limited energy potential

2    would not be sufficient to ignite the fiberglass

3    reinforced plastic wall panels as the first fuel

4    ignited?

5           A.    I don't know.  You're right.  I'm neither

6    agreeing or disagreeing.

7           Q.    Do you agree that the heat of combustion

8    from a developing fire, which originated elsewhere,

9    would provide sufficient heat to ignite the

10   fiberglass reinforced plastic panels?

11          A.    It depends on how much heat that the fuel

12   source produced.  If only one cup ignited, probably

13   not.  If a bunch of cups ignited, yes.

14          Q.    Okay.  How about the heat combustion from

15   this developing fire?

16          A.    Which developing fire?

17          Q.    The one at the scene of the fire.  If it

18   did not start -- you saw the damage that this fire

19   created.  And if it did not start at the wireless

20   device, was that fire -- that developing fire enough

21   that it would provide sufficient heat to ignite the

22   fiberglass reinforced plastic panels?

23          A.    I think that at any point on that shelf

24   once it ignited and your fuel package was burning, it

25   would ignite the reinforced wall panels, yes.

1        Q.    Do you agree with the statement that the

2  products of combustion are lighter than air, thus

3  rise in the atmosphere?

4        A.    Yes.

5        Q.    Do you agree that when a fire originates

6  at floor level, the products of combustion rise and

7  attack all items combustible or non-combustible?

8        A.    Yes.

9        Q.    Do you agree that this type of attack

10 results in a floor to ceiling pattern as is present

11 in this fire?

12       A.    As long -- yes.  As long as you have

13 burning material from floor to ceiling, you're going

14 to get that pattern.

15       Q.    So a new statement.  Had the fire

16 originated at the base station, the floor to ceiling

17 pattern that is present in this fire would not have

18 been present?

19       A.    I disagree with that.

20       Q.    Okay.  So explain to me the evidence you

21 are relying on to disagree with that statement.

22       A.    Had a fire originated on the top shelf or

23 in close proximity to the Ion IQ base station, that

24 would be your first or secondary fuel package.  If

25 that secondary fuel package continued to burn and

1    drop down, you would have a -- the whole shelf would

2    ignite and you could create that pattern.

3          Q.    Okay.  But had the fire originated at the

4    base station, so had the fire originated -- that the

5    wireless device was the origin of the fire, is that

6    what you just referenced?

7          A.    Uh-huh.

8          Q.    Okay.  So you're saying that the floor to

9    ceiling pattern that is -- actually, strike that.

10              Do you agree that there's a floor to

11   ceiling pattern that is present in this fire?

12         A.    Yes.

13         Q.    Okay.  So you do agree with that?

14         A.    Yes.

15         Q.    Okay.  So explain to me how the fire could

16   have originated at the base station and there be a

17   floor to ceiling pattern, the various scenarios,

18   unless it's just the two that you've already covered.

19   Just that it could have fallen off or radioactive --

20   what did you call it?  Not radioactive.

21                    MR. WIGGINS:  I hope not.

22                    MS. DALY:  Strike that.

23                    THE WITNESS:  Radiant heat transfer.

24   Radiant heat or direct conductive transfer from the

25   base station could have ignited surrounding

1   combustibles.

2           Like surrounding combustibles, like the

3   foam products that were there, will burn readily and

4   they will puddle.  They melt first and puddle.  They

5   can drop combustible material to the floor which

6   would ignite other combustibles in close proximity.

7   That could create a floor to ceiling pattern.

8           It could also happen if a portion of the

9   Ion IQ fell down beside the shelves and ignited

10  combustible materials at floor level.

11          Q.   (Ms. Daly)  Any other theory?

12          A.   No.

13          Q.   Do you agree that the photographs of the

14  scene illustrate a shadow effect on the wall to the

15  right of the rear drive-thru window, indicating that

16  something was mounted on the wall at that location?

17          A.   Yes.  It was later identified as the base

18  station.

19          Q.   Correct.  Do you disagree with the

20  statement that the shadow effect on the wall was

21  attacked by a developing fire, and the presence of

22  that item protected the wall surface from further

23  damage?

24          A.   That is possible, yes.

25          Q.   Okay.

1        A.    I don't disagree with that statement.

2    What I would say is is that I don't know how long

3    that item stayed on the wall.  I don't know if it was

4    held there by the shelf.  I don't know.

5        Q.    Other than what you've already said to me

6    today, is there any other evidence that you have that

7    refutes Mr. Lacy's opinion that the base station was

8    attacked by a developing fire, and that's what caused

9    the protection -- protected wall surface from further

10   damage?

11       A.    No.

12       Q.    Take a moment and read opinion seven.

13       (Witness examined document)

14       Q.    Okay, so does your scenario require the

15   heating and subsequent ignition of a primary fuel

16   development into open combustion, heat transfer to

17   secondary fuels, ignition of those secondary fuels,

18   and then a second phase of fire development that

19   would cause the fire patterns on the wheeled aluminum

20   storage rack and adjacent stainless steel wall

21   covering?

22       A.    Yes.

23       Q.    Do you agree with Mr. Lacy's finding that

24   there would have been insufficient time between Mr.

25   Diamantopoulos leaving the restaurant in the 8:20 to

1    8:25 range, and the fire being reported at 8:41 for

2    the ignition and development of both primary and

3    secondary fuel packages?

4            A.    No, I -- I disagree with that.

5            Q.    And what -- what are you relying on to

6    disagree with that finding?

7            A.    Well, an open flame ignition source, which

8    is the theory of Mr. Lacy, developed this fire in

9    that timeframe.  An open flame ignition at the ion IQ

10   base station could do the same thing.

11               I don't know what he's basing his

12   timeframe of 8:00 to 8:05.

13           Q.    Before we get there, when you say there

14   could have been an open flame at the wireless ---

15           A.    --- Uh-huh.

16           Q.    --- Explain to me how this wireless device

17   could have had electrical failure that would have

18   created an open flame.

19           A.    I can't tell you how it failed.  I don't

20   know what the failure modes and mechanisms are of the

21   item.

22           Q.    Okay.

23           A.    If it failed, I would imagine that it

24   would ignite a standoff that's in close proximity or

25   touching the circuit board, which would in turn

 1    ignite combustible materials.

 2              And if that was occurring and it was on

 3    fire, it would be an open flame.

 4         Q.   The modes of mechanisms that could have

 5    produced this electrical failure, is that something

 6    you would have to rely on Mr. Stone ---

 7         A.   --- Yes.

 8         Q.   --- To determine ---

 9         A.   --- Yes, ma'am.

10         Q.   If Mr. Stone was unable to determine that,

11    the modes of mechanism that could have caused an

12    electrical failure in this wireless base system, what

13    evidence would you use to determine that there was an

14    electrical failure?

15         A.   Well, if he was unable to that -- are you

16    -- okay, if -- are you saying if he's unable to

17    determine or he's able to eliminate it?  Because if

18    he's unable to determine ---

19         Q.   --- If he doesn't know the modes of

20    mechanism of this wireless device to even give an

21    opinion about the electrical components ---

22         A.   --- Uh-huh ---

23         Q.   --- Of this wireless device ---

24         A.   --- Right ---

25         Q.   --- So if he's not even able to do that,

1    what part of his opinion can you rely on in regards

2    to whether or not there was an electrical failure of

3    this wireless device?

4          A.   I couldn't, and that's why my cause

5    determination would be undetermined.

6          Q.   And that's because you've ruled everything

7    else out except for this wireless device.  Is that

8    correct?

9          A.   Yes, ma'am.

10                    MS. DALY:  God bless you.

11                    MR. WIGGINS:   Thank you.

12         Q.   (Ms. Daly)  The last statement says the

13   ignition would have needed to occur between 8:00 a.m.

14   and 8:05 a.m. in order for your scenario to be

15   plausible.

16                    What evidence do you have that contradicts

17   Mr. Lacy's finding that the fire would have had to --

18   the ignition would have had to have started at 8:00

19   -- between 8:00 and 8:05 a.m.?

20         A.   Well, we know it hadn't started at eight

21   o'clock because it wasn't there at 8:15.  And we know

22   that it wasn't burning at 8:25 because the insured

23   says that he left then and it wasn't burning.  So the

24   fire would have had to have developed between 8:25

25   and when it was discovered.

1          Secondly, from the timeframe to -- to

2    arbitrarily provide a timeframe of 8:00 to 8:05, I

3    don't know what he would base that on.  He'd have to

4    know a lot more about the fuel package and the

5    ignition location and so forth to develop a fire -- a

6    -- a fire progression scenario that could actually

7    provide a timeframe like that.

8          Q.    Anything else?

9          A.    No, ma'am.

10          Q.    Opinion eight.  Do you have any evidence

11    to refute that finding?

12          (Witness examined document)

13          A.    No.  They said they looked at it and

14    eliminated it.  I can't say because I don't know any

15    more than that.

16          Q.    Opinion nine.  Do you have any reason to

17    disagree with Mr. Lacy's finding in number nine?

18          (Witness examined document)

19          A.    As far as their -- them saying that they

20    eliminated on January 26, 27th and 30th, that would

21    be up to Mr. Martini.

22              As far as November 16th through the 29th

23    -- and the 29th of November, I did not find any

24    source of ignition so I would agree with that.

25          Q.    Number 10.

1          (Witness examined document)

2          A.    I agree.

3          Q.    Number 11.  Do you agree with everything

4    found in that finding?

5          (Witness examined document)

6          A.    I agree.

7          Q.    Have you ever spoken to Mr. Cavarock

8    regarding his opinions in this case?

9          A.    No.

10         Q.    Do you know whether Mr. Cavarock believes

11   this fire was incendiary or electrical in nature?

12         A.    I don't.

13         Q.    Number 12.

14         (Witness examined document)

15         A.    No, I agree.

16         Q.    Number 13.

17         (Witness examined document)

18         A.    I agree.

19         Q.    Number 14.

20         A.    That's what the -- the notes from Mrs.

21   Locklear and from Mr. Lacy's report indicate.  I have

22   not interviewed them.

23         Q.    You have not interviewed them?

24         A.    No.

25         Q.    Okay.  Number 15.

 1          (Witness examined document)

 2          Q.    Any reason to disagree with number 15?

 3          A.    No.  I saw it in the photograph on January

 4     30th.  It was present.

 5          Q.    Number 16.

 6          (Witness examined document)

 7          A.    The only thing that -- that I've noted

 8     about this that's different is that I believe there

 9     was a claim for damage, or that there were some

10     damaged electronic components at that point.

11               So as far as stating it didn't affect the

12     business, I don't know if that's accurate, but

13     otherwise, I agree.

14          Q.    Is there anything that -- about that

15     incident that you believe impacted this fire?

16          A.    No, ma'am.  And I think we've talked about

17     17 already.

18          Q.    So you agree with ---

19          A.    --- I don't see the discrepancy because

20     I've been able to review the video now.

21          Q.    Right.

22          A.    Like I said earlier, the only thing I

23     disagree with on that is the inappropriate use of

24     process of elimination is when you don't have a

25     clearly defined origin area.  And as I said, the

1    clearly defined origin area provided by Mr. Lacy is

2    floor level only, and I don't know that there's

3    enough data to support that.

4         Q.    If Mr. Lacy relied on an electrical

5    engineer, in this case Henry Martini's finding that

6    there was not an electrical ignition source to this

7    fire, would that be appropriate?

8         A.    Yes.

9         Q.    Have you had an opportunity to review Mr.

10   Martini's expert report?

11        A.    Yes, ma'am.

12        Q.    I'm going to walk through his opinions.   I

13   understand you're not an electrical engineer or a

14   mechanical engineer, but I would like to know if you

15   have any basis to contradict Mr. Martini's findings.

16             Let's start with number one.

17        (Witness examined document)

18        A.    I agree.

19        Q.    Number two.

20        A.    I agree.

21        Q.    Number three.

22        A.    It would be up to Mr. Stone to discuss

23   that.

24        Q.    Number four.

25        (Witness examined document)

1          Q.    Let's go back to number three.  Is that

2    because you're not qualified to render an opinion on

3    whether there was evidence of an electrical failure

4    identified in and around the area of fire of origin

5    that could have served as an ignition source for the

6    fire?

7          A.    Yes, ma'am.

8          Q.    Number four.

9          A.    I would agree with that.  Mr. Stone has

10   indicated he saw nothing.

11         Q.    Number five.

12         A.    I would agree with that.

13         Q.    Number six.

14         A.    Whether they were -- it's going to be up

15   to Mr. Stone to deal with that.  They certainly were

16   not there on November of 2012.

17         Q.    Do you have any evidence to contradict

18   number six?

19         A.    That they were not eliminated, or that

20   they were eliminated?

21         Q.    Right.

22         A.    Like I said, it's going to be up to Mr.

23   Stone.

24         Q.    Up to Mr. Stone, okay.

25         A.    Right.

1        Q.   I just want to make sure that you don't

2   have an opinion on that.

3        A.    Huh-uh.

4        Q.   So that the record is clear, do you have

5   an opinion on that?

6        A.    About -- about whether ---

7        Q.   --- About the finding in number six, that

8   the current circuit boards were eliminated, or is

9   that Mr. -- for Mr. Stone to opine?

10       A.   We discussed this earlier about what steps

11  would have to be taken, and that's going to be up to

12  Mr. Stone.  I can only tell you what I have

13  experienced in the past.

14       Q.   Thank you.  We will not go through that

15  again.

16            Number seven.

17       A.   I would -- again, I think we've been

18  through this.  My only disagreement for that is is

19  that when we talk about that protected area on the

20  wall, I don't know for sure how it came apart, and

21  whether or not there was a portion that stayed on the

22  wall through any timeframe during the fire that could

23  help create that pattern.

24            I do agree that it -- he -- he -- and my

25  statement is is that it's the only source of

1    electrical ignition that has not been eliminated.

2    That's my statement.

3          Q.    Do you agree that a well defined area of

4    origin more likely than not will result in an area of

5    greater fire heat damage than a protected area?

6          A.    We talked about that a few minutes ago

7    too, about whether or not I could give you a

8    percentage as to whether a protected area would, and

9    I can't.

10         Q.    You said it's more likely than not, but

11   you can't give me a percentage?

12         A.    It is more likely.  On most occasions you

13   would expect that, yes.

14                 MS. DALY:  Let's go off the record.

15   (2:52-2:57 p.m. - recess)

16         Q.    (Ms. Daly)  Mr. Booth, do you know whether

17   Mr. Small was given the expert reports of Mr. Lacy

18   and Mr. Martini in this case?

19         A.    I'm unaware.

20         Q.    Were you taught during your training that

21   low voltage devices generally cannot be the ignition

22   sources for fires?

23         A.    Earlier on, yes.  But through I guess the

24   past seven or eight years I have been told otherwise.

25         Q.    By?

 1          A.    Mark Cassell from LWG Consulting.  His

 2   comment to me was you have a mini Maglite in your

 3   pocket and it's three volts of DC current, and it

 4   produces -- the filament on the bulb produces 5,000

 5   degrees.  And that under the right circumstances

 6   could cause a fire.  And that that it would be a

 7   concern when dealing with a low voltage piece of

 8   equipment.  But of course, I'm not qualified to

 9   eliminate him.  That's why I hire him or someone

10   else.

11          Q.    Do you agree that low voltage devices

12   generally cannot be ignition sources for fires?

13          A.    They're designed as such.  Yes, ma'am.

14          Q.    Would you agree that would be very rare

15   for a low voltage device to be the ignition source

16   for a fire?

17          A.    I don't know that I can say that.  A lot

18   of -- there are fires that are undetermined, lots of

19   them that are undetermined because items can't be

20   eliminated.

21               And it would be very possible that some of

22   those are from low voltage appliances that have been

23   thought of as impossible as ignition sources, and

24   which we may not know.  And so I can't say whether

25   it's highly unusual or that it doesn't -- or it --

Page 206

```
 1    very rare.

 2         Q.    How many cases have you worked on in your

 3    experience that relate to fire investigation?

 4         A.    Okay.  Restate that, please.

 5         Q.    How many fire investigations have you been

 6    a part of?

 7         A.    Approximately 1,500.

 8         Q.    And of those 1,500 ---

 9         A.    --- Uh-huh.

10         Q.    --- Have you ever been involved in a fire

11    investigation where it was determined that a low

12    voltage device was the ignition source for the fire?

13         A.    Well, 12 volts of DC is a lower voltage

14    and so, yes -- automobiles.

15         Q.    Anything lower than that?

16         A.    Not that I can recall.

17         Q.    You said you found this one article

18    written by Mr. Small.  Did you find any other

19    articles that were contrary to Mr. Small's opinion?

20         A.    No.  I found one other article that kind

21    of echoed the -- the studies that he's made, or that

22    he's had.  Although, it's my understanding, and, of

23    course, I'm not in that circle, that there are very

24    few studies about low voltage equipment that -- like

25    the one he's done.
```

1          Q.    Do you know whether Mr. Small's opinion
2     that low voltage devices can be the ignition source
3     of fires? Do you know whether that is an accepted
4     principle within the engineering field?
5          A.    I don't know.
6          Q.    A few wrap up questions.  Have you ever
7     worked with any other attorney with the McCoy Wiggins
8     firm?
9          A.    No.
10          Q.    Is this the first case you've had with
11     them?
12          A.    Yes, ma'am.
13          Q.    After going through all the evidence in
14     this case, have you had any thoughts that Mr.
15     Diamantopoulos started this fire?
16          A.    Like I said in the beginning, it was a
17     consideration from the beginning.  I just don't know
18     that there's enough data to say either way.
19               And then we have two potential
20     possibilities that are equally weighted and they
21     should -- if that's the case, then it should be an
22     undetermined fire.
23          Q.    Is it your opinion that it is more likely
24     than not that Mr. Diamantopoulos did not start this
25     fire?

 1        A.    No.

 2        Q.    Is it your opinion that the wireless

 3   device started -- strike that.

 4             Is it your opinion that it is more likely

 5   than not the wireless device was the ignition source

 6   for this fire?

 7        A.    No.

 8        Q.    Have you ever spoken to anyone, including

 9   the attorneys in this case, regarding whether or not

10   Mr. Diamantopoulos was involved in the setting of

11   this fire?

12        A.    Well, I mentioned to them that it was a

13   possibility, but other than that, no.

14        Q.    Did they talk to you about whether or not

15   they considered it to be a possibility?

16        A.    I think that -- that at the time we

17   discussed it I -- I mentioned that it -- they needed

18   to be -- in the beginning I told them that they

19   needed to be aware that if I felt like it was a set

20   fire, I was going to tell them that.

21             I also told them that -- that the

22   timeframes and the circumstantial information that

23   was there were -- -- were -- weren't great.  And that

24   -- that it is a possibility that we have two possible

25   potentials.

1          Q.   Can you rule out the fact that Mr.

2   Diamantopoulos started this fire?

3          A.   No, ma'am.

4                    MS. DALY:  And I don't have any

5   further questions.  Thank you.

6                    THE WITNESS:  Okay.

7                    MR. WIGGINS:  I have just a couple

8   questions and I'll be through.

9                         EXAMINATION

10  BY MR. WIGGINS:

11         Q.   Mr. Booth, you testified in this case

12  concerning the fire -- extensively concerning the

13  location of the Ion IQ in the restaurant.  Is that

14  correct?

15         A.   Yes, sir.

16         Q.   And when you visited the restaurant for

17  the first time in what, November 2012?

18         A.   Yes, sir.

19         Q.   Was that -- was that Ion IQ present in the

20  -- in the restaurant?

21         A.   No, sir.

22         Q.   Did you ever learn or did anyone ever tell

23  you what happened to it?

24         A.   No.

25         Q.   And did you discuss that with -- with Mr.

1    Lacy?

2         A.   Yes.

3         Q.   And Mr. Lacy -- what did he tell you when

4    you talked to him about it?

5         A.   He said that he didn't have it and he

6    asked whether or not I knew whether it was in the

7    area of origin or not.

8         Q.   Which indicated he did not know whether or

9    not it was in the area of origin.

10        A.   Well, it would seem that he didn't know

11   where it was.

12        Q.   Okay.  Did you ever discuss that with SBI

13   -- the SBI agent, Mr. Royal?

14        A.   I did.

15        Q.   Did he tell you whether or not he had

16   discussed it with Mr. Lacy?

17        A.   He said that he had.

18        Q.   And did he tell -- did he say that he told

19   Mr. Lacy where he found it?

20        A.   Yes.

21        Q.   And did he have photographs showing where

22   he found it?

23        A.   He did.

24        Q.   Did you review the photographs?

25        A.   I did.

1        Q.    And did you review those photographs at

2    his office -- or from his computer?

3        A.    Yes.

4        Q.    And did you recognize what the device was

5    when you saw it?

6        A.    No, I did not.

7        Q.    Did he -- did Mr. Royal, SBI Agent Royal

8    know what it was when he saw it?

9        A.    No.

10        Q.    At the time that you saw it is it your

11    testimony that neither you nor Agent Royal knew what

12    it was?

13        A.    That's correct.

14        Q.    And when did you first learn that it was

15    an Ion IQ communication device in the restaurant?

16        A.    It was later on after receiving the

17    photographs from Mr. Lacy and Mr. Martini.

18              In seeing the item on the table, we were

19    able to -- with the understanding that that item was

20    an Ion IQ or one was in that area, we were able to

21    compare it with the photographs that were provided to

22    us and to the owner's manual, that they reasonably

23    appeared to be the same.

24        Q.    When was the first time that you learned

25    that Mr. Lacy and Mr. Martini had looked at that Ion

1    IQ device and had ruled it out as an ignitable source

2    for this fire?

3           A.   Well, their initial reports indicated they

4    had eliminated all electrical and mechanical sources

5    of ignition.  However, I don't -- it's my

6    understanding they didn't know what it was until

7    after it was identified by I think it was Mr.

8    Diamantopoulos, and his -- was it -- in his

9    deposition was what was -- in one of the report.

10          Q.   And you talked to Mr. Dowlat about it on

11   one occasion, did you not?

12          A.   Yes, that's correct.

13          Q.   And Mr. Dowlat explained to you how it

14   worked and what it was for?

15          A.   Well, he told me that it was -- it was the

16   intercom for the drive-thru.

17          Q.   Okay.  Did he indicate to you that he had

18   installed that system for Mr. Diamantopoulos?

19          A.   Yes.

20          Q.   And was he able to give you, and did he

21   give you the receipt where it had been purchased by

22   him, and installed at the restaurant, that is the

23   Miami Subs restaurant?

24          A.   He didn't give it to me, but it was in the

25   documents that were provided.

1          Q.    You don't know the source of that?

2          A.    Not right at the moment.  I believe that

3     they were with Mr. Jezierski's documents, and would

4     have been part of what was provided to him during the

5     claims process.

6          Q.    Is there -- is there a National Fire

7     Protection Association code that is applicable to

8     investigation of fires?

9          A.    It's a guideline, yes.

10         Q.    Some portions are accepted as being

11    gospel, have they not?

12                    MS. DALY:  Objection.

13         Q.    (Mr. Wiggins)  Well, you're familiar with

14    the fact that it's pretty much accepted in the

15    industry, is it not?

16         A.    It's an accepted guide in the industry,

17    yes.

18         Q.    And do all, or most all investigators,

19    origin and fire investigators, comply with -- with

20    that National Fire Protection Association guidelines?

21                    MS. DALY:  Objection to form.

22         Q.    (Mr. Wiggins)  If you know.

23         A.    And -- and all of the fire investigators

24    that I know use it as a guideline.

25         Q.    Okay.  Did you read Mr. Lacy's report?

1        A.    I did.

2        Q.    Did he indicate that he followed the

3   National Fire Protection Association guidelines in

4   his investigation of this fire as the cause and

5   origin investigator?

6        A.    It does say that on his report.

7        Q.    Okay.  Did he comply with those

8   provisions, in reference to the Ion IQ I have

9   referenced particularly to.

10                  MS. DALY:  Objection to form.

11                  THE WITNESS:  The only thing that I

12  have seen is that an item of interest that should be

13  considered was not collected as an item of the

14  evidence.

15       Q.    (Mr. Wiggins)  And would he -- would you

16  as an investigator, had you been the one who had

17  found this Ion IQ communication device, what would

18  you have done with it as an investigator?

19       A.    I would have stored it.

20       Q.    Would you have tagged it?

21       A.    Yes.

22       Q.    And you would have known that had you

23  identified it that somebody else may come behind you

24  and want to look at it to identify that device, and

25  determine whether or not it had anything to do with

1    the cause of the fire?

2                        MS. DALY:  Objection.

3                        THE WITNESS:  There are times when

4    items are sufficiently documented by photographs.

5    But then there are times when there are items that

6    cannot be sufficiently documented by one or two

7    photographs without doing a more thorough

8    examination.

9          If it is an item that I believe,

10    personally believe will take further examination

11    other than visual examination of field, I would

12    believe -- I would take it as evidence.

13          Q.   (Mr. Wiggins)  What if even you decided in

14    your own mind it was not a cause of the fire, what

15    would you have done as an investigator, as a cause

16    and origin investigator?

17          A.   If it was something that I did not believe

18    could be easily examined and documented, it would be

19    -- and I would be concerned of an alternative theory,

20    then I would collect the item so that it could be

21    examined by anyone that might have an alternative

22    theory.

23          Q.   Did you ever ask Mr. Lacy if he knew what

24    had happened to the Ion IQ system -- device?

25          A.   He said that he didn't have it.

 1          Q.    And that was the first time that you were

 2     aware of it was in November 2012?

 3          A.    The first time that ---

 4          Q.    --- That you were ---

 5          A.    --- Aware that he didn't have it?

 6          Q.    Right.

 7          A.    No.   The first time I was aware that he

 8     didn't have it was when I talked to him on the phone

 9     about the evidence exam, and asked him for an

10     evidence list.

11               The comment that I made to him at the

12     joint scene exam on November 16th was that I asked

13     him if he placed the manufacturer of the headset on

14     notice.   But in -- on April the 11th of 2013, at four

15     o'clock I called Mr. Lacy.   And he called back and

16     advised that there was no protocol.   He told me that

17     he wanted -- I told him that we wanted an evidence

18     list.   And he advised he had plastic cups, debris

19     samples, and John Cavarock had branch circuitry and

20     receptacles.

21               I asked about the circuit board and the

22     SBI photographs, and he said he had -- he said no.   I

23     asked if he knew if -- if it was from the intercom or

24     not -- he asked me that, if I knew if it was from the

25     intercom or not, and I said I wasn't sure because I

1    hadn't seen it, but it was in the SBI's photographs.

2                So that would have been April the 11th

3    when I first found out that it was not in his

4    possession.

5        Q.    And was that your only discussion that you

6    had with Mr. Lacy concerning that device?

7        A.    Concerning that device, yes.

8        Q.    In developing the hypotheses concerning

9    the fire, Mr. Booth, in that process did you consider

10   anything other than the evidence that you find during

11   the course of your actual investigation on-site?

12               That is, do you consider any extraneous

13   materials or information other than what you're doing

14   as far as your investigation is concerned?

15                MS. DALY:  Objection to form.

16       Q.    (Mr. Wiggins)  Do you understand what I'm

17   talking about?

18       A.    I do.  Once a cause and determination --

19   determination is made, other indicators are utilized

20   to support a cause determination.  So after a -- I

21   would use physical evidence and evidence at the scene

22   and circumstances surrounding the incident to form an

23   opinion regarding the cause and origin of the fire.

24               The other information, circumstantial

25   information and so forth, is outside of the origin

1    and cause determination.

2           Q.    And is it your testimony here today that

3    -- that based upon your investigation that you --

4    that you would have developed two hypotheses

5    concerning the origin of this fire?

6           A.    Yes.

7                      MS. DALY:   Would you repeat that

8    question back?

9    (Next-Previous question was read back)

10                     MS. DALY:   Thank you.

11          Q.    (Mr. Wiggins)  And what were those -- what

12   would those two hypotheses have been?

13          A.    The hypotheses would be that this was an

14   incendiary fire or that potentially an Ion IQ

15   failure.

16          Q.    And, therefore, you would have -- you had

17   -- you would have made the decision that the cause

18   was undetermined -- could not be determined?

19          A.    If the Ion IQ was in my presence and it

20   could be eliminated, potentially I would not have

21   made the same determination.  Because we don't have

22   it to look at and it cannot be examined, then yes,

23   that would be my determination, that it was

24   undetermined.

25                     MR. WIGGINS:   That's all I have.

1    Thank you.

2                            EXAMINATION

3    BY MS. DALY:

4         Q.   You stated earlier that you would have

5    collected the base station.

6              Would you have collected the base station

7    in order for an engineer to examine it?

8         A.   Yes, ma'am.

9         Q.   Is there any discussion with Terry Lacy

10   that you have not told us about today?

11        A.   No.

12                  MS. DALY:  I don't have any further

13   questions.  Thank you.

14                  MR. WIGGINS:  Thank you very much.

15                  THE WITNESS:  Okay.

16        WHEREUPON,

17     at 3:19 o'clock p.m. the deposition was adjourned.

18

19

20

21

22

23

24

25

1            CERTIFICATE OF TRANSCRIPT

2            I, Cassandra J. Stiles, Notary Public in

3    and for the County of Forsyth, State of North

4    Carolina at Large, do hereby certify that there

5    appeared before me the foregoing witness;

6            That the testimony was duly recorded by

7    me, reduced to typewriting by me or under my

8    supervision and the foregoing consecutively numbered

9    pages are a complete and accurate record of the

10   testimony given at said time by said witness;

11           That the undersigned is not of kin nor

12   associated with any of the parties to said cause of

13   action, nor any counsel thereto, and that I am not

14   interested in the event(s) thereof.

15           IN WITNESS WHEREOF, I have hereunto set my

16   hand this the 18th day of August, 2013.

17                        Cassandra J. Stiles, CVR

18                        Certified Court Reporter

19                        Atlantic Professional Reporters

20                        Post Office Box 11672

21                        Winston-Salem, NC 27116-1672

22

23

24

25

1                    CERTIFICATE OF OATH

2              I, Cassandra J. Stiles, Notary Public in

3    and for the County of Forsyth, State of North

4    Carolina at Large, do hereby certify that there

5    appeared before me the foregoing witness;

6              That the witness personally appeared

7    before me at the date, time and location hereon

8    captioned and was personally sworn by me prior to the

9    commencement of the proceeding in the matter hereon

10   captioned.

11             IN WITNESS WHEREOF, I have hereunto set my

12   hand this the 18th day of August, 2013.

13                          Cassandra J. Stiles, CVR

14                          Certified Court Reporter

15                          Atlantic Professional Reporters

16                          Post Office Box 11672

17                          Winston-Salem, NC 27116-1672

18

19

20

21

22

23

24

25

1                          WITNESS CERTIFICATION

2              I, STEVEN C. BOOTH, hereby certify:

3              That I have read and examined the contents of

4     the foregoing testimony as given by me at the time

5     and place hereon indicated, and;

6              That to the best of my knowledge and belief,

7     the foregoing pages are a complete and accurate

8     record of all the testimony given by me at said time,

9     except as noted on the Attachment A hereto.

10    I have ____ have not ____

11    made changes/corrections _____

12                                    Steven C. Booth

13         I,_____, Notary Public for the

14    County of _____, State of _____,

15    hereby certify:

16              That the herein-above named appeared before me

17    this the _____ day of _____, 19_____, and;

18              That I personally witnessed the execution of

19    this document for the intents and purposes as herein-

20    above described.

21                         _____

22                                    Notary Public

23    My Commission Expires:

24    _____              (SEAL)

25

1                         ADDENDUM A

2          Upon reading and examining my testimony as

3     herein transcribed, I make the following additions,

4     changes and/or corrections, with the accompanying and

5     corresponding reason(s) for the same:

6

7     Page    Line              Is Amended to Read

8     _____|_____|_____

9     _____|_____|_____

10    _____|_____|_____

11    _____|_____|_____

12    _____|_____|_____

13    _____|_____|_____

14    _____|_____|_____

15    _____|_____|_____

16    _____|_____|_____

17    _____|_____|_____

18    _____|_____|_____

19    _____|_____|_____

20    _____|_____|_____

21

22                  _____

23                        Stephen Edward Stone

24

25

1                    CERTIFICATE OF MAILING

2         I, Cassandra J. Stiles, CVR, do hereby certify

3    that a true copy of the transcription of the matter

4    hereon captioned was served on the party named below

5    by the placement of said transcript copy in the

6    United States Mail, Priority Mail delivery, with

7    proper postage affixed, addressed as follows:

8

9

10        Steven C. Booth

11        Post Office Box 1227

12        Morehead City, NC  28557

13

14

15        This the 19th day of August, 2013.

16

17

18        _____

19                    Cassandra J. Stiles, CVR

20

21

22

23

24

25