IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:12-CV-00610-F

C O P Y

CITY GRILL HOSPITALITY GROUP, INC.,  )
                                     )
                        Plaintiff,   )
                                     )
         vs.                         )
                                     ) D E P O S I T I O N
NATIONWIDE MUTUAL INSURANCE COMPANY, )
                                     )
                        Defendant.   )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)


_____
HUNTER B. LACY, CFI
_____


One West Fourth Street
Winston-Salem, North Carolina

Wednesday, August 21, 2013
10:03 o'clock a.m.


_____
Atlantic Professional Reporters
Winston-Salem, NC  27116-1672

**EXHIBIT 10**

## NOTES

Page:Line        Subject Matter        Relates To        Action

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

APPEARANCES OF COUNSEL


Richard M. Wiggins, Esq.

McCOY WIGGINS CLEVELAND & O'CONNOR, PLLC

202 Fairway Drive

Post Office Box 87009

Fayetteville, North Carolina  28304-7009



Rachel E. Daly, Esq.

WOMBLE CARLYLE SANDRIDGE & RICE, LLP

One West Fourth Street

Winston-Salem, North Carolina  27101


OTHER APPEARANCES

I N D E X

STIPULATIONS                                              5

EXAMINATION
        Mr. Wiggins                                       6

        _____

ADJOURNMENT                                             237
CERTIFICATE OF TRANSCRIPT                               238
CERTIFICATE OF OATH                                     239
WITNESS CERTIFICATE                                     240
WITNESS ADDENDUM                                        241
CERTIFICATE OF MAILING                                  242

E X H I B I T S

| Name | Offered By | Identified |
|------|-----------|------------|
| Deposition Exhibit 123 | Plaintiff | 174 |
| Deposition Exhibit 124 | Plaintiff | 228 |

1                          STIPULATIONS

2             Pursuant to notice and/or consent of the

3    parties, the deposition hereon captioned was

4    conducted at the time and location indicated before

5    Cassandra J. Stiles, Notary Public in and for the

6    County of Forsyth, State of North Carolina at Large.

7             The deposition was conducted for use in

8    accordance with and pursuant to the applicable rules

9    or by order of any court of competent jurisdiction.

10            Reading and signing of the testimony was

11   requested prior to the filing of same for use as

12   permitted by applicable rule(s).

13

14

15

16

17

18

19

20

21

22

23

24

25

1          The witness, HUNTER B. LACY, CFI, being

2    first duly sworn to state the truth, the whole truth

3    and nothing but the truth, testified as follows:

4          (10:03 o'clock a.m.)

5                        EXAMINATION

6    BY MR. WIGGINS:

7          Q.   Good morning again, Mr. Lacy.

8          A.   Good morning.

9          Q.   You and I just met again this morning --

10   Richard Wiggins -- I think maybe we met back in maybe

11   November of 2012.

12         A.   Briefly, yes, sir.

13         Q.   Very briefly at the Miami Subs Restaurant

14   in Fayetteville.

15         A.   Yes, sir.

16         Q.   Do you recall that?

17         A.   Yes, sir.

18         Q.   And you're here today for your expert

19   deposition.

20              You understand that?

21         A.   Yes, sir.

22         Q.   And you've had your deposition taken many

23   times.

24         A.   Yes, sir.

25         Q.   You know the drill.

1      A.   Yes, sir.

2      Q.   And the only thing I would say is, again,

3  remind you that if you're responding to a question,

4  just -- don't just shake your head pos -- yes, or

5  negatively, no, and answer ---

6      A.   --- I understand.

7      Q.   And if I ask a -- ask you a question that

8  you do not understand, please ask me to repeat it and

9  make myself more clear, and I'll be more than happy

10  to try to do that, because I, as most lawyers, do ask

11  questions sometimes that has -- is unintelligible.

12      A.   Okay.

13      Q.   Again, state your full name for the

14  record, please, sir.

15      A.   Hunter B. Lacy, L-a-c-y, and I go by the

16  nickname of Terry.

17      Q.   How did you come by the nickname, Terry?

18      A.   In the mid fifties, a secretary at the

19  private school where my father worked basically

20  picked it, and it stuck for, you know, 58 -- well, 57

21  years or so.

22      Q.   Well, very good.  I was wondering, because

23  it had nothing to do with Hunter.

24      A.   No, sir.  Everybody in my -- all the males

25  in my family have nicknames.

1          Q.    I see.  I see.

2                Just give me a brief sketch of your

3    background, your work background, your educational

4    background?

5          A.    In May of 1978 I graduated from

6    Gardner-Webb College, then, now University.

7                In August of 1978 I went to work for the

8    Shelby, North Carolina Fire Department as a

9    firefighter.

10                In November of 1978 I was promoted to fire

11    inspector and ---

12          Q.    --- Let me ask you something.  I've

13    wondered about this.

14                What is the difference between a fire

15    inspector and a fire investigator?

16          A.    In small departments, the fire inspector

17    does everything -- fire prevention inspections,

18    public education and fire investigation.

19          Q.    He does it all?

20          A.    Yes, sir.

21          Q.    Okay.

22          A.    In larger departments -- Charlotte, for

23    example -- you have fire inspectors, fire educators,

24    fire investigators, so each one does the one item.

25    Fire inspectors do inspections, education --

1    educators do the education activities, investigators

2    do investigations.

3              In smaller departments, you typically --

4    one hat does all.

5         Q.   I understand.

6         A.   So anyway, November of '78 I become a fire

7    inspector in Shelby.

8              In September of 1979 I leave Shelby and go

9    to Charlotte as a fire inspector, but I -- my

10   situation was a little different.

11             I went in the door in Charlotte doing

12   about 50 percent fire inspection, 50 percent fire

13   investigation.

14             Novem -- I'm sorry.  June of 1981 I become

15   an investigator, and basically since June of 1981 all

16   I have done is investigative activities.

17        Q.   Okay.

18        A.   In November of 1992 -- I'm sorry.  June --

19   I don't know why I'm hung on November.

20             June of 1992 I left the Charlotte Fire

21   Department and went to work for Royal Insurance

22   Company as a fire investigator, and later as the

23   manager of the fire investigations group.

24             In 2003, the parent company of Royal

25   decided to exit the United States insurance market,

1    so in September of 2004 I was laid off.

2              Immediately transitioned to a company that

3    was then known as MJM Investigations, again, doing

4    fire investigation.  Stayed there until 2007.

5              Went to a company called EFI Global doing

6    fire investigations.

7              In July of 2008 I went to Valentine

8    Associates doing fire investigations.

9              And March -- I'm sorry -- May of 2009 went

10   to work for Donan Engineering, stayed there until

11   July of this year, and I'm in the process of forming

12   my own company.

13        Q.   What is the name of your company that

14   you're forming?  Have you named it?

15        A.   Paperwork is not at the North Carolina

16   Secretary of State's, but I believe it will be called

17   Investigative Resources Global.

18        Q.   Investigative Resources Global?

19        A.   Yes, sir.

20        Q.   I noticed in your -- is this the latest CV

21   that I have, your -- that's attached to your federal

22   expert report?

23              Is that the last, most recent one?

24        A.   At the time of the report -- and to be

25   very candid with you, I've not -- I've not updated it

1    since then, so yes, that probably is the most recent.

2         Q.   Okay.

3         A.   But that would have been in June or July

4    of this year.

5         Q.   Okay.

6         A.   So it's fairly accurate.  It wouldn't have

7    been July.  It probably would have been May or June,

8    but it's fairly accurate.  I just forget the date on

9    the report.

10        Q.   I noticed from your resume, or CV, that

11   you've testified in a good many lawsuits over the

12   course of your career.

13        A.   Yes, sir.

14        Q.   Both civil cases and in criminal cases.

15        A.   Yes, sir.

16        Q.   I noticed you've testified in -- you've

17   given expert testimony in about 25 criminal cases

18   over the course of your career.

19        A.   Yes.  Well, I don't know the exact number,

20   but yes, sir, a fair number of criminal cases.

21        Q.   And that goes back to, what, in the 1980s?

22        A.   1982 would have been when Judge Forest

23   Ferrell qualified me as an expert on a 1981 fire.

24        Q.   And do you remember the name of that case?

25        A.   State of North Carolina versus Douglas

1    Hunt.

2         Q.   Do you remember State of North Carolina

3    versus Vernon Damion Williamson?

4         A.   Yes, sir.

5         Q.   That was in 1985 also.

6         A.   Yes, sir.  But Hunt was before Williamson.

7         Q.   That was the first one?

8         A.   No, sir.

9         Q.   I'm sorry.  Hunt was....

10        A.   If you're going -- if you have my CV in

11   front of you ---

12        Q.   --- I do.

13        A.   --- Look right ---

14        Q.   --- I do.

15        A.   Look right below court testimony, you'll

16   see a sentence or two.

17        Q.   All right.  I see.  I see.  I've got it.

18             That was UNC versus Douglas Hunt.  State

19   of North Carolina versus Douglas Hunt.

20        A.   That was when I was first qualified as an

21   expert, in the Douglas Hunt case.

22        Q.   Okay.

23        A.   Then Vernon Damion Williamson was a little

24   bit later.

25        Q.   And in the testimony that you've given in

1    the criminal cases, has it always been on behalf of

2    the state, or has it been on both sides of the fence,

3    both ---

4          A.    --- On behalf of the state.

5          Q.    Okay, and these were all arson cases, I

6    suppose?

7          A.    Yes, sir.

8          Q.    And you did the investigation, the fire

9    investigation, on behalf of the state in those cases?

10         A.    All with the exception of one.

11         Q.    Okay.

12         A.    There is a Haywood County case -- and

13   without looking at it I don't remember the name of

14   the defendant -- but there is a Haywood County, North

15   Carolina, case where I did the investigation for the

16   insurance company, and the state chose to subpoena me

17   as a witness in addition to the government

18   investigators as to the origin and cause of the fire.

19               It's listed on there, I would say,

20   sometime in the late '90s or early 2000s.

21         Q.    And then you've also listed some civil

22   cases in which you've given expert testimony.

23         A.    Yes, sir.

24         Q.    And the first one you have listed is Helen

25   Threatt versus H.E. Hiers Estate?

1          A.    Yes, sir.

2          Q.    And was that a cause and origin case?

3          A.    It was.  And that investigation I

4     conducted as a employee of the Charlotte Fire

5     Department and was subpoenaed by the plaintiff to

6     testify for them.

7          Q.    And then the next one you've listed is

8     Harrington versus A.G. Boone Company.  That was '87.

9                Do you recall that case?

10         A.    Yes, sir.

11         Q.    Cause and effect?

12         A.    Same scenario.  Accidental fire.  I worked

13    it for the Charlotte Fire Department, subpoenaed by

14    the plaintiff.

15         Q.    And you were at that time a fire

16    investigator ---

17         A.    --- Yes, sir.

18         Q.    --- Not a fire....

19         A.    Inspector.

20         Q.    Inspector.

21         A.    Correct.

22         Q.    And then State of -- then you got one

23    listed, State of North Carolina versus Eugene White.

24                Was that a civil case?

25         A.    No, sir.

1        Q.   That was a criminal case?

2        A.   No, sir.  If you see in the docket number,

3   if it's CR it's criminal, if it's CV it's civil.

4        Q.   I see, criminal.  I got you.

5             And they just got listed in a separate

6   place here.

7        A.   By the way, those are listed

8   chronologically, sir.

9        Q.   I got you.  Okay.

10             Then Collingwood versus Wood versus G.E.

11   Real Estate Equities, Superior Court.  That's a CV

12   case.

13        A.   Again, accid ---

14        Q.   --- Cause and origin?

15        A.   Accidental fire, worked it for the

16   Charlotte Fire Department, subpoenaed by the

17   Plaintiff.

18        Q.   And then Commonwealth of Massachusetts

19   versus George M. Ploude, P-l-o-u-d-e.

20             That's a case ---

21        A.   -- That is a criminal case.

22             I worked that fire for Royal Insurance,

23   and the district attorney's office in Massachusetts

24   subpoenaed me to testify for them.

25        Q.   And then Sharon Logan versus Carlot --

1    Charlotte Housing Authority, civil case, and I guess

2    that was a cause and origin case also?

3          A.    Yes, sir.

4          Q.    And you testified on behalf of?

5          A.    The defendant.

6          Q.    And the last one you have listed here is

7    Kevin Wilson versus State Farm, and that, I guess,

8    was a cause and origin also?

9          A.    Yes, sir.  I was retained by State Farm in

10   Roanoke, Virginia, to do the origin and cause of a

11   fire and was -- subsequently testified for them.

12         Q.    On behalf of State Farm?

13         A.    At deposition and at trial for State Farm.

14         Q.    Okay, other than the ones that you've

15   listed on your CV, do any other cases come to mind in

16   which you've testified as an expert ---

17         A.    --- No, sir.

18         Q.    --- As to fire and origin?

19         A.    I'm -- I'm fairly certain that is a full

20   list.

21         Q.    Okay.

22         A.    And the reason I say that is because it's

23   something I've maintained through the years.

24         Q.    Have you ever been disqualified as an

25   expert in any case in which you've been called to

```
 1   testify?

 2          A.    No, sir.

 3          Q.    And every court that you've been asked to

 4   testify in, you have qualified as an expert witness,

 5   I take it?

 6          A.    Every time I have been submitted, I have

 7   been qualified ---

 8          Q.    --- Okay.

 9          A.    --- As an expert.

10                And the only reason I say that is I have

11   probably testified in 200 matters as a fact witness.

12          Q.    Okay.

13          A.    Approximately 200.

14          Q.    And that would not be as an expert fire

15   and origin investigator, I take it?

16          A.    The 200 times would have been during my

17   career as a fire investigator, but for whatever

18   reason, I was testifying as a fact witness and not an

19   expert.

20          Q.    I understand.

21                Since you've been involved with Donan, was

22   Nationwide a client of Donan on a regular basis?

23                        MS. DALY:  Objection to form.

24                        MR. WIGGINS:  Well, let me strike

25   that.
```

 1        Q.    (Mr. Wiggins)  Was it a regular client of

 2   Donan Engineering?

 3                     MS. DALY:   Objection to form.

 4                     THE WITNESS:   I'm going to be honest

 5   with you.  I don't know, simply because I did not,

 6   and today do not know how to calculate how many

 7   referrals they give the company.

 8                Donan probably has 300 professional

 9   employees east of the Mississippi.  They're more

10   prevalent -- they've got one or two offices west, but

11   not much.

12                I have no idea how much work Donan got

13   from Nationwide.

14                     MR. WIGGINS:   Okay, let me ask it

15   this way.

16        Q.    (Mr. Wiggins)  How many cases do you

17   recall working on in which Nationwide was the

18   insurer?

19        A.    I never counted.  I probably did three to

20   four a month.

21        Q.    And would that have been as a cause and

22   origin investigator?

23        A.    Yes, sir.

24        Q.    And would all of these cases have been in

25   instances where an adjuster or someone else

1    associated with Nationwide Insurance Company thought

2    there may be some question as to the cause and

3    origin?

4                    MS. DALY:  Objection to form.

5                    THE WITNESS:  In all cases they

6    retained me to identify the origin and cause of the

7    fire, and I would believe that on most all of those

8    occasions the adjuster did not know the origin and

9    cause of the fire when he called in the referral.

10   And the dollar value was such that they wanted to

11   know the origin and cause of the fire.

12                    MR. WIGGINS:  Okay.

13                    THE WITNESS:  I don't -- I mean, I

14   -- yeah, I'll leave it at that.

15        Q.   (Mr. Wiggins)  And would it be fair to say

16   that the cases that you worked on for Nationwide were

17   cases in which there may have been some question

18   about the cause and origin?

19        A.   No ---

20                    MS. DALY:  --- Objection.  Asked and

21   answered.

22                    MR. WIGGINS:  Pardon?

23                    THE WITNESS:  No, sir.

24        Q.   (Mr. Wiggins)  Explain that to me, then,

25   the difference.

 1              If it would not be something they would --
 2    you said they wanted to know the cause and origin of
 3    the fire ---
 4         A.   --- Well ---
 5         Q.   --- Because of the dollar amount.
 6         A.   Okay, maybe I misunderstood ---
 7              MS. DALY:  --- Objection.
 8    Mischaracterization of his testimony.
 9              THE WITNESS:  Maybe I misunderstood
10    your question.
11              When Nation -- I don't recall Nationwide
12    ever calling me, telling me they think they know the
13    cause of the fire and they want me to investigate it.
14              MR. WIGGINS:  Okay.
15              THE WITNESS:  What I almost always
16    got was I've got a fire, I need you to look at it.
17              MR. WIGGINS:  Okay.
18              THE WITNESS:  And when I would see
19    them at the scene, or wherever, they would basically
20    say I don't know what happened.
21              The adjusters are very hesitant to jump to
22    conclusions.  They want evidence.
23         Q.   (Mr. Wiggins)  As a fire and origin
24    investi -- let me strike that again.  Let me ask you
25    this.

 1              Have you done any investigations on behalf

 2    of Womble Carlyle?

 3         A.    No, sir.

 4         Q.    Has the methology of fire and origin

 5    investigation changed since you got into the business

 6    in any particular significant way?

 7                    MS. DALY:  Objection to form.

 8                    THE WITNESS:  I don't know that I

 9    have changed how I process a fire scene.

10              What I have seen change is the fuels

11    involved in the fire, so that necessitated some

12    changes.

13              As the recommended methodology has been

14    documented in books and articles, I realized I was

15    doing that in the '80s.

16                    MR. WIGGINS:  Uh-huh.

17                    THE WITNESS:  It just wasn't called

18    that.

19              What is now referred to as a scientific

20    method, I used prior to 1993 when it was -- when it

21    came out of the United States Supreme Court.  But it

22    wasn't written anywhere then.

23              But when I saw it, I was kind of like

24    we've been doing that.

25         Q.    (Mr. Wiggins)  All right, that's what I

 1    was getting at.

 2              I've noticed that over the years that some

 3    courts back in the early '80s were beginning not to

 4    qualify C&A investigators as experts because they

 5    were taking great liberties with their testimony.

 6              Do you recall anything like that?

 7                   MS. DALY:  Objection to form.

 8                   THE WITNESS:  No, sir.

 9         Q.   (Mr. Wiggins)  Okay, tell me about NFPA.

10    You're familiar with that?

11         A.   Yes, sir.

12         Q.   How does it fit into what cause and origin

13    investigators do?

14              How does it relate to what you do?

15                   MS. DALY:  Objection to form.

16                   THE WITNESS:  NFPA is the National

17    Fire Protection Association, and while the title is

18    national, it is international and it is the sole

19    organization of its type in the world.

20              They publish 350, 375 -- I haven't counted

21    them lately -- documents that comprise what is called

22    the National Fire Codes, and for the most part those

23    are the fire codes that are used throughout the

24    United States.

25              They publish two documents that are

1    directly connected with fire investigation, and then

2    a large number that are indirectly.

3              One of the documents is NFPA 921, which is

4    on the investigation of fires and explosions, and it

5    is a guideline -- in their own terminology, it is a

6    guide in their own terminology for the investigation

7    of fires.

8              NFPA also publishes NFPA 1033,

9    Professional Qualifications of Fire Investigator, and

10   it de -- it's essentially a job description for fire

11   investigators.

12             I was a member of the 921 committee in the

13   late -- mid to late '90s to 2004, and I'm currently a

14   member of the NFPA 1033 committee.

15                       MR. WIGGINS:  Okay.

16                       THE WITNESS:  Go ahead.

17                       MR. WIGGINS:  I'm sorry.

18        Q.   (Mr. Wiggins)  Do they have local chapters

19   of that?

20        A.   No, sir.

21        Q.   It's just a national organization?

22        A.   Yes, sir.

23        Q.   And it has membership?

24        A.   It does.

25        Q.   And you are a member of that organization?

 1          A.    I am.

 2          Q.    And have you served as an officer of the

 3    NFPA?

 4          A.    I have not.

 5          Q.    I take it there are officers and directors

 6    of that organization.

 7          A.    Yes, sir.

 8          Q.    But you've served on committees of that

 9    organization?

10          A.    Yes, sir.

11          Q.    What committees have you served on during

12    the course of your career?

13          A.    The NFPA 921 committee and the NFPA 1033

14    committee.

15          Q.    And do you subscribe to that as being

16    somewhat of the standard that most and all cause and

17    origin investigators should adhere to?

18                        MS. DALY:  Objection to form.

19                        THE WITNESS:  I agree that it --

20    that 9 -- NFPA 921 details a preferred methodology.

21          Q.    (Mr. Wiggins)  Okay, and what I'm asking,

22    Mr. Lacy, is if an investigator falls below that

23    standard, would he be qualified as a qualified cause

24    and origin investigator?

25          A.    Sure.

 1                    MS. DALY:  Objection to form.

 2          Q.   (Mr. Wiggins)  He would be?

 3          A.   Sure.

 4          Q.   And do any courts, to your knowledge, use

 5   that NFPA 921 standard as any kind of a benchmark for

 6   qualifying cause and origin experts?

 7                    MS. DALY:  Objection to form.

 8                    THE WITNESS:  No, sir.

 9          Q.   (Mr. Wiggins)  Have you ever been asked by

10   a court if you were a member of the NFPA?

11          A.   I honestly do not believe I've ever been

12   asked that question.

13          Q.   Is there any other standards that are out

14   there that you are aware of in addition to the NFPA

15   Section 921 that prescribes -- proscribes methods and

16   means of cause and origin investigations?

17          A.   No, sir.

18          Q.   I noticed in your reports that you preface

19   your reports by saying that it was done in accordance

20   with 921.

21          A.   Yes, sir.

22          Q.   And so you do -- you, yourself, believe

23   that to be the standard in which you would conduct

24   your investigations?

25          A.   Yes, sir.

1          Q.    Have you taught any courses on behalf of

2      the NFPA?

3          A.    I believe years ago I taught several NFPA

4      921 courses.   They were not sponsored solely by the

5      NFPA.   The NFPA was a partner.

6          Q.    Have you written any articles and

7      submitted them to the NFPA for publication?

8          A.    No, sir.

9          Q.    There is a state -- is there a state

10     standard or -- strike that.

11               Is there any kind of a state qualification

12     in North Carolina for fire -- for cause and origin

13     investigators?

14         A.    Yes, sir.   The North Carolina State Fire &

15     Rescue Commission offers a certified fire

16     investigator program, and that's the only one -- I

17     mean, that's the only such program that I'm aware of

18     in North Carolina.

19         Q.    And do you have to be licensed in North

20     Carolina to call yourself a qualified fire and origin

21     investigator?

22         A.    Well -- no, sir, you don't.

23         Q.    Do you think they should be?

24               MS. DALY:   Objection.

25               THE WITNESS:   I think the

1    qualification issue should be left up to the courts.

2              Certification can be handled by an agency

3    such as the fire and rescue commission, but actual

4    qualifications -- because I am a certified fire

5    investigator, but that doesn't mean that my comfort

6    level with investigating the fire on a aircraft

7    carrier is as high as it would be on a routine house

8    fire.

9              When you certify fire investigators,

10   you're not certifying them by types of fires.  You're

11   certifying them by fires.

12             As far as the actual qualifications of an

13   individual investigator, I don't think you can

14   determine that until you know what type of fire it

15   is.  That's the qualifications.  And you used the

16   word, qualifications.

17             If you're going to certify investigators,

18   yeah, that's fine to certify as a fire investigator.

19        Q.   (Mr. Wiggins)  And you are a certified

20   fire investigator?

21        A.   Yes, sir.

22        Q.   And so that kind of brings us to why you

23   are here today, because you are a qualified fire

24   cause and origin investigator, and you were called to

25   investigate this fire, on behalf of Nationwide, at

1    Miami Subs Restaurant in Fayetteville, North

2    Carolina, on or about February 25th, 2012.  Is that

3    correct?

4          A.    I believe ---

5                      MS. DALY:   --- Objection to form.

6          Q.    (Mr. Wiggins)  On or about.

7          A.    I believe it was January 25th.

8          Q.    25th, 2012?

9          A.    Yes, sir.

10         Q.    And who retained you in this case?  Was it

11   Nationwide?

12         A.    Zak Gurley is an adjuster with Nationwide.

13   Z-a-k G-u-r-l-e-y.

14               And on January 25th he called in the

15   assignment.  It was given to me.  I called him on the

16   25th, left a voice mail, and I believe I called Jimmy

17   on the 25th and left a voice mail.

18         Q.    You're talking about Jimmy Diamantopoulos?

19         A.    Yes, sir.

20         Q.    And what did you tell Jimmy when you

21   called him?

22         A.    I told him who I was by name and phone

23   number.  Told him I'd been retained to investigate

24   the fire at Miami Subs and needed him to call me to

25   make arrangements to meet him there.

1      Q.    And what was -- when you talked to Mr.

2    Gurley, do you recall what he told you he wanted you

3    to do?

4            What was the scope of your investigation?

5      A.    The first thing he told me was that the

6    fire had been reassigned and was no longer his.  But

7    otherwise, the conversation evolved around origin and

8    cause.

9      Q.    And when you said origin and cause, that

10    -- tell me what that kind of assignment would

11    involve?

12      A.    Identify where the fire originated and

13    identify the ignition source for the fire and

14    identify the classification of the fire.

15      Q.    Okay.  We talk about cause.

16            Is cause and ignition the same, synonymous

17    with each other, or is it different?

18      A.    Different.

19      Q.    Okay, how is it different?

20      A.    Well, cause is the sequence of events that

21    brings the ignition source in contact with the fuel

22    source.  A person leaving food on a stove would be a

23    cause.

24      Q.    Okay.

25      A.    The food on the stove would be the fuel.

1    The person failing to cut off the stove would be --
2    the ignition source would be the -- the burner on the
3    stove, and the person failed to cut it of.
4         Q.   And the fuel source, then, would be what
5    was on the stove that got burned?
6         A.   No, sir.  The fuel, yes, sir.  Yes, sir.
7         Q.   That would be the fuel.
8              And so your duties as a qualified fire and
9    -- fire origin and cause investigator was to make
10   those determinations at the Miami Subs Restaurant.
11             You understood that when you were called?
12        A.   Yes, sir.
13        Q.   And you then called Jimmy.
14             And did you call anyone else or speak with
15   anyone else other than those two persons ---
16        A.   --- No, sir.
17        Q.   --- Before you came down to Fayetteville?
18        A.   No, sir.
19        Q.   And so the 25th -- the 26th you did come
20   to Fayetteville?
21        A.   Yes, sir.
22        Q.   And tell me what time you got there on
23   that day?
24        A.   I think it was approximately at nine a.m.
25        Q.   Okay, and you had arranged with Jimmy to

1    meet you there on that date?

2         A.    On the 26th, on my way to Fayetteville, I

3    was able -- I got -- I was able to get up with Jimmy.

4    I had not spoken to him.  I left Charlotte on the

5    26th not having spoken to Jimmy.

6         Q.    Okay.

7         A.    Got him on the phone on my way down.

8               I also spoke with Fayetteville Fire

9    Department, learned that the SBI was investigating.

10   I called the supervisor of fire investigations,

11   learned that Chad Royal was investigating, so I

12   called Chad.

13        Q.    Okay.

14        A.    And basically, number one, are you -- are

15   you finished with the scene, and he said he was.  And

16   then I ---

17        Q.    --- He -- which one, now?

18        A.    Chad.

19        Q.    Chad said he was?

20        A.    Chad Royal said he was -- he had completed

21   his fire scene examination.  He wanted to know what

22   time I was going to get there.  I told him, and he

23   met me out there later.

24        Q.    Okay.  You seem to have known Chad prior

25   to this time.

 1          A.    No, sir.

 2          Q.    You did not?

 3          A.    No, sir.

 4          Q.    Did you know other SBI agents in

 5     Fayetteville at that time?

 6          A.    I knew the supervisor -- his supervisor,

 7     Lee.

 8          Q.    Okay, did you know any other of the

 9     investigators from any of the departments, fire

10     department, police department, who had come on the

11     scene or had been on the scene in Fayetteville?

12          A.    Of this fire?

13          Q.    Yes, of this fire.

14          A.    No, sir.

15          Q.    And you were able to get hold of Jimmy and

16     Jimmy agreed to meet you there.

17          A.    Yes, sir.

18          Q.    At about nine o'clock?

19          A.    Yes, sir.

20          Q.    And he did meet you there?

21          A.    He did.

22          Q.    And he let you in?

23          A.    He did.

24          Q.    And who was there when you arrived at the

25     scene?

1          A.    I believe just Jimmy.

2          Q.    Okay, and no other investigator was there

3     at that time?

4          A.    No, sir.

5          Q.    The fire had been suppressed?

6          A.    Yes, sir.

7          Q.    Completely suppressed.

8                Was there any smoldering embers or smoke

9     or -- still visible at that time?

10         A.    No, sir.

11         Q.    And when you went in to the restaurant,

12    did Jimmy stay there or did he leave?

13         A.    He stayed for a little while, then left

14    ---

15         Q.    --- Okay.

16         A.    --- Then came back.

17         Q.    And did you have a conversation with Jimmy

18    about what had happened or got his version of what

19    happened?

20         A.    Almost immediately after arriving, I

21    introduced myself to him.

22                I use an aluminum clipboard to write on.

23    I put it on the hood of my truck and interviewed him.

24         Q.    And you told him that you were there on

25    behalf of Nationwide Insurance Company, did you not?

 1                    MS. DALY:  Objection to form.

 2                    THE WITNESS:  I don't know that I

 3     repeated it when I met him on the scene, but I

 4     definitely told him that in the voice mail on the

 5     25th, and probably told him that in the telephone

 6     conversation on the 26th.

 7                    MR. WIGGINS:  Okay.

 8                    THE WITNESS:  I don't know that I

 9     told him again when I saw him in person.

10          Q.   (Mr. Wiggins)  And do you think he knew

11     what the purpose of your being there was?

12          A.   I am comfortable I explained it to him.  I

13     don't have any idea if he knew.

14          Q.   Okay.

15          A.   I mean, I'm just going to be very candid

16     with you.  I don't know that part.

17          Q.   I will say that Jimmy is a Greek and he

18     has an accent.

19          A.   Yes, sir.

20          Q.   And you learned that in speaking to Jimmy

21     ---

22          A.   --- Yes, sir.

23          Q.   --- It's sort -- sometimes difficult to

24     understand what he says.  I understand that.

25                But he stayed there for a few minutes

Page 35

1    after you arrived and he let you in?

2         A.   Yes, sir.

3         Q.   And you interviewed him there and took

4    down a statement.

5              And do you have your notes with you today

6    that you took?

7                   MS. DALY:  Mr. Wiggins, here are

8    four files and his notes are on these files as well.

9                   MR. WIGGINS:  Can I read them?

10                   MS. DALY:  Yes.  Everything is on

11   here and all of the documents he produced in response

12   to your subpoena, sir.

13                   MR. WIGGINS:  Okay.

14                   MS. DALY:  Can we go off the record?

15                   MR. WIGGINS:  Yeah.

16        (10:37-10:42 a.m. - recess)

17                   MR. WIGGINS:  Back on the record.

18        Q.   (Mr. Wiggins)  Was there any -- was there

19   any information, Mr. Lacy, that you developed prior

20   to coming to Fayetteville other than what you've told

21   me about?

22        A.   On the morning of the 26th, Special Agent

23   Chad Royal of the SBI told me he had not determined

24   the cause of the fire.

25        Q.   And was that telephonically ---

1        A.    --- It was.

2        Q.    --- He told you that?

3        A.    It was.

4        Q.    Anybody else that you talked to to get

5   some background other than Mr. Royal -- Chad?

6        A.    No.  No, sir.

7        Q.    Just to kind of wind that end of it up,

8   after this -- after your investigation ended, or

9   terminated, did you -- have you learned anything else

10  since the termination of your investigation that

11  would bear on this fire?

12                MS. DALY:  Objection to form, and to

13  when you're referring to -- the end of the

14  investigation.

15                MR. WIGGINS:  I'm referring to after

16  he completed his investigation, whenever that was.

17                THE WITNESS:  No, sir.

18        Q.    (Mr. Wiggins)  Now, in preparation for

19  your testimony here today, Mr. Lacy, have you read

20  any depositions or articles?

21        A.    Yes, sir.  I've read, to my knowledge,

22  every -- I have reviewed transcripts of the

23  depositions that I've been provided.

24        Q.    Okay.

25        A.    And examination under oath.

1          Q.    Okay.

2          A.    I don't know that I've gotten them all,

3     but I've reviewed everything I've been given.

4          Q.    Okay.  Have you -- let me go through some

5     of the players here.

6                You've reviewed the EUO's of Jimmy

7     Diamantopoulos, have you not?

8          A.    I have.

9          Q.    You have reviewed the deposition of Jimmy

10    Diamantopoulos, have you not?

11         A.    I have.

12         Q.    Have you reviewed the deposition of Mrs.

13    Moon?

14         A.    I have.

15         Q.    Did you also interview Mrs. Moon?

16         A.    I did.

17         Q.    Yourself, you interviewed her?

18         A.    I did.

19         Q.    And did you review the deposition of Mr.

20    Lapene?

21         A.    I did.

22         Q.    Did you interview Mr. Lapene?

23         A.    I did.

24         Q.    And did you review or have you read the

25    deposition of Mr. Stone -- Steve Stone?

1          A.    I have.

2          Q.    And have you read and reviewed the

3    deposition of Steve Booth?

4          A.    I have.

5          Q.    You knew Steve Booth.

6          A.    I did.

7          Q.    You know Steve Booth.

8          A.    I do.

9          Q.    How long have you known Steve Booth?

10         A.    Approximately 10 years.

11         Q.    Is that from professional associations

12   that you've known him?

13         A.    Yes, sir.

14         Q.    And do you respect him as a -- as a cause

15   and origin fire investigator?

16         A.    Yes, sir.

17         Q.    And did you know Mr. Stone prior to this

18   particular case or have any contact with him?

19         A.    I did not know him and have not had any

20   contact with him -- other contact with him.

21         Q.    But you have reviewed the findings of all

22   the other experts in this case, and that would have

23   been Mr. Stone, Mr. Booth, I believe, and I believe

24   those are the only two that we've taken depositions

25   of.

 1        A.    Yes, sir.

 2        Q.    Over the years you've told me that you've

 3   conducted and been conducting fire and origin

 4   investigations since the early '80s.

 5              Approximately how many fires have you

 6   investigated over your career?

 7        A.    Approximately 3500.

 8        Q.    And have all of those been cause and

 9   origin issues in those cases, or has there been some

10   other issues there?

11        A.    Origin and cause.

12        Q.    And I noticed that you've also been called

13   and have qualified as an expert in other

14   jurisdictions other than North Carolina also.

15        A.    Yes, sir.

16        Q.    What other states have you testified and

17   qualified as an expert in?

18        A.    At trial, Massachusetts.  And then have

19   been offered as an expert at deposition in Virginia,

20   Ohio, Tennessee and Florida and South Carolina.  I

21   think that's it.

22        Q.    Okay, have you participated in fires, test

23   fires, during the course of your career?  I'm sure

24   you have.

25        A.    Yes, sir.

1      Q.    Is that something that fire investigators

2    do on a regular basis?

3      A.    Yes, sir.

4      Q.    What is the purpose of that?

5      A.    To observe fire behavior.

6            I mean, there are some fires that are set

7    for training purposes, simply just to watch.  No

8    particular concern as to what the fuel is or how it's

9    lit -- just to watch.

10           There are other fires that are set with a

11   specific scenario in mind, and you -- and again, you

12   -- you want to see what happens.

13           1986 or 1987, one or the other.  It's been

14   a little while.  I mean, we burned a couple of houses

15   in Shelby, and my purpose for being there was to

16   train police investigators from Charlotte.

17           So we went in, laid on the floor of the

18   room that was burning.  Stayed as long as we could

19   just to -- so he could see a fire burning.  So you do

20   it to document what occurs in any -- any fire

21   situation or in specific scenarios that you're

22   interested in.

23     Q.    Over the course of your career, as you've

24   testified, you've participated in a good many arson

25   investigations, and are there patterns that you look

1    for in arson investigations that aren't peculiar to a

2    cause and origin or is it all the same?

3              A.    You're looking for patterns in any origin

4    and cause investigation, not just arson.  Any fire

5    investigation.

6              Q.    What are the patterns that you look for in

7    a cause and origin investigation?

8              A.    Well, you're looking for the development

9    of the fire at the origin, then spread of the fire,

10   ventilation patterns.  I mean, that's what -- that's

11   what you're looking for.

12             Q.    Okay, and if you see a fire that has

13   multiple origins, is that an indicator of some sort?

14             A.    Yes, sir.

15             Q.    Is that an ar -- is that an indicator of

16   arson?

17             A.    Well, it's an indicator that the fire is

18   incendiary in nature.

19             Q.    And what about -- what about finding

20   incendiary devices at a fire?  That's also an

21   indicator, is it not?

22             A.    Indicator that the fire is incendiary.

23             Q.    And if there is -- if there is some type

24   of fuel present, or an incendiary material present,

25   that's the -- that's the -- I suppose also a gauge of

1    what you might find?

2         A.    Well, understand that a fuel has to be

3    present for any fire to occur.  So you -- I've got --

4    the fire investigator has to identify the fuel

5    involved in the fire on all fires ---

6         Q.    --- Okay.

7         A.    --- Whether they be accidental or

8    incendiary.

9         Q.    That's a prerequisite?

10        A.    I wouldn't say it's a prerequisite.  I

11   would just say it's one of those items that you have

12   to identify prior to the conclusion of the

13   investigation.

14        Q.    And do you also look for trailers?

15        A.    Yes, sir.

16        Q.    And explain what a trailer is.

17        A.    A combustible material, whether it be a

18   liquid or a solid, that is used to spread the fire

19   unnaturally from one area to another.

20        Q.    And anything else that you can think of

21   that are such indicators that we've just been talking

22   about?

23        A.    No, sir.

24        Q.    What about smoke?  I'm interested in smoke

25   patterns, and you've talked about that.

1              That is an indicator of sorts, is it not?

2                    MS. DALY:  Objection to form.

3                    THE WITNESS:  Indicator of what?

4                    MR. WIGGINS:  Indicator of the

5     course and the flow of a -- of a flame.

6                    THE WITNESS:  Smoke is a byproduct

7     of all combustion, and the manner in which it flows

8     is of interest to the investigator.

9          Q.   (Mr. Wiggins)  Does smoke contain carbon

10    monoxide or carbon dioxide or other combustible

11    material?

12         A.   Yes.

13         Q.   Sometimes can that explode?

14         A.   Yes.

15         Q.   What happens if that catches an explosive

16    force?  What happens in that kind of a fire?

17                    MS. DALY:  Objection to form.

18                    THE WITNESS:  It depends on the

19    scenario at the time that it occurs.

20              It can level a building, which is -- an

21    explosion is the most perfect form of combustion.  Or

22    it can just -- the carbon monoxide can continue to

23    burn, so it can be ---

24         Q.   (Mr. Wiggins)  --- You mean, it can burn

25    by itself, that is the fuel source?

1                    MS. DALY:  Objection to form.

2                    THE WITNESS:  Only after a -- after

3     a fire is occurring elsewhere.  But carbon monoxide

4     is combustible.

5                    MR. WIGGINS:  I see.  I see.

6                    THE WITNESS:  Carbon dioxide is not.

7         Q.   (Mr. Wiggins)  Okay, are there other

8     combustible materials in smoke other than carbon

9     monoxide?

10        A.   There are other gases, and some are

11    combustible, some are not.

12        Q.   What produces those gases in smoke?

13        A.   Fire as we know it, as we watch it -- if

14    you watch on -- if you see video on a television or

15    if you actually watch it in person, is actually

16    incomplete combustion, meaning not everything is

17    consumed by the fire.

18             In an explosion -- let me rephrase that.

19    An explosion is complete combustion.

20        Q.   Okay.

21        A.   Is perfect combustion.

22             So when you have incomplete combustion,

23    these fire gases, carbon monoxide -- carbon monoxide

24    and a host of others are produced.  The more

25    incomplete combustion you have, the greater

1    production of gases.  The less incomplete combustion,

2    the less production of gases.

3         Q.    When you got to the Miami Subs Restaurant

4    and you -- after you interviewed Jimmy, you then went

5    into the restaurant to begin your investigation.  Is

6    that not correct?

7         A.    Yes, sir.

8         Q.    And just walk me through what you did.

9         A.    I walked in the side door.  If you stood

10   on McPherson Church Road and looked at the front, it

11   would be the right side.  And since I know we're

12   going there, drive-thru windows would be on the left

13   side.

14        Q.    Okay.

15        A.    Walked in the side door and just walked

16   around the interior of the restaurant, starting in

17   the seating area.  And there was a little game room.

18   Walked through all of that.

19              Then wandered behind the cash registers,

20   then wandered in the line where the cooking equipment

21   was.  Then came back out, went to my right.  That led

22   me into the area where the rear drive-thru window was

23   located.

24              I don't think I immediately went toward

25   the rear door until we got it open and got a little

1    bit more light back there.  That was the only area

2    that did not have windows.

3            I try not to walk around dark fire scenes,

4    because you don't know what's hanging from above ---

5        Q.    --- Absolutely.

6        A.    --- Or what the floor is.

7        Q.    Absolutely.

8        A.    So yeah, we -- once we got the rear door

9    opened, I went on down that hall from the drive-thru

10   window area to the rear door area.

11       Q.    Okay.

12       A.    But I just -- I -- I don't have -- I don't

13   take my note pad, I don't take my camera.  I just

14   walk in and make observations.

15       Q.    And when you -- so that we're on the same

16   page of music, when you talk about the front window

17   -- there were two drive-in windows ---

18       A.    --- Yes, sir.

19       Q.    --- At the Miami Subs Restaurant.

20       A.    Yes, sir.

21       Q.    And the front window would have been the

22   one that you subsequently identified as being the

23   source of the fire?

24       A.    Sir, it may be a matter of semantics, but

25   I actually believe that's the rear drive-thru window.

1          Q.    Okay.  I just want to be sure we were

2     talking about the same window.

3               You think that's the rear ---

4          A.    --- To me, that's the rear of the

5     building, so that's -- it's kind of confusing,

6     because it -- when you -- when you drive -- when you

7     go through the drive-thru process, it is the first

8     window you come to.

9          Q.    That's what I was thinking.

10         A.    But to me, it's at the rear of the

11    building.

12         Q.    Okay.  Well, yesterday we talked about

13    that as being the first window.

14         A.    I think it's called window one.

15         Q.    Okay, window -- let's call it window one,

16    then.

17         A.    But to me, it's at the rear of the

18    building.

19         Q.    So can -- for the purpose of our

20    discussions today can we call it window one ---

21         A.    --- Yes, sir.

22         Q.    --- So that we are on the same page of

23    music and we're not confusing each other.

24         A.    That's fine.

25         Q.    Okay.  And I noticed in your drawings you

Page 48

1   have -- you've identified that.

2              You've got -- you've got your notes before

3   you there?

4        A.    Yes, sir.

5        Q.    Okay, look at the drawings ---

6        A.    --- Which one you got?

7        Q.    The first one I have is ---

8        A.    --- Okay, I've got that one in my hand.

9        Q.    And you've got various numbers on this

10  sheet.

11             Tell me what that is.

12       A.    The numbers inside the circles or the

13  squares indicate number of chairs.

14       Q.    Okay, and that's all that's shown on this

15  -- on this particular sheet.  Is that correct?

16             Just trying to give an outline of the

17  restaurant and where there's chairs and ---

18       A.    --- And some -- couple measurements.

19       Q.    Okay.  And a couple -- I see the

20  measurements.

21             And then you've got Pepsi, coffee.  Is

22  that what that is?

23       A.    Tea and Pepsi.

24       Q.    Tea and Pepsi.

25       A.    That is the beverage bar.

 1          Q.    Okay.

 2          A.    To put it in perspective, sir, McPherson

 3     Church would be at the top of the diagram.

 4          Q.    Okay.

 5          A.    Do you see where the word ---

 6          Q.    --- I do.

 7          A.    Do you see where the word, date, is?

 8          Q.    I do.

 9          A.    I didn't write McPherson ---

10          Q.    --- I see.

11          A.    --- But that would be the McPherson side.

12                The right side would be -- near where you

13     see 2.0, the right side would be the game room.

14          Q.    Okay.

15          A.    Then the bottom, if -- if something were

16     to be drawn below Pepsi, coffee, tea and Pepsi, the

17     next thing to draw would be the line where the cash

18     registers are.

19          Q.    Okay, and would that be shown on the next

20     drawing that you have?

21          A.    It is.

22          Q.    Okay.  And I see a sofa, table and ---

23          A.    --- Love seat.

24          Q.    --- And love seat, and I see measurements

25     on that.

1          Then you've got four -- you've got tables

2    and you've got four, four.

3          Is that the seating area there?

4       A.   No.  It's the number of chairs, or number

5    of people ---

6       Q.   --- Number of chairs.

7       A.   Number of people that -- and understand,

8    some of these are benches, so number of people who

9    could sit at that table.

10      Q.   Okay, and then you've got a square in the

11   middle -- or rectangle in the middle, 13 by 10.

12      A.   That's a pool table.

13      Q.   Pool table.

14          And this is the game room that you had

15   referenced here earlier on?

16      A.   Yes, sir.

17      Q.   And the next drawing that you have is the

18   -- is the drive-thru.

19          Is that the drive-thru window shown in

20   this one -- in this drawing?

21      A.   With all due respect, can you show me what

22   you're looking at.

23      Q.   I'm sorry.

24      (Witness examined document)

25      A.   Yes, sir.  I have that drawing -- I have

1    that diagram in front of me.

2              At the top left corner you see a square

3    penetrating a vertical line.

4         Q.    Okay.

5         A.    You see the vertical line originating

6    under the word, case?

7         Q.    I do.

8         A.    Okay, come down about an inch.

9         Q.    Okay.

10        A.    And you see a square through -- around

11   that line?

12        Q.    Uh-huh.

13        A.    That is the number one drive-thru window.

14              If you come down on that wall near where

15   you see a CR ---

16        Q.    --- Do you have it -- you don't have it

17   marked one on yours?

18        A.    No, sir.

19        Q.    Would you mark it on mine and put your

20   initial by it, just so I know where we're talking ---

21        A.    --- Do you want me to mark ---

22                   MS. DALY:   --- Do you want it with

23   the red pen ---

24                   MR. WIGGINS:   --- Yeah.  Oh, that.

25   Yeah.

1                    MS. DALY:  --- So that it shows up?

2                    MR. WIGGINS:  Yeah, please.

3                    THE WITNESS:  Do you want me to mark

4    number two?

5                    MR. WIGGINS:  Yes, please.  We got

6    it down pat.

7                    THE WITNESS:  Okay.

8         (Witness marked document)

9                    MR. WIGGINS:  Thank you.

10        Q.   (Mr. Wiggins)  And you've got the first

11   drive-thru window shown there.

12        A.   Yes, sir.

13        Q.   And then behind that you've got a grill,

14   and that is the kitchen area?

15        A.   Yes, sir.  You see refrigerator, grill,

16   deep fat fryers, food prep, and then FF for french

17   fry.

18        Q.   And please, again, draw on there where

19   McPherson Church Road would be in reference to that

20   drawing, and where Skibo Road would be in reference

21   to that drawing -- or 401 bypass.

22        A.   Okay.

23        (Witness marked document)

24        Q.   Thank you.

25        A.   Uh-huh.

1        Q.    And look -- look down, Mr. Lacy, where you

2    got beside 88.

3              Do you see that number?

4        A.    Yes, sir.

5        Q.    What does that have reference to?

6        A.    That ice cream box is 88 inches across the

7    front ---

8        Q.    --- Okay.

9        A.    --- 88 inches wide.

10       Q.    And 23 is the -- is the width of it?

11       A.    Umm, 28.

12       Q.    I'm sorry, 28.

13             And then above that you've got another

14   drawing of a -- I'm sorry.  I can't read that.

15       A.    The 28-by-31 box?

16       Q.    Yes, sir.

17       A.    That is a refrigerator -- refrigeration

18   box.  It contains bottles of water and packs of salad

19   dressing.

20       Q.    Okay, and then going back to where you've

21   marked the first drive-thru window to be, behind that

22   is the office.  Is that not correct?

23       A.    Correct.

24       Q.    Okay, and that would be shown on your next

25   drawing, or would it be shown in your next drawing?

```
 1          A.   Hang on one second.

 2          (Witness examined documents)

 3          A.   Yes, sir.

 4          Q.   Okay.

 5          A.   Well, let me see what you're looking at,

 6     just so I can be sure ---

 7          Q.   --- Be sure we're ---

 8          A.   --- Yeah, we're looking at the same thing.

 9     That is.

10          Q.   That's good.

11          A.   Yes, sir.

12          Q.   And -- I'm sorry.  Go ahead.

13          A.   This shows the hallway going toward the

14     rear of the building, but it also includes the office

15     areas.

16          Q.   Okay.

17          A.   The -- right under the -- you see a number

18     36 at the top?

19          Q.   I do.

20          A.   That is the width of the drive-thru window

21     number one.

22          Q.   Okay, and that's the one we've been

23     talking about.

24          A.   Yes, sir.  There's 22 inches between the

25     window and the wall.
```

Page 55

1          Q.    Okay.

2          A.    Coming down the wall there's 70 and a half

3    inches between the exterior wall and the door to that

4    office.    Then that office is 48 and a half inches

5    deep and 105 inches wide.

6          Q.    Is there a door -- where you have 34.5, is

7    there a door there?

8          A.    No, sir.

9          Q.    Okay, and there is no door leading from

10   that area back into the office, then?

11         A.    Not into the area that's 70 -- that's 48.5

12   inches deep and 105 inches wide.

13         Q.    Okay.

14         A.    There's one door leading into the area

15   that's 59.5 by 55.5.

16         Q.    And what is that -- what is that area

17   there?

18         A.    To me, they're both the office.

19         Q.    Okay, was one more of a storage area than

20   the -- than the office area?

21         A.    I do not know.

22         Q.    Couldn't -- couldn't tell.

23               And then coming back, again, just get

24   orientation, would you write on here again in red,

25   show McPherson Church Road just so we'll know which

1    direction we are looking, and 401 bypass, or Skibo.

2          A.   Okay.

3          (Witness examined document)

4          Q.   What you've drawn on this, Mr. Lacy, the

5    bottom of this page you've shown McPherson Church

6    Road, and to the left of your drawing you've shown

7    Skibo Road.  Is that correct?

8               And the ---

9          A.   --- Whoa, whoa, whoa, whoa.  May I have

10   that back?

11         Q.   Yes.  It's kind of difficult to get the

12   orientations on these things.

13         A.   Hang on a minute.

14         (Witness examined document)

15         A.   Yeah.

16         Q.   The drive-thru window faces ---

17         A.   --- No, hang on a minute.  Hang on a

18   minute.

19              The drive-thru window faces ---

20         Q.   --- Skibo.

21         A.   --- Skibo.

22         Q.   Uh-huh.

23         A.   I'm comfortable with that.

24              Skibo and McPherson Church intersect, so I

25   guess I did actually -- I actually -- I did have it

1    right.  I apologize.

2         Q.    That's quite all right.  Thank you.

3              So what we've got here is the number one

4    drive-thru window faces Skibo Road.  Is that correct?

5         A.    Yes, sir.

6         Q.    And McPherson Church Road would be on the

7    -- would be at the left side of your drawing?

8         A.    Yes, sir.

9         Q.    On this drawing you do not show drive-in

10   window number two.

11        A.    I do not.

12        Q.    Okay, let's go to the next drawing, and

13   that would be this one.

14              Is that what you have?

15        A.    Yes, sir.

16        Q.    And that is a -- you're going to have to

17   tell me what this is.

18        A.    Okay.

19        Q.    Because I don't recognize this.

20        A.    This is the ---

21        Q.    --- I do.  I do.  This is the entrance?

22        A.    No, sir, this is the rear -- rear hallway.

23        Q.    Okay.

24        A.    Pick up the last one we just worked on.

25        Q.    Okay.

1          A.    Lower left you'll see WH, water heater.

2          Q.    I got that, yes.

3          A.    Okay, orient that with the water heater on

4     this.

5          Q.    I got it.

6          A.    This is just an extension of the -- of

7     that area.

8                You see the door on the right-hand side

9     marked by 41 and a half inches.  On the right-hand

10    side you see a door opening about midway, and you see

11    the number 41 ---

12         Q.    --- 41.5.

13         A.    That is the rear door of the -- of the

14    building.

15         Q.    Okay.

16         A.    This area that's 82 inches by 40 and a

17    half inches is where electrical panels are located,

18    and then the area that's 63 by 75 is storage.

19                The drive-in -- drive-thru window number

20    one would be continuing up the top of the....

21         Q.    Drawing.

22         A.    Drawing.  So Skibo Road would be at the

23    top and ---

24         Q.    --- Again, we'll write it on there just so

25    we'll know exactly where we are.

1          (Witness marked document)

2          A.   And then -- and because this is just a

3     continuation of that other diagram, McPherson Church

4     is going to be on the left.

5          (Witness marked document)

6          Q.   Okay, and then the next drawing is a -- it

7     looks like it's a drawing of the entire outer

8     perimeter of the building?

9          A.   Correct.

10          Q.   And this has somewhat the same numbers as

11     your earlier drawings except it's for the entire

12     perimeter of the building?

13          A.   Correct.

14          Q.   Then the next page you've got freezer on

15     exterior rear of building, depth 92.5, length 380.5.

16               Was this an enclosed freezer or was it a

17     free -- standalone?

18          A.   This -- this is a freezer that is outside

19     of the envelope of the building, but you actually

20     enter it from that rear hall.

21          Q.   Okay.  Okay, now, going back to what we

22     were talking about earlier, you said you didn't walk

23     around that area.

24               You walked around everything we've looked

25     at here on your -- on your drawings.

Page 60

1           A.    Inside and outside.

2           Q.    And without camera, without taking notes,

3    just making the walk.

4           A.    Yes, sir.

5           Q.    And you looked at all those areas?

6           A.    Yes, sir.

7           Q.    And what did you do next?

8           A.    Photographed them.

9           Q.    Okay, and what kind of a camera do you

10   use?

11          A.    Digital.

12          Q.    Is it a 3D digital camera?

13          A.    It's not 3D, no, sir.

14          Q.    And the purpose of that was to photograph

15   the entire fire scene as you observe -- as you were

16   observing it when you were walking through this

17   restaurant?

18          A.    Yes, sir.

19          Q.    And was there evidence of fire suppression

20   when you walked through the building?

21          A.    No direct evidence of fire suppression,

22   but I knew the fire had been suppressed.

23          Q.    Okay, and after you began taking

24   photographs -- and I think I have -- how many

25   photographs did you take?  Do you recall?

1          A.    Sir, I never counted them.  I would say,

2     all told, probably close to a thousand.

3          Q.    Did you use all -- you didn't develop the

4     whole thousand and furnish them to counsel, did you?

5                    MS. DALY:  Objection to form.

6                    MR. WIGGINS:  If you know.

7                    THE WITNESS:  Well, they're digital

8     photographs, so I did not print them all, but I have

9     provided all of them to counsel.

10         Q.    (Mr. Wiggins)  On a tape, on a ---

11         A.    --- On a CD.

12         Q.    On a CD.  Okay.

13                Some of them I want to show you and just

14     you and I discuss here for a few minutes and -- just

15     to kind of, again, get oriented.

16                I'm going to show you -- I think I've

17     already marked these as Plaintiff's Exhibit Number

18     94.

19                    MS. DALY:  Mr. Wiggins, before we

20     get into that, may we take a five-minute comfort

21     break?

22                    MR. WIGGINS:  Oh, yeah, sure.

23                    MS. DALY:  Thank you.

24                    MR. WIGGINS:  Sure.

25         (11:14-11:19 a.m. - recess)

1        Q.    (Mr. Wiggins)  Mr. Lacy, I'm going to show

2    you what's been marked as -- for identification as

3    the Plaintiff's Exhibit Number 94 and ask if you can

4    -- I think this is one of your photographs -- if you

5    can, identify that.

6            (Witness examined document)

7        A.    Yes, sir.

8        Q.    And what is this?

9        A.    It is a photograph of drive-thru window

10   one, which you see the light showing through the

11   window on the left center of the photograph.

12       Q.    I do.

13       A.    The wall to the right of that where you

14   see the electrical boxes mounted in a conduit running

15   ---

16       Q.    --- I do.

17       A.    --- Is a wall of the office area.  And

18   then on the left side is the remains of the bread

19   cart.

20       Q.    Okay.  Now, tell me what material the wall

21   was made of, if you know.

22       A.    Fiberglass reinforced panels.

23       Q.    Okay, and is that a flammable material, in

24   your opinion?

25       A.    No, sir.

Page 63

1          Q.    The bread cart that you see in this

2     photograph, it's all folded together?

3          A.    No, sir.  Those are trays ---

4          Q.    --- I see.

5          A.    --- That were inside the bread cart.

6          Q.    Okay.

7          A.    Stacked inside, and so -- and they

8     remained stacked after the fire.

9          Q.    Okay.  You took this photograph at an

10    angle looking toward -- looking toward number one

11    drive-thru window?

12         A.    Mr. Wiggins, I'm not going to say for sure

13    that I took this photograph.

14              I will agree that it is a photograph of

15    the fire scene, and I took a whole lot of similar

16    photographs ---

17         Q.    --- Okay.

18         A.    --- But I -- I'm not going to swear to you

19    ---

20         Q.    --- That you took this one?

21         A.    --- That this is my photograph.

22         Q.    I understand.

23         A.    But I recognize it as a photograph of the

24    interior of the fire scene.

25         Q.    And is this what you saw -- what I'm

1   getting at, really, is what -- is this what you saw

2   the first day you were on site?

3          A.   Yes, sir.

4          Q.   Okay, and that's fairly representative of

5   what you saw?

6          A.   Yes, sir.

7          Q.   I show you what has been previously marked

8   for identification as Plaintiff's Exhibit Number 97,

9   Mr. Lacy, and ask if you can identify that

10  photograph.

11              And again, I don't know whether you took

12  this.  I thought you did, but you may not have.

13         A.   Well, first, Mr. Wiggins, I'm not going to

14  deny taking it, but before I say that I did take it,

15  I would obviously like to compare it to my

16  photographs.

17         Q.   Okay.

18         A.   But it is representative of the fire

19  scene.

20         Q.   Okay, and tell me what this scene is

21  looking at.

22         A.   I'm looking straight on at drive-in --

23  drive-thru window number one.  You see the broken-out

24  glass?

25         Q.   I do.

1          A.    That's the bread cart to the left and the

2     wall to the office to the right.

3          Q.    Okay, and are those trays to the bread

4     cart on the left lower part of this photograph?

5          A.    Yes, sir.

6          Q.    Okay, let me show you what has been marked

7     for identification as Plaintiff's Exhibit Number 114

8     and ask if you can identify that photograph, Mr.

9     Lacy.

10         A.    Yes, sir.

11         Q.    And what is this representative of?

12         A.    Okay, first, the manner in which it's

13    labeled is upside down.

14         Q.    I understand that.  I see it is.

15         A.    Okay, so if you've got the exhibit label

16    in the lower left, it is the -- it's a photograph of

17    the office wall like -- orient it like this, sir.

18         Q.    Okay.

19         A.    Yes, sir.  It is a photograph of the

20    office wall.

21              You see a little bit of drive-thru window

22    number one on the left side of the photograph right

23    above the label, and then you see the door to the

24    office.

25         Q.    Okay.

1        A.    And you've got the ceiling above it.

2        Q.    And I see a lot of wiring in that ceiling.

3              Do you know what that wiring went to,

4    where all that housing was for -- what it -- what

5    that housing was for?

6        A.    A substantial amount of it was

7    communication or sound equipment.  Was not

8    electrical.

9        Q.    And can you identify in this photograph

10   what has later become identified as a protected area

11   on the wall next to the drive-in window?

12       A.    Yes, sir.  You see it on the left side of

13   the photograph just to the right of the portion of

14   the window that's illustrated in the photograph.

15       Q.    Okay, and did you pay any attention to

16   that on the day that you were there doing your

17   initial investigation?

18       A.    By all means.

19       Q.    Okay, did you note it somewhere in your

20   notes?

21       A.    I did.

22       Q.    Okay, and ---

23       A.    --- Well....

24       Q.    I'm sorry.  Go ahead.

25       A.    I don't know that I wrote it down.

1                I use my photographs as some manner of

2   documenting some items.  I don't necessarily write

3   down everything but I take a picture of it.

4          Q.   And you had measured the distance from

5   that window to the angle of the wall there, had you

6   not?

7          A.   Okay, is angle of the wall ---

8          Q.   --- You -- the ---

9          A.   --- The same thing as corner?

10         Q.   Right.  The corner.  I'm sorry.  Yeah.

11         A.   No, no problem.  I just want to be sure,

12  again, we're on the same page.

13         Q.   Right, right.

14         A.   Yes, sir, I have.

15         Q.   And that's in the notes that we just

16  looked at earlier.  That is ---

17         A.   --- It's in the diagrams, yes, sir.

18         Q.   In the diagrams.

19              I believe -- and just so we're -- go back

20  and look at that and let's see what it was.

21         (Witness examined documents)

22         Q.   Do you have it?

23         A.   Yes, sir.

24         Q.   What is that?

25         A.   It's 22 inches.

Page 68

1          Q.    Not quite two feet.

2          A.    Correct.

3          Q.    Two inches short of two feet.  Is that

4    correct?

5          A.    One -- one -- one foot 10 inches.

6          Q.    Okay, and all of this -- most of this

7    wiring you see in the ceiling there, you said, goes

8    to the audio equipment in the office?

9                Was that what that would have been?

10         A.    First, I saw very little that would be

11   considered branch circuit electrical wiring.

12         Q.    Okay.

13         A.    I would believe that most of it would be

14   audio, video, or some other type of communication

15   equipment.

16         Q.    Okay.  Now, I see in this photograph the

17   entire ceiling was gone.  Is that ---

18         A.    --- Yes.

19         Q.    --- What you saw when you went there?

20         A.    Yes, sir.

21         Q.    What kind of ceiling was in that building,

22   Mr. Lacy?

23         A.    A drop-in ceiling, also called a false

24   ceiling, with panels that drop into a tray.

25                If you see this, where I'm running my ---

1          Q.    --- I do.  I see that.

2          A.    Okay, that is the framing for the drop-in

3    ceiling.

4          Q.    Okay, and what was that drop-in ceiling

5    made of?

6          A.    Celo -- well, celotex.

7          Q.    Is that highly flammable?

8          A.    The finish on it is not, because of the

9    health department requirements.  It will smolder more

10   than it will burn.

11               Typically what happens is after it gets

12   hot, and then wet from firefighter -- fire

13   suppression hoses, it just crumbles.

14         Q.    Okay, and when you went there -- I'm

15   sorry.  I have a cold that I can't quite shake.

16               When you went there did you see all of

17   that celotex material on the floor?

18         A.    In this area -- in other words, if this

19   photograph extended on down to the floor, that floor

20   area was reasonably clean from where S -- SBI Special

21   Agent Royal had examined the floor.  I saw piles of

22   debris in which I believe celotex debris was located.

23         Q.    Okay, and it had not been completely

24   consumed by fire?  Let me strike that.

25               You tell me what degree of fire had

1    consumed that celotex material.

2                        MS. DALY:  Objection to form.

3                        THE WITNESS:  No, it had not been

4    totally consumed, and in -- probably very little of

5    it had been consumed.

6              As I mentioned earlier, the heat from a

7    developing and spreading fire damages the integrity

8    of the celotex panel.  Water from fire suppression

9    hoses destroys the integrity of the celotex panel,

10   and typically it then just falls to the floor and

11   becomes a mushy gray material.

12       Q.   (Mr. Wiggins)  And you observed some of

13   that mushy gray material when you were there on the

14   26th of January?

15       A.   Yes, sir.

16       Q.   I show you what has been marked for

17   identification as Plaintiff's Exhibit Number 112, Mr.

18   Lacy, and again ask you if that is something you can

19   identify and speak to.

20       (Witness examined document)

21       A.   Yes, sir.  That is the ceiling in the rear

22   hall.

23       Q.   And -- I'm sorry.  Go ahead.

24       A.   You see some wall surface on the bottom

25   left of the photograph, and that is the wall to the

1    office.

2          Q.    And there is a chain to the right portion

3    of the photograph.

4                Do you see that chain?

5          A.    Yes, sir.

6          Q.    What does that extend to?

7          A.    I do not recall.

8          Q.    And there is a fluorescent light in this

9    photograph.

10         A.    Yes, sir.

11         Q.    And was that photo -- was that -- did you

12   observe that fluorescent light at the time of your

13   initial visit to the restaurant?

14         A.    I did.

15         Q.    How many of those lights were in the area

16   where window number one was located?

17         A.    I believe it would have been these two

18   lights that are in this photograph.

19         Q.    Okay.

20         A.    I mean, that would have been -- they would

21   have been directly in front of the window, and I

22   believe that was it.

23         Q.    Okay, and I see some material hanging down

24   just to the lower left of the fluorescent lighting.

25                Do you see that?

1          A.    Yes, sir.

2          Q.    Would that be the celotex material we

3    spoke about earlier ---

4          A.    --- It would.

5          Q.    --- Some of it?

6          A.    It would.

7          Q.    I show you what I've marked as Plaintiff's

8    Exhibit Number 115, Mr. Lacy, and ask if you can

9    identify and speak to that photograph.

10         (Witness examined document)

11         A.    Sir, I believe it is a fluorescent light

12   fixture.

13         Q.    Okay, and is it on -- do you know where it

14   is located in this photograph?

15         A.    No, sir.

16         Q.    But it's typical of all the fluorescent

17   lighting system you saw in the restaurant?

18         A.    Yes, sir.

19         Q.    I show you what has been marked as

20   Plaintiff's Exhibit Number 95 and ask if you can

21   identify that photograph.

22         (Witness examined document)

23         A.    Yes, sir.  That is the left rear corner of

24   the restaurant.

25                  Shown in the upper left-hand corner of

1    this photograph is drive-thru window number one.

2            Q.    Okay.

3            A.    Shown in the bottom left corner is a

4    portion of the wheeled bread cart.

5                  And then, shown on the upper right-hand

6    corner of the photograph is the wall to the office.

7            Q.    And it is no longer there.  It's gone.

8            A.    Correct.

9            Q.    And is part of that wall lying on the

10   floor?

11           A.    It is.

12           Q.    And had it partially been consumed by

13   fire?

14           A.    I don't know that it had been consumed by

15   fire, but it had been partially damaged by fire.  I

16   believe firefighters pulled the rest of it down.

17           Q.    Okay, and do you know what that black

18   thing is in the lower part of the photograph?

19           A.    I believe it's a cash register drawer.

20           Q.    Okay, could you identify where that cash

21   register drawer had been prior to the fire?

22           A.    No, sir.

23           Q.    I show you what has been marked for

24   identification as Plaintiff's Exhibit Number 108 and

25   ask if you can identify and speak to this photograph.

1          (Witness examined document)

2          A.   I don't know what that is.

3          Q.   I think what -- are you talking about the

4     writing on this?

5          A.   Yeah.  I mean, I -- I -- I haven't looked

6     at it hard, but I'm seeing handwriting, some of which

7     I can't recognize.

8          Q.   Okay.  This is handwriting -- I -- let me

9     represent to you what it is.

10              That's the handwriting of Chad Royal, I

11     believe.

12                  MS. DALY:  I'm not certain.

13          Q.   (Mr. Wiggins)  I had asked -- this is

14     where he talked about identifying and -- and found

15     the printed circuit board, Mr. Lacy.

16              And then to the left he has got where he

17     placed the electric -- the circuit board.

18          A.   Okay, this is a wall -- the floor area

19     underneath drive-thru window number one.

20          Q.   Okay.

21          A.   I would prefer not to make any comment on

22     the words written on it.

23          Q.   I don't want you to ---

24          A.   --- Okay.

25          Q.   --- Make any comment about that.  I just

Page 75

1    wanted you to comment on the ---

2            A.    --- Because I'll be honest with you, I

3    don't -- I can't read the words.

4            Q.    Okay.  What I want you to look at is the

5    debris that's in that pile to the right lower part of

6    that photograph.

7            A.    Yes, sir.

8            Q.    Was that representative of what you saw on

9    the first walk-through that you made of the

10   restaurant?

11           A.    No, sir, that debris had been removed.

12           Q.    Do you know -- did you ask anyone who had

13   removed it?

14           A.    Chad Royal told me he had.

15           Q.    Okay.

16           A.    And he pointed to me the pile in which he

17   moved it to.

18           Q.    Okay, and where did he move it to?

19           A.    Utilizing the position in which he was

20   standing to take this photograph, it would be about

21   two feet to his left.

22           Q.    Okay.

23           A.    In -- going back toward the front of the

24   restaurant.

25           Q.    And that's what you found when you went

 1    there?  Is that true?

 2         A.    Found what?

 3         Q.    That you found this material moved to a

 4    different location ---

 5         A.    --- Yes, sir.

 6         Q.    --- According to what you were told by Mr.

 7    Royal.

 8         A.    Yes, sir.

 9         Q.    SBI Agent Royal.

10         A.    Yes, sir.

11         Q.    And did you ask him what he had found in

12    this area, if anything?

13         A.    I -- I -- I don't recall if I posed a

14    question to him in that manner, no, sir.

15         Q.    Okay, and did he tell you that he had

16    found or discovered anything of interest in that

17    pile?

18                    MS. DALY:  Objection to form.

19                    THE WITNESS:  At some point on

20    January 26 or January 27 he told me that he had found

21    some printed circuit boards and had placed them on

22    the counter toward the front of the restaurant.

23                    MR. WIGGINS:  Okay.

24                    THE WITNESS:  I don't know where the

25    printed circuit boards came from exactly, but looking

1    at them, observing heat damage, part -- observing the

2    heat damage that they sustained, I'm comfortable they

3    came from this area.

4                    MR. WIGGINS:  Okay.

5                    THE WITNESS:  But where they were

6    exactly, I do not know.

7         Q.   (Mr. Wiggins)  Okay, I'll represent to

8    you, again, Mr. Lacy, this is his handwriting.  He

9    said I placed the electric circuit boards in this

10   location.

11              Do you see there?

12        A.   (No response)

13        Q.   Did he ever tell you he had done that?

14        A.   No, sir.

15        Q.   Okay, one other thing.

16              He did tell you, though, that he had found

17   this in the debris pile just below and to the right

18   of the drive -- number one drive-thru window.

19        A.   Told me he found what?

20        Q.   These printed circuit boards.

21        A.   I don't recall his explanation as being

22   that detailed.

23        Q.   Okay.  Just so I understand exactly, he

24   told you that he had found the printed circuit boards

25   in that area.

1              Is that what it was?

2         A.   Yes, sir.

3         Q.   Okay.  I show you what has been marked for

4    identification as Plaintiff's Exhibit Number 103 and

5    ask if you can identify that photograph.

6         A.   I've got two other ones.

7         Q.   I'm sorry.

8         A.   No, that's okay.  I just realized -- that

9    is the wall surface in the office.

10        Q.   What is that box in the lower right

11   portion of the photograph?

12             Do you see that?

13        A.   I do not know.

14        Q.   And the wiring -- all of this wiring that

15   you see here you have identified as being in the

16   office?  Is that correct?

17        A.   Yes, sir.

18        Q.   Okay.  And then this flat material in the

19   middle of the photograph, do you know what that is?

20        A.   Not specifically, no.

21        Q.   And do you know what this wiring

22   controlled in that -- particularly in the office?

23                  MS. DALY:  Objection to form.

24                  THE WITNESS:  I do not.

25        Q.   (Mr. Wiggins)  Okay, I show you what I've

1    marked as the Plaintiff's Exhibit Number 99 and see

2    if you can identify that photograph.

3            (Witness examined document)

4        Q.    That may be pretty close to one I've shown

5    you earlier.

6            (Witness examined document)

7        Q.    Is that the drive-in window number one to

8    the right there that I'm looking at here?

9        A.    I don't believe so.

10       Q.    Okay, then maybe I got disoriented.

11            Do you recognize this photograph at all?

12       A.    I believe this is the opening from the

13   rear wall -- rear hall into the office area.

14   However, I'm not real sure.

15       Q.    Okay.

16       A.    I think the photograph that you just sow

17   -- showed me -- and I don't know the number of them

18   -- 114 -- 163 -- I'm sorry -- 163 would have been

19   taken further to the left -- further to the right.

20       Q.    Okay.

21       A.    But I'm -- but in all honesty, I would

22   like -- I did not take this photograph, so I would

23   like to examine other photographs to tell you exactly

24   where it is.  But I believe it's the opening from

25   that rear hall into the office.

1          If that -- if that is the case, the

2     drive-thru window is to the left of this photograph.

3          Q.    Number one drive-thru window?

4          A.    Yes, sir.

5          Q.    Again let me show you what has been marked

6     as Plaintiff's Exhibit Number 98, and this is similar

7     to one you've identified earlier, but just a

8     different photograph.

9          Do you -- can you identify that

10    photograph?

11         A.    Yes, sir.  This is the floor area just

12    inside drive-thru window number one, and it shows the

13    rolling -- or the rolled aluminum bread cart to the

14    left.  You see the cash register drawer.  Right under

15    the 98 label you see the wall.

16         And this photograph was taken before

17    Special Agent Royal conducted his fire scene

18    examination.

19         Q.    Okay, and this was before he had moved the

20    debris to a different location.  Is that correct?

21         A.    Yes, sir.

22         Q.    And I think you further identified that it

23    was moved from the top of where this photograph is to

24    a location back this side of the bread cart.

25         Is that -- do you have any ---

1        A.    --- I'm not real sure what you mean by

2    this side.

3        Q.    I'm sorry.  I'm sorry.  The lower part of

4    the bread cart in this photograph.

5        A.    I believe the debris was moved to what

6    would be the lower left corner of the photograph.

7        Q.    The lower -- and when I say this side, I

8    mean, as I'm looking at it here, this side of that

9    bread cart right here that you've identified.

10       A.    Yes, sir.  If you run a little bit lower

11   and a little bit to your left of the photograph, that

12   would be where the debris went.

13       Q.    Did Special Agent Royal tell you that he

14   had bagged any of that material?

15       A.    He did not.

16       Q.    Did you learn that he had bagged any of

17   that material?

18       A.    I did not.

19       Q.    Did you bag any of that material?

20       A.    I did not.

21       Q.    I show you what has been marked as the

22   Plaintiff's Exhibit Number 110, and I'll represent to

23   you this is a photograph I know that was taken by

24   Chad Royal.

25             Can you identify that photograph?

1          (Witness examined document)

2          A.    This is going to be the wall and floor

3     area underneath drive-thru window number one.  On the

4     left-hand side you see what is the right rear corner

5     of the wheeled aluminum bread cart.

6          Q.    And do you recognize the object that's

7     leaning against the wall in the center of this photo

8     ---

9          A.    --- In all honesty, sir, the debris is not

10    -- well, the photograph ---

11         Q.    --- Yes.

12         A.    --- Is not detailed enough, and I cannot

13    zoom in on it to recognize -- to conclusively

14    identify what it is.

15         Q.    Okay, do you have an idea what it is?

16         A.    I see a shape that is consistent with a

17    printed circuit board.

18         Q.    Okay.

19         A.    But that's all I -- that's the only way I

20    can describe it.

21         Q.    Okay.  And I see dark spots on the top of

22    that object, whatever it is, dark areas in the top,

23    dark areas to the lower side, and it seems to be of a

24    gray or grayish-blue color.

25              Do you see that?

 1                    MS. DALY:  Objection to the form of

 2    the question, to the statement.

 3         Q.    (Mr. Wiggins)  Do you see the coloring in

 4    that photograph?

 5         (Witness examined document)

 6         A.    To an extent, yes.

 7         Q.    Okay.

 8         A.    Any -- any black that we're looking at on

 9    those items leaning against the wall could be debris

10    or the result of incomplete combustion, sooting and a

11    lack of total burning.

12         Q.    I show you what has been marked as Exhibit

13    Number 113 and ask if you can identify that.

14              And I'll represent to you that's just a

15    closeup of the prior photograph that you looked at.

16         A.    Okay, the exhibit label is placed in an

17    incorrect location.

18         Q.    It is.

19         A.    Okay.

20         Q.    It is.

21         A.    I still -- I still see something that I

22    believe to be a printed circuit board, but

23    insufficient detail to -- to describe it any further.

24         Q.    Okay.  Do you see those grooves on the --

25    on that ---

1          A.    --- Yes, sir.

2          Q.    --- Instrument, whatever it is?

3          A.    Yes, sir.

4          Q.    And you see screw -- I see screws on that

5     -- on that board.

6                Do you see that?

7          A.    Okay, I'm not real sure what you're

8     referring to as board.

9          Q.    Well, I'm just calling it the board ---

10         A.    --- Okay.

11         Q.    --- Because -- yeah.

12         A.    Yes.  I see one on the right side and I

13    see two on the left side and I see one in the middle

14    and one on -- and two toward the bottom.

15         Q.    Are you familiar with printed circuit

16    boards?

17         A.    In a general sense.

18         Q.    Have you ever had an occasion to take a

19    printed circuit board from plastic housing on any

20    kind of device and look at it?

21         A.    No, sir.

22         Q.    Okay.

23                    MR. WIGGINS:  Do you have that?

24                    MS. DALY:  Uh-huh.

25         Q.    (Mr. Wiggins)  I show you what has been

1    marked for identification as Exhibit Number 92.

2              We are going to a different area now, Mr.

3    Lacy -- and ask if you can identify that photograph.

4         A.   It is a photograph of the front counter,

5    to the -- I guess, left center you see a drink

6    machine dispenser.

7         Q.   Uh-huh.

8         A.   And that is for drive-thru window number

9    two.

10        Q.   Okay.

11        A.   On the left-hand side of the photograph

12   you see a metal frame that I believe is actually the

13   drink dispenser for the main dining room.

14             Remember earlier in one of my diagrams we

15   had Pepsi, tea, coffee, Pepsi?

16        Q.   Correct.

17        A.   I think that's in that same -- that's that

18   same row.

19             Then right dead in the middle of the

20   photograph is a computer tower.

21        Q.   Okay, and was that computer tower in that

22   location when you first went to the restaurant on

23   January the 26th, 2012?

24        A.   It was.

25        Q.   And did you make any effort to examine

1    that CPU?

2          A.    I examined the exterior of it, yes, sir.

3          Q.    Did you look to see if there were any hard

4    drives in that CPU?

5          A.    They had been removed.

6          Q.    Did you observe that on your own or did

7    someone like Agent Lacy tell you they had been

8    removed?

9          A.    I observed it on my own.

10          Q.    Did anybody later tell you who had removed

11    them?

12          A.    Fayetteville Police Department.

13          Q.    Who told you that?

14          A.    Special Agent Royal.

15          Q.    And did you have an occasion at some point

16    to meet Detective House ---

17          A.    --- I did.

18          Q.    --- Of the Fayetteville Police Department?

19          A.    I did.

20          Q.    And did Special Agent Royal tell you that

21    he had taken possession of those items?

22          A.    Who is he?

23          Q.    Mr. House, Detective House.

24          A.    Yes, sir.

25                      MS. DALY:  It is almost noon.

 1              Can we go off record?

 2                   MR. WIGGINS:  Sure.

 3         (11:54 a.m.-12:45 p.m. - Luncheon recess)

 4         Q.   (Mr. Wiggins)  Mr. Lacy, when we dropped

 5    off we were talking about some of the photographs and

 6    identifying those ---

 7         A.   --- Yes, sir.

 8         Q.   --- Before the lunch break.  I'm just

 9    going to show you Exhibit Number 107 and ask if you

10    can identify that document.

11         A.   Yes, sir.  These are the two hard drives

12    removed from the computer towers that were

13    illustrated in an earlier photograph.

14         Q.   Okay, and did you finally obtain -- excuse

15    me -- obtain possession of these hard drives?

16         A.   I did.

17         Q.   And you obtained those from the --

18    Detective House ---

19         A.   --- I did.

20         Q.   --- Of the Fayetteville Police Department.

21              And after you learned that Mr. House had

22    taken these hard drives, did you contact him about

23    that, about the hard drives?

24                   MS. DALY:  Objection to form.

25                   MR. WIGGINS:  You can answer if you

1    know.

2                        THE WITNESS:  No.  I'm -- I'm trying

3    to remember exactly how it played out.  He was at the

4    fire -- he came to the fire scene.  Let me backtrack.

5                        Chad Royal had told me that House had

6    them.  House then came to the fire scene.  I asked

7    him what he was going to do with them.  And to the

8    best of my knowledge, his answer was I don't know.

9    And I asked him if he would voucher them over to me

10   and allow me to have them examined.  He said yes.  He

11   said that would be a great idea.

12                        And I think it was more the tone of his

13   voice than what he said.  I then asked him why.  And

14   he said his IT people had told him it would be months

15   before they could look at them and he didn't want to

16   wait months.  And I just said I'm comfortable I can

17   get it done faster.

18        Q.   (Mr. Wiggins) Did he tell you or give you

19   any indication of what he thought was contained on

20   the hard drives?

21        A.   Yes.  From the very beginning I

22   understood, and I believe he understood, and I

23   believe Chad Royal understood it contained video

24   files from the surveillance cameras.

25        Q.   Okay.  After you obtained -- when you --

Page 89

1      I'm sorry.  Strike that.

2                  When you obtained these files, did you

3      sign a evidence receipt form for Detective House?

4           A.    I did.

5           Q.    Acknowledging you had received these

6      documents?

7           A.    I did.

8           Q.    I mean -- I'm sorry -- these hard drives?

9           A.    Yes, sir.

10          Q.    Did you ever deliver those back to

11     Detective House?

12          A.    I did not.

13          Q.    Has he ever requested you deliver them

14     back to him?

15          A.    He did not.

16          Q.    Did he ever -- did Detective House ever

17     have any further conversation with you in reference

18     to these hard drives after you signed the receipt to

19     take possession of them?

20          A.    Not that I recall.

21                      MR. WIGGINS:  Excuse me.  Do you

22     have a copy?  Did I give you that?

23          Q.    (Mr. Wiggins)  I show you what has been

24     marked as Plaintiff's Exhibit Number 100 and ask if

25     you can identify that photograph.

1        A.    It's a photograph of the office.  As you

2   go in the door from the rear hallway, this would be

3   the office to the right.

4        Q.    Okay, and was that the operating office as

5   you observed it for the restaurant?

6        A.    Well, there were two rooms.  One would be

7   the one illustrated in the photograph.  The other

8   room would be behind the photographer.  I don't know

9   the exact purpose of each room.  But between those

10  two rooms, they constituted the office.

11       Q.    And on the top -- you see the top -- the

12  door has been demolished or partly demolished.  Do

13  you see that?

14       A.    Yes, sir.

15       Q.    Was that done during the fire suppression

16  activities or was it fire damage?  Could you tell?

17       A.    That is a -- that's a fire pattern ---

18       Q.    --- Okay.

19       A.    --- On the door.

20       Q.    What are the dark areas there, Mr. Lacy,

21  on this photograph?  Does it have any significance at

22  all?

23       A.    Dark areas where?

24       Q.    I'm sorry.  On the door, above the door.

25       A.    That's smoke staining.

1          Q.    Okay, and is this -- these lines by the

2     left margin of the photograph, is that also smoke

3     staining?

4          A.    It is.

5          Q.    Okay.  In the upper right-hand corner of

6     this photograph is a machine of some description.

7               Do you recognize that?

8          A.    I now know that to be the DVR on which the

9     video files for these surveillance cameras were

10    recorded.

11         Q.    Okay.  Do you see the wiring coming out of

12    the ceiling panel going to that DVR?

13         A.    I see some wiring.  I do not see where it

14    connects to the DVR simply because of the angle of

15    the photograph.

16         Q.    Okay.

17         A.    But I see some wiring.

18         Q.    Okay.  And to the right of that DVR do you

19    see another device of some description?

20         A.    Is that the device that's hanging down at

21    a 45-degree angle?

22         Q.    No.  I'm sorry.  I'm -- which one are you

23    speaking of now?  Let's be sure.

24               Okay, what have you identified as the DVR?

25         A.    This right here.

1        Q.    Okay.  Yeah, with the thing hanging down.

2        A.    I have no idea what that is.

3        Q.    Okay.  And, then, the machine to the left

4   of the DVR, do you recognize that?

5        A.    I do not know what that is, sir.

6        Q.    Did you ever examine it during any of your

7   investigation?

8        A.    It was taken as evidence in November of

9   2012 and examined in Raleigh in April of 2013.

10       Q.    Okay, and was that at Mr. Cavaroc's

11  laboratory in Raleigh?

12       A.    It was.

13       Q.    And do you know who took possession of

14  this?

15       A.    Mr. Cavaroc.

16       Q.    Okay.  And Mr. Cavaroc was the engineer

17  representing the Public Works Commission of the city

18  of Fayetteville?

19       A.    He was.

20       Q.    Did you know Mr. Cavaroc prior to this

21  occasion?

22       A.    I did.

23       Q.    Have you worked with him before?

24       A.    Yes.

25       Q.    And I also -- I see some wiring going to

1    that device, now, from this photograph.  But you

2    didn't examine that either, I take it.

3          A.    That wiring would have been examined in

4    Raleigh in April.  But, no, I did not examine it at

5    the fire scene in January.

6          Q.    Okay.  Was that wiring taken and was it

7    present at the conference that was held in Mr.

8    Cavaroc's laboratory in 2013?

9          A.    It was.

10         Q.    When you examined the office, Mr. Lacy,

11   was there personal items of Jimmy Diamantopoulos in

12   the rest -- in the office?  Do you recall any of

13   those items?

14         A.    I'm not real sure what would be

15   characterized as personal.  I mean, I -- there were

16   -- there were furnishings and personal property,

17   business personal property in the offices.  But I'm

18   not real sure if I know what was personal and what

19   was not.

20         Q.    Okay.  Did you see any photographs in the

21   office?

22         A.    I do not remember.

23         Q.    Okay.  Hockey stick?

24         A.    I do remember seeing a hockey stick.

25         Q.    Okay.

1          A.    That -- that....

2          Q.    I show you what has been marked as Exhibit

3    101, which is a -- it's just a closeup of what I just

4    showed you.  And, again, on the upper left-hand --

5    right-hand corner of this photograph is what you have

6    previously identified as the DVR.  Is that correct?

7          A.    Yes, sir.

8          Q.    And then to the left of that is the audio

9    system that was taken by Mr. Cavaroc.

10         A.    I did not specifically remember it was the

11   audio system.  But, yes, that item was taken by Mr.

12   Cavaroc.

13         Q.    And it was present at the examination that

14   was conducted at his laboratory in Raleigh.

15         A.    It was.

16         Q.    And that part of that DVR system that's

17   hanging down, you don't -- you didn't -- you don't

18   recognize what that is?

19         A.    No, sir.

20         Q.    Was that the position that it was in when

21   you saw it ---

22         A.    --- Yes, sir.

23         Q.    --- When you were in the restaurant in

24   January the 26th, 2012?

25         A.    Yes, sir.

1        Q.    And did you also photograph this item?

2        A.    Yes, sir.

3        Q.    Had you ever seen a DVR system like this

4    before?

5                    MS. DALY:  Objection to form.

6                    THE WITNESS:  Not that I'm aware of.

7                    MR. WIGGINS:  Okay.

8        Q.   (Mr. Wiggins)  You -- when you saw this,

9    did you know what it was?

10        A.    No, sir.

11        Q.    Did you inquire of Jimmy what it was?

12        A.    No, sir.

13        Q.    Did you ever have any discussions at all

14    with Jimmy concerning this DVR?

15                    MS. DALY:  Objection to form.

16                    THE WITNESS:  Indirectly, yes.

17                    MR. WIGGINS:  Okay.

18                    THE WITNESS:  On January 26th,

19    January 27th, and let's include January 30th, the

20    following Monday, Detective House, Special Agent

21    Royal, and I had multiple conversations regarding the

22    surveillance system and the cameras.  We all thought

23    -- and I thought because they told me -- but we all

24    thought ---

25        Q.   (Mr. Wiggins)  --- Well, wait a minute.

1    Be specific in ---

2                      MS. DALY:  --- No.  Let him finish

3    his answer.

4                      MR. WIGGINS:  Well, when he's

5    talking about they, I just want to be sure who they

6    are.

7                      THE WITNESS:  Okay.  Both Special

8    Agent Royal and Detective House told me individually

9    and I believe jointly that the video files for the

10   camera surveillance system were on the computer for

11   which -- or from which Detective House had removed

12   the hard drives and subsequently vouchered over to

13   me.  I never in my mind imagined that the item that I

14   have identified in Exhibit 100 and 101 was a DVR.

15                      MR. WIGGINS:  Okay.

16        Q.   (Mr. Wiggins)  And when did you first

17   learn that it was the DVR?

18        A.   I'm going to say January or February 2013.

19        Q.   Okay.

20        A.   I don't remember the -- the specific date.

21        Q.   Okay.

22        A.   But it was well after -- it was after we

23   were at the scene in Fayetteville in November.

24        Q.   You read Jimmy Diamantopoulos' deposition.

25        A.   Yes, sir.

 1          Q.    And do you recall what he said in the

 2     deposition about this DVR and a conversation with you

 3     concerning the DVR?

 4          A.    I'm afraid you've got to be more specific.

 5          Q.    Okay.  Do you recall him saying that on

 6     January the 26th he received a phone call from you

 7     asking that you meet him at the Miami Subs

 8     restaurant?

 9          A.    Okay, that's correct.

10          Q.    And did you do that?  Did you actually

11     call him on -- do you recall him -- calling him on

12     that morning?

13          A.    Okay, if you remember, I testified earlier

14     that on my way to Fayetteville on January 26th I

15     called him.  I had left him a voice mail on the 25th.

16     He did not call me back.  I called him on the 26th on

17     my way to Fayetteville.  And we did not discuss the

18     DVR in that conversation.  That was the conversation

19     where we -- where I confirmed that he could meet me

20     at Miami Subs to let me in.

21          Q.    Okay.  Now, on Friday, January the 27th,

22     did you call Jimmy at 9:22 a.m.?

23          A.    I very well may have but I do not recall.

24          Q.    Okay.  And what is your telephone number?

25          A.    7 -- well, the number that I would have

1    used to call him on would have been 704-284-2658.

2         Q.    Okay.  Do you know whose number

3    704-677-2787 would be?

4         A.    Read that off to me again.

5         Q.    Okay.  704-677-2787.  And it says ---

6         A.    --- May I confer with Ms. Daly?

7         Q.    Sure.

8                    MS. DALY:  Can we go off record?

9                    MR. WIGGINS:  Off record.

10        (1:01-1:01 p.m. - recess)

11                   THE WITNESS:  That is the phone

12   number of Mike Austin of Nationwide Insurance.

13        Q.    (Mr. Wiggins)  And is he -- does he live

14   in Mooresville, North Carolina?

15        A.    I thought he lived in Huntersville or the

16   Cornelius area.  But he lives approximately 25 miles

17   north of Charlotte.  That would include Huntersville,

18   Cornelius, Davidson, and Mooresville.

19        Q.    Do you have any idea why he would have

20   been calling Jimmy Diamantopoulos on January 27th,

21   2012?

22        A.    Yes, sir.  That is the date that Mike

23   Austin came to the Miami Subs fire scene.  I do not

24   know the substance of the conversation.  But he would

25   have arrived in Fayetteville at approximately 10:30.

1    And it could have been a -- well, I -- I'm not going

2    to speculate on the conversation.

3           Q.    Okay.  Were you there when he arrived?

4           A.    I was.

5           Q.    And the purpose of his coming to the

6    restaurant was to consult with you concerning your

7    investigation.

8           A.    No, sir.

9           Q.    It was not that purpose.  What was the

10   purpose?

11          A.    To meet with Mr. -- with Jimmy.

12          Q.    Okay, and did you meet with Jimmy along

13   with Mike Austin?

14          A.    I met with Jimmy individually.  I did not

15   meet with Jimmy and Mike.

16          Q.    Okay.  Did you ever learn what the subject

17   of the conversation was between Mike and Jimmy?

18          A.    I probably know what one subject was.

19          Q.    Okay, and what was that?

20          A.    That the -- the case was being transferred

21   from Mike Austin to Mike -- to -- one moment, please.

22          Q.    Jezierski?

23          A.    Yes, sir.  Thank you.  Mike -- but I was

24   trying to remember his first name.  Is it Mike?

25          Q.    Yeah, Mike Jezierski.

1         A.    Okay.  Mike -- it was -- Mike Austin -- on

2    Thursday the file was transferred from Zak Gurley to

3    Mike Austin.

4         Q.    Okay.

5         A.    On late Thursday -- on Thursday morning it

6    was transferred.  On late Thursday afternoon or

7    Friday morning it was determined that it was going to

8    be transferred to Mike Jezierski.  And Mike Austin

9    decided to drive to Fayetteville to tell Jimmy that,

10   as opposed to telling him on the phone, drive to

11   Fayetteville and tell him in person.

12        Q.    And what time of the day on the 27th did

13   he arrive?

14        A.    Approximately 10:30.

15        Q.    Okay, and was Jimmy there then or did he

16   come later?

17        A.    I believe he was there.

18        Q.    Okay, and was anyone else there besides

19   you and Jimmy when he arrived?

20        A.    Special Agent Royal would have been there.

21   And I believe representatives of the agent, the

22   insurance agent arrived before Mr. Austin.  I don't

23   recall if Mr. Takis was there.  I think that's it.

24        Q.    Okay.  And in any event, going back to the

25   deposition of Jimmy Diamantopoulos, he said he

1    recalled on the morning of the 27th that you came to

2    him with the DVR in your hands and that you asked him

3    what it was.  Did that ever happen?

4            A.    No, sir.

5            Q.    Did you ever have any conversation, to

6    your recollection, with Jimmy concerning that DVR?

7            A.    No, sir.

8            Q.    Did you ever hear Jimmy call and talk to

9    Bob Dowlat about downloading any information from the

10   DVR surveillance system?

11           A.    No, sir.

12           Q.    Did Jimmy ever give you the telephone

13   number of Bob Dowlat whom he said you could call to

14   get information on how to download the video system?

15           A.    No, sir.

16           Q.    Did you ever have a convers -- did you

17   ever hear Jimmy in a conversation with Bob Dowlat

18   asking him about downloading, again, the information

19   from the DVR system?

20           A.    No, sir.

21           Q.    You have read the deposition of Jimmy

22   Diamantopoulos and you recall that his testimony was

23   in opposition to what you've just testified to.

24           A.    Yes, sir.

25                      MS. DALY:  Objection to form.

1                    THE WITNESS:  Yes, sir.

2          Q.   (Mr. Wiggins)  Is that correct?

3          A.   Yes, sir.

4          Q.   But then, again, you're telling me today

5     that that conversation never occurred.

6          A.   Yes, sir, I am.

7          Q.   When you were at the restaurant, Mr. Lacy,

8     did you see the cameras that were positioned

9     throughout the interior and exterior of the Miami

10    Subs restaurant?

11         A.   I did.

12         Q.   And did you count them?

13         A.   I don't ever believe I counted all of

14    them, no, sir.

15         Q.   Okay.  Was there one in the area where the

16    -- what you and I have previously identified as

17    drive-thru window number one?

18         A.   I never saw one.  So I don't know for

19    sure.

20         Q.   Okay.  On the 27th of January when you

21    were there -- and we're -- I'm jumping back again

22    now.  When you -- we talked about it this morning

23    when you initially walked through the restaurant you

24    did that without a camera, without making any notes.

25    Is that correct?

1          A.    Yes, sir.

2          Q.    Then you came back.  And then what did you

3     do?

4          A.    Photographed it.

5          Q.    Okay, and those were the photographs that

6     you've identified earlier that are attached to your

7     deposi -- to your federal report -- or some of those

8     are attached to your federal report.

9          A.    Okay, those -- the photographs that I have

10    identified both in my May 2012 report to Nationwide

11    and in my federal report contain photographs taken on

12    January 26, January 27th, and possibly January 30th.

13         Q.    Okay.

14         A.    So I don't want to limit it to just the

15    26th.

16         Q.    Okay.

17         A.    All three dates.

18         Q.    All right, but you did take some of the

19    photographs on January the 26th.

20         A.    Without -- I probably took the majority on

21    the 26th.

22         Q.    Okay, and some of those photographs have

23    been attached to your -- either your letter of May

24    2012 or your federal report in 2013.

25         A.    Yes, sir.

1        Q.    After you photographed the restaurant,

2    then what did you do?

3        A.    I believe that's when I started taking

4    measurements of the seating area and the game room,

5    working from the front toward the back.

6        Q.    Okay.

7        A.    And, yeah, we went through the cooking

8    area, the areas containing drive-thru windows one and

9    two, and the back hall, measured that freezer that

10   was kind of like an offset of the building, and then

11   began looking at fire patterns.

12       Q.    Okay, and when did you start -- what time

13   of day did you start looking at the fire patterns?

14       A.    I don't remember, sir.

15       Q.    Okay.  And again referring back to Jimmy

16   Diaman -- the deposition of Jimmy Diamantopoulos, as

17   I recall his testimony, Mr. Lacy, he said that on the

18   26th of January, that late in the afternoon that he

19   was there with you and that you were -- was walking

20   through the restaurant and that you showed a -- shown

21   a -- had a flashlight and you showed a flashlight on

22   the circuit board at the location where Agent Royal

23   had placed it.  Do you recall him saying that?

24       A.    No, sir.

25       Q.    Okay.  Did you -- do you recall that being

1    in his deposition?

2        A.    Not off the top of my head.

3        Q.    Okay.

4        A.    No, sir.

5        Q.    Did that ever happen?

6        A.    No, sir.

7        Q.    Did you ever walk through the restaurant

8    with a flashlight with Jimmy?

9        A.    I'm sure I did.

10       Q.    Okay, but you have no recollection of

11   having looked at a circuit board that was lying

12   against the wall below the window of takeout window

13   number one?

14       A.    No, sir.  I remember the circuit board as

15   already being on a counter top.

16       Q.    On -- when you completed your -- when did

17   you -- what did you complete on the first day that

18   you were there?

19             Again, I'm having it -- relating it to

20   your origin-and-cause investigation.

21       A.    Some interviews ---

22                 MS. DALY:  --- Objection to form.

23   You can answer.

24                 THE WITNESS:  Some interviews, most

25   of the photography, most of the diagraming was done

1    on the 26th, most if not all, and some of the

2    examination of the fire patterns.

3                         MR. WIGGINS:  Okay.

4         Q.   (Mr. Wiggins)  And we've talked some about

5    the fire -- somewhat about fire patterns earlier.

6    But in an origin-and-cause investigation you develop

7    hypotheses, do you not?

8         A.   Yes, sir.

9         Q.   And is fire patterns a hypothesis that you

10   look at or you develop along in your -- with your

11   investigation?

12                        MS. DALY:  Objection to form of the

13   question.

14                        THE WITNESS:  I use fire pat -- fire

15   patterns in my evaluation of the fire patterns to

16   assist in the development of the hypothesis but the

17   fire patterns are not the hypothesis itself.

18                        MR. WIGGINS:  Okay.

19        Q.   (Mr. Wiggins)  They aid -- they sometimes

20   can aid the hypothesis, can they not?

21        A.   Yes, sir.

22        Q.   And you realize and understand that

23   sometimes fire patterns can fool an investigator, can

24   they not?

25                        MS. DALY:  Objection to form.

1          Q.    (Mr. Wiggins)  As you've experienced in

2     your career.

3                         MS. DALY:  Objection to form.

4                         THE WITNESS:  Sometimes, yes.

5                         MR. WIGGINS:   Okay.

6          Q.    (Mr. Wiggins)  And what time did you leave

7     the restaurant on the 26th?

8          A.    Approximately six p.m.

9          Q.    This would be in January, so it would have

10    been getting dark at six p.m.

11         A.    It was -- it was dark.

12         Q.    It was dark.

13               And you came back on the following day?

14         A.    Yes, sir.

15         Q.    And did you notify Nationwide that you

16    were going to go back to the restaurant on the

17    subsequent day of January the 27th?

18         A.    I don't remember.

19         Q.    Okay.  Did you -- what -- typically when

20    you are given an assignment by in this case

21    Nationwide, do you quote a budget for an O&E -- a --

22    an origin-and-cause investigation?

23         A.    No, sir.

24         Q.    Would you have been authorized to go back

25    on a second day without notifying Nationwide?

1          A.   Yes, sir.

2          Q.   As part of the scope of your

3   investigation?

4          A.   Yes, sir.

5          Q.   And you did return on the 27th of January.

6          A.   I'm sorry.  I did not understand.

7          Q.   You under -- you returned on the 27th of

8   January.

9          A.   Yes, sir, I did.

10         Q.   And, again, what time did you arrive on

11  the 27th?

12         A.   I think it was about 10 o'clock.

13         Q.   Okay, and Jimmy was there to let you in?

14         A.   He was.

15         Q.   Had you called him and asked him to do

16  that?

17         A.   No, sir.  I think we reached that

18  agreement on the afternoon of the 26th before I left.

19         Q.   Okay, and was there anyone else at the

20  restaurant when you arrived about 10 o'clock on the

21  27th?

22         A.   I think Special Agent Royal was already

23  there.

24         Q.   Okay, and was he doing any work that you

25  could observe when you got there?

 1      A.    No, sir.

 2      Q.    Had you previously arranged for Detective

 3  Royal to be present on the 27th?

 4      A.    Not specifically.

 5      Q.    Okay.  He just happened to show back up on

 6  that date?

 7      A.    When I spoke to him on the 26th, he said

 8  he wanted to come back out to the fire scene and I

 9  said fine.  I don't know that we had another

10  conversation about the 27th.

11      Q.    Okay.  At that point in time Agent Royal

12  -- SBI Agent Royal had determined the fire to be one

13  undetermined.

14      A.    Yes, sir.

15      Q.    And that had also been the conclusion that

16  had been assigned by the Fayetteville police

17  department -- I mean, the Fayetteville fire

18  department.

19      A.    I don't know that they had made a

20  determination on the 27th.

21      Q.    Okay.  At some point you became aware that

22  they did, did you not?

23              MS. DALY:  Objection to form.

24              THE WITNESS:  Only by review of the

25  fire report.

 1                    MR. WIGGINS:   Okay.

 2         Q.   (Mr. Wiggins)  Did you review the fire

 3    report?

 4         A.   I did.

 5         Q.   And did it determine the fire at the Miami

 6    Subs restaurant to be undetermined?

 7         A.   That's what the fire report shows, yes,

 8    sir.

 9         Q.   Okay, and did you look at the police

10    report filed by Detective House?

11         A.   Yes, sir.

12         Q.   And did it also classify the fire as being

13    undetermined?

14         A.   I don't remember a specific sentence, but

15    in a general sense, yes.

16         Q.   Now, when you went back on the 27th, and

17    with Detective -- SBI Agent Royal being present, did

18    you and he jointly continue the investigation?

19         A.   We did.

20         Q.   And what did you do on that day?

21         A.   I spent most of the 27th either

22    interviewing employees or working in the area of

23    drive-thru window number one.

24         Q.   Okay.  Now, I have your notes that we have

25    identified early on, and I'm not going to mark these

1    because I don't have them -- I can't mark them as an

2    exhibit because I can't let them go right now.  But

3    you have notes in here of their interviews, do you

4    not?

5         A.   Yes, sir.

6         Q.   Look at the -- do you have this before you

7    here, the one with Jimmy Diamantopoulos at the top?

8         A.   Yes, sir, I do.

9         Q.   Okay, and what is -- what was the day that

10   you wrote this?

11        A.   January 26th.

12        Q.   Okay.  I'm sorry but I -- is it on here

13   and I'm ---

14        A.   --- No, sir, it's not.

15        Q.   Okay.  I'm sorry.  I didn't -- probably

16   didn't see it.

17             The managers you have identified on here

18   as being Tori Moon, James McDonald, and Joel

19   somebody?

20        A.   Yes, sir.

21        Q.   You interviewed Tori Moon?

22        A.   I did.

23        Q.   And did you interview James McDonald?

24        A.   I do not believe so.

25        Q.   Okay.  Then on -- the next one we have is

1    Lewis Hardin Construction.  Was he there on the 26th

2    or 27th of January?  Is it noted on your report here?

3           A.   His presence on the fire scene is not

4    noted.  The notation in my notes is because he

5    renovated the building in 2010.

6           Q.   Okay.  Do you know why he was there?

7           A.   Why he was there when?

8           Q.   I'm sorry.  Maybe I'm misunderstanding.

9                Is this the result of an interview that

10   you had with Lewis Hardin?

11          A.   No, sir.  This is page two of the

12   interview notes of Jimmy.

13          Q.   I'm sorry.  Okay, he told you that Lewis

14   Hardin had renovated the restaurant in 2010.

15          A.   '10.

16          Q.   And he gave you the cost of that, I take

17   it, here?

18          A.   Yes, sir.

19          Q.   And there's a claim filed with State Farm.

20          A.   Yes, sir.

21          Q.   And some other miscellaneous information

22   that you obtained from him on that date.  Correct?

23          A.   Yes, sir.

24          Q.   Okay.  And then the next one you have is

25   John Pavlikianidis -- is a guess.  Is that correct?

1      A.    John.   His last name starts with a P.

2      Q.    Okay.   And there's no interview notes

3 here.   He was the maintenance man, you've got here.

4      A.    Yes, sir.

5      Q.    And you conducted no interview with him.

6      A.    No, sir.

7      Q.    And then you got Mrs. Moon next, Victoria

8 Moon.

9      A.    Yes, sir.

10      Q.    You did interview her.

11      A.    I did.

12      Q.    And is this the notes from your interview

13 with her?

14      A.    It is.

15      Q.    And was this done on the 27th of ---

16      A.    --- 20 -- 26th.

17      Q.    26th of January?

18      A.    Yes, sir.

19      Q.    She said that she worked for Miami Subs

20 before.   When she said before, was that -- means

21 prior to a reopening in 2011?

22      A.    She worked for Miami Subs in Florida

23 before she moved to North Carolina.   She worked at

24 Miami Subs before the vandalism claim.   She worked at

25 other stores during the renovation and then worked at

1    Miami Subs after it reopened.

2         Q.    Okay.  And she gave you a synopsis of the

3    damage that had been sustained by the restaurant as a

4    result of the vandalism claim that was made back in

5    2010?

6         A.    Yes, sir.

7         Q.    She said business was good.  She gave you

8    the deposits, average deposits.  Is that what she

9    gave you there?

10        A.    Yes, sir.

11        Q.    And said she had no personal problems.

12        A.    No, sir, that's not what she said.

13        Q.    I'm sorry.

14        A.    No personnel problems.

15        Q.    I'm sorry.  No personnel problems.  I'm

16   sorry -- and then the date.  And then next is the

17   hours of operation when she operated the restaurant

18   from 00 -- from, I guess, midnight to four o'clock

19   a.m.?

20        A.    That is a reference to when they have law

21   enforcement officers on the property.

22        Q.    Okay.  Is the next page continuing your

23   interview with Mrs. Moon?

24        A.    It is.

25        Q.    And did you talk to her about the

1    surveillance system -- the monitoring system for the

2    surveillance system?

3           A.   I did.  And I believe that comes up on the

4    27th.

5           Q.   Okay.  Was that a separate interview with

6    Mrs. Moon?

7           A.   Yes, sir.

8           Q.   And is it in -- contained in your reports

9    here, too?

10          A.   Yes, sir, it is.

11          (Witness examined document)

12          A.   Go to a page that has 10-30-11 across the

13   top.

14          Q.   Okay, I got it.

15          A.   That is the continuation of my interview

16   with Tori.

17          Q.   Okay.

18          A.   And this -- this part of the interview

19   occurs on the 27th.

20          Q.   Okay, and I see the note that she made

21   here.  The only thing that is different -- I -- the

22   only thing different is that cams were off.

23          A.   Yes, sir.

24          Q.   Was she talking about the monitoring

25   systems?

 1                    MS. DALY:  Objection to form.

 2                    MR. WIGGINS:  If you know.

 3                    THE WITNESS:  Tori and others,

 4    meaning employees, Raven, Joseph, Duenes, all made

 5    the observation the cameras were off.

 6                    MR. WIGGINS:  Okay.

 7                    THE WITNESS:  In reading transcripts

 8    in the intervening months I've come to understand

 9    that maybe the cameras were on but the monitor in the

10    office was off.

11                    MR. WIGGINS:  Okay.

12                    THE WITNESS:  But in January of

13    2012, if I wrote cams, they told me cam -- and that's

14    my abbreviation.

15                    MR. WIGGINS:  I understand.

16                    THE WITNESS:  They told me cameras,

17    because, now, I -- if -- if they had said monitors, I

18    would have written monitors or mons -- m-o-n-s.

19                    MR. WIGGINS:  Right.

20                    THE WITNESS:  Because I'll

21    abbreviate at the drop of a hat.  But if they said --

22    if I wrote cams, they said cameras.

23                    MR. WIGGINS:  Okay.

24         Q.   (Mr. Wiggins)  And -- but you did come to

25    understand that there were two monitors in the

1    restaurant, did you not?

2                     MS. DALY:  Objection to form.

3                     MR. WIGGINS:  Well, let me strike

4    that.

5         Q.   (Mr. Wiggins)  Did you ever see the two

6    monitors in the restaurant?

7         A.   In the restaurant or in the office?

8         Q.   Well, I think one was in the restaurant

9    and one was in the office.

10        A.   I was aware of a monitor in the office.

11        Q.   Okay.

12        A.   I was not aware of a monitor in the

13   restaurant.

14        Q.   Okay.  So that day -- that is, the 27th --

15   you spent most of the day, then, interviewing various

16   persons.  Is that....

17        A.   Like I say, most of the day.  But I spent

18   some time.

19        Q.   Okay, and those persons that you

20   interviewed was -- Paul McKinnon was one, was he not?

21        A.   I don't recall interviewing Mr. McKinnon.

22        Q.   Okay.  He picked up -- he's the guy that

23   picked up the trash.

24        A.   Yes, sir.

25                  Are you looking at a page with his name

1   across the top?

2          Q.   I am.  I am.

3          A.   That is a continuation of my interview of

4   Tori.

5          Q.   Okay.

6          A.   So I -- no, I don't think I've talked to

7   him.

8               No, this is a -- this is a continuation of

9   the interview with Tori.

10         Q.   Okay.  And you asked -- you were asking

11  her about the finances of the restaurant, were you

12  not, in the ---

13         A.   --- I think I was asking her more about

14  procedures.  I mean, obviously I did, because

15  somewhere -- I mean -- well, I've asked her about

16  both, how things -- who did what, how things were

17  handled.  And dollar amounts did come up, yes.

18         Q.   Did you ever talk to Jimmy about any of

19  these issues that you discussed with Mrs. Moon?

20         A.   No, sir.

21         Q.   And, then, the last page of your interview

22  of Mrs. Moon, it says Jimmy does not always what?

23         A.   Arm.

24         Q.   System in a.m.?

25         A.   Yes, sir.

1          Q.    Okay, and do you know what she had

2    reference to when she was speaking about that?

3          A.    Yes, sir.  Let me look back at one other

4    thing before I answer.

5          (Witness examined document)

6          A.    Tori opens on Saturday and Sunday.  She

7    works Monday to Thursday nights, off on Friday, opens

8    on Saturday and Sunday.  When she comes in on

9    Saturday and Sunday the alarm system is typically --

10   let me rephrase that.  She found the alarm system

11   typically off, meaning not armed.

12              And in response to a question she said

13   when Jimmy comes in and gets the deposit and leaves

14   he does not activate the system.

15         Q.    That's in the a.m.

16         A.    Yes, sir.  So that's my statement there.

17   Jimmy does not always arm system in a.m.

18         Q.    Okay.  And, then, the notation just below

19   that says wiring for old equipment was present.

20         A.    Yes, sir.

21         Q.    What was that in reference to?

22         A.    Video surveillance and alarm system.

23         Q.    Okay.  And Mrs. Moon told you that.

24         A.    Yes, sir.

25         Q.    There has been some talk and some

1    testimony by other witnesses, Mr. Lacy, that said the

2    -- there was a plug in the office unplug -- un --

3    pulled out, that was not plugged in for an old video

4    system.  Do you recall that?

5         A.    I do not recall seeing a cable that was

6    not plugged in at the scene.  I do recall

7    observations and statements made in April of this

8    year that the old system was not plugged in.

9         Q.    And, then, the statement just below that

10   was no new equipment at first window.  What was that

11   in reference to?

12        A.    No new equipment was installed at the

13   first drive-thru window during the renovations.

14        Q.    Okay, and did Mrs. Moon tell you that?

15        A.    Yes, sir.

16        Q.    And did she not mention to you that there

17   was this Ion IQ system present at that window which

18   was electrically operated?

19        A.    No, sir, she did not.

20        Q.    Did you ask her about that?

21        A.    No, sir.

22        Q.    The next interview you had was with Joseph

23   Owens.  Would that be ---

24        A.    --- No, sir.

25        Q.    --- What I'm looking at correctly?

```
 1        A.   Well, that's not the next interview.  But
 2   the last page of my notes is an interview of Joseph
 3   Brandon Duenes -- D-u-e-n-e-s.
 4        Q.   Okay, and this was also on the 27th of
 5   January?
 6        A.   Yes, sir.
 7        Q.   He was the assistant manager?
 8        A.   Yes, sir.
 9        Q.   He talked about financial issues, behind
10   on payroll.  Do you recall that?
11        A.   Yes, sir.
12        Q.   Owes four checks as of 1-30-12?
13        A.   Yes, sir.
14        Q.   Normal payday is Monday, did not pay him
15   on January 23rd?
16        A.   Yes, sir.
17        Q.   He has check on 1-16-12, didn't cash it.
18   Is that what he says?
19        A.   No.  That is my notes of Jimmy told him
20   not to cash it.
21        Q.   Okay.  Paid $600 to produce man, and then
22   under that it has got approximately $3,100.  What
23   does that mean?  What is that in reference to?
24        A.   The cost of the delivery was $3,100.
25   Jimmy had $2,500 cash.  Mr. Duenes paid -- gave Jimmy
```

1    600.  So Jimmy -- Mr. Duenes -- Duenes' 600 and

2    Jimmy's 2,500 totals 3,100, which was paid to the

3    produce man.

4          Q.   Okay.  And then he goes on to say that

5    Friday before the fire that he paid, cut back on,

6    dumpster removed two months ago.

7          A.   Can ---

8          Q.   --- That ---

9          A.   --- Can I ---

10         Q.   --- That was told ---

11         A.   --- Can I explain that?

12         Q.   Sure.

13         A.   On the Friday before the fire the natural

14   gas service was cut off for nonpayment of a bill.

15   Mr. D. -- or Jimmy ran to Natural -- Piedmont Natural

16   Gas, paid it.  They came back out and cut it back on.

17   That's all the deals with the natural gas service.

18         Q.   Okay.

19         A.   A separate issue, part of the same

20   conversation, the dumpster had been removed two

21   months ago.

22              Now, if you will go back a couple of pages

23   in my notes to where you saw Mr. McKinnon's name --

24   well, it's in my notes of the interview of Tori.

25         Q.   Mr. McKinnon's name.  I see it.

1        A.    All right, hang on.  You -- you got to it

2   faster than I did.

3              Mr. McKinnon was being paid by cash by

4   Jimmy to pick up the trash.  And that's where you see

5   the note picked up trash at 0700.  And that happened

6   to be on the day of the fire.

7        Q.    Okay.  That is, Paul McKinnon that picked

8   up the trash at the restaurant at seven o'clock on

9   the day of the fire.

10       A.    Yes, sir.  And then that's his phone

11  number.

12       Q.    Did he tell you how long he had been doing

13  that?

14       A.    Several months.

15       Q.    In your conversations with Jimmy did you

16  discuss with Jimmy his financial situation ---

17       A.    --- Not any ---

18       Q.    --- As he observed it?

19       A.    No, sir.

20       Q.    And did you ever ask Jimmy anything about

21  his finances directly?

22       A.    I did not.

23       Q.    Did you ever learn that Jimmy had paid to

24  Riddle, Joe Riddle, his lessor, $6,000 the night

25  before the fire?

 1                    MS. DALY:  Objection.

 2                    THE WITNESS:  I think I became aware

 3    of that when I started looking at transcripts.

 4                    MR. WIGGINS:  Okay.

 5         Q.  (Mr. Wiggins)  But not before?

 6         A.   And I think the easiest way to identi --

 7    to answer the question is I learned about it in 2013,

 8    but not in 2012.

 9         Q.   Okay, and did you also learn in 2013 that

10    the week before the fire that he had paid to Mr.

11    Riddle $6,000 towards his taxes for 2011?

12         A.   I remember seeing that in the transcript.

13         Q.   The hard drives that you recovered from

14    Detective House, you took possession of those.

15         A.   Yes, sir.

16         Q.   And you took those back to Char -- to your

17    office in Charlotte.

18         A.   Yes, sir.

19         Q.   And you subsequently had discussions with

20    Nationwide representatives in reference to those hard

21    drives, did you not?

22         A.   I did.

23         Q.   And you subsequently downloaded the

24    information on those hard drives.

25                    MS. DALY:  Objection to form.

 1                    THE WITNESS:  I did not.

 2          Q.   (Mr. Wiggins)  Did you ---

 3          A.   --- I -- I took them to a third-party

 4   vendor, instructed him to copy the hard drives to an

 5   external hard drive and examine the external hard

 6   drive, examine the copy and tell me what was on it.

 7          Q.   Okay, and did that actually happen?

 8          A.   It did.

 9          Q.   And you obtained permission from

10   Nationwide to pay for getting that done?

11          A.   Actually Nationwide paid him.

12          Q.   Directly?

13          A.   I -- he -- the vendor forwarded the

14   invoice to me.  I forwarded the invoice to Mike

15   Jezierski.

16          Q.   Okay, and did the downloaded information

17   -- was that furnished to your office?

18          A.   It was.

19          Q.   It was?

20          A.   Yes, sir.

21          Q.   And did you then download it to see what

22   was on the hard drive?

23                    MS. DALY:  Objection to form.

24          Q.   (Mr. Wiggins)  What was downloaded -- I'm

25   sorry.  I misstated that -- what was downloaded from

1    the hard drive.

2              MS. DALY:  Objection to form.

3              THE WITNESS:  The two hard drives

4    turned out to be identical.  One was a mirror image

5    of the other.

6         Q.  (Mr. Wiggins)  Would it have been a backup

7    ---

8         A.  --- Yes, sir.

9         Q.  --- To the other?

10        A.  Yes, sir.  I instructed the vendor to copy

11   them to the hard drive, to the external hard drive.

12   I did plug the external hard drive into my laptop and

13   I looked at the files.  I did not look at the files

14   on the hard drives removed from the computers.  I

15   looked at the files on the external hard drive which

16   was the copy.

17        Q.  Okay, and this would have been information

18   from the POS system in the restaurant.

19        A.  Yes, sir.

20        Q.  And that's what you determined it to be.

21        A.  Yes, sir.

22        Q.  And it was a recording or a recordation of

23   the monies that went through the cash register

24   through the POS system?

25        A.  Yes, sir.

1          Q.    And did you furnish that information to

2    Mike Jezierski?

3          A.    What I told Mike was there were no files

4    on the hard drive of investigative value to me.

5          Q.    Okay.

6          A.    And -- and -- and I specifically said no

7    video files.  And I said there's nothing on there of

8    value to me.

9          Q.    Okay, and did you furnish the other

10   information to Mike Jezierski that you had downloaded

11   from that hard drive?

12                    MS. DALY:  Objection to form.

13                    THE WITNESS:  I'm not real sure I

14   understand what you mean by furnished other

15   information.

16         Q.    (Mr. Wiggins)  Well, the information that

17   was then -- that you looked at, that you reviewed,

18   did you ever furnish that on to Jezierski?

19         A.    The only thing I furnished to Mr.

20   Jezierski was the oral explanation that I just

21   summarized.  It's POS files, nothing of any value.

22         Q.    Okay.  Did you tell him that it was

23   information that had to do with the financial monies

24   that came into the restaurant through the POS system?

25         A.    I think I said POS.  I don't know that I

1    said financial records of monies.  I just think I

2    said it's POS system files.

3              Q.   Okay, and what did you do with the

4    information after you looked at it?

5              A.   Umm, nothing.

6              Q.   And you still had it in your office ---

7              A.   --- Well, it's -- when it's in my office,

8    it's in evidence storage.  And it's still there today

9    as far as I know.

10             Q.   Okay.  At Donan.

11             A.   Let me qualify that.  At some point we

12   provided -- I shipped a -- I had the external hard

13   drive copied and shipped to Scott Brown.  And I

14   forget what Mr. Brown told me he was going to do with

15   it but I think it was to provide it to Jimmy.

16             Q.   Okay.

17             A.   Then we received a request from Womble

18   Carlyle to return the hard drives to you.

19             Q.   And that was in 2013?

20             A.   That was within the last month.

21             Q.   Okay.

22             A.   And maybe like within the last two or

23   three weeks.

24             Q.   All right.

25             A.   I can't remember the exact date.  I know

1   where there's an e-mail that would tell me they have

2   been shipped.  But I remember that it was your law

3   firm because we were originally given a P.O. box and

4   I said UPS won't go to a P.O. box, I need a street

5   address, and an attorney in this firm got me a street

6   address.

7          Q.    Okay.

8          A.    So the -- the actual hard drives that were

9   taken by Detective House, vouchered over to me, are

10  no longer in my possession.

11         Q.    Okay.  Now, you wound up with your

12  interviews on the 27th of January?

13         A.    Yes, sir.

14         Q.    And did you form any conclusions or form

15  any hypotheses as to how this fire had occurred as of

16  that time?

17         A.    No, sir.

18         Q.    Did you have any thoughts about what was

19  the cause and origin of this fire at that time?

20         A.    On the 26th and 27th -- I can combine the

21  two dates -- I was comfortable with the origin.

22  Sometime on the 27th -- and I cannot be more

23  specific.  I don't recall what time exactly -- I

24  called Henry Martini, who's an electrical engineer

25  with Donan, and as is typical of my conversations

1    with Henry, I probably said what are you doing on

2    Monday.  And he probably replied nothing.  I said can

3    you meet me in Fayetteville.

4         Q.   Okay.  He is an employee of Donan, is he

5    not?

6         A.   He is.

7         Q.   And he is an electrical engineer and is

8    employed by Donan.

9         A.   He is.

10        Q.   And he's a full-time employee of Donan --

11   at Donan.

12        A.   He is.

13        Q.   He is not independent.

14        A.   Correct.

15        Q.   And you called him and asked him to meet

16   you at the restaurant on Monday.

17        A.   Yes, sir.

18        Q.   And do you typically -- when you have need

19   for an engineer or someone who has greater expertise

20   in a particular area than you do, do you typically

21   try to do -- use someone in-house?

22                    MS. DALY:  Objection to form.

23                    THE WITNESS:  No, sir.  I use

24   someone I'm comfortable with.

25                    MR. WIGGINS:  Okay.

 1          Q.   (Mr. Wiggins)  And as far as engineers are

 2   concerned, in this instance did you feel comfortable

 3   in using Mr. Martini rather than someone independent

 4   and outside of Donan?

 5          A.   I did ---

 6                    MS. DALY:  --- Objection to form.

 7                    THE WITNESS:  I did.

 8                    MR. WIGGINS:  You did.

 9                    THE WITNESS:  And do.

10                    MR. WIGGINS:  And do.

11          Q.   (Mr. Wiggins)  And upon reflection would

12   it not have been better to have gotten an independent

13   engineer to assist you in your -- in this

14   investigation?

15                    MS. DALY:  Objection.

16                    THE WITNESS:  I saw and even today

17   see no reason to hire any electrical engineer other

18   than Henry Martini.

19                    MR. WIGGINS:  Okay.

20          Q.   (Mr. Wiggins)  Henry had only been --

21   Henry Martini had only been at the firm for a short

22   time prior to this fire, had he not?

23          A.   17, 18 months.

24          Q.   Okay, yeah.  And you had been there for

25   ---

1          A.    --- Well ---

2          Q.    --- Several years.

3          A.    Two and a half years.

4          Q.    Two and a half years.

5          A.    So he's almost a year and a half.  I'm two

6     -- so I've been there a year longer, yeah.

7          Q.    Okay.

8          A.    Yeah, okay.

9          Q.    And -- but you were not in the same area

10    as he was with the company.

11         A.    I ---

12                    MS. DALY:  --- Objection to form.

13                    THE WITNESS:  I work out of

14    Charlotte and he works out of Green -- Charlotte,

15    North Carolina.  He works out of Greenville, South

16    Carolina.

17                    MR. WIGGINS:  Okay.

18         Q.    (Mr. Wiggins)  And -- go ahead.

19         A.    And so you understand, that is within the

20    same Donan region.  Geographically Donan is divided

21    into regions.  South Carolina, North Carolina, and

22    Virginia is one region.

23         Q.    Okay.

24         A.    So we were within the same Donan group.

25         Q.    Do you have electrical engineers on the --

1    on your staff in Charlotte?

2           A.    No, sir.

3           Q.    Are all the electrical engineers with

4    Donan in Greenville, South Carolina?

5           A.    No, sir.

6           Q.    Where are they?

7           A.    There's one in Mocksville, one -- well,

8    there is a position in Nashville.  That position is

9    currently -- well -- well, let's just say there's a

10   position in Nashville.  It was vacant.  I can't tell

11   you if it was vacant in January 2012.

12               There's an electrical engineer in

13   Columbus, Ohio.  There's an electrical engineer in

14   Louisville, Kentucky.  There is an electrical

15   engineer in Cincinnati.  There is an electrical

16   engineer in South Bend, Indiana.  There's an

17   electrical engineer in one of the Illinois offices.

18   Right off the top of my head I can't remember which

19   one.

20          Q.    Had you used other engineers from Donan

21   other than Henry Martini?

22          A.    No, sir.

23          Q.    You asked Henry to meet you there on

24   Monday.

25          A.    Yes, sir.

1          Q.    And he did meet you there on Monday.

2          A.    He did.

3          Q.    And when I was talking to him yesterday, I

4     thought you all were in the same office in Charlotte.

5     But that's not true, is it?

6          A.    No, sir.

7          Q.    I was mistaken if I assumed that.

8                So you -- he drove in from Greenville.

9     You drove in from Charlotte.

10         A.    Yes, sir.

11         Q.    And met at the restaurant.  Did you all

12    have any other conversations about this fire other

13    than to just ask -- asking him to meet you there on

14    Monday?

15         A.    No, sir.

16         Q.    Did you -- you did not give him any

17    thoughts that you had as to the cause of this fire.

18         A.    No, sir.

19         Q.    You told him that you wanted him to be

20    present to rule out any electrical issues or problems

21    that might be a contributing factor to this fire.

22         A.    No, sir.

23         Q.    You didn't tell him that.

24         A.    No, sir.

25         Q.    What did you tell him?

1        A.    Go back to -- and I know this sounds

2    funny.  But I probably prefaced the whole

3    conversation -- I don't even identify myself.  I dial

4    his phone number.  He answers.  I say what are you

5    doing on Monday.  He recognizes my phone number.  He

6    recognizes my voice.  He obviously answered nothing.

7    I probably told him I'm at a restaurant fire in

8    Fayetteville.  I need you to look at the electrical

9    service.

10        Q.    Okay, and he did.  He came and did that.

11        A.    Yes, sir.

12        Q.    On Monday.

13        A.    And may I continue?

14        Q.    Sure.

15        A.    I probably never told him Miami Subs,

16   meaning the name.  I probably never mentioned City

17   Grill Hospitality.  I probably never mentioned Jimmy.

18   I know I didn't mention his last name.  I probably,

19   as is the pattern, e-mailed him over the weekend what

20   we call our field pages that had all that

21   information.  It had the project number, the date of

22   loss.  I e-mailed it to him over the weekend so when

23   he gets ready to leave his house on Monday morning he

24   has got an address of 552 North McPherson Church

25   Road.

1          Q.    Okay.

2          A.    And that's all I -- and -- and -- and you

3    have to understand.  This is our pattern.

4          Q.    Did you get permission from Mike Jezierski

5    to obtain the services of Mr. Martini?

6          A.    I believe I ran it by Mike Austin, because

7    by then I had not spoken to Mike Jezierski, and got

8    authorization.

9          Q.    Okay, and did he ask you for a budget for

10   that cost?

11         A.    No, sir.

12         Q.    In any event, on Monday you met again at

13   the restaurant.  What time did you get there?

14         A.    Nine to 10 a.m.

15         Q.    And was he there ---

16         A.    --- Probably 10, because Henry had a

17   further drive than I did.  So....

18         Q.    And when you got there was there anyone

19   else at the restaurant besides you and Mr. Martini?

20         A.    Not that I recall.

21         Q.    And was -- did -- how did you get into the

22   restaurant?

23         A.    I had made arrangements with Jimmy to meet

24   us.

25         Q.    Okay, and he did meet you there on the ---

1        A.    --- He did.

2        Q.    And was there anyone else who came to the

3    restaurant on that Monday, the 30th of January, other

4    than you and Mr. Henry Martini?

5        A.    Mike Jezierski came on that day.

6        Q.    Okay.  Did you know he was coming?

7        A.    Yes.  I think I learned that late Friday

8    afternoon.

9        Q.    Okay.

10        A.    Detective House was supposed to come but I

11    do not believe he did.

12        Q.    Okay.

13        A.    Special Agent Royal came late on the

14    afternoon.

15        Q.    Okay, and when you and Mr. Martini got

16    there did you have any further respons -- had you --

17    was there anything further that you needed to do for

18    your cause -- origin-and-cause investigation?

19        A.    No, sir.

20        Q.    Had you essentially completed your

21    investigation as of that time?

22        A.    I don't think it would be accurate to say

23    I had completed it.  But I was at a point where I

24    needed him to look at some light fixtures, the

25    printed circuit boards that we've discussed

1    previously today, and some wiring that was all placed

2    on a counter and I had held it there for him to

3    examine.  And that's what I wanted him to do.

4              And I think what we did ultimately was

5    walked inside and I pointed that out to him and

6    walked off and let him go do his own.

7         Q.   And did you do anything else yourself on

8    that day other than meet him there and let him do

9    what he was going to do?

10        A.    I recall photographing the unfinished

11   portion of a porch or an addition on the McPherson

12   Church Road side of the restaurant.  I realized, I

13   think, over the weekend I had not measured that.

14             And by the way, I do recall the name of

15   one other person who was present there.

16        Q.   And who was that?

17        A.    Fire Investigator Scott Hume -- H-u-m-e --

18   who is with Donan.  He is a fire investigator in

19   Raleigh and he is a new -- at that time he was a new

20   investigator and he was just there observing.

21        Q.   When you had gone -- when you had been at

22   the restaurant on either the 26th or the 27th you had

23   collected samples from the floor and determined there

24   weren't any accelerants in the restaurant?

25        A.    I collected those samples on January 27th,

1    shipped them off to the lab on -- let me check, but I

2    believe it's the 28th.

3         (Witness examined document)

4         A.    Yes, sir, I shipped them to the lab on the

5    28th.

6         Q.    Okay, and you got a response on the --

7    February the 5th or thereabouts?

8         A.    February -- yeah, I probably got a verbal

9    phone -- a verbal call on the 5th.  Correct.

10        Q.    And told you that there were no

11   accelerants ---

12        A.    --- Yes, sir.

13        Q.    --- Present.

14        A.    Yes, sir.

15        Q.    And I was going to see if I had a

16   photograph of that.

17             In your photographs -- I don't have one

18   here.  I'm sorry.

19             Mr. Lacy, what I was going to show you was

20   a -- was that table with the circuit boards on it and

21   have you identify where it was.  But it was -- was it

22   out in the restaurant area?

23        A.    Yes, sir.

24        Q.    And ---

25        A.    --- Let me look right here.

1          Q.    Do you have a photograph of it?

2                     MS. DALY:  Sure.  Let me....

3                     MR. WIGGINS:  Yeah.  It'd help me

4      just kind of....

5                     MS. DALY:  Can we go off the record

6      just a moment.

7                     MR. WIGGINS:  Sure.

8          (1:56-1:59 o'clock p.m. - recess)

9                     THE WITNESS:  That's not to say I

10     didn't take a picture of it.  That's just to say I

11     did not include it in my report.

12                     MR. WIGGINS:  Okay.

13         Q.   (Mr. Wiggins)  Let's identify that as

14     being -- and we -- because we introduced the report

15     of Mr. Martini yesterday during his deposition.  So

16     what you identified now is photograph number 33 ---

17         A.    --- 33 ---

18         Q.    --- That's contained in the report of

19     Henry Martini.  Would that be the -- the date of that

20     would be?

21         A.    May 23rd, 2012.

22         Q.    Okay.  That was his first report to

23     Nationwide.

24         A.    Yes, sir.

25         Q.    I got you.  Okay, so we've identified --

1    and that's -- now, is that the -- is that where that

2    circuit board was when you first saw it?

3            A.    Yes, or very close.

4            Q.    Okay.

5            A.    And the reason I say that is Special Agent

6    Royal had put some items near the cash registers.  I

7    may have moved them a few inches or a few feet,

8    because I kind of lined stuff up there for Henry to

9    look at.

10           Q.    Okay.

11           A.    It would -- it's closer to where it is in

12   this picture than anything else.

13           Q.    Was there anything else that you had lined

14   up on that table for Henry to look at?

15           A.    Some wiring and ---

16           Q.    --- Where did the wiring come from?

17           A.    In the area of origin.

18           Q.    Okay.

19           A.    Some -- most of which was found by Special

20   Agent Royal.  But I think I added a piece or two to

21   it.

22           Q.    Okay.

23           A.    Then I had four fluorescent light fixtures

24   that we found on the floor in the area of origin and

25   I placed them at the front of the restaurant for

1    Henry to look at.

2         Q.    Okay, and did you see Henry Martini

3    examine or look at the circuit boards?

4         A.    I did.

5         Q.    And did he -- did -- what did you see him

6    do?

7         A.    Visually examine them and take phot --

8    photographs of them and look -- flip them over in his

9    hands.

10              Understand.  I didn't -- I wasn't standing

11   there the entire time.

12        Q.    I understand.

13        A.    If I would walk by or do something, I'd

14   see he's looking at them.

15        Q.    Okay.  What other items were on the table

16   other than the wiring and the circuit boards?

17        A.    I believe that would be it.

18        Q.    Okay, and were the fluorescent light

19   fixtures in a general area?

20        A.    Yes, sir.

21        Q.    And who had moved them and put them there?

22        A.    The fluorescent light fixtures, I moved

23   them.

24        Q.    You moved them from the area of origin to

25   the area that has been identified as -- in photograph

1    33 of Henry Martini's deposition -- report in 2012,

2    May of 2012.

3         A.   Only thing I would change would -- the

4    fluorescent fixtures are illustrated in photograph

5    31.

6         Q.   Okay.

7         A.   Not 33 -- 31 of his May 2012 report to

8    Mike Jezierski.

9         Q.   Okay.  Now, after you saw him look at the

10   circuit boards, did you see him look at anything

11   else?

12        A.   Yes, sir.

13        Q.   What else did you see him look at?

14        A.   I don't remember the exact order, but he

15   looked at the -- he examined all the electrical

16   components in the area of origin.

17        Q.   Okay, and that is -- that would be in a

18   different place from where the plate was located in

19   photograph 33.

20        A.   Yes, sir.

21        Q.   And when you say he examined the wiring in

22   the area of origin, what would he have done in

23   reference to that examination?

24        A.   Photographed it, visually examined it.

25   And in this case, although he -- although he doesn't

1    do that on every fire scene we work, he made some

2    notations on the electrical boxes located in the area

3    of origin.

4          Q.    I believe there were three electrical

5    boxes in the area of or -- three other ones.  Is that

6    right -- correct?

7          A.    Yes, sir.  And he labeled them as one,

8    two, and three.

9          Q.    Okay.  And he -- on those electrical boxes

10   he showed some tripped -- some of the tripped -- the

11   word escapes me.  He -- some of them were tripped.

12   Some of the switches were tripped in the boxes.

13         A.    Okay.  Now, understand when I say

14   electrical boxes I'm talking about junction boxes,

15   electrical outlet boxes in the area of origin.

16         Q.    Okay.  You aren't talking about the ---

17         A.    --- I'm not talking about electrical

18   panels.

19         Q.    --- Electrical panels.  You aren't talking

20   about those.

21         A.    No, sir.

22         Q.    Okay.  They're more than three electrical

23   panels.

24         Q.    Okay.

25         A.    But there are three electrical boxes in

1    the area of origin.  Photograph 20 of that same

2    report illustrates elec -- what he identified as

3    electrical box one.  And I don't think there's any

4    real system to his -- which one is one and which one

5    is two.

6              Photograph 22 identifies receptacle two.

7    And photograph 24, again, of his May 2012 report,

8    identifies receptacle three.  That is -- he does that

9    simply so that a year later, two years later, five

10   years later, if somebody says what outlet are you

11   talking about, he can say I'm talking about

12   receptacle one.

13        Q.   Now, did you tell -- or did Mr. -- well,

14   strike this.  Let me start over again.

15             Did Mr. Martini ask you where the circuit

16   board came from?

17        A.   I'm sure he did.

18        Q.   Okay, and what did you -- what would you

19   have told him, or what do you recall telling him?

20        A.   Area of origin.

21        Q.   And did he tell you what that circuit

22   board was for?

23                  MS. DALY:  Objection to form.

24                  THE WITNESS:  Did Mr. Martini?

25                  MR. WIGGINS:  Tell you that.

1                    THE WITNESS:  No, sir.

2        Q.   (Mr. Wiggins)  Did you tell him what that

3    circuit board was for?

4        A.   I didn't know.  And I don't think he knew.

5        Q.   And did you go and ask Jimmy

6    Diamantopoulos what it was?

7        A.   No, sir.

8        Q.   Do you know whether or not Mr. Martini

9    went and asked Jimmy ---

10       A.   --- I do not.

11       Q.   --- Diamantopoulos what it was?

12       A.   --- I do not know.

13       Q.   Is it your understanding that Mr. Martini,

14   when he did his investigation, did not know exactly

15   the location of that circuit board?

16                    MS. DALY:  Objection.

17                    THE WITNESS:  I do not know.

18       Q.   (Mr. Wiggins)  Do you know whether or not

19   Mr. Martini -- well, let me put this in the

20   affirmative.

21            You do know from your testimony just now

22   that he did know that it came from the area of origin

23   of the fire as you had identified it.

24       A.   Yes, sir.

25       Q.   Did it ever occur to you at that point,

1    Mr. Lacy, that it might have been an item that could

2    or might have been a cause of the fire?

3                         MS. DALY:  Objection to form.

4                         THE WITNESS:  No, sir.

5                    Would you please repeat -- repeat the

6    question.

7          Q.   (Mr. Wiggins)  Did it ever occur to you at

8    that point in time, when you first knew that it came

9    from the place of origin or the area of origin of the

10   fire, that it might or could have been an item that

11   could have started or caused the fire?

12                        MS. DALY:  Objection to form.

13                        THE WITNESS:  No, sir.

14         Q.   (Mr. Wiggins)  Did you see Mr. Martini

15   examine the fluorescent lights that you had produced

16   and carried to the front of the restaurant?

17         A.   If you are talking about the fluorescent

18   light fixtures, yes.

19         Q.   Yeah, I'm talking about the fixtures, yes.

20                   And do you recall what he did in reference

21   to those fixtures?

22         A.   Looked -- looked at the connectors where

23   the bulbs are plugged in or inserted and looked at

24   the ballast and looked at any electrical cables that

25   supplied electrical service to the fixture.

 1        Q.    Okay.  Have you ever investigated a fire

 2   that was caused by a defect in the ballast of a

 3   fluorescent lighting system?

 4        A.    Yes, sir.

 5        Q.    Do you know that the only way to really

 6   test for a defect in the ballast, which is a item

 7   that controls heat going to the light, or a

 8   transformer, I suppose, for a lack of a better word,

 9   can only be examined by taking it apart and

10   determining if there's any defects in that system?

11                    MS. DALY:  Objection to form.

12                    THE WITNESS:  I'm not aware that

13   that's the only way, no, sir.

14        Q.    (Mr. Wiggins)  But that's the usual way,

15   is it not?

16                    MS. DALY:  Objection to form.

17                    THE WITNESS:  I examined the light

18   fixtures.  I saw no fire patterns on the four that I

19   stacked out front or the two that remained in the

20   ceiling that you showed me photographs of earlier.  I

21   saw no evidence that the fire had originated in any

22   of those fluorescent light fixtures.

23              Not only did I examine the fixtures

24   themselves, but there was no evidence that the fire

25   originated at ceiling height anywhere in that

1　restaurant.

2　　　　Q.　(Mr. Wiggins)　Okay, back to my original

3　question, the best and most efficient way of

4　determining if there's any defect in the ballast

5　would have been to have them examined laboratorially

6　by an in-depth examination, would it not?

7　　　　　　　　　MS. DALY:　Objection to form.

8　　　　　　　　　THE WITNESS:　Sir, part of your

9　answer is correct.　However, if there is such a

10　defect, you are going to see it on the exterior of

11　the housing of the ballast and the fixture.　You're

12　going to see a distinct burn pattern that tells me as

13　a fire investigator the original heat came from this

14　light ballast.

15　　　　　　　　　MR. WIGGINS:　Okay.

16　　　　　　　　　THE WITNESS:　Now, I can interpret

17　that pattern.　Then I need an electric engineer such

18　as Mr. Martini to conduct the examination that you're

19　talking about.　And I -- I don't dispute what you're

20　talking about.　But you're talking about step three

21　of a four-or-five-step process.　And steps one and

22　two involves an observation at the fire scene that

23　warrants step three occurring.

24　　　　　　　　　No such observation occurred.　And the

25　observations were to the contrary.　No evidence

1    occurred that the fire originated at the ceiling.

2    And there was significant evidence that the fire

3    originated at the floor underneath the drive-thru

4    window number one.

5         Q.   (Mr. Wiggins)  But you're going to yield

6    to the opinion of Mr. Martini in reference to whether

7    or not there was any defect in a ballast that might

8    or could have caused the fire.

9                    MS. DALY:  Objection.

10                   THE WITNESS:  My statement is that I

11   am going to testify that I saw no patterns on any of

12   six fixtures indicative of a fire originating at a

13   light fixture.  And I asked Mr. Martini to examine

14   them.

15                   MR. WIGGINS:  Okay.

16                   THE WITNESS:  That's -- that's what

17   -- that's my testimony.

18                   MR. WIGGINS:  Okay.

19        Q.   (Mr. Wiggins)  And he pretty much

20   confirmed what your opinion was in reference to those

21   fluorescent fixtures.

22        A.   Yes, sir.

23        Q.   Did he tell you that he agreed with your

24   assessment of the fixtures and that they in his

25   opinion would or could not have been the cause of the

1    fire?

2         A.    I don't know that he said -- he ever told

3    me he agreed with me.  I'm comfortable he told me

4    they didn't cause the fire.

5         Q.    Okay.  Was there anything else that Mr.

6    Martini was called upon to examine on that date that

7    he met you there, on the 30th of January 2012?

8         A.    Well, my sole purpose for Mr. Martini's

9    involvement in this investigation from January 20 --

10   January 30th through to date is to examine electrical

11   service and components.

12        Q.    And you would yield to any assessment that

13   he made in reference to those components?

14        A.    Yes, sir.

15        Q.    And he would be the source that you would

16   have relied upon to give you his opinion as to

17   whether or not there was anything in any of those

18   components that could have been an ignition source of

19   this fire.

20        A.    Yes, sir.

21        Q.    When did he complete his investigation of

22   those items on that Monday, the 22nd -- the 30th of

23   January?

24        A.    I don't recall what time but two, three

25   o'clock.

1          Q.    Okay.

2          A.    It would have been in the afternoon.

3          Q.    Okay.  So the items that you recall that

4    he looked at was basically -- the items that he

5    looked at would have been the circuit boards.  Is

6    that correct?

7          A.    Yes, sir.

8          Q.    And let me ask you this.  Did he point out

9    anything to you in reference to those circuit boards

10   during the course of his investigation?

11         A.    No, sir.

12         Q.    The next thing he looked at was the

13   wiring.  And that wiring was taken from, again, the

14   area where you had identified the origin of the fire.

15   Is that correct?

16         A.    Yes, sir, with one explanation.

17         Q.    Okay.

18         A.    I don't know the order exactly that he

19   identified things in.

20         Q.    Okay.

21         A.    I mean, that he examined these items.

22         Q.    Okay.

23         A.    I just know he was in that part of the

24   store for several hours.

25         Q.    Did he have any -- did he make any

1    comments to you about the wiring?

2            A.    Did not cause the fire.

3            Q.    He made that comment to you.

4            A.    Yes, sir.

5            Q.    And did he identify the wiring that he

6    said could not -- or did not cause the fire?

7            A.    No, sir, not to me, anyway.

8            Q.    Other than -- we talked about the

9    fluorescent light fixtures, was there anything else

10   that he examined that you can recall on the day that

11   he was there?

12           A.    The electrical pon -- components that

13   remained in the office wall adjacent to drive-thru

14   window number one.

15           Q.    Okay.  The electrical components would

16   have been the electrical boxes?

17           A.    Labeled one, two, and three.

18           Q.    One -- labeled one, two, and three.

19           A.    In photos 25, 23, and 20.

20           Q.    Okay.

21           A.    In his May 2012 report.

22           Q.    Okay, and that was the report that was

23   made to Nationwide ---

24           A.    --- Yes, sir.

25           Q.    --- Insurance Company.

1        A.    Yes, sir.

2        Q.    Is there anything else that you asked him

3    to look at electrically on that date?

4        A.    No, sir.

5        Q.    After that examination you had a

6    discussion with Mr. Martini as to his findings, I

7    take it.

8        A.    I don't recall any conversations after

9    January 30th.  I know he told me on the 30th he saw

10   no evidence that the fire was electrical.

11       Q.    Okay.  That's what I'm getting at.  He

12   told you that after he completed his investigation.

13       A.    On the 30th.

14       Q.    On the 30th.

15       A.    Yes, sir.

16       Q.    And did you have any further conversations

17   with Mr. Martini after that in reference to that

18   issue?

19                    MS. DALY:  Objection to form.

20                    THE WITNESS:  Well, yes.

21                    MR. WIGGINS:  Okay.

22       Q.    (Mr. Wiggins)  When was that?

23       A.    Sometime in November when we were no --

24   when we were contacted.  I had conversations with Mr.

25   Booth and Mr. Cavaroc.  I'm trying to think who else

 1    I talked to -- but that led to our going back to

 2    Miami Subs in November of 2012.

 3         Q.   Okay.  After you -- after the conversation

 4    with Mr. Martini in 2 -- in January 30th of 2012,

 5    then did you send an e-mail to Michael Jezierski in

 6    reference to your findings?

 7         A.   I wrote a letter to Mr. Jezierski.  I may

 8    have attached that letter to an e-mail.  But the

 9    substan -- the substantive information was in a

10    Microsoft Word document, not in an e-mail.

11         Q.   I had asked this earlier, but just to get

12    it into the record, Mr. Lacy, this is a letter that

13    we earlier identified which is Exhibit -- Plaintiff's

14    Exhibit Number 35, that said that there were no

15    accelerants in the sample that you had sent to the

16    lab.  Is that correct?

17         A.   Okay, I -- it is the e-mail.  I would

18    question the exhibit number.  I don't know -- I

19    cannot read the second digit of the number that

20    begins with three.

21         Q.   Okay.  But that's what it is.

22         A.   It's the e-mail, yes, sir.  I'm not going

23    to agree to the exhibit number.  I'm going to agree

24    it's an e-mail from me to Mr. Jezierski saying the

25    lab analysis was negative.

1        Q.    Let me show you what has been marked as
2    the Plaintiff's Exhibit Number 36 and ask if you can
3    identify ---

4        A.    --- And -- okay.

5        (Witness examined document)

6        A.    Yes, sir.  This is the letter that I sent
7    to Mr. Jezierski.  And as I mentioned earlier, it
8    very well may have been attached to an e-mail but the
9    e-mail would have just simply said see the attached
10   letter.  The substantive information would have been
11   in Microsoft Word, not in an e-mail.

12       Q.    Okay.  And the substance of this letter is
13   that you had completed your fire scene invest --
14   examination of the Miami Subs restaurant at 552 North
15   McPherson Church Street.  The electrical engineer,
16   Henry Martini, PE, examined the fire scene on January
17   the 30th and concluded that after examination the
18   fire was not the result of a failure of the
19   structural or electrical components or of an
20   appliance in the building.  Is that true?

21       A.    Yes, sir.

22       Q.    And you base the -- that information, I
23   take it, upon what Mr. Martini had told you after his
24   examination?

25       A.    Yes, sir.

1          Q.   And you wrote this letter after having

2     known that the circuit boards were found in the or --

3     in the area of origin of this fire.

4          A.   Yes, with an explanation.

5          Q.   Okay.

6          A.   May I explain?

7          Q.   Sure.  Oh, yeah, sure.

8          A.   I wrote this letter after know -- after

9     knowing that the circuit birds -- circuit boards were

10    found in the area of origin and Mr. Martini had

11    examined the circuit boards and found no evidence of

12    their involvement in the fire.

13         Q.   But shouldn't you have reported that to

14    Nationwide for them to make the substance -- the

15    significance of that determination?

16                   MS. DALY:  Objection to form.

17                   THE WITNESS:  Nationwide is relying

18    on me and Mr. Martini to make that determination.

19         Q.   (Mr. Wiggins)  Well, you knew that the

20    letter that you were writing to Nationwide Insurance

21    Company was going to be used by them either to deny

22    or to pay this claim, did you not?

23         A.   No, sir.

24         Q.   You did not know that?

25         A.   No, sir.

1          Q.    You did not know that they were relying

2     upon your examining -- your cause-and-origin -- your

3     origin-and-cause investigation to make the

4     determination of whether to pay or deny the claim?

5          A.    The original ---

6                    MS. DALY:   --- Objection to the

7     form.

8                    THE WITNESS:   The original

9     conversation with Mike Jezierski about this letter

10    has to deal with the second paragraph.

11                    MR. WIGGINS:   Okay.

12                    THE WITNESS:   His concern was were

13    the government investigators completed with the

14    examination of the fire scene and the structure.

15    That was the -- he and I had a phone conversation

16    probably on February -- well, it says in February

17    1st.  His main -- well, no, I won't say main.  His

18    number one concern, primary concern was are the

19    government investigators finished.

20                    Then I think he asked me has the

21    electrical engineer looked at it.  So I summarized

22    everything that Henry and I did in the first

23    paragraph.  I summarized what the government

24    investigators did in the second paragraph.

25                    This letter I am very comfortable was not

1    to be used as a basis for pay or deny.

2          Q.   (Mr. Wiggins)  Let me show you what has

3    been marked as Exhibit Number 37, and you may or may

4    not recognize that document, Mr. Lacy.  It's entitled

5    Commercial, slash, Farm Property Large Loss Report.

6          (Witness examined document)

7          A.   I saw it on -- among other documents

8    forwarded to me by this law firm, but I've never read

9    it in detail.

10         Q.   Okay.  Look on the second page of this

11   document where it says facts of loss.

12              Do you see that?

13         A.   Yes, sir.

14         Q.   And there it says the fire started in the

15   area of the kitchen, slash, rear hall of the

16   restaurant.

17              Did you agree with that statement, or do

18   you agree with that statement?

19         A.   Yes, sir.

20         Q.   And then the next statement is the fire

21   consumed the shelf rack of plastic plates, styrofoam

22   containers, boxes and plastic bags.

23         A.   Yes, sir.

24         Q.   You agree with that statement?

25         A.   Yes, sir.

1          Q.    And it says the fire burned up the wall

2    and damaged the ceiling tiles.    And we've discussed

3    that.

4               And you, I take it, agree with that?

5          A.    Yes, sir.

6          Q.    There is possible heat damage to the bar

7    joists that support the roof.

8               Did you make that assessment when you did

9    your investi ---

10         A.    --- I made that observation.    I'm not a

11   structural engineer, but I would confirm that's

12   correct.

13         Q.    And the remainder of the building suffered

14   severe smoke damage.

15              Would that be a true statement?    You would

16   agree with that?

17         A.    Yes, sir.

18         Q.    The contents, including the equipment,

19   furniture, small ware, table wares, food were also

20   damaged by the severe smoke.

21              Is that also a correct statement?

22         A.    Yes, sir.

23         Q.    And the health inspector ordered all

24   food-handling equipment needs to be replaced.

25              Was that information you obtained from a

1    -- one of the public officials?

2          A.    I have no idea.

3          Q.    You never talked to anyone about that --

4    one of the health inspectors about that?

5          A.    No, sir.

6          Q.    And the exterior EIFS system suffered only

7    minor smoke damage in the area around the drive-in

8    window.

9                Would that be a true statement?  You would

10   agree with that?

11         A.    Yes.

12         Q.    And then it says, according to the verbal

13   report from the origin-and-cause investigator -- and

14   that would have been identifying you, would it not?

15         A.    Yes, sir.

16         Q.    The origin of the fire is in the area

17   that's next to the rear drive-in -- and we've

18   identified it as the first in our conversation today.

19         A.    Yes, sir.

20         Q.    Is that correct?

21         A.    Yes, sir.

22         Q.    First drive-in window near the front wall

23   of the office.  And then it says the cause of the

24   fire is incendiary in nature.

25                Is that what you told Mr. Jezierski on or

1     about the 1st of February 2012?

2          A.    Yes, sir.

3          Q.    And then in the next bracket down it talks

4     about expert consultants.  It says -- checks yes, and

5     said we hired Donan Electrical Engineer Henry Martini

6     to assist with the determination of the cause of the

7     fire by excluding electrical.

8                You see that?

9          A.    Do I see it?

10         Q.    Yeah.

11         A.    Yes, sir, I do.

12         Q.    And the budget for the investigation is

13    $2,500.

14               You have no knowledge of that, I take it?

15         A.    I have no knowledge of any of the budgets

16    that are set under experts and consultants.

17         Q.    Okay.  You never had anything to do with

18    that at all or any input into that?

19         A.    No, sir.

20         Q.    The plastic plates that you had reference

21    to, the shelf rack of plastic plates, styrofoam

22    containers, boxes and plastic bags, was that in the

23    information given to you by Mrs. Moon?

24         A.    I believe so.

25         Q.    Well, did anybody else ever tell you

1    anything about the location of the styrofoam plates,

2    the plastic cup -- cups and the styro -- and -- I'm

3    sorry -- and the plastic knives, forks, etcetera?

4         A.    My only hesitation is to see if Raven

5    mentioned it.

6              (Witness examined documents)

7         A.    No, that probably came from Ms. Moon.

8         Q.    Okay, and where did Mrs. Moon tell you

9    that those devices, those plastic cups, the styrofoam

10   plates, the knives and forks and the cellophane

11   containers were located?

12        A.    On the shelf to the right of drive-thru

13   window number one.

14        Q.    Okay, and that would have -- would that

15   have been in the vicinity where you've now come to

16   realize and know that was the location of the Ion IQ

17   communication device in the restaurant?

18        A.    Yes, sir.

19                   MS. DALY:   Object to the form.

20        Q.    (Mr. Wiggins)  Just to go back just for a

21   moment, Mr. Lacy, to a conversation we talked about

22   early on -- this is Exhibit 42.

23              Is this invoice that you had reference to

24   concerning the Seagate hard drives that were....

25              (Witness examined document)

1          A.    Yes, sir.

2          Q.    And this a -- data recovery was 250

3     gigabytes.  Do you see that?

4               Then it has got a total of 1,370, and then

5     ES -- USB 135, total 1,505.

6               And this, you said, was paid by Mr.

7     Jezierski.

8          A.    Yes.

9          Q.    It's not -- didn't come through you, did

10    it?

11         A.    The invoice came to me and I forwarded it

12    to Mr. Jezierski for payment.

13         Q.    And then the next page of this is a data

14    recovery evaluation directed to you -- I'm sorry --

15    from you to Jezierski.  Is that correct?

16         A.    Yes.

17         Q.    And this is dated 3-7-2012, and again, you

18    say there's approximately 13 gigabytes of data

19    recovered, when it actually was 250 gigabytes, was it

20    not?

21                    MS. DALY:  Objection to form.

22                    THE WITNESS:  All right, Mr.

23    Wiggins, go back to the invoice.

24                    MR. WIGGINS:  I got it.  Okay.

25                    THE WITNESS:  The hard drives are

1    250 gigabytes in size.

2                    MR. WIGGINS:  I got you.  Okay.

3                    THE WITNESS:  There's only 13 gig on

4    -- on one of the hard drives.

5              You see where, under miscellaneous, Mr.

6    Stone put not necessary?

7                    MR. WIGGINS:  I do.

8                    THE WITNESS:  Remember my telling

9    you earlier that they only copied one of the hard

10   drives because they were ---

11                    MR. WIGGINS:  --- One was a backup.

12                    THE WITNESS:  One was -- they're --

13   they're -- one was an image of the other.

14                    MR. WIGGINS:  I understand.

15                    THE WITNESS:  So it's a 250-gig hard

16   drive that contained 13 gig of data.

17                    MR. WIGGINS:  Okay.

18                    THE WITNESS:  So they only copied 13

19   gig.

20                    MR. WIGGINS:  Okay.

21        Q.   (Mr. Wiggins)  And then that was sent --

22   that was sent to you by Marvin Stone of Rewave Data

23   Recovery.

24        A.   What was sent to me?

25        Q.   Those -- the -- well, what he sent to you

1    was the zip files for your review.  You got those?

2         A.   Yes ---

3                   MS. DALY:  --- Objection to form.

4                   THE WITNESS:  Yes, sir.  And I got

5    the external hard drive that's referenced on the

6    invoice as costing $135.

7                   MR. WIGGINS:  Okay.

8         Q.   (Mr. Wiggins)  Again, just to kind of tie

9    down the conclusion of that, Mr. Lacy, let me show

10   you what I've marked as Exhibit -- Plaintiff's

11   Exhibit Number 44.

12             This is a e-mail from Jezierski to Harold

13   Snyder.  You see that?

14        A.   Yes, sir.

15        Q.   Did you get a copy of this?

16        A.   No, sir.

17        Q.   He says, anyway, I talked with the O&C

18   investigator.

19             That would have been you, I take it?

20        A.   Yes, sir.

21        Q.   Who has the hard drive.  He said that the

22   programs in the hard drive looks like a new computer

23   hard drive.  There were no video files.

24             You told me that earlier and that you told

25   him that.

1        A.    Yes, sir.

2        Q.    In fact, there are no, quote, normal, end

3    quote, data files that you would expect to see on a

4    computer that was used for several weeks -- da, da,

5    da, da, or it was wiped clean and the original

6    software reinstalled.

7             What is he talking about there?  Do you

8    know?

9        (Witness examined document)

10       A.    I -- you said original software, and I

11   don't see -- oh, there it is, original starting

12   software.

13       Q.    Uh-huh.

14       (Witness examined document)

15       A.    All right, what Mr. Jezierski is saying is

16   -- and this is what I told him to some extent.

17            There are no video files.  I told him

18   that.

19       Q.    Uh-huh.

20       A.    There are no normal data files that you

21   would expect to see on a spreadsheet that was used

22   for several weeks, begin parenthesis, Word docs,

23   spreadsheets, etcetera, end parenthesis.

24            That's the extent of what I told him.

25       Q.    Okay.

1        A.   Then, apparently, I told him that I was

2  going to check with the technician to see what his

3  thoughts are, but I can tell you at this point my

4  thought was we're done with the hard drives.

5        Q.   But the hard drives never were wiped

6  clean, were they?  They had ---

7        A.   --- No, sir.

8        Q.   --- They had data on them?

9        A.   Yes, sir.

10       Q.   Now, after you left the restaurant on the

11  30th, you had completed your investigation at that

12  point, Mr. Lacy.

13            Would that be a true statement?

14       A.   Yes, sir.

15       Q.   And you had concluded at that point in

16  time that this fire was an incendiary fire?

17       A.   Yes, sir.

18       Q.   And go back to one of my earlier questions

19  -- had you ever developed any kind -- well, let me

20  strike that.

21            Had you given any consideration to the

22  fact that the circuit board that was found in the

23  area of origin of this fire might have had anything

24  to do with the fire?

25                 MS. DALY:  Objection to the form of

1    the question.

2                        THE WITNESS:  Not after Mr. Martini

3    told me that he saw no evidence of the fire

4    originating at the printed circuit board.

5         Q.   (Mr. Wiggins)  Should not that circuit

6    board have been submitted to someone like Mr. Cavaroc

7    to ident -- to have been examined microscopically or

8    x-rayed to determine whether or not there was any

9    defects in that system ---

10                        MS. DALY:  --- Objection.

11        Q.   (Mr. Wiggins)  --- Prior to making that

12   call?

13                        MS. DALY:  Objection to the form of

14   the question.

15                        THE WITNESS:  As far as examining a

16   printed circuit board, I would believe Mr. Martini

17   would possess the same skills as Mr. Cavaroc.

18        Q.   (Mr. Wiggins)  He did not examine it by

19   x-ray at the scene, did he?

20        A.   No, sir.

21        Q.   He did not remove any parts from the

22   circuit board during the course of the examination,

23   did he?

24        A.   Not that I'm aware of.

25        Q.   He did not, nor did you, tag and -- to

1    preserve that circuit board, did you?

2         A.    No, sir.

3                        MS. DALY:  Objection to form.

4         Q.    (Mr. Wiggins)  And would it not have been

5    your responsibility to have collected any evidence,

6    any physical evidence at the scene of the fire, and

7    preserved that for future examination by anyone else

8    coming behind you and Mr. Martini to have looked at

9    that to make any determination about the cause of

10   this fire?

11                       MS. DALY:  Objection to the form of

12   the question.

13                       THE WITNESS:  It would have been my

14   responsibility, number -- that's number one.

15            Number two, we left those items there for

16   whoever came after us.

17        Q.    (Mr. Wiggins)  Did you tag, though -- did

18   you tag the ---

19        A.    --- No, sir.

20        Q.    --- Circuit board ---

21        A.    --- I only tag what I remove.

22        Q.    And you removed several things from the

23   restaurant, did you not?

24        A.    Yes, sir.

25        Q.    You removed the can that had the gas

 1    written on it?

 2         A.    Before I get too far I'm going to check my

 3    notes.

 4         Q.    Okay.

 5         (Witness examined document)

 6         A.    Yes, sir.

 7         Q.    What else did you remove?

 8         A.    Four plastic Pepsi cups six and a half

 9    inches tall.

10         Q.    Where did you find those?

11         A.    In the -- under the counter -- I guess

12    you'd call it a food prep counter.

13              But I was told that cups of this --

14    similar cups were found on that metal rack, and then

15    six plastic, tan-colored 10-inch diameter plates,

16    likewise, same location where I secured them from,

17    but plates very similar to that were on that metal

18    shelf.

19         Q.    Were they styrofoam plates?

20         A.    No, sir, these were plastic.

21         Q.    Plastic.

22         A.    On that shelf were styrofoam and plastic

23    plates.

24         Q.    Okay.

25         A.    Then the gas can, as you mentioned, which

1    is actually an eight-liter plastic container labeled

2    gas, originally it was a fruit drink mix container,

3    but someone had written gas on it -- fire debris

4    sample from -- from the floor area under the first

5    drive-thru window.

6                  Those are the four items I secured from

7    the fire scene.  Then I had the two hard drives

8    vouchered over to me by Detective House.

9         Q.   Now, you say it would have been your

10   responsibility to have tagged and preserved any

11   physical evidence that was of any significance in the

12   fire.

13                  Is that ---

14                  MS. DALY:  --- Objection.

15        Q.   (Mr. Wiggins)  Would that be true?

16                  MS. DALY:  Objection to form and

17   mischaracterization of his testimony.

18                  THE WITNESS:  Well, it would be my

19   responsibility to identify, collect, tag, secure and

20   store any evidence removed from a fire scene.

21                  MR. WIGGINS:  Okay.

22                  THE WITNESS:  That's number one.

23                  Other items of value that were left at the

24   scene would not have been tagged.

25                  MR. WIGGINS:  Okay.

 1                    THE WITNESS:  All right, I -- you --

 2    I tag ---

 3         Q.    (Mr. Wiggins)  --- What is ---

 4         A.    --- I tag ---

 5         Q.    --- Why ---

 6         A.    --- I tag only what I take.

 7         Q.    Okay, and why did you not consider it to

 8    be prudent to have tagged and preserved the circuit

 9    board that was found in the area of the -- of the

10    fire?

11         A.    There is a line ---

12                    MS. DALY:  --- Objection.

13                    THE WITNESS:  There is a line of

14    thought that items of value can be left at the fire

15    scene if the fire scene can be secured, and this one

16    certainly could.

17                    Mr. -- I mean, Jimmy was able to lock the

18    doors.  We went back there in November and found the

19    doors locked exactly how they were being locked in

20    January and February when I was there.

21                    NFPA 921 actually contains a sentence or

22    two about leaving those items at the scene for other

23    parties to examine.  We had no idea who was coming

24    behind us.

25         Q.    (Mr. Wiggins)  But you knew, or suspected,

1    that somebody would be coming behind you, did you

2    not?

3            A.   No, sir.

4                      MS. DALY:  Objection to form.

5            Q.   (Mr. Wiggins)  Did you not think that?

6                      MS. DALY:  Objection to the form.

7                      THE WITNESS:  No, sir.  I have

8    probably -- well, no.  I'll just leave it at that.

9    No, sir.

10           Q.   (Mr. Wiggins)  Let me show you what I've

11   marked as Plaintiff's Exhibit Number -- 123....

12                    (* Exhibit 123 was marked *)

13           Q.   And ask if you can identify that document.

14           (Witness examined document)

15                    MR. WIGGINS:  I'll give it to her

16   since she doesn't....

17                    THE WITNESS:  Yes, sir.

18           Q.   (Mr. Wiggins)  And in both of your reports

19   that you filed ---

20           A.   --- Okay, this is a portion of the

21   document.  This is not the entire document.

22           Q.   I understand.

23           A.   Okay.

24           Q.   But what have you got there in your hand?

25           A.   I have the cover sheet.  I do not have

1    pages one through 16.

2         Q.    Okay.

3         A.    I do not have pages 18 through 109.  I do

4    not have pages 110 through -- I'm sorry -- 111

5    through 130.

6               So I mean, there's a substantial portion

7    of the document missing.

8         Q.    Look on the third page, Mr. Lacy, it says

9    11.35.1 -- 3.5.1, responsibilities of investigator.

10              Do you see that?

11        A.    Yes.

12        Q.    And it says there the responsibility of

13   the investigator or anyone who handles or examines

14   evidence -- and you did in fact handle or examine

15   this evidence, did you not?

16        A.    Yes, sir.

17        Q.    Is evidence preservation and scope of

18   responsibility carried -- varies according to such

19   factors at the investigator's jurisdiction, whether

20   he or she is a public official or private sector

21   investigator, whether criminal conduct is indicated,

22   and applicable laws and regulations.

23              However, regardless of the scope and

24   responsibility of the investigator, care should be

25   taken to avoid destruction of the evidence.

1              You agree with that, do you not?

2                    MS. DALY:  Objection to form.

3                    THE WITNESS:  Yes, sir.

4         Q.   (Mr. Wiggins)  And look at chapter 15,

5    which is on page 134.  It's got documentation of the

6    investigation.

7         A.   Okay.

8         Q.   And 15.1.1 states that the goal in

9    documenting any fire or explosion investigation is to

10   accurately record the investigation through media

11   that will allow investigators to recall and

12   communicate their observations at a later date.

13              You did that, did you not?

14        A.   Yes, sir.

15        Q.   And it also says, under 1.1.2, thorough

16   and accurate documentation of the investigation is

17   critical, because it's from this compilation of

18   factual data that investigative opinions and

19   conclusions can be supported and verified.

20              You agree with that, do you not?

21        A.   Yes.

22                    MS. DALY:  Object.

23        Q.   (Mr. Wiggins)  And you did that.  You made

24   notes ---

25        A.   --- Yes, sir.

1          Q.    --- That could be -- you took photographs.

2                All of those things could be verified by

3     anybody coming behind you, could they not?

4          A.    Yes, sir.

5          Q.    Okay.

6          A.    And let me explain my answer further, if I

7     may.

8          Q.    You may.

9          A.    I agree with what is said in 15.1.2.  I

10    would also call your attention to 11.3.5.

11                You mentioned 11.3.5.1.  Removal of those

12    items from the fire scene could also result in

13    another party -- because on January 30th I had no

14    idea who might be coming behind us -- another party

15    alleging spoliation.

16          Q.    You're talking about 11.3.5?

17          A.    Point one.

18          Q.    And then at ---

19          A.    --- I'm sorry.  11.3.5.

20          Q.    Spoliation of evidence.

21          A.    Yes.

22          Q.    And generally do you take care to avoid

23    that kind of an issue or a problem?

24                      MS. DALY:  Objection to form.

25                      THE WITNESS:  Yes, sir.  And the

1    common way to avoid that problem is you leave the

2    evidence at the scene until other parties can look at

3    it.

4             If I remove it from the scene, parties

5    have alleged, albeit unsuccessfully, that -- they've

6    alleged evidence spoliation.

7         Q.   (Mr. Wiggins)  In 16.1, Mr. Lacy, we've

8    got physical evidence, 16.1.  It says, during the

9    course of any fire investigation, the fire

10   investigator is likely to be responsible for

11   locating, collecting, identifying, storing, examining

12   and arranging for testing of physical evidence.  The

13   fire investigator should be thoroughly familiar with

14   recommended and accepted methods of processing such

15   physical evidence.

16            And one in 16.3 says preservation of the

17   fire scene and physical evidence, and it says every

18   attempt should be made to protect and preserve the

19   fire scene and as intact and undisturbed as possible

20   with the structure, contents, fixtures and

21   furnishings remaining in their pre-fire locations.

22            You agree with that, do you not?

23        A.   Yes, sir.

24        Q.   And of course, in this case Mr. -- in this

25   particular instance the SBI agent had removed or had

1    reconstructed some of the fire scene prior to your

2    arrival?

3         A.    Yes.

4         Q.    And it says that the fire -- the entire

5    fire scene should be considered the physical evidence

6    and should be preserved and protected.

7              And you generally would try to do that?

8         A.    Yes, sir.  And that's why we left the

9    printed circuit boards there, in case anybody else

10   came in behind us and wanted to look at them.

11        Q.    Well, wouldn't it have been better to have

12   protected the circuit boards if you had taken them in

13   your possession, tagged them, identified them and

14   stored them, and told -- made known to anyone who

15   wanted to come look at them that you had them in your

16   possession for them to examine and look at?

17                  MS. DALY:  Objection to form.

18                  THE WITNESS:  That is one way of

19   looking at it.  However, if we do that, you open

20   yourself up to a spoliation claim for removing them

21   from the scene.

22        Q.    (Mr. Wiggins)  Look at 16.5.7 entitled

23   Collection of Appliances or Small Industrial

24   Equipment.  @@

25                  Do you see that, Mr. Lacy?  That's on page

1    ---

2         A.    --- Yes.

3         Q.    --- 151.  Whenever an appliance or other

4    type of equipment is believed to be part of the

5    ignition scenario, it is recommended that the fire

6    investigator have it examined or tested.  Appliances

7    must be collected as physical evidence to support the

8    fire investigator's determination that the appliance

9    was or was not the cause of the fire.  Do you ---

10        A.    --- Okay, I have a problem with the first

11   sentence.

12        Q.    Okay.  Do you have a problem with any part

13   of that?

14        A.    The first sentence I do.

15        Q.    Okay.  What first sentence do you have a

16   problem with?

17        A.    Whenever an appliance or other type of

18   equipment is believed to be part of the ignition

19   scenario.

20        Q.    Okay.

21        A.    PCB -- that printed circuit board was not

22   part of the ignition scenario.

23        Q.    Well, it could have been, could it not?

24                   MS. DALY:  Objection to form.

25                   THE WITNESS:  Not by our

 1   determination.

 2                    MR. WIGGINS:   Okay.

 3        Q.   (Mr. Wiggins)  But it could have been by

 4   someone else's determination, couldn't it?

 5                    MS. DALY:  Objection to form.

 6                    THE WITNESS:   Mr. Martini came in

 7   and examined it, said it was not involved in the

 8   ignition -- not -- not -- was not the ignition source

 9   for the fire.

10        Q.   (Mr. Wiggins)  He could have been wrong

11   about that, couldn't he?

12                    MS. DALY:  Objection.

13                    THE WITNESS:   Based upon the skills,

14   his training, and the accuracy of prior

15   investigations, I trust Henry Martini immensely.

16        Q.   (Mr. Wiggins)  Well, I trust him, too, Mr.

17   Lacy.  But he could have been wrong ---

18                    MS. DALY:   --- Objection to form.

19        Q.   (Mr. Wiggins)  --- Couldn't he?

20        A.   I don't believe he was.

21        Q.   He told me yesterday that the best way to

22   have determined whether or not there was any defect

23   in this PCB board, this printed circuit board would

24   have been to submit it to Mr. Cavaroc's laboratory to

25   examine it.

 1                    MS. DALY:  Objection.  Complete

 2    mischaracterization ---

 3         Q.   (Mr. Wiggins)  --- Would you agree?

 4                    MR. WIGGINS:  Maybe I did misunder

 5    ---

 6                    MS. DALY:  --- Mischaracterization

 7    of ---

 8                    MR. WIGGINS:  --- Maybe I did mis

 9    ---

10                    MS. DALY:  --- Mr. Martini's ---

11                    MR. WIGGINS:  --- He did say that.

12                    MS. DALY:  No, he did not.

13                    MR. WIGGINS:  Would not you agree

14    with that?  Well, tell me what he said.

15                    MS. DALY:  Objection.

16                    MR. WIGGINS:  Well, Rachel, tell me

17    what he said.

18                    MS. DALY:  Mr. Martini said ---

19                    MR. WIGGINS:  --- Yeah.

20                    MS. DALY:  --- That it would not

21    have been -- that the -- what he did was exactly what

22    needed to be to determine whether or not there was an

23    electrical source of ignition on that PC board.

24                    MR. WIGGINS:  He said he made that

25    determination but he said that the best thing would

 1    be ---

 2                    MS. DALY:  --- No, he did not.

 3        Q.   (Mr. Wiggins)  Would not the best system

 4    to have been to -- the best thing to have done was

 5    submit this to a laboratory to test it to see whether

 6    or not it was a possibility that it could have

 7    contributed to this fire, Mr. Lacy?

 8                    MS. DALY:  Objection to form.

 9                    THE WITNESS:  If Mr. Martini had

10    come to me on January 30th, 2012 and said we need to

11    get this x-rayed, I would have said okay.  He didn't.

12    He came to me and told me the PC -- the printed

13    circuit boards are not involved in the ignition of --

14    as the -- not involved in the fire, damaged as a

15    result of the fire, not involved in the fire.

16              The wiring that was placed on the surface

17    beside the printed circuit boards, I examined it.

18    It's not involved in the fire.  The fluorescent light

19    fixture ---

20        Q.   (Mr. Wiggins)  --- Wait.  Who said he

21    examined it?

22        A.   Mr. Martini examined it.

23        Q.   He told me he didn't examine it.

24        A.   Well ---

25                    MS. DALY:  --- Objection.

1    Mischaracterization of testimony.

2                        MR. WIGGINS:  Well, what did he say,

3    Rachel?

4                        MS. DALY:  I think Mr. Martini's

5    testimony will speak for itself ---

6                        MR. WIGGINS:  --- Well, he said he

7    couldn't find it.

8                        MS. DALY:  --- In his deposition.

9                        MR. WIGGINS:  He didn't recall ever

10   seeing it is what I recall he said.

11                        THE WITNESS:  Well, Mr. Wiggins,

12   it's in a photograph that he included in his report.

13                        MR. WIGGINS:  Okay.

14                        THE WITNESS:  I believe he examined

15   it.

16                        MR. WIGGINS:  Okay.

17      Q.   (Mr. Wiggins)  If he did not examine it,

18   then what would your answer be?

19                        MS. DALY:  Objection to form.

20   Examined it.  What are you referring to when you say

21   it?

22                        MR. WIGGINS:  I'm talking about the

23   electrical source for the PCB board.

24                        MS. DALY:  Objection to form.

25                        THE WITNESS:  Okay, the wiring that

1    I'm talking about is the wiring that was placed on

2    the counter near the cash registers, and Mr. Martini

3    examined it.

4                        MR. WIGGINS:   Okay.

5         Q.    (Mr. Wiggins)  Do you know what wiring

6    that was?

7         A.    No, sir.

8         Q.    Okay.  I'm talking ---

9         A.    --- That was -- that ---

10        Q.    --- I talking about the wiring for the PCB

11   board.

12        A.    Okay, that would have been in the wall

13   behind the sheet rock beside drive-through window

14   number one.

15        Q.    Okay.  Did you see it?

16        A.    No, sir.

17        Q.    Did you examine it?

18        A.    No, sir.  The fire did not originate at

19   that height.

20        Q.    Okay.  Again, my question, Mr. Lacy, was

21   Mr. Martini could have been -- could have made an

22   error in his assessment, could he not?

23                        MS. DALY:   Objection.

24        Q.    (Mr. Wiggins)  Even though you have great

25   confidence in his ability, we all make mistakes, and

1    he could have made a mistake, couldn't he?

2                    MS. DALY:  Objection to form of the

3    question.

4                    THE WITNESS:  If he made some

5    mistake, as you suggest, he -- he makes a mistake on

6    an -- on a component that is not in the area of

7    origin of the fire.  It is above the area of origin.

8    And it also -- photographs also illustrate that that

9    component was not involved in the origin of the fire

10   but was attacked by a developing fire.

11                    So the big issue about whether or not he

12   could have made a mistake kind of -- not kind of ---

13        Q.   (Mr. Wiggins)  --- You think it's

14   irrelevant.

15        A.   Yes, sir.

16                    MS. DALY:  Objection to form.

17                    MR. WIGGINS:  Okay.

18        Q.   (Mr. Wiggins)  All the evidence that you

19   ever collected, Mr. Lacy, in reference to the

20   location of the styrofoam plates, the plastic plates,

21   the plastic cups, and the cellophane in which those

22   cups were encased were on the top shelf of the drying

23   rack in and near drive-in window number one.

24        A.   I don't know that all of those items were

25   on the top shelf.  They were on shelves.

1          Q.    I think Mrs. Moon said they were on the

2     top shelf and that there -- others were reserved for

3     drying plates.  Do you recall that?

4          A.    Yes, sir.  And I thought some of the

5     plates that I took as evidence in item four -- I'm

6     sorry -- item three could have been lower.

7          Q.    Okay.

8          A.    They may have been -- honestly, the plates

9     I took were not the ones that were on that shelf and

10    drying.  They were identical to what was on that

11    shelf and drying.  So I took it that those -- some of

12    those items would be lower.

13         Q.    Did anyone ever tell you that they were in

14    any other place than on that shelf, on that drying

15    rack?

16         A.    What are you characterizing as they?

17         Q.    I'm talking about anybody that you

18    interviewed.

19         A.    But what items were anywhere else?

20         Q.    Those styrofoam plates, those plastic

21    plates, those plastic cups, and the cellophane in

22    which they were encased.

23         A.    I saw some other items down that hall, the

24    rear hall of the restaurant.  But it's my

25    understanding they were on this shelf.

 1        Q.    Okay.

 2        A.    And when I say shelf I'm talking about the

 3   whole unit, all shelves.

 4        Q.    Okay.  And my question was did anyone ever

 5   tell you that they were located any other place other

 6   than on that drying rack in or an area where you've

 7   identified as the area of the fire.

 8        A.    No, sir.

 9        Q.    Let's talk about the point of origin, the

10   area of origin for just a moment.  You've said that

11   the location of this Ion IQ was not within the area

12   of origin of this fire.

13        A.    Correct.

14        Q.    Now, area of origin and point of origin

15   are two different things, are they not?

16        A.    Yes.

17        Q.    Point of origin means the exact spot where

18   this fire located -- was located, or might have been

19   located.  Is that correct?

20                   MS. DALY:  Objection to form.

21                   THE WITNESS:  It is a term that's

22   used differently by different people.  But typically

23   point is more specific than area.

24                   MR. WIGGINS:  Okay.

25        Q.    (Mr. Wiggins)  And area can be a pretty

1    large area, could it not?

2         A.    In the eyes of the beholder, sir.

3         Q.    Could not the area of this -- origin of

4    this fire have been anywhere within the area of the

5    shelf of this -- top shelf of this drying rack and

6    the floor of this restaurant?

7         A.    No, sir.

8         Q.    Why do you say that?

9         A.    The damage to the floor of the area just

10   inside the drive-through window number one, the

11   damage to the rolled aluminum cart, and the identi --

12   observation, identification, and documentation of the

13   protected area pattern on the wall to the right of

14   the drive-through window number one.

15        Q.    Okay.  Now, going back for just a moment

16   to what I was just -- we were just talking about,

17   collection of this data, collection of the physical

18   evidence.  And you said you agree with this paragraph

19   except for the first paragraph.  And that -- the

20   first sentence says whenever an appliance is believed

21   to be part of the ignition scenario.

22             And would not that have been part of the

23   ignition scenario either to rule in or to rule out

24   the ignition source of this fire?

25                  MS. DALY:  Objection to form.

 1                    THE WITNESS:   Mr. Martini examined

 2    it and eliminated it.   It was excluded as a potential

 3    ignition source.

 4         Q.   (Mr. Wiggins)  And then in 16.5.7.1, where

 5    practical, it says, the entire appliance or item of

 6    equipment should be collected intact as physical

 7    evidence.   This includes any electrical power cords

 8    or fuel lines supplying or controlling it.

 9              And that power cord was not collected, was

10    it, Mr. Lacy?

11         A.   Okay, 16.5 ---

12                    MS. DALY:   --- Objection to the form

13    of the question.

14                    THE WITNESS:   --- .7.1 hinges on the

15    first sentence of 16.5.7, whenever an appliance or

16    other type of equipment is believed to be part of the

17    ignition scenario.   If the appliance or other type of

18    equipment is not believed to be part of the ignition

19    scenario, 16.5.7.1 does not apply.

20                    MR. WIGGINS:   Okay.

21         Q.   (Mr. Wiggins)  And that's your answer and

22    you stick by it.

23                    MS. DALY:   Objection.

24                    THE WITNESS:   Sir, from January

25    30th, 2012 -- let me backtrack.   January 26 and

1    January 27th I saw fire patterns that indicated to me

2    the fire did not originate anywhere other than the

3    floor below drive-through window number one.  On

4    January 30th Mr. Martini eliminated the multiple

5    electrical components in the area of drive-through

6    window number one.

7         Q.   (Mr. Wiggins)  That ---

8         A.   --- Based on my observation of fire

9    patterns, Mr. Mar -- Martini's exclusion of the

10   electrical components, I determined the fire was not

11   electrical in nature.

12        Q.   Okay.  If that determination had been

13   erroneous, though, the elec -- the circuit boards

14   should have been further investigated and looked at

15   by a -- in a laboratory setting.  Is that not true,

16   Mr. Lacy?

17                    MS. DALY:  Objection to form.

18                    THE WITNESS:  I don't understand the

19   question at all.

20                    MR. WIGGINS:  Okay.

21        Q.   (Mr. Wiggins)  I'm saying that if --

22   you're saying that you made that determination, that

23   Mr. Lacy made that -- that Mr. Martini made that

24   observation.  Is that correct?

25                    MS. DALY:  Objection to form.

 1                    THE WITNESS:  I made what

 2   determination?

 3        Q.   (Mr. Wiggins)  You made -- you -- based

 4   upon the statements to you from Mr. Martini that the

 5   circuit boards were not defective and did not --

 6   would -- could not have served as the ignition source

 7   for this fire, you then based your opinion on the

 8   area of origin of this fire as being the floor of the

 9   Miami Subs restaurant and not anyplace else.

10        A.   No, sir.

11                    MS. DALY:  Objection.

12        Q.   (Mr. Wiggins)  That's not correct?

13        A.   No, sir.

14        Q.   What did you base it on then?

15        A.   I based the identification of the area of

16   origin on fire patterns on January 26 and 27th before

17   Mr. Martini examined it.  Then we had all this

18   evidence, and I said look at it.

19        Q.   What is the area of origin as you've

20   identified it for this fire?

21        A.   Underneath the window, underneath

22   drive-through window number one, on the floor.

23        Q.   Okay.  How -- over what period -- over

24   what surface of the floor?

25                    MS. DALY:  Objection to form.

 1                    THE WITNESS:  I'm not going to say

 2    right up against the wall underneath the window, but

 3    within one tile of the window, which is about four

 4    inches, extending probably to 18 to 24 inches away

 5    from the window.

 6         Q.    (Mr. Wiggins)  And I take it it's your

 7    testimony that you never considered even after

 8    learning that -- well, let me strike that.

 9              You never, until you completed your

10    investigation, ever learned of the exact location of

11    the circuit board.  Is that correct?

12         A.    Correct.

13         Q.    And you only learned about that, I

14    believe, after you read the depositions of Mr.

15    Diamantopoulos.

16         A.    To be honest with you, I don't remember

17    whose deposi -- whose -- we -- whose transcript it

18    was I read.

19         Q.    Okay, but you read it somewhere.

20         A.    Yes, sir.

21         Q.    And my question, then, would have been had

22    you known that this PCB, printed circuit board had

23    been located right next to where Mrs. Moon has

24    identified those styrofoam cups, those plastic cups,

25    styrofoam plates, and the cellophane encasing those

1    items was located, would that have changed or had

2    anything to do with your opinion about the ignition

3    source for this fire.

4                    MS. DALY:  Objection to form.

5                    THE WITNESS:  No, sir.

6         Q.    (Mr. Wiggins)  And, again, that's based

7    upon the opinion of Mr. Martini that the printed

8    circuit boards were not defective.

9         A.    No, sir.

10        Q.    Okay.  What -- straighten me out then.

11        A.    The area of origin -- let me rephrase

12   that.  I identified the area of origin at floor level

13   on the 27th, if not the 26th, but most definitely by

14   the time I left the fire scene on January 27th, 2012,

15   as at floor level underneath drive-through window

16   number one.  I based that on the damage to the

17   wheeled aluminum cabinet.  I based that on the damage

18   to the wall underneath the drive-through window.  And

19   when I say wall I'm talking about the vert -- the

20   vertical wall surface.

21                  I based that on the presence of the fire

22   pattern or -- I don't want to say the fire pattern --

23   on fire patterns indicating that the fire originated

24   below the area in which I subsequently learned the IQ

25   Ion device was mounted.  The fire originated below

1    that area, passed through that area vertically, and

2    kept going to the ceiling.

3              I also observed a fire pattern spreading

4    behind the wheeled aluminum cart going toward

5    drive-through window number two.

6         Q.   How do you explain that?

7         A.   By the fire originating at the floor.

8    That pattern is totally inconsistent with the fire

9    originating at the IQ Ion device.  The damage to the

10   fiberglassed, reinforced panel that shows a protected

11   pattern is totally inconsistent with the fire

12   originating at the IQ Ion panel -- and I call it

13   panel -- device or item.  The damage to the wheeled

14   aluminum cart is not consistent with the fire

15   originating at the IQ Ion item.

16        Q.   Going back for just a moment, what do you

17   consider -- when we're talking about the area of

18   origin, you say we are not talking about the point of

19   origin.  Is that correct?

20                   MS. DALY:  Objection.

21        Q.   (Mr. Wiggins)  Are we talking about two

22   different things, Mr. Lacy?

23        A.   It's -- in my mind the words are

24   synonymous.  There are a lot of people who will say a

25   big circle can be an area, a small circle can be a

1    point.  I -- I believe the fire originated at floor

2    level underneath the window.  If one wants to call

3    that the area, so be it.  If someone wants to call

4    that the point, so be it.

5              When I think of a differ --

6    differentiation between area of origin and point of

7    origin, I am thinking that if I identified the area

8    of origin as the back of the restaurant, the back

9    half of the restaurant, behind the cash registers,

10   more generalized than what I have testified to today

11   -- but when I'm talking about an area that is 22

12   inches wide and no more than 35 inches -- I'm sorry

13   -- 22 inches deep and no more than 35 inches wide.

14        Q.   Two by two by three?

15        A.   Roughly, yeah.  When -- when I'm talking

16   about that area -- I'm going to be honest with you.

17   You can call that an area of origin.  You can call

18   that a point of origin.  You're not going to get any

19   objection from me.

20             The fire did not originate up the wall.

21   The fire originated on the floor.  The fire spread

22   vertically exactly like I would have expected that

23   fire to spread.  It spread horizontally exactly like

24   that fire -- like I would have expected that fire to

25   spread.  It produced a protected pattern on the wall

1    where the IQ Ion device was located as the fire

2    pattern passed through that area headed to the

3    ceiling.

4         Q.   I understand that's what you've testified

5    to and that's what you've written in your reports.

6              Did you ever develop any kind of a

7    hypothesis that the Ion IQ device could or might have

8    been a heat source for ignition of this fire ---

9                   MS. DALY:   --- Objection.

10        Q.   (Mr. Wiggins)   --- Ignition -- initially

11   ---

12        A.   --- Maybe ---

13        Q.   --- At this point?

14                  MS. DALY:   Objection to the form of

15   the question.

16                  THE WITNESS:   Maybe for 90 seconds,

17   until I looked on the morning of the 26th, or maybe

18   the afternoon of the 26th.   Let's just say on the

19   26th -- briefly, until I saw that fire pattern and

20   said, okay, it didn't originate up there.

21             Now, understand, on the 26th I didn't know

22   about the IQ Ion.

23                  MR. WIGGINS:   I understand.

24                  THE WITNESS:   I didn't know what was

25   on the wall.   But I've got a black pattern -- let me

1  rephrase that.  I've got a black protected area on
2  the wall that is in the middle of a fire pattern
3  originating at floor level, rising to the ceiling.
4  And once it hits the ceiling it goes horizontal,
5  exactly like the way I would have expected it to do.
6          Then I see the damage to the wheeled
7  aluminum cart.  Then I see the fire patterns going
8  toward drive-through window number two.
9          On the afternoon of the 27th I realized
10 that the grout from the tile -- when I got down there
11 to take my sample, I realized that grout had taken a
12 lot of heat, and it was structurally unstable.  Now,
13 I don't want to mean -- when I say unstable, I don't
14 want to mean it's explosive.  But it wasn't worth
15 grout anymore.  Two foot away the grout's fine.  Two
16 foot behind me is fine.  Two foot to the left of me
17 is fine.
18         Understand, I'm on my knees looking at the
19 drive-through window, office wall to my right,
20 wheeled cabinet to my left.  And in this one area
21 I've got grout that is substantially fire damaged.
22              MR. WIGGINS:  Okay.
23              THE WITNESS:  Had the combustible
24 items on the metal shelf fallen to the floor during
25 the fire, I wouldn't have had this kind of damage, or

1    I would have had damage that was three foot by six

2    foot, not 22 inches by 35 inches.  But right here

3    I've got localized damage to the grout.

4                    I've got a pattern to the wheeled aluminum

5    cart right here.  I've got a fire pattern on the wall

6    below the drive-through window number one that starts

7    two, three inches off the floor and goes the entire

8    height of that room.  It originates below and passes

9    through.

10                   And when I say it, I mean the fire pattern

11   -- originates below and passes through the height of

12   the IQ Ion device and goes on to the ceiling.

13                   I look at the pattern on the wheeled

14   aluminum cart.  I look at the pattern on the wall

15   going toward drive-through window number two.  They

16   are no way, underlined, bold font, all caps, no way

17   consistent with a fire originating at IQ Ion.

18                   Then on Monday I have Mr. Martini examine

19   them.  Other than knowing that I'm back here in the

20   left rear corner near drive-through window number

21   two, I don't tell him anything more.  He look ---

22                   MR. WIGGINS:  --- Okay.

23                   THE WITNESS:  He looks at it and

24   says it's not involved in the fire.

25                   Somewhere along the way you asked me if I

1   should have called Mr. Cavaroc, Dr. -- yeah, John

2   Cavaroc.  I don't think so.  I think Henry Martini is

3   capable of examining the PC board, the wiring, and

4   the fluorescent fixtures.  And he and I have worked

5   fires where he has told me you got a problem here,

6   this caused the fire.

7              We do work for both property adjusters and

8   liability adjusters.  If he tells me it did not cause

9   the fire, I believe him.  If he tells me it did cause

10  the fire, I believe him.  If he tells me he doesn't

11  know, I believe him.  If I didn't believe him on any

12  one of those three items, I wouldn't use him.

13              MR. WIGGINS:  I understand.

14      Q.   (Mr. Wiggins)  When you left the PCB on

15  the shelf, as you've testified, did you tell Jimmy or

16  anyone else that you were leaving them there for any

17  purpose, you were leaving them in their custody?

18              MS. DALY:  Objection to the

19  characterization that you say he left on the shelf.

20              THE WITNESS:  No, sir.

21      Q.   (Mr. Wiggins)  When you went back there in

22  November of 2012, they were gone, weren't they?

23      A.   As was a whole lot of stuff in that

24  restaurant.

25      Q.   Okay.

1          A.    Not just PC boards and fluorescent light

2     fixtures, tables, cash registers, steel, stainless

3     steel tables, cooking appliances.  It was all gone.

4          Q.   All missing.  All missing.

5          A.    Gone.

6                    MS. DALY:  Let's take a break.

7                    MR. WIGGINS:  Sure.

8     (3:21-3:29 p.m. - recess)

9                    MR. WIGGINS:  Back on the record?

10                    THE WITNESS:  Yes, sir.

11          Q.   (Mr. Wiggins)  Mr. Lacy, I'm going to show

12     you what has been marked for identification as the

13     Plaintiff's Exhibit 46B and ask if you can flip

14     through that and identify that.

15          (Witness examined document)

16          A.    Yes, sir.  These are the photographs, 119

17     of them, that were attached to my report to Michael

18     Jezierski dated May 21st, 2012.

19          Q.   And what was the purpose of this report to

20     Michael Jezierski?

21          A.    It was requested by Scott Brown, and if he

22     identified a purpose, I don't know.  I have just done

23     this work long enough to know at some point in time

24     most of my clients want a -- want a report prepared

25     to summarize my investigation.

1        Q.   And you said, at your request, beginning

2   on January the 26, 2012, the fire scene examination

3   was conducted.

4             That's when you began your examination,

5   was it not?

6        A.   Yes, sir.

7        Q.   And it really wasn't Mike Jezierski who

8   did that.  It was someone else.

9             Mike Austin, I believe you said?

10       A.   Actually, Zak Gurley.

11       Q.   Zak Gurley.

12       A.   But in all honesty, sir, this is a -- this

13  is template language.  I don't type at your request

14  beginning on January 26, 2012.  That is pre-filled

15  in.

16            So if your is Nationwide's, it's okay.  If

17  it's Mr. Jezierski -- no, you're right.  It was

18  actually Zak Gurley.

19       Q.   Doesn't matter.

20       A.   And at the end of the day, it does not

21  matter to me.

22       Q.   It doesn't matter.  It doesn't matter to

23  me, either.

24       A.   Okay.  Okay.

25       Q.   Just thought it was kind of odd ---

1          A.    --- Well, I'll be honest with you, I

2     didn't realize it till just now.

3          Q.    And then contained in this report is a

4     background of your investigation, which is on the

5     second page of this letter -- report.

6          A.    Yes, sir.

7          Q.    And then you talk about the statements

8     given to you Sean Berry of Security Central about

9     Jimmy going to the restaurant and entering the wrong

10    access code and having to change -- get that changed.

11              Do you recall that?

12         A.    Yes, sir.

13         Q.    And then you talk about your conversations

14    with Zachary Scott Lapene, and said Mr. Lapene had

15    heard certain things about payroll checks that were

16    bouncing and the natural gas services being

17    terminated recently.

18              Do you recall that?

19         A.    Yes, sir.

20         Q.    And then the next page is Ms. Moon had

21    said she paid in cash to other employees, and that

22    they were currently owed two weeks salary.

23              You talk about a dumpster was removed

24    several months ago because Mr. Diamatopoulos not

25    being paid the bill.  And electrical service had been

1    in arrears for several months totalling $3,000.  Mrs.

2    Brown's had a lot of trouble cashing payroll checks.

3              All of this was information that was not

4    germane to your determination of the cause and origin

5    of this fire, was it?

6                   MS. DALY:  Objection to form.

7                   THE WITNESS:  No, sir.  They were

8    statements that just came up during my interviews of

9    these employees.

10        Q.   (Mr. Wiggins)  It had nothing to do with

11   your cause and origin ---

12        A.   --- I mean, it's not ---

13                  MS. DALY:  --- Objection to form.

14                  THE WITNESS:  It's not evidence of

15   the origin and cause of the fire, no.

16        Q.   (Mr. Wiggins)  And you did not consider it

17   to be such ---

18        A.   --- No, sir.

19        Q.   --- Did you?

20        A.   No, sir.

21                  MS. DALY:  Objection to form.

22        Q.   (Mr. Wiggins)  And it would have been

23   improper under 921 to make that determination?

24                  MS. DALY:  Objection to form.

25        Q.   (Mr. Wiggins)  That is, to make a

1    determination of cause and origin based upon hearsay

2    statements from other persons about someone's

3    financial ---

4         A.    --- Correct.

5         Q.    --- Condition.

6         A.    As soon as you said financial, I -- I

7    agree with you.  I just wanted to hear what -- but

8    no, you're right.

9         Q.    Okay.

10        A.    I'm looking at physical evidence, fire

11   evidence.

12        Q.    Exactly.

13              And in the next page you state that -- you

14   go on to say some other examples of that same thing

15   and the PWC matter.

16              And then you go on to talk about the

17   Fayetteville Fire Department having been called and

18   what they found.

19              And you said Firefighters Handford and

20   Hagan saw ceiling tiles falling near the drive-thru

21   window and were able to extinguish a fire burning on

22   the floor near the drive-thru window with minimal

23   water.

24              Jones stated that the owner arrived at the

25   scene early in the fire.

1                    Do you recall that?

2          A.    Yes, sir.

3          Q.    And that was part of the report that you

4    made on the -- in May -- well, in May 21, 2012.

5                    And then you said after the subsequent

6    investigation and conversation with Mr. Martini,

7    Royal identified the fire as incendiary in nature.

8                    That was based upon his conversation with

9    you that Mr. Martini had ruled out all electrical

10   sources and appliances as a source of this -- as an

11   incendiary source of this fire?  Is that correct?

12                         MS. DALY:  Objection to form.

13                         THE WITNESS:  Ruled out all ---

14                         MR. WIGGINS:  --- Electrical ---

15                         THE WITNESS:  --- As an incendiary

16   source?

17                         THE WIGGINS:  At -- well, all -- I'm

18   sorry.

19                    All electrical appliances and/or equipment

20   that could have been a cause of this fire.

21                         THE WITNESS:  Mr. Martini did

22   eliminate all of that, yes.

23         Q.    (Mr. Wiggins)  He told that -- you then

24   told that to Special Agent Royal, did you not?

25         A.    To be honest with you, I don't know if I

1   told him or if Special Agent Mart -- I mean, if Mr.

2   Martini -- or if all three of us were standing there

3   and had a conversation -- either Martini or Lacy

4   related to Royal.

5         Q.   And based upon that, you're now aware that

6   Agent Royal then changed his classification of this

7   fire from undetermined to incendiary?

8         A.   Yes, sir.

9         Q.   And you go on to say that -- stated the

10  fire scene -- you talk about the fire scene

11  examination was conducted, utilizing recognized and

12  accepted procedures and practice for fire

13  investigation as outlined in 2011 edition of NFPA.

14  We talked about that.

15         And I -- I've shown you some of the guides

16  for fire and explosion investigation from 921, have I

17  not?

18       A.   Yes, sir.

19       Q.   And we've talked about that.

20       A.   Yes, sir.

21       Q.   And then you talk about the study that you

22  made, and that -- on the next page, that is, page

23  five -- you talk about alterations did not impact --

24  that is, Royal's rearrangement of the fire scene did

25  not impact your investigation.

1          And that would be a true statement, would

2     it not?

3          A.    Hang on a minute.

4          Q.    You see where I'm talking about?

5          A.    All right, now, I'm looking at page eight.

6          Q.    I'm sorry, page eight.  I'm sorry.

7          A.    Okay.  No, I just wanted to be with you

8     all -- you said page five.

9          Q.    I'm sorry.

10         A.    Yeah, page eight, third paragraph.  The

11    alterations did not impact my ability to form an

12    opinion as to the origin and cause of the fire.

13         Q.    Correct.  And then you say in the last

14    paragraph, the right -- the rear drive-thru window

15    was not in active use, thus no electrical appliances

16    were located in that area.  No electrical, mechanical

17    or otherwise heat-producing equipment was located in

18    that area.

19              You now know, you did not know then, that

20    there was electrical equipment that -- that there was

21    heat-producing equipment in that area?

22         A.    Yes, sir.

23         Q.    And you then say Special Agent Royal moved

24    a lot of the debris from that area near the rear

25    drive-thru window.  Examination of debris, again,

1    revealed no evidence of value.

2              And although you then knew that he had

3    removed the circuit board from that area, you

4    determined that that did not reveal any evidence of

5    value?

6         A.   The -- I mentioned to you earlier today,

7    he moved the debris from in front of the drive-thru

8    window to over almost in front of the wheeled

9    aluminum cart.  I went through the debris on the

10   floor.

11        Q.   You never saw it ---

12             MS. DALY:  --- Let him finish

13   answering his question.

14                  THE WITNESS:  I went through ---

15                  MS. DALY:  --- The first question.

16                  THE WITNESS:  --- The debris on the

17   floor.  There was no -- there was nothing of any

18   value remaining in the debris on the floor.

19             The printed circuit boards had already

20   been moved to the table.

21        Q.   (Mr. Wiggins)  As you first saw it?

22        A.   Yeah, as we discussed.

23        Q.   Okay.

24        A.   But there was nothing left on the floor of

25   any value.

Page 210

1          Q.   And that's what you meant by this

2     statement?

3          A.   Yes, sir.

4          Q.   And then you say examination of the area

5     under the rear drive-thru window revealed no evidence

6     of an ignition source.

7               That was a statement that you also made?

8          A.   Correct.

9          Q.   And you made that statement not knowing at

10    the time that the printed circuit board was located

11    in the area where you subsequently learned that it

12    was placed?

13                    MS. DALY:  Objection to the form of

14    the question.

15                    THE WITNESS:  Correct.

16         Q.   (Mr. Wiggins)  And then in the last page,

17    page 10, the ignition source of the fire is an

18    unidentified open flame device that is based on the

19    following facts.

20               Exclusion of electrical, mechanical and

21    otherwise heat-producing equipment in the area of the

22    origin of the fire.

23               And number two, an open-flame device is

24    the only competent ignition source available to

25    complete the ignition sequence for this fire.

1          That was your conclusions, I take it, Mr.

2    Lacy?

3          A.    Yes, sir.

4          Q.    And let me ask you about that.

5                The ignition source is unknown.  The open

6    -- you say an open flame, but you don't know what the

7    ignition source was when you say an open flame, do

8    you?

9                      MS. DALY:  Objection to form.

10                     THE WITNESS:  I am -- when I say an

11   unidentified open flame device, I am referring to the

12   flame from a cigarette lighter, the flame from a

13   struck match, the flame from an appliance that we

14   could use to light a charcoal grill.  I'm talking

15   about the flame produced by a lit plumber's torch.

16   An open flame.

17         Q.    (Mr. Wiggins)  Did you find any evidence

18   of any of those devices at the scene?

19         A.    No, sir.

20         Q.    And you made the determination of an open

21   source fire without finding any such device at the

22   scene?

23         A.    Correct.

24         Q.    And then you say an open flame device is

25   the only competent ignition source available.

```
 1              And that means that you had excluded at
 2   that point any known electrical devices in the area,
 3   including all of the things we've talked about here
 4   today.  The fluorescent light -- lights in the
 5   restaurant, the printed circuit board, the electrical
 6   outlets in that area, all of those things had been
 7   eliminated by Mr. Martini?
 8         A.   Yes, sir.
 9         Q.   And that's what you base your decision
10   upon.  Is that correct?
11         A.   Yes, sir.
12         Q.   And would this have been based upon what
13   is known as the process of elimination of causes of
14   fires?
15                   MS. DALY:  Objection to form.
16                   THE WITNESS:  A portion of it is,
17   yes.
18         Q.   (Mr. Wiggins)  Okay, and is that also
19   known as the negative corpus theory?
20         A.   Negative corpus and process of elimination
21   are two different things.
22         Q.   Okay, tell me about that.
23         A.   Negative corpus is -- the best example --
24   well, an example of negative corpus is you have a
25   vacant house that no one's living in.  There's no
```

1    electrical service, and it has no gas service, no

2    fuel oil service and it catches on fire.  And an

3    investigator says it has to be intentionally set.

4              He doesn't know where it originated, other

5    than within the four exterior walls, above the floor

6    and below the ceiling.  But because there's no

7    electrical, no mechanical, none of this, none of

8    that, it's got to be incendiary.

9              Process of elimination where you have a

10   well-defined area of origin, and in my mind, at 22

11   inches deep and 35 inches wide, at floor level, I

12   have a well-defined area of origin.  I don't have --

13   I don't have a competent ignition source within that

14   well-defined area of origin.

15             Beyond that evidence, I have the movement

16   of a wheeled aluminum storage rack from near the --

17   what we've been calling drive-thru window number two.

18   I don't say it in here, but the conversation you and

19   I have had, moving it from drive-thru window number

20   two near -- closer to drive-thru window number one --

21   after four a.m. on January 24th and before

22   approximately 8:40 a.m. on January 24th.

23        Q.   How do you know it was not moved by fire

24   fighters who had entered the restaurant?

25        A.   Because the fire patterns on the side tell

1   me that it was in the location that I first observed

2   it in at the time of the fire.

3        Q.   And you can ---

4        A.   --- May I continue with ---

5        Q.   --- Oh, I'm sorry.

6        A.   --- With my answer?

7        Q.   I'm sorry.  Go ahead.

8        A.   I also have evidence that Mr. -- or Jimmy,

9   Mr. D., however you want to -- whatever you want to

10  call him, the owner -- entered the restaurant at

11  8:15, received a phone call from the alarm company at

12  8:17, and depending upon what sequence of events you

13  utilize, left the restaurant between 8:25 and 8:35.

14            We have a fire reported at 8:41.  I

15  observed flames venting out the window of drive -- of

16  drive-thru -- out of the glass of the window of

17  drive-thru number one at 8:43.  We have Mr. -- we

18  have Jimmy passing in front of Walmart and we've got

19  firefighter -- at 8:45 -- and we got fire fighters

20  arriving at 8:46.

21            Utilizing all of that evidence as part of

22  process of elimination, and 921 allows it, I

23  determined the fire is incendiary.

24       Q.   You talk about 941.  Are you talking

25  941.18?

1          A.    I'm talking about 841, not 940 ---

2          Q.    --- 921.

3          A.    Oh, 921.

4          Q.    921, 86.5.  Is that what you're talking

5    about?

6          A.    8.6.5?

7          Q.    18.6.5.

8          A.    Uh-huh.  Okay, 18, yes, sir.

9          Q.    And this talks about the inappropriate use

10   of the process of elimination.

11                Do you see that?

12         A.    Yes, sir.

13         Q.    And that's what you emphasized in your

14   response in your expert report made in 2013, June of

15   2013?

16         A.    Yes, sir.

17         Q.    And you say that ---

18         A.    --- Excuse me.  Oh, expert -- yes, sir.

19   Yes, sir.

20         Q.    And this says the process of determining

21   the ignition source for a fire by eliminating all

22   ignition sources known -- found, known or believed to

23   have been present in the area of origin, and then

24   claiming such methology is proof of an ignition

25   source for which there is no evidence of its

1   existence, is referred to by some investigators as

2   negative corpus.

3            Negative corpus has typically been used in

4   classifying fires as incendiary, although the process

5   has also been used to characterize fires --

6   classified as accidental.

7            This process is not consistent with a

8   scientific method, is inappropriate, and should not

9   be used because it generates an un-testable

10  hypotheses and may result in incorrect determinations

11  of the ignition source and first fuel ignited.

12           Any hypothesis formulated by the casual

13  factors -- that is fuels -- first fuel, ignition

14  source, ignition sequence, must be based on facts.

15  These facts are derived from evidence, observations,

16  calculations, experiments, and the law of science.

17  Speculative information cannot be included in the

18  analysis.

19           Do you agree with that statement there?

20  Is that what you -- do you adhere to that?

21       A.   Okay, beginning with the process of

22  determining the ignition source and going through the

23  phrase first fuel ignited, that deals with negative

24  corpus.

25       Q.   Okay.

1        A.    Beginning at any hypothesis formulated for

2    the causal factors must be based on facts, that is

3    process of elimination.

4             Process of elimination is allowed,

5    negative corpus is not.

6        Q.    Okay.

7        A.    There is a difference between the two.

8        Q.    Some investigators use it synonymously, do

9    they not?

10                 MS. DALY:  Objection.

11       Q.    (Mr. Wiggins)  You know that, don't you,

12   Mr. Lacy?

13                 MS. DALY:  Objection.

14       Q.    (Mr. Wiggins)  That some use it

15   interchangeably.

16       A.    Yes.

17       Q.    And it's often used interchangeably by

18   fire investigators?

19       A.    Incorrectly.

20       Q.    Incorrectly.  But you make a

21   differentiation between the two.

22       A.    Yes, sir.

23       Q.    And this section prohibits, as you've

24   suggested, a negative corpus theory for developing

25   the period for the -- for the fire -- or the cause

1   and origin of a fire.

2            A.    Yes, sir.

3            Q.    And it does not, in your cal -- in your

4   estimation, prevent process of elimination?

5            A.    Correct.

6            Q.    And what do we mean by -- what do you mean

7   by process of elimination?

8            A.    In -- in all honesty, sir, it's probably

9   not the best title, but it's what the industry has

10  established.

11               When an investigator looks at a vacant

12  house fire that does not have electrical service and

13  says incendiary, that's negative corpus.  He's not

14  examined the electrical components.

15               When an investigator or an engineer does

16  in fact examine electrical components and has a

17  well-defined area of origin and has facts that

18  support an incendiary fire, all of which supported an

19  incendiary fire -- not just one of those items -- all

20  of which support an incendiary fire, you may -- I

21  mean, that's process of elimination.  You've got to

22  start with a well-defined area of origin.

23               If I did not have information that the

24  wheeled aluminum cart had been moved, if I did not

25  have information that Jimmy had left the restaurant

1    immediately -- well, not immediately, but in the

2    minutes preceding the fire -- discovery of the fire

3    -- I may have done something different.

4              But the bottom line, sir, is that evidence

5    -- evidence was presented to me by a -- with a

6    competent source, independent source, and I felt and

7    still feel to this day that it -- it supported an

8    incendiary fire cause.

9         Q.   We've established that you did not know

10   what the ignition source of this fire was beyond

11   speculation.

12                  MS. DALY:  Objection.

13   Mischaracterization of his testimony.

14        Q.   (Mr. Wiggins)  You said open flame.

15              You don't know what kind of an open flame

16   it was.

17        A.   No, sir.

18        Q.   And you do not know -- what was the first

19   fuel ignited in this fire?

20        A.   Probably the shrink wrap, or plastic

21   wrapping around the cellophane -- cellophane --

22   around the urethane products.

23        Q.   Okay, and the only evidence you have with

24   their location is on or about the top shelf as given

25   to you by Mrs. Moon?

 1                    MS. DALY:  Objection to form.

 2                    THE WITNESS:  Mrs. Moon never said

 3    top shelf.  She just said they were stored on that

 4    shelving.

 5         Q.   (Mr. Wiggins)  Do you have any evidence or

 6    did you develop any evidence that there were in any

 7    other place at any time during ---

 8         A.   --- It would have ---

 9         Q.   --- The investigation.

10         A.   It would have been awfully easy to move

11    them from a top shelf to the floor.

12         Q.   I know it would have been easy to have

13    moved them, Mr. Lacy, but I'm asking you do you have

14    any evidence that it was moved.

15         A.   No, sir.

16         Q.   And then 18 -- look at 18.6.5.1, and it

17    says cause undetermined.

18              In the circumstance where all hypothesized

19    fire causes have been eliminated -- and that's where

20    we talked about, process of elimination ---

21         A.   --- Okay.

22         Q.   --- And the investigator is left with no

23    hypothesis that is -- that is evidenced by the facts

24    of his investigation, the only choice for the

25    investigator is to opine that the fire cause, or

1    specific casual factors -- causal factors, remains

2    undetermined.  It is improper to base hypotheses on

3    the absence of any supporting evidence.

4                Do you agree with that statement?

5         A.   Yes, sir.

6         Q.   That is, it is improper to opine a

7    specific ignition source that has no evidence to

8    support it even though all other hypothesized sources

9    were eliminated.

10               Do you agree with that statement?

11        A.   I agree with the statement as its

12   contained in 921.  It's not applicable to this

13   investigation.

14        Q.   Okay, why is not applicable to this

15   investigation?

16        A.   Go back up to the first sentence of

17   18.6.5.1.

18               In the circumstances where all

19   hypothesized fire causes have been eliminated and the

20   investigator is left with no hypothesis that is

21   evidenced by the facts of the investigation.

22        Q.   Okay.

23        A.   I've got evidence, facts of investigation,

24   that indicate the fire is incendiary and not

25   accidental, not undetermined, not natural.  Four fire

1   causes.  Incendiary, accidental, undetermined,

2   natural.

3              I've got facts of the investigation that

4   indicate the fire is incendiary.

5        Q.   Is not what you're saying, Mr. Lacy,

6   trying to prove a negative?

7              That is, a lay investigator could say I'm

8   going to rule out everything else except incendiary,

9   call the fire incendiary, and say prove me wrong?

10       A.   No, sir.

11       Q.   That couldn't happen?

12       A.   Not in this case.  I'm not going to say it

13  can't happen.  I'm saying it's not happening in this

14  case.

15       Q.   I understand you're saying it's not

16  happening in this case.

17             But I'm just saying that when you use the

18  process of elimination or a negative corpus, whatever

19  you want to call it, you're winding up by saying, you

20  know, we can't determine the cause of this fire, so

21  therefore, we're saying it's incendiary, prove me

22  wrong.

23             Doesn't that happen?

24                  MS. DALY:  Objection.

25                  THE WITNESS:  I don't know.  It

1    didn't happen here.  That is not the case here, sir.

2         Q.   (Mr. Wiggins)  And you're saying the fact

3    that you're relying upon is the timing factor of

4    Jimmy being in the restaurant, the timing factor of

5    flames being seen in and near the restaurant at 8:41

6    a.m., and the fact that the cart was moved from a

7    point where Mrs. Moon said it was, at or near

8    drive-thru window number two, nearer to drive-in

9    window number one.

10             Is that what you're saying?

11        A.   Yes, sir.

12        Q.   What is the significance, Mr. Lacy, of

13   having moved -- or the cart being moved from window

14   number one down near window number two?

15        A.   To obstruct the visibility of -- of the

16   fire from the exterior of the restaurant.

17             The wind -- when you moved the cart where

18   it was moved, it obstructed, or blocked may be a

19   better word, vision through drive-in window number

20   two.

21             And if you stood on McPherson Church Road

22   or in the front of the restaurant in a straight line

23   from drive-in window number one to McPherson Church

24   Road, it -- it blocked that vision.  Fire could be

25   set on the floor.

 1              Remember the side of the cart is damaged,

 2    not the front.  So it's set underneath the window,

 3    but the window is partially blocked by the wheeled

 4    aluminum cart, the window being that of drive-in

 5    window number one.

 6              And then -- and I went in the restaurant

 7    and stood -- and when I draw a -- basically a

 8    diagonal line from the left rear toward the right

 9    front, when I get in that diagonal line, I can't see

10    the origin of the fire because of the cart.

11              If the cart is moved back up to where it

12    is closer to drive-in window number two, you could

13    see the area of origin.

14         Q.    Is it your testimony you could have seen

15    into the -- into the window from McPherson Church

16    Road back to the location of this window number one

17    in the daytime and have seen someone in the

18    restaurant?

19              Is that what you're saying?

20         A.    Well, the way I -- I didn't go outside and

21    look through.

22         Q.    Okay.

23         A.    I -- where I -- I stood in the restaurant

24    and realized, even in the restaurant, you couldn't

25    see the origin on the floor underneath drive-in

1    number -- drive-thru window number one.

2            Q.    Okay.

3            A.    So if you can't ---

4            Q.    --- Going back ---

5            A.    --- If you can't see it from inside the

6    restaurant, you're not going to be able to see it

7    from outside.

8            Q.    So your theory is that it would have been

9    -- have blocked and provided refuge for someone

10   trying to set a fire in the restaurant?

11           A.    First, I agree with the first part of your

12   statement.  I don't agree with the second part.

13                 I agree that it was moved to block the

14   visibility, not so much of a person but of

15   development of the fire.

16           Q.    Okay.

17           A.    Development and spread of the fire.

18           Q.    Did it ever -- did you ever wonder or

19   think about the fact that this fire occurred in or

20   about 20 minutes till nine o'clock in the morning at

21   the intersection of McPherson Church Road, Skibo

22   Road, which had traffic on those two roads, which

23   were the busiest of the day -- and those are the two

24   busiest roads in Fayetteville -- why someone would

25   set fire to a restaurant at that time of the day

 1   rather than in the middle of the night?

 2                    MS. DALY:  Objection to form.

 3                    THE WITNESS:  I've -- I've been

 4   investigating fires approximately 35 years, and I

 5   have been involved with the pro -- profiling of fire

 6   setters.  And one of the things that I learned

 7   through that is, yes, there are some distinct

 8   characteristics that you can profile.  But there's

 9   always kind of that wild hair that happens and you

10   can't explain it.

11                    But in answer -- to answer your question,

12   it is an odd time of day.  Other than what I observed

13   on January 26 and 27 and January 30 -- I mean, I

14   don't know that that's the busiest intersection in

15   Fayetteville, but it is a -- two busy roads.

16                    MR. WIGGINS:  And ---

17                    THE WITNESS:  --- But let me add

18   this, and this -- this came to my mind.  I'm not

19   trying to cut you off.  It just popped in my mind.

20                    That is more justification for moving

21   something to block vision because you've got two busy

22   roads.

23                    If you -- if you've got two country roads

24   and you're not worried about somebody driving down

25   there or sitting at intersections waiting for lights

1    to turn green, you don't need to move a cart to block

2    it.  But if you do have that, you do need to move a

3    cart to block it

4          Q.   (Mr. Wiggins)  Did you find, Mr. Lacy, any

5    incendiary fire indicators in this restaurant when

6    you did your investigation?

7                    MS. DALY:  Objection to form.

8                    THE WITNESS:  Well, certainly the

9    owner leaving the property in a period of a few

10   minutes before discovery of the fire is an indicator

11   of an incendiary fire.

12                The movement -- and typically textbooks

13   say structural component, but the movement of the

14   wheeled aluminum cart would be an indicator of an

15   incendiary fire.  Those are the two that I considered

16   in my investigation towards -- that resulted in the

17   identification of an incendiary fire.

18                There are multiple other indicators of an

19   incendiary fire that I did not use in hypothesizing

20   that the fire was incendiary.  But those are the two

21   that I used.

22         Q.   (Mr. Wiggins)  That comes to your mind

23   now?

24         A.   Yes.  Well, it came to my mind in January.

25   Not now, but in January.

1        Q.   Did you ever know how many -- or did you

2   determine from Mrs. Moon or from Jimmy the number of

3   these styrofoam shelves, plastic cups, and -- and

4   plates were on that -- on those shelves -- on that

5   drying shelf?

6        A.   Okay, please re -- please restate the

7   question.

8        Q.   Did you ever determine from Mrs. Moon or

9   from Jimmy, or any other source, for that matter, the

10  number of styrofoam plates, the number of plastic

11  cups and/or plates and/or plastic utensils that were

12  on that drying shelf?

13       A.   No, sir.

14       Q.   Let me just show you very quickly -- I'm

15  not going to spend much time with this, and we'll be

16  through pretty quickly here -- what I will call

17  Exhibit Number 124, and ask you if you can identify

18  this document.

19            (* Exhibit 124 was marked *)

20       (Witness examined document)

21       A.   Yes, sir.  This is my report dated June

22  28, 2013.

23       Q.   And did you attach photographs to this

24  report to Ms. Daly, dated June 28, 2013?

25       A.   Not -- I didn't do a photo log like I did

1    with the May 2012 report.

2              What I did is refer to photo numbers in

3    opinions three and six.  And those -- these photo

4    numbers are on the CDs that you received this

5    morning, and I think they're under a file labeled

6    Lacy Photo report two -- I mean, Lacy report two,

7    number two, photos.

8         Q.   Okay.

9         A.   And all of these digital images that you

10   see, like on page five and on page four, you see

11   where I've listed digital images?

12        Q.   Okay.  Yeah.

13        A.   They're in a specific folder on one of

14   those CDs that you were given this morning.

15        Q.   Okay.

16        A.   I did not do a separate photo log.

17             Many of these same photos are in my May

18   2012 report, but they're detailed here.

19             And there are two additional photos under

20   item number 15 -- opinion 15 on page seven.

21        Q.   Did you include a copy -- a photo of the

22   circuit board that was located by you or Mr. Martini

23   on the shelf that you said -- where it was placed?

24        A.   No, sir, because Mr. Martini included a

25   photograph of that in his May 2012 report, so I

 1    didn't go back and duplicate it.

 2         Q.    Is essentially the only difference between

 3    this report to Mrs. Daly, which is, again, dated June

 4    28, 2013, and the one dated May 2012, is the

 5    inclusion of the information concerning the base

 6    station -- Ion IQ base station for the restaurant

 7    drive-thru communication system?

 8                         MS. DALY:  Objection to form.

 9                         THE WITNESS:  Okay.  All right,

10    pages one, two and three and the top paragraph on

11    page four are somewhat identical to my May 2012

12    report.  I don't identify opinions as -- in the May

13    2012 report as I do in this report.

14         Q.    (Mr. Wiggins)  This is more extensive?  Is

15    that what you're saying?

16         A.    Yes.  And then, beginning on page eight it

17    talks about information reviewed and considered, and

18    interviews conducted, depositions reviewed, previous

19    depositions.  Then compensation, qualifications,

20    exhibits, all of that -- I mean, none of that is

21    included in the May 2012 report but is included in

22    this report.

23         Q.    And on paragraph 15 -- you see that?

24         A.    I'm flipping back there.  One second.

25         (Witness examined document)

1          A.    Yes, sir.

2          Q.    And it says any video recording equipment

3     on a shelf in the office was still in that location

4     on January 30th, 2012.

5                That was not in your original report, was

6     it?  That's added to this report?

7          A.    Yes, sir.

8          Q.    And that's because you became aware of

9     that existence during -- between the time you

10    completed your investigation and the time you wrote

11    this report?

12         A.    Well, item number ---

13                    MS. DALY:  --- Objection to the

14    form.

15                    THE WITNESS:  Item number 15 is in

16    there because I read in Mr. -- I mean, in Jimmy's --

17    in one of the transcripts -- but right now, off the

18    top of my head, I don't remember if it was EUO or

19    deposition -- that he saw me remove it from the

20    building on January 26, and I didn't.

21         Q.    (Mr. Wiggins)  But that's -- what I'm

22    saying, that's new.

23         A.    Yes, sir.

24         Q.    And then -- and then I see that you had

25    added the information about the Ion IQ in this report

1   in some detail which was not mentioned in the earlier

2   report.

3          A.   Correct.

4          Q.   Other than that, the reports that you

5   filed are essentially the same and you had made the

6   same arguments about the cause and origin of the fire

7   supported in this report as you did the first report?

8          A.   Yes, sir.

9          Q.   One more thing I want to talk about ---

10         A.   --- Okay, that's fine.

11         Q.   --- And we'll be finished up here.

12              I show you what I'm going to mark as --

13   and I only have one of these, so I'm going to have to

14   -- this has already been introduced as an exhibit --

15   it's Langham & Associates report -- expert -- federal

16   report to Mr. Lacy.

17              Have you he read that report?

18         A.   Who authored it?

19         Q.   The author of this was Steven Booth.

20         A.   Yes, sir.

21         Q.   Let me show it to you, and I have not --

22   I'm sorry.

23         A.   That's all right.

24         Q.   Have not put the attachments to that

25   because the only thing basically it was was the Ion

1      -- all the information about the Ion IQ system.

2           A.   Okay.

3           Q.   And very quickly, look at page one of this

4      report, in summary of cause and origin, did you read

5      that?

6           A.   Okay, I'm looking at that.  I'm seeing

7      that as numbered page two.

8           Q.   Page two is correct.

9           A.   Okay.

10          Q.   And ---

11          A.   --- I see the paragraph.

12          Q.   Right.  Summary of cause and origin, and

13     the -- would you read that paragraph and see whether

14     you disagree or agree with that.

15          A.   You want me to read it out loud?

16          Q.   No, you can just read it to yourself.

17          (Witness examined document)

18          A.   Okay, I've read it.

19          Q.   Do you agree or disagree with anything

20     that Mr. Lacy has stated in that paragraph?

21                    MS. DALY:  Objection to the form.

22                    THE WITNESS:  I don't believe Mr.

23     Lacy stated anything in the ---

24                    MR. WIGGINS:  --- I'm sorry.

25                    THE WITNESS:  --- Paragraph.

1                         MR. WIGGINS:  I'm sorry.  It's

2    getting late in the afternoon.  Excuse me.

3                         THE WITNESS:  It's all right.

4                         MR. WIGGINS:  Mr. Booth....

5                         MS. DALY:  Do you want him to go

6    sentence by sentence and tell you whether or not he

7    agrees or disagrees?

8                         MR. WIGGINS:  Well, if -- if he can

9    just tell me whatever it is he can testify ---

10                        THE WITNESS:  --- Mr. Booth opines

11   that the cause would be undetermined.  I opined that

12   the cause would be incendiary.

13       Q.   (Mr. Wiggins)  And that's two different

14   things, and he ---

15       A.   --- Well, I mean, that's the lump sum.  In

16   other words ---

17       Q.   --- That's the bottom line?

18       A.   Yeah.  I mean, there's one or two things

19   in the middle that I may not agree with, but it all

20   leads to he's undetermined, I'm incendiary.

21       Q.   And the point of all of this, Mr. Lacy, is

22   that reasonable minds will reach different

23   conclusions.  Is that not correct?

24                        MS. DALY:  Objection.

25                        THE WITNESS:  After reviewing Mr.

1    Booth's deposition -- and I think he was deposed last

2    Friday, and I -- and I looked at his deposition on --

3    his transcript on Monday.

4              I don't know if Mr. Booth knew everything

5    on May 30th that he knew on August 16th, two and half

6    months in there, so I'm -- I'm not going to say that

7    two reasonably minded individuals can reach separate

8    opinions.  Where I'm going to be -- go more specific

9    is a person who knows less information than another

10   might read -- might reach a different opinion.

11        Q.   (Mr. Wiggins)  He's basing his conclusions

12   on the fact that he did not have an opportunity, nor

13   did any investigator on behalf of the property -- the

14   -- Jimmy Diamatopoulos, to examine the Ion IQ system.

15        A.   Okay.

16        Q.   And therefore, he cannot rule that out as

17   a possible source.

18              Do you understand that?

19        A.   Yes, sir.  But I believe in his transcript

20   from last Friday's deposition, he does talk about two

21   possible hypotheses, one of which is incendiary, one

22   of which is accidental involving the IQ Ion.

23              And as the time frame between Mr. --

24   between Jimmy's departure from the building lessens

25   with the discovery of the fire, it is a greater

1    likelihood that Mr. -- that Jimmy set the fire or was

2    in the building when the fire was set as opposed to

3    the fire being accidental.

4              He doesn't say anything in here about

5    that, because I don't know that Steve knew all of the

6    time frame information on May 30th that he knew on

7    July 16th.

8         Q.   But assume that he did know the time frame

9    information, Mr. Lacy, at the time that he gave his

10   deposition, there would still be a difference between

11   his opinion and your opinion, would there not?

12        A.   Yes.

13        Q.   And I know, as you have seen from his

14   deposition, that Mr. -- that Mr. Booth respects your

15   opinion, and likewise, I take it, you respect his

16   opinion?

17              MS. DALY:  Objection to the form.

18              THE WITNESS:  Yes.

19        Q.   (Mr. Wiggins)  Is there any other factors

20   other than -- any other factors, Mr. Lacy, other than

21   what we've discussed in your report, that you're

22   going to testify to upon the trial on this matter to

23   the jury that influenced your opinion that this fire

24   was incendiary in nature?

25        A.   That's not listed in this report?

1        Q.    Not -- right, that's not listed in that

2   report.

3        A.    No, sir.

4                  MS. DALY:  Objection to form.

5                  MR. WIGGINS:  I think that's all I

6   have.

7                  MS. DALY:  Thank you.

8           I don't have any questions.

9                  THE WITNESS:  Did you say you do or

10  don't?

11                 MS. DALY:  I don't.

12                 THE WITNESS:  Okay.

13                 MR. WIGGINS:  I think I'm tired.

14       WHEREUPON,

15     at 4:19 o'clock p.m. the deposition was adjourned.

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF TRANSCRIPT

2              I, Cassandra J. Stiles, Notary Public in

3      and for the County of Forsyth, State of North

4      Carolina at Large, do hereby certify that there

5      appeared before me the foregoing witness;

6              That the testimony was duly recorded by

7      me, reduced to typewriting by me or under my

8      supervision and the foregoing consecutively numbered

9      pages are a complete and accurate record of the

10     testimony given at said time by said witness;

11             That the undersigned is not of kin nor

12     associated with any of the parties to said cause of

13     action, nor any counsel thereto, and that I am not

14     interested in the event(s) thereof.

15             IN WITNESS WHEREOF, I have hereunto set my

16     hand this the 31st day of August, 2013.

17                         Cassandra J. Stiles, CVR

18                         Certified Court Reporter

19                         Atlantic Professional Reporters

20                         Post Office Box 11672

21                         Winston-Salem, NC 27116-1672

22

23

24

25

```
 1                  CERTIFICATE OF OATH

 2             I, Cassandra J. Stiles, Notary Public in

 3   and for the County of Forsyth, State of North

 4   Carolina at Large, do hereby certify that there

 5   appeared before me the foregoing witness;

 6             That the witness personally appeared

 7   before me at the date, time and location hereon

 8   captioned and was personally sworn by me prior to the

 9   commencement of the proceeding in the matter hereon

10   captioned.

11             IN WITNESS WHEREOF, I have hereunto set my

12   hand this the 31st day of August, 2013.

13                            Cassandra J. Stiles, CVR

14                            Certified Court Reporter

15                            Atlantic Professional Reporters

16                            Post Office Box 11672

17                            Winston-Salem, NC 27116-1672

18

19

20

21

22

23

24

25
```

1                         WITNESS CERTIFICATION

2           I, HUNTER B. LACY, CFI, hereby certify:

3           That I have read and examined the contents of

4     the foregoing testimony as given by me at the time

5     and place hereon indicated, and;

6           That to the best of my knowledge and belief,

7     the foregoing pages are a complete and accurate

8     record of all the testimony given by me at said time,

9     except as noted on the Attachment A hereto.

10    I have ____ have not ____

11    made changes/corrections _____

12                                    Hunter B. Lacy, CFI

13           I,_____, Notary Public for the

14    County of _____, State of _____,

15    hereby certify:

16           That the herein-above named appeared before me

17    this the _____ day of _____, 19_____, and;

18           That I personally witnessed the execution of

19    this document for the intents and purposes as herein-

20    above described.

21                         _____

22                                    Notary Public

23    My Commission Expires:

24    _____            (SEAL)

25

1                          ADDENDUM A

2          Upon reading and examining my testimony as

3     herein transcribed, I make the following additions,

4     changes and/or corrections, with the accompanying and

5     corresponding reason(s) for the same:

6

7     Page    Line              Is Amended to Read

8     _____|_____|_____

9     _____|_____|_____

10    _____|_____|_____

11    _____|_____|_____

12    _____|_____|_____

13    _____|_____|_____

14    _____|_____|_____

15    _____|_____|_____

16    _____|_____|_____

17    _____|_____|_____

18    _____|_____|_____

19    _____|_____|_____

20    _____|_____|_____

21

22                     _____

23                          Stephen Edward Stone

24

25

Page 242

```
 1                    CERTIFICATE OF MAILING

 2        I, Cassandra J. Stiles, CVR, do hereby certify

 3   that a true copy of the transcription of the matter

 4   hereon captioned was served on the party named below

 5   by the placement of said transcript copy in the

 6   United States Mail, Priority Mail delivery, with

 7   proper postage affixed, addressed as follows:

 8

 9

10        Hunter B. Lacy, CFI

11        c/o Gemma L. Saluta, Esq.

12        One West Fourth Street

13        Winston-Salem, NC  27101

14

15

16        This the 3rd day of September, 2013.

17

18

19             _____

20                       Cassandra J. Stiles, CVR

21

22

23

24

25
```