IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:12-CV-00610-F

C O P Y

CITY GRILL HOSPITALITY GROUP, INC.,  )
                                     )
                      Plaintiff,  )
                                     )
        vs.                          )
                                     ) D E P O S I T I O N
NATIONWIDE MUTUAL INSURANCE COMPANY, )
                                     )
                      Defendant.  )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

_____

L. HENRY MARTINI, P.E.
_____

One West Fourth Street
Winston-Salem, North Carolina

Tuesday, August 20, 2013
10:12 o'clock a.m.

_____

Atlantic Professional Reporters
Winston-Salem, NC  27116-1672

**EXHIBIT 12**

NOTES

Page:Line      Subject Matter       Relates To      Action

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

_____|_____

APPEARANCES OF COUNSEL


Richard M. Wiggins, Esq., and
James A. McLean, III, Esq.
McCOY WIGGINS CLEVELAND & O'CONNOR, PLLC
202 Fairway Drive
Post Office Box 87009
Fayetteville, North Carolina  28304-7009


Rachel E. Daly, Esq.
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One West Fourth Street
Winston-Salem, North Carolina  27101


OTHER APPEARANCES

```
              I N D E X
```

STIPULATIONS                                            5


EXAMINATION
      Mr. Wiggins                                       6

_____

ADJOURNMENT                                           140
CERTIFICATE OF TRANSCRIPT                              141
CERTIFICATE OF OATH                                   142
WITNESS CERTIFICATE                                   143
WITNESS ADDENDUM                                      144
CERTIFICATE OF MAILING                                145

```
           E X H I B I T S
```

| Name | Offered By | Identified |
| --- | --- | --- |
| Deposition Exhibit 46A | Plaintiff | 69 |
| Deposition Exhibit 46B | Plaintiff | 108 |

1                         STIPULATIONS

2              Pursuant to notice and/or consent of the

3    parties, the deposition hereon captioned was

4    conducted at the time and location indicated before

5    Cassandra J. Stiles, Notary Public in and for the

6    County of Forsyth, State of North Carolina at Large.

7              The deposition was conducted for use in

8    accordance with and pursuant to the applicable rules

9    or by order of any court of competent jurisdiction.

10             Reading and signing of the testimony was

11   requested prior to the filing of same for use as

12   permitted by applicable rule(s).

13

14

15

16

17

18

19

20

21

22

23

24

25

 1           The witness, L. HENRY MARTINI, P.E. being

 2    first duly sworn to state the truth, the whole truth

 3    and nothing but the truth, testified as follows:

 4           (10:12 o'clock a.m.)

 5                              EXAMINATION

 6    BY MR. WIGGINS:

 7           Q.   Good morning, Mr. Martini.  Again, I'm

 8    Richard Wiggins.  We just met.  I think we met about

 9    last November at the site in Fayetteville.  Is that

10    correct?

11           A.   Yes.

12           Q.   You're here today for us to take your

13    deposition as an expert.

14                Do you understand that?

15           A.   Yes.

16           Q.   This isn't going to be a completely

17    arduous exercise for you this morning, and just want

18    to find out your findings and what you did in

19    relation to this fire that occurred back in January

20    24th, 2012.

21                You understand that?

22           A.   Yes.

23           Q.   Have you had your deposition taken before?

24           A.   Yes, I have.

25           Q.   Many times?

1          A.    A few.

2          Q.    A few times.  So you understand the drill.

3                The only thing I would just say very

4     briefly is, if you want to take a break any time,

5     please let me know or let Rachel know and we'll be

6     glad to accommodate you.  This isn't a -- a relay

7     race of any kind, and we've got plenty of time to get

8     this done.

9          A.    My last -- my last one was 10 hours, so...

10         Q.    This will not be 10 hours, I can assure

11    you.

12                And again, it's so easy to shake your head

13    affirmatively rather than saying verbally yes or no,

14    and if you'll make sure you answer verbally to every

15    question.

16                And if I ask a question and you don't

17    understand what I'm asking, please ask me to repeat

18    it, because, unfortunately, I have a habit of asking

19    questions sometimes that don't make good sense even

20    to me.

21                Just so we're on the same sheet of music,

22    is that okay?  Is that fair?

23         A.    Sure.

24         Q.    Very good.

25                Where do you -- where do you live, Mr.

 1    Martini?

 2         A.    I live in Greenville, South Carolina.

 3         Q.    Okay, and you're associated with Donan?

 4    Is that correct?

 5         A.    Yes, that's correct.

 6         Q.    And what is the -- what is the legal name

 7    of that company?

 8         A.    Donan Engineering Company, Incorporated.

 9         Q.    And where is it -- where is the main

10    office or the home office of that company?

11         A.    It's based out of Louisville, Kentucky.

12         Q.    And do they have more than one office, I

13    take it?

14         A.    Yes.

15         Q.    And how many offices does Donan have?

16         A.    I don't have the specific number in my

17    head.

18         Q.    But many offices around the country?

19         A.    Mostly located in the eastern half of the

20    country at this time.

21         Q.    Okay, and how long have you been with

22    Donan?

23         A.    Umm, will be three years in October.

24         Q.    Okay, and before that what were you doing?

25         A.    I worked for Unified Investigations.

1        Q.    And what did you do with Unified

2   Investigations?

3        A.    Same type of work.

4        Q.    Engineering-type work?

5        A.    Yes.

6        Q.    And go ahead and give me your educational

7   background as you can recall it.

8        A.    Sure.  I attended the University of

9   Central Florida in Orlando, Florida, from -- do you

10  want time periods as well?

11       Q.    Yes, please.

12       A.    1976 through 1981.  Bachelor of science in

13  engineering with a major in electrical engineering.

14       Q.    Okay.

15       A.    I'll just progress up from there.

16       Q.    Sure.

17       A.    My first job after that was with

18  Underwriter's Laboratories in Tampa, Florida, their

19  Tampa office.  That was from 1981 to 1986.  I was one

20  of their project engineers evaluating products to

21  their standards, and did some work with standards

22  writing as well.

23       Q.    Okay.

24       A.    Following that I did some consulting work

25  for manufacturers seeking to obtain UL approval on

1   their products.

2              I worked for a company, Engineering

3   Assessments, in the late eighties for a couple of

4   years.  That was my first work in the forensic field.

5              Following that I worked in Jacksonville,

6   Florida, for nine or 10 years with the Hunter

7   Lighting Group, which was the lighting division of

8   the Hunter Fan Company, as their engineering manager.

9        Q.   Hunter what kind of company -- fan?

10       A.   Lighting.

11       Q.   Lighting company?

12       A.   Lighting was one of the products I worked

13  at -- I dealt with at -- at UL.

14       Q.   Okay.

15       A.   And so I was in charge of all their

16  product safety evaluations and submittals, ULCSA, and

17  quality control, both on the receiving end and

18  manufacturing end, addressing any problems that came

19  up.  Addressed problems that reported from the field

20  with their products, and a little bit in the product

21  design aspect as well with regards to safety.

22       Q.   Okay.

23       A.   That takes us up through 1999.

24              Following that I went to work with

25  Applications Engineering Group in Atlantic Beach,

1    Florida, doing forensic work full time.

2            Q.    And then Donan?

3            A.    Applications Engineering Group was '99

4    through 2009, nine -- nine years -- and then a couple

5    years with Unified and then Donan.

6            Q.    Okay, UL Laboratories, that was in

7    Florida?

8            A.    Yes.

9            Q.    And you were testing similar products for

10   safety issues?

11                 Is that what you were doing?

12           A.    The majority of my work was in the fan and

13   lighting group, not the product groups.

14           Q.    Is the CV that's attached to your latest

15   report, is that current?

16           A.    It's current.  It doesn't go back -- that

17   far back as what we covered just now.

18           Q.    Okay.

19           A.    But ---

20           Q.    --- Pretty current ---

21           A.    --- It's otherwise current.

22           Q.    In preparation for your testimony today,

23   have you read any documents, any type of depositions

24   or anything in preparation?

25           A.    Depositions I was provided are -- were

 1    listed in my report.  The only -- I've looked at two

 2    since then, which was Mr. Stone's and Mr. Booth's.

 3             Q.    And when did you read Mr. Booth's

 4    deposition?

 5             A.    That would have been last night.

 6             Q.    Okay, and did you talk to anyone in

 7    preparation for your deposition here today -- Mr.

 8    Lacy or anyone in connection with Donan?

 9             A.    I saw Mr. Lacy yesterday, and we didn't

10    discuss really anything about the case.  We -- we met

11    here for a pre-deposition meeting.

12             Q.    And that was yesterday?

13             A.    Yes.

14             Q.    When you came to work for Donan, was Mr.

15    Lacy already there?

16             A.    Yes, he was.

17             Q.    And how long had he been with -- with

18    Donan?

19             A.    I don't recall his exact start date.

20             Q.    Do you know what his title is with Donan?

21             A.    Other than fire investigator, no.

22             Q.    Who is your immediate supervisor?

23             A.    Michael Spensieri.

24             Q.    Is he an engineer also?

25             A.    Yes.

1        Q.    Is his -- is the organization of Donan

2    divided in separate compartments, such as

3    investigation, origin and cause, investigation,

4    engineering, etcetera, etcetera?

5        A.    Just during this year they -- they split

6    the engineering and fire investigation groups.

7        Q.    And so prior to that it was all

8    integrated?  Would that be correct?

9        A.    Yes.

10       Q.    Okay, and do you know when Mr. Lacy came

11   to work for Donan?

12       A.    I don't specifically recall that.

13       Q.    Is he your supervisor in any respect

14   whatsoever?

15       A.    Mr. Lacy?

16       Q.    Uh-huh.

17       A.    No.

18       Q.    Does he work in a separate area now at

19   Donan from where you work at Donan?

20       A.    Well, again, he would have worked under

21   the fire investigation group, and I'm on the -- in

22   the engineering group.

23       Q.    Okay, and what is your background as far

24   as fire investigations is concerned?

25       A.    I've been investigating fires or assisting

1    in fire investigations for coming up on 15 years.

2         Q.    Okay, in all the jobs that you've had, has

3    that been one of the duties that you've been involved

4    in?

5         A.    All the jobs?

6         Q.    Or most of the jobs.

7         A.    Well, in my previous work I was working on

8    the product design and manufacturing side on product

9    issues.

10              And then on the forensic side I'm working

11    on the other end of the spectrum, after the product

12    has failed, trying to figure out why it failed.

13              And so my career has probably been split

14    roughly half and half between the two.

15         Q.    When you were working on products trying

16    to determine what caused them to fail, what kind of

17    products were they?

18         A.    Caused them to fail?

19         Q.    Yeah.  You were -- you said that one of

20    the things that you did in some of the jobs that you

21    held was determine what products might have failed or

22    what caused them to fail.

23                    MS. DALY:  Objection to form.

24         Q.    (Mr. Wiggins)  Do you understand what I'm

25    asking?

1        A.    Well, it -- it sounds kind of vague to me,

2   but we can break it down.

3        Q.    Okay.  Okay, what I'm asking is you said

4   that you had worked in the electrical field in

5   examining appliances or electrical items that might

6   have failed.  Is that correct?

7        A.    Yes.

8        Q.    And part of that -- part of your job was

9   to determine why they failed.

10       A.    Yes.

11       Q.    And I was asking what kind of products did

12  you examine to determine what might have caused its

13  failure.

14       A.    Okay.  In the -- taking it back to UL, we

15  -- we tested products basically for safety issues and

16  fire issues, seeing that they had met our

17  requirements.  So that's not specifically looking at

18  products that had failed, but seeing if it holds up,

19  and if it does fail, why.

20            Looking at why something has failed is

21  typically on the forensic side, and in that case it's

22  been everything you can imagine -- if it's electrical

23  in nature, appliances, components, you name it, I've

24  probably seen it over the years.

25       Q.    Okay, and household -- household

 1    appliances you looked at, I guess, over the years ---

 2          A.    --- Oh, yeah.

 3          Q.    --- That might have failed ---

 4          A.    --- Yes.

 5          Q.    --- From as small as a computer to as

 6    large as a refrigerator, I suppose?

 7          A.    Sure.  My wife is afraid to leave anything

 8    plugged in at this point.

 9          Q.    Okay.  The depositions that you said that

10    you reviewed was the deposition of Dimitrios

11    Diamantopoulos.  Is that correct?

12          A.    Yes.

13          Q.    Mr. Zachary Lapene -- do you recall that

14    deposition?

15          A.    Not specifically, but if I put it down, I

16    read it.

17          Q.    He was the guy who had the motorcycle shop

18    ---

19          A.    --- Oh, yeah, uh-huh.

20          Q.    --- Next to the Miami Sub's building.

21          A.    Yes.

22          Q.    Deposition of Mr. Dowlat Sh Ahi, do you

23    remember that one?

24          A.    He installed the surround system?

25          Q.    Right.

1          A.    Uh-huh.

2          Q.    And the videos of Jimmy Diamantopoulos,

3    volumes one and two, do you recall reading those?

4          A.    Yes.

5          Q.    And then the examination under oath of

6    Victoria Moon, she was the night manager at Miami

7    Subs.

8          A.    Yes.

9          Q.    Do you recall that?

10          A.    Yes.

11          Q.    And the examination of Takis Michalos, do

12    you recall that one?  He was one of the owners of the

13    Miami Subs franchise.

14          A.    Yes.

15          Q.    The photographs you said you looked at was

16    all the photographs of the property, the fire scene,

17    laboratory examination.

18              And when you speak of laboratory

19    examination, that was the one that was done in

20    Raleigh?  Is that correct?

21          A.    Yes.

22          Q.    And the compensation rate you say is 165

23    per hour for engineering work and 225 per hour for

24    deposition-trial testimony.

25              Have you billed Nationwide for your

1    services to this point in time?

2                Do you know what they -- and do you know

3    what they are?

4                      MS. DALY:  Objection to form.

5                      THE WITNESS:  I bill ---

6         Q.   (Mr. Wiggins)  --- Have you billed them?

7         A.   I -- I bill my time on a daily basis, but

8    beyond that I don't know anything else about it.

9         Q.   Do you bill it through -- you bill it

10   through Donan?

11        A.   Yes.

12        Q.   And they would have been the ones who

13   would have billed for your work?  Is that correct?

14        A.   That is correct.

15        Q.   Do you know what they've bill for your

16   work for this -- to this point in time?

17        A.   I do not.

18        Q.   One of the -- you've listed in your CV

19   your continuing education courses you've taken, and

20   one of those is in 2006, Principles of Electrical

21   Fires by Vytenis Babrauskas, PhD, Central Texas Fire

22   Investigator Association, annual conference, Austin,

23   Texas.

24                Do you recall that conference?

25        A.   Yes.

1          Q.    Tell me about Mr. Babrauskas.

2                Do you consider him to be an expert in the

3     field?

4          A.    I do.

5          Q.    Have you taken other courses that he might

6     have taught over time?

7          A.    I wish there were more to take.

8          Q.    Okay.

9          A.    But no, I haven't.

10         Q.    Is he somewhat considered the preeminent

11    authority in that -- in that field?

12                    MS. DALY:  Objection to form.

13                    THE WITNESS:  Yes.  He's done a lot

14    of work related to electrical causation of fires.

15         Q.    (Mr. Wiggins)  And have you ever submitted

16    any articles for his review or done any writing that

17    he has looked at?

18         A.    No.

19         Q.    Have you written any articles relative to

20    your field?

21         A.    No.

22         Q.    Pardon?

23         A.    No.

24         Q.    And you've also listed courses, taught in

25    electrical and gas appliance inspections in 2003, and

1    in 2005, electrical and gas appliance inspections.

2              Has that been somewhat an area that you've

3    become interested in over the years?

4         A.    Well, it's what I do.

5         Q.    Pardon me?  That's what you do?

6         A.    That's what I do.

7         Q.    Well, electrical and gas appliance

8    inspections particularly is what I'm asking.

9                    MS. DALY:  Objection to form.

10                   THE WITNESS:  That -- that course

11   covered part of what I do.  Basically, the appliance

12   portion in it was for fire investigators and

13   insurance adjusters.

14        Q.    (Mr. Wiggins)  And do you work with

15   insurance adjusters on a regular basis in your work?

16        A.    Yes.

17        Q.    When did you first learn about the fire at

18   the Miami Subs Restaurant in Fayetteville, North

19   Carolina?

20        A.    I don't know that I would know the

21   specific date, but typically what happens is Mr. Lacy

22   would contact me to check my availability for a given

23   fire that he's -- he's investigating, and then we set

24   up a mutually agreeable date and time and we meet.

25        Q.    Are you qualified as an origin -- origin

1    and cause investigator?

2         A.    Actually I am, yes.

3         Q.    You are.

4               And do you have the same expertise in that

5    area as Mr. Lacy would have?

6         A.    I don't specifically do origin and cause

7    work.  The reason I invested the time to learn that

8    aspect of it is to make sure that I have to build a

9    -- look at a -- a fire scene in the big picture.

10              So if you bring me a handful of things

11   that were from a fire scene, and I pick up one and I

12   say, yeah, it looks like it may have caused the fire.

13   Well, if it turns out it was from two rooms away, you

14   know, I have to -- I -- I like to be able to

15   understand what -- what they know and what they're

16   seeing and be able to question them if I -- I think

17   ---

18        Q.    --- Okay.

19        A.    --- You know, I just need to be able to

20   understand it.  That's why I got that.

21        Q.    Okay.  This fire occurred on January the

22   24th of 2012, and Mr. Lacy, I think, was contacted

23   maybe on at least a day after that, maybe the 25th,

24   26th of 2012.

25                   MS. DALY:  Objection to the form of

1    the question.

2        Q.    (Mr. Wiggins)  Do you recall talking to

3    Mr. Lacy about this fire on or about that period of

4    time?

5        A.    If I remember correctly, I believe he

6    called me from the scene.  He -- he did his

7    investigation and he called me and said, I need you

8    to come look at some things at this -- this fire

9    loss, when are you available, and then went from

10   there.

11       Q.    And do you know what -- do you have any

12   notes that would indicate what date that was?

13       A.    I believe he -- I'd say he called me from

14   his first time out there.

15       Q.    Do you have -- did you make any notes of

16   your investigation when you went to the scene on the

17   30th of January, 2012?

18       A.    Sure.

19       Q.    Do you have those notes with you?

20                    MS. DALY:  Mr. Wiggins, they're

21   being copied right now.

22                    MR. WIGGINS:  Okay.

23                    MS. DALY:  Apparently -- can we go

24   off the record?

25                    Thank you.

```
 1          (10:32-10:45 a.m. - recess)

 2          Q.   (Mr. Wiggins)  Mr. Martini, I -- excuse

 3     me, I've got a piece of candy in my mouth.

 4               You were retained on or about the 30th of

 5     January 2012?  Is that correct?

 6          A.   Yes.  Like I say, it would have been

 7     probably a few days earlier when Mr. Lacy called me.

 8          Q.   I'm sorry?

 9          A.   It would have been a few days prior when

10     Mr. Lacy first contacted me.

11          Q.   Okay, and after Mr. Lacy contacted you,

12     were you contacted by anybody from Nationwide?

13          A.   No.

14          Q.   Did you ever talk with anyone from

15     Nationwide?

16          A.   (No response)

17          Q.   Again, let me -- let me to back.

18               In reference to your being retained to --

19     as an engineer to conduct an examination of the Miami

20     Subs building in Fayetteville.

21          A.   In reference to being retained, no.

22          Q.   Okay, and when was the first day you went

23     to Fayetteville to visit the Miami Subs building?

24          A.   Around January 30th.

25          Q.   Of 2012?
```

```
 1         A.    2012, yes.

 2         Q.    Okay, who was there when you -- did you go

 3    -- I'm going to strike that.

 4               Did you go with Mr. Lacy or did you go by

 5    yourself?

 6         A.    Mr. Lacy was present.

 7         Q.    And did he drive you to Fayetteville or

 8    did you drive him to Fayetteville?

 9         A.    We met there.

10         Q.    You met there, so you didn't come

11    together?

12         A.    No.

13         Q.    Who else was there when you got to the

14    Miami Subs building?

15         A.    I believe -- I believe the owner let us

16    in, and I believe someone from Nationwide was there

17    just surveying the scene, I think, doing inventory

18    and such.

19         Q.    Do you recall anyone else there?

20               The SBI agent, was he there?

21                    MS. DALY:  Objection to form.

22               Are you talking about when he arrived?

23         Q.    (Mr. Wiggins)  When you arrived.

24         A.    Mr. Royal -- he -- he showed up later in

25    the day.
```

1          Q.    Okay.

2          A.    At the end of the day.

3          Q.    And was there anyone there from the

4    Fayetteville Police Department?

5          A.    Not that I recall.

6          Q.    At what time of day did you arrive there

7    at the Miami Subs building?

8          A.    I believe that would have been probably

9    about nine o'clock.

10          Q.    And was Mr. Lacy there when you got there?

11          A.    Yes, I believe he was.

12          Q.    And what did you understand precisely your

13    assignment to be in reference to being retained by

14    Nationwide Insurance Company?

15          A.    My assignment was to identify all

16    potential electrical sources of ignition for the fire

17    and to determine if any of those played a role in

18    causing the fire.

19          Q.    And was it also your obligation to rule

20    out any items that you thought would not have been a

21    cause of the fire?

22                    MS. DALY:  Objection to form.

23                    THE WITNESS:  Sure.  I mean, that's

24    part of the process.  Identify it, examine it and

25    rule it in or rule it out, or undetermined.

1        Q.    (Mr. Wiggins)  Okay, and what was Mr.

2   Lacy's role in reference to this fire at the Miami

3   Subs Restaurant?

4        A.    Primarily his -- his task was to identify

5   the origin of the fire, where the fire started.

6        Q.    And let me just -- I want to be clear

7   about this.

8              That was not your obligation or your duty.

9   Is that correct?

10       A.    That is correct.

11                    MS. DALY:  Thank you.

12                    MR. WIGGINS:  Is that it?

13                    MS. DALY:  Yes, sir.

14                    MR. WIGGINS:  Thank you.

15                    MS. DALY:  You're welcome.

16       Q.    (Mr. Wiggins)  And you would -- would you

17   defer to Mr. Lacy for any of the investigation that's

18   related to the origin or cause of this fire?

19                    MS. DALY:  Objection to form.

20       Q.    (Mr. Wiggins)  Except for the particular

21   electrical area that you were involved in.

22       A.    Yes.

23       Q.    And did you attempt to perform the same

24   duties that he would have performed as an origin and

25   cause investigator in this fire?

 1                    MS. DALY:  Objection to form.

 2                    THE WITNESS:  No.

 3        Q.   (Mr. Wiggins)  And was his ---

 4        A.   --- At least as far -- as far as

 5   determining the area of origin?

 6        Q.   Yes, the area of origin.

 7        A.   Okay.  Yeah, same answer.

 8        Q.   And the scope of your duties in reference

 9   to your investigation would have been electrical

10   issues to rule out those matters that might have or

11   could have caused a fire by use or by malfunction of

12   electrical -- electrical issue?

13                    MS. DALY:  Objection to form.

14                    THE WITNESS:  That's correct.

15        Q.   (Mr. Wiggins)  I have your notes before me

16   here and I would have the same problem with these

17   that Rachel had with those of Mr. Booth in trying to

18   read them.

19        A.   I understand that.

20        Q.   At the top of the page you've got a number

21   36-12010020-0.  What is that?

22             Is that some kind of identifying number?

23        A.   That would be our company's file number.

24        Q.   Okay, and below that you have a -- I take

25   it it's a date.  Is it 6 -- I can't....

1        A.    That's an '05.

2        Q.    I'm sorry?

3        A.    I think that's an '05 -- 6-05 -- 0-5.

4        Q.    Is that a date?

5        A.    Yes.

6        Q.    Okay, and what does that date reference?

7        A.    That's the date I would have made the

8   notes or sketches that are applicable.

9        Q.    Is this -- now, let's see, where would the

10  first note be?  Have I got this backwards?  Does it

11  start at the very back?

12            Is that the first notes you made?

13       A.    I think the first -- or the earliest notes

14  that you're going to find in here are dated November

15  29th.

16       Q.    Okay.

17       A.    I did make some sketches on January 30th.

18  I was not able to locate them, and I recreated them

19  on the 29th.

20       Q.    I'm sorry.  What page would that be on?

21  The second page I see a ---

22       A.    --- All right.

23                 MS. DALY:  It's the second page.

24                 THE WITNESS:  Anything with 11-29.

25                 MR. WIGGINS:  Okay.

1          MS. DALY:  And they continue for

2  several drawings.

3          Q.   (Mr. Wiggins)  Okay, so all of these notes

4  would have been made on 11-29?  Is that correct, Mr.

5  Martini?

6          A.   The ones with that date, yes.

7          Q.   Let's see, 11-29, 11-29, and then the

8  third page, Mr. Dowlat -- Bob Dowlat notes, when were

9  they made?  I do not -- I don't see a date on there.

10          A.   Yeah, some of those were just when I was

11  reviewing depositions or EUO's.  They're just -- just

12  some notes.

13          Q.   And then the next is 4-17-13.  That would

14  have been this year.  Is that correct?

15          A.   Yes.

16          Q.   And then the next page, where we talk

17  about the IME, Ion IQ, do you see that page?

18          A.   Yes.

19          Q.   And that was made -- those notes were made

20  in what -- on what date?  Do you recall?

21          A.   Not specifically.  That's kind of a

22  running -- looking for details on the wireless

23  device, and then some notes about a deposition, and

24  then more notes where I contacted the manufacturer.

25          Q.   Okay.

1          A.    There's a date next to that of 6-17-13.

2          Q.    And that would have been -- that would

3    have been more than a year after the fire.  Is that

4    not correct?

5          A.    Correct.  This was in the last few months

6    leading up to today.

7          Q.    And then the -- that next page is 11 --

8    you've got a date on it 11-29-2012, and it has a

9    drawing on there.

10              Was that when you visited the Miami Subs

11   building in November of 2012?

12         A.    Yes.

13         Q.    Okay, and then beside that it's got

14   another date, 10-23-09.

15              What is that?

16         A.    It says Miami Subs filed a claim against

17   PWC for surge damage to various equipment.

18         Q.    Okay, and then April the 19th, 2010, Miami

19   Subs report....

20         A.    Reported break-in, theft, vandalism,

21   etcetera.

22         Q.    And then it's got to May 31, 2011.

23         A.    Renovation.

24         Q.    Renovation.  Okay.

25         A.    And then fire in January.

1          Q.    And then there's a drawing on this page

2     also, and this -- the electrical room, the office of

3     the Miami Subs building -- is that what this is?

4          (Witness examined document)

5          A.    Yeah, that's an overview of where power is

6     coming in from the transformers near the building,

7     underground feed to the outside panel into the

8     electrical room and the office.  Just general

9     orientation.

10          Q.    And then the next page is a continuation

11     of that same investigation or visit that you made to

12     Miami Subs on 11-29-2012?

13          (Witness examined document)

14          A.    That's my review of the breaker panels in

15     their electrical room.

16          Q.    And this was done on November 29th, 2012?

17          A.    Yes.

18          Q.    And again there is a sketch, and this

19     shows the main panels, electrical panels, of the

20     Miami Subs building, and it's got CB Panel A -- C --

21     well, turned this upside down here -- CB panel C, CB

22     panel B.

23               And there were -- those were all located

24     in different locations in the building.  Is that

25     correct?

1         A.    The panels?

2         Q.    Yeah, the panels.   Yes.

3         A.    They were located within the area that's

4     sketched.

5         (Witness examined document)

6         A.    This is the layout of the electrical

7     panels, the circuit breaker panels.   That's what CB

8     is.

9         Q.    Okay.

10        A.    That was a layout of those four panels --

11    five panels in that room.

12        Q.    And this is the rear -- you've got it

13    here, rear entrance?

14        A.    Rear exterior walls ---

15        Q.    --- Walls.

16        A.    --- Side exterior wall.

17        Q.    I -- I just can't get oriented.

18             Where is the wall where the panel C and B

19    is located?   Where are they?

20        A.    If you look at it -- if you look at it

21    this way, rear exterior wall.   I think, if you're

22    looking at the -- compare that to the previous

23    sketch.

24        Q.    Okay.

25        A.    So that the rear -- if I can lean over --

1    the back of the building, what I would have called a

2    rear exterior wall ---

3            Q.    --- Okay, I got you.  Okay.

4            A.    There's a wall here.

5            Q.    I understand.

6            A.    So that -- that's the orientation.  This

7    is just a closer view of -- of that.

8            Q.    And then on this next page, this panel C

9    and B would be the exterior wall also?

10           A.    That would be the -- the front side.

11           Q.    Right here?

12           A.    Yes.

13           Q.    Inside the building?

14           A.    Yes.

15           Q.    Okay, now I understand.

16           A.    Such that if you take this -- this now is

17   in the same orientation as that.

18           Q.    Okay.  And then the next entry date is

19   4-17-13, and this says joint lab inspections of

20   collected evidence, and it says on the back, evidence

21   collected in -- can't read the next word.

22           A.    I see evidence collected in -- in January

23   by Lacy.

24           Q.    Okay.  By Lacy.

25                 And then there's one through seven.  Is

1    this the evidence that was collected by Mr. Lacy that

2    was delivered to the PWC engineer in Raleigh in April

3    of 2013?

4          A.   Yes.

5          Q.   And that would have been a sample -- I'm

6    sorry.  Again, I can't read -- can you read....

7          A.   Yeah.  A sample can.

8          Q.   X-rayed for -- again....

9          (Witness examined document)

10         A.   X-rayed from above can and probably side,

11   and I left out side.

12         Q.   Okay.

13         A.   John Cavaroc x-rayed the can prior to us

14   opening it.

15         Q.   Who did?

16         A.   John Cavaroc.

17         Q.   And then the next entry is -- I can't read

18   -- the ups?

19         A.   Cups.

20         Q.   Cups.

21         A.   Three is plates.

22         Q.   Okay.

23         A.   Four is plastic container labeled gas.

24         Q.   Okay.

25         A.   Five and six were the hard drives, and

1    then number seven was the cloned copies of the

2    drives.

3         Q.   Okay, and let's go back and look at these

4    as you've given them to me.

5              The sample can, that was a can that was

6    just found in the restaurant by Terry Lacy?

7              Is that what -- what that is?

8         A.   No, that was a can of debris that he

9    collected.

10        Q.   And what -- would that have been debris

11   that was found at or about the place where he

12   identified the area of origin of the fire?

13        A.   Yes.

14        Q.   And did you yourself investigate or look

15   at that material?

16        A.   We -- we all did.

17        Q.   And how did you -- how did you examine it,

18   by what means?

19        A.   First it was x-rayed, and then we all

20   looked at the x-rays.  And then we began with opening

21   the contents, spread it on the table, everybody had

22   the opportunity to sift through it and look at it.

23        Q.   Tell me about x-rays.

24             Is that a common form of investigating

25   various items found in a fire to determine any

1    defects or any problems there might have been with a

2    -- with an item?

3         A.   It's the first step because it's

4    non-destructive.

5              And often -- and after the residue of a

6    fire, frankly sometimes we just end up with a big

7    melted blob.  And rather than spending three days

8    chipping away at it, the easiest thing to start with

9    is just take an x-ray and see if there's anything

10   worthwhile inside to -- to take a closer look at.

11        Q.   And that would have been the material that

12   is item number one there that Mr. Cavaroc x-rayed?

13        A.   Yes.

14        Q.   And did it reveal anything of interest?

15        A.   No.

16        Q.   Could you identify what it was?

17        A.   I'd have to look at my photos to see

18   specifically what was in there.  There's nothing

19   remarkable.

20        Q.   And then number two was cups, number three

21   was plates.

22             Were these cups and plates non-consumed by

23   fire?

24        A.   Correct.

25        Q.   And do you know where they came from --

Page 37

1    where Mr. Lacy obtained those from?

2         A.   I think that was all photographed and

3    documented, yes.

4         Q.   Okay, did you have photographs showing

5    those cups or those plates?

6         A.   When they were collected or at the lab?

7         Q.   At the lab.

8         A.   Yes.

9         Q.   And then next is a plastic container of

10   gas with a gas label on it.

11             That was also looked at and examined by

12   everyone who was present there at that examination?

13        A.   Correct.

14        Q.   And what was the interest in that can?

15        A.   Just unusual to find a can labeled gas in

16   a restaurant.

17        Q.   Was there -- was there in fact gas in the

18   can when you looked at it or had it be emptied out?

19        A.   It was empty.

20        Q.   And was there any gas residue in the can?

21        A.   Not that I recall.

22        Q.   And then you got hard drive -- two hard

23   drives, and they were brought there by Mr. Lacy to

24   the meeting with Mr. Cavaroc?

25        A.   Yes.

1        Q.    And had those hard drives been downloaded,

2    to your knowledge?

3                    MS. DALY:  Objection to form.

4                    THE WITNESS:  The information I had

5    was that they were copied, not downloaded.

6        Q.    (Mr. Wiggins)  They were copied?

7        A.    Yes.

8        Q.    When you mean copy, what do you have

9    reference to?

10                    MS. DALY:  Objection to form.

11                    THE WITNESS:  Cloned.  In other

12   words, anything other than cloning may alter the

13   contents, so....

14       Q.    (Mr. Wiggins)  And these were not the

15   original hard drives that were recovered from the

16   Miami Subs Restaurant, but were copies of those hard

17   drives?

18                    MS. DALY:  Objection.

19       Q.    (Mr. Wiggins)  Is that what you're saying?

20            I just want to be sure I understand what

21   you're saying.

22       A.    I'm saying five and six were the originals

23   and number seven was the copy.

24       Q.    Do you know where the originals were?

25       A.    When?

 1                    MS. DALY:  Objection to form.

 2                    MR. WIGGINS:  Pardon?

 3                    THE WITNESS:  When?

 4                    MR. WIGGINS:  At the time of this

 5     examination when you and Mr. Cavaroc met up in

 6     Raleigh.

 7                    THE WITNESS:  Do I know where they

 8     were?

 9                    MR. WIGGINS:  Yes, or do you know

10     who had them.

11                    MS. DALY:  Objection to form.

12                    THE WITNESS:  Well, Mr. Lacy brought

13     them to the inspection.

14          Q.   (Mr. Wiggins)  he brought the copies to

15     the inspection?

16                    MS. DALY:  Objection to form.

17                    MR. WIGGINS:  Well, I'm just trying

18     to be sure I understand.

19          Q.   (Mr. Wiggins)  Did he bring the originals

20     that he had obtained from the Miami Subs Restaurant

21     to this meeting with Mr. Cavaroc, or did he bring

22     copies of those -- of those hard drives that he had

23     obtained from the Miami Subs Restaurant?

24                    MS. DALY:  Objection to form.

25                    THE WITNESS:  Both.

1          Q.    (Mr. Wiggins)  He brought both of them?

2          A.    Yes, sir.  That's why five and six -- hard

3   drive number seven is external drive imaged from five

4   and six.

5          Q.    And were both of those examined at the

6   time that you met with Mr. Cavaroc in Raleigh?

7          A.    Only visually.

8          Q.    And was any effort made to download any of

9   the information that might have been on either of

10  these hard drives?

11                  MS. DALY:  Objection to form.

12                  THE WITNESS:  Not at that time, no.

13         Q.    (Mr. Wiggins)  And number seven, it's --

14  I'm sorry -- you'll have to read that to me.  I

15  can't....

16         A.    External drive imaged from number five and

17  six, which is five and six above, and then Seagate

18  one terabyte.

19         Q.    Was that just identifying the hard drives

20  that you identified in five and six?

21                  MS. DALY:  Objection to form.

22                  THE WITNESS:  Number seven is a --

23  is one hard drive that contains the cloned two hard

24  -- clones of the two hard drives, namely five and

25  six.

1      Q.   (Mr. Wiggins)  And were they produced at

2  the examination at Mr. Cavaroc's laboratory by Mr.

3  Lacy?

4                 MS. DALY:  Objection to form.

5                 THE WITNESS:  They were brought in,

6  made available for inspection.

7      Q.   (Mr. Wiggins)  By Mr. Lacy?

8      A.   Yes.

9      Q.   Then below that, again, Safe Labs....

10     A.   Evidence.

11     Q.   Evidence -- and this is items that were

12  not brought by either you or Mr. Lacy to the meeting

13  at Mr. Cavaroc's lab.  Is that correct?

14     A.   That is correct.

15     Q.   And the first one there is an electric

16  power....

17     A.   Meter.

18     Q.   Meter -- and do you know who produced that

19  at the meeting?

20     A.   Mr. Cavaroc.

21     Q.   And do you know who Mr. Cavaroc was

22  retained by?

23     A.   The electric utility company, PWC.

24     Q.   In Fayetteville?

25     A.   Yes.

1          Q.    And number two, again, please read that.

2          A.    I'm sorry.

3          Q.    I'm sorry.

4          A.    Receptacle number one and connected

5     wiring.

6          Q.    And then no....

7          A.    No evidence of electrical failure.

8          Q.    Okay, and do you know where that came

9     from?

10         A.    That was the rear wall adjacent to the

11    rear drive-thru window.

12         Q.    And that would have been the furthest wall

13    away from the window?

14         A.    Actually, to make this easier, if we pull

15    out my sketch -- one of my November 29 sketches, it

16    -- it shows that back area and the receptacle.

17    They're labeled.

18         Q.    Is it further back in your notes or

19    further up?

20         A.    I don't know.  That will give us something

21    to reference.

22         Q.    You've drawn the rear drive-in window on

23    this sketch.  Is that correct?

24         A.    Yes.

25         Q.    And then the wall that you're referencing

1    here in number two would be the wall furthest away

2    from the window.

3               Would that be the one that we're talking

4    about?

5         A.    So -- so that wall that you're seeing the

6    receptacles on, that is the wall to the rear of the

7    rear drive-thru window, front to back in the store,

8    and is the wall between the rear drive-thru area.

9    And the office area is on the other side.

10        Q.    Okay, at the top of that drawing, Mr.

11   Martini, you've got JC evidence number two?

12        A.    Correct.

13        Q.    And what is that referencing there?

14        A.    That's indicating -- that -- that

15   correlates to the list that we're going through.

16              JC is John Cavaroc, evidence number two.

17   So that -- that would be evidence that he took as

18   number two.  And then number three is labeled as

19   well.

20        Q.    And what -- what is that box drawing that

21   he has there -- or that you have there?

22        A.    That's a junction box.

23        Q.    And that junction box was located, again,

24   on one of the walls in the area where the drive-thru

25   window is located?

1        A.    That junction box is actually above

2    ceiling level.

3        Q.    Above ceiling -- above ceiling level?

4        A.    Yes.

5        Q.    Then number three is receptacles number

6    two and three and branched wiring.  Is that correct?

7        A.    Let's see number three.

8              Receptacles is number two and three and

9    connected wiring.  No evidence of electrical failure.

10       Q.    And is that numbered correspondingly on

11   your drawing?

12       A.    Yes.

13       Q.    And that's two and three that's on your

14   drawing?  Is that also correct?

15       A.    Yes.

16       Q.    And did everybody who was present concur

17   in that analysis, that there was no problems to that

18   electrical wiring?

19       A.    I heard nothing to the contrary.

20       Q.    That was your conclusion, was it not?

21       A.    Yes.

22       Q.    Then number four was....

23       A.    Oh, it's Onkyo receiver.

24       Q.    Okay.

25       A.    Looks like audio equipment.

```
 1        Q.   And what does that have reference to in
 2   reference to the drawing?
 3        A.   That was removed from the office area if
 4   it's not on this drawing.
 5        Q.   What is an Onkyo receiver?
 6        A.   Onkyo is a brand name.  Receiver is the
 7   audio receiver.
 8        Q.   A radio?
 9        A.   You can call it that.
10        Q.   Okay.  I don't -- I didn't know what it
11   was.
12        A.   It's basically a combination -- radio and
13   amplifier is a receiver.
14        Q.   Okay.
15        A.   That's a short....
16        Q.   Was it a -- was it an item that played
17   music in the restaurant?
18        A.   Yes.  Yes, it is.
19        Q.   And that would have been number four.
20             And where is number four on the drawing?
21        A.   It's not.  Number four is only electrical
22   items in ---
23        Q.   --- Okay.
24        A.   --- In the area of origin.
25        Q.   Who brought the Onkyo receiver to the
```

1    meeting, if you can recall?

2          A.    Mr. Cavaroc.    That was one of the items he

3    collected.

4          Q.    Had you ever seen it before?

5          A.    It was up on the shelf above the desk in

6    the office.

7          Q.    Had you seen it when you were there on the

8    30th of January 2012?

9          A.    Yes.

10         Q.    Did you see anything else on that shelf

11   when you were there on January 30, 2012?

12                    MS. DALY:   Objection to form.

13         Q.    (Mr. Wiggins)  Relating to any kind of

14   electrical equipment.

15         A.    Well, he had -- he had a number of items

16   on the shelves.  I'd have to look at the photo to

17   give you a list of what was there.

18         Q.    Okay.  We'll look at it in just a moment.

19   But was ---

20         A.    --- I mean, audio equipment is -- his

21   computer was there.  His DVR recorder was up high.  I

22   didn't really pay attention to it.

23         Q.    Okay.

24         A.    It wasn't really my area of focus.

25         Q.    Did you take photographs of that yourself,

1    or did someone else take photographs of that area?

2         A.    I took some area -- some photographs of

3    the office area, but I focused on the other end

4    closer to the fire.

5         Q.    And was the wiring that -- that ran to the

6    Onkyo receiver also brought to the meeting?

7         A.    Are you referring to the connected power

8    supply?

9         Q.    Connected power supply, yes.

10        A.    I believe so.

11        Q.    And is it also noted on your notes here?

12        A.    Well, on the notes it covers the receiver,

13   and there was a -- kind of a speaker distribution box

14   that was, I believe, on top of that -- kind of a

15   five-channel distribution box so they could take the

16   output on the receiver and send it to multiple pairs

17   of speakers throughout the restaurant.

18        Q.    And did anyone observe any issues --

19   electrical issues -- with that Onkyo receiver?

20        A.    No.

21        Q.    Or any of the wiring that was connected to

22   that receiver?

23        A.    No.

24        Q.    The next item is electronics.

25        A.    Electronics and cords from office wall.

1          Q.    And then you've got in parens ---

2          A.    --- This is the backside of drive-thru

3     wall.

4          Q.    Okay, and what kind of electronics was

5     recovered and brought to the meeting?

6          A.    Basically we -- he collected everything on

7     that wall.  Mostly his data -- data cables.  It was a

8     big mess.

9          Q.    Burned?

10         A.    Yes.  Heat damaged.

11         Q.    Heat damage?

12         A.    Yeah.

13         Q.    And was any other electronic equipment

14    brought to the meeting by Mr. Cavaroc?

15         A.    There's some things further down.

16         Q.    Number six is a....

17         A.    Originally I wrote alarm panel, and then

18    drew a line through that when we actually determined

19    what it was.  And then -- plus a UPS, uninterruptible

20    power supply, from the south wall of the office.

21              The alarm panel -- what we originally

22    thought was an alarm panel was -- turned out to be a

23    power supply particularly used for surveillance

24    cameras.

25         Q.    And did Mr. Cavaroc bring that to the

Page 49

1    meeting?

2          A.    Yes.

3          Q.    Did he bring the DVR to the -- to the

4    meeting?

5          A.    No.

6          Q.    Do you recall seeing that DVR when you

7    were at the restaurant on January the 30th, 2012?

8          A.    Yes.

9          Q.    Did you ever see it after you were there

10   on January 30th, 2012?

11         A.    No.

12         Q.    Okay.  When you said the PS-18 DC10-A,

13   what is that?  Not plugged into UPS.

14               What does that have reference to, please.

15         A.    That is the surveillance camera power

16   supply.

17               When we looked at that we determined that

18   it had not -- was not plugged in, not connected to

19   power ---

20         Q.    --- Okay.

21         A.    --- At the time of the fire.

22         Q.    Okay, and do you know where that came

23   from?

24         A.    It was on the shelves above the office

25   desk.

1          Q.   And did all of the wiring that went into

2     that DVR -- was that brought to the meeting with Mr.

3     Cavaroc?

4                    MS. DALY:  Objection to form.

5          Q.   (Mr. Wiggins)  To your knowledge.

6          A.   The wiring that went to the missing DVR?

7          Q.   Uh-huh.

8                    MS. DALY:  Objection to form.

9                    THE WITNESS:  I don't believe that

10    was collected.

11                   MR. WIGGINS:  Okay.

12                   THE WITNESS:  There would have been

13    secondary cables connected to it.  I don't think we

14    collected that.

15         Q.   (Mr. Wiggins)  That was not something that

16    any -- in any event, that you collected when you were

17    there?

18         A.   I did not collect that.

19         Q.   Okay, let's go on to number seven.

20              The next page is a monitor, south wall of

21    the office.

22         (Witness examined document)

23         Q.   Is that what is written there?

24         A.   Yes.

25         Q.   And beside that you've got AC ERV 173?

1          A.    It's a brand and model number.

2          Q.    And what is that -- what does that have

3    reference to?

4          A.    Just a video monitor from the office.

5          Q.    And were there more than one video monitor

6    in the -- in the building?

7                      MS. DALY:  Objection to form.

8                      THE WITNESS:  In the building, yes.

9          Q.    (Mr. Wiggins)  That you saw?

10         A.    Yes.

11         Q.    Okay, did you see the other one at Mr.

12   Cavaroc's lab in Raleigh or just the one that you've

13   got noted here in number seven?

14         A.    Just the one from the office.

15         Q.    Do you know why the other one was not

16   collected?

17         A.    The other ones I remember seeing, some in

18   the kitchen area, I don't recall if they were even

19   there at the later inspection -- site inspection.

20         Q.    Number eight, again, printer.  Is that

21   what that word is?

22         A.    Printer, yeah.  Southwest wall of office.

23   HP is the brand.

24         Q.    Hewlett Packard?

25         A.    Yes.

1        Q.   And was the wiring collected also to that

2   printer?

3        A.   Yes.

4        Q.   And was it present at Mr. Cavaroc's lab?

5        A.   Yes.

6        Q.   And was that inspected by everyone and

7   nothing was found particularly wrong with that?

8        A.   That's correct.

9        Q.   Number nine?

10       A.   Number nine says bank deposit book.

11       Q.   Okay, what was the significance of that,

12   Mr. Martini, if you know?

13       A.   It was found in the office.  I'm not sure

14   why it was collected.

15       Q.   Number 10, debris from between....

16       A.   Drive-thru windows ---

17       Q.   Drive-thru windows.

18            And was that collected in cans or some

19   other source for storage?

20       A.   If I remember correctly, it was in a bag.

21       Q.   And do you know who collected that debris

22   that was there?

23       A.   Mr. Cavaroc.

24       Q.   And was that also viewed by x-ray?

25       A.   I don't recall specifically.  If -- if it

1    was, I'd have photos of the x-rays in my -- in my

2    photos.

3            Q.    Number 11 is wiring?

4            A.    Small gauge.

5            Q.    Small gauge and....

6            A.    End of fluorescent tube.

7            Q.    End of fluorescent tubes.

8                  And they came from the fluorescent wiring

9    in the restaurant?

10           A.    Mr. Cavaroc retrieved those from a debris

11   pile near the rear drive-thru window.

12           Q.    And number 12?

13           A.    Outlet wall plate.

14           Q.    And ---

15           A.    --- He retrieved that from the same area.

16           Q.    And that was inspected and was found not

17   to have been defective in any way that you could

18   determine.  Is that correct?

19           A.    That's correct.

20           Q.    The notes that you have here on the HME

21   Ion IQ, they were made sometime after the meeting

22   that you had in Raleigh with Mr. Cavaroc?

23           A.    Yes.

24           Q.    Do you know about what date they would

25   have been made?  Is there anything on -- strike that.

1          Was there anything on this document that

2   would indicate about what day it was made?

3          A.   I've got a June 17th date in the

4   lower-left column, so it would have been somewhere

5   within a week of that -- in the week prior.

6          Q.   Was that the first time, Mr. Martini, that

7   you knew what the make or model of the communication

8   system that was present in the restaurant for the

9   take-out window that had been looked at early on by

10  you?

11         A.   I was made aware of make and model, what

12  -- what that was through my reading of EUO's or

13  depositions.

14         Q.   Okay.

15         A.   Correct.

16         Q.   And that would have been sometime in 2013?

17         A.   Yes.

18         Q.   The next page on your notes you have --

19  you have information concerning Bob Dowlat, Creative

20  Computers.

21          Did this come from his deposition or did

22  you have a conversation with him directly?

23         A.   From his deposition.

24         Q.   And would this also have been made

25  sometime in 2013 when you reviewed his deposition?

1          A.    Yes.

2          Q.    The next page you've got a CD labeled

3    Class File 103.

4                And I'm sorry, the last word is....

5          A.    PDF.

6          Q.    PDF.  And what does that have reference

7    to?

8          A.    Those were CD's provided by counsel for me

9    to review.  Just information.

10         Q.    And next is 157 photos.

11               Were they furnished to you by counsel for

12   you to review?

13         A.    Yes.

14         Q.    And then you've got two photos later, N&M,

15   0417 shows the DVR still in place.

16               Do you see that?

17         A.    Yes.

18         Q.    And what -- what reference -- what photos

19   do you have reference to there?

20         A.    Okay, let's go back up to page 157 of this

21   -- was that a complaint?

22               Photo -- photo identified as NWM 01415

23   shows receptacle with my paint marking.  Two photos

24   later, NWM 01417, shows the DVR still in place.

25         Q.    And then in complaint number 13 it states

1    Lacy met with Jimmy two days after the fire and then

2    removed the DVR.

3              You see that?

4         A.    Yes.

5         Q.    Where did you find -- where did you obtain

6    that information?

7         A.    It's one of the complaint documents.

8         Q.    Furnished to you by counsel?

9         A.    Yes.

10        Q.    And then you got first fire call, and then

11   another fire -- I'm sorry.

12        A.    First fire call 8:41 a.m.  Smoke through

13   drive-thru window.

14        Q.    8:43, is that --

15        A.    --- Yeah.  Smoke from front door.

16              Next line, cycle shop puts truck in lot

17   8:30 to 8:35.

18        Q.    Okay.

19        A.    Surveillance camera system installed by

20   Creative Computers.  Micros POS, drive-thru speaker

21   system, and then EUO, Jimmy volume one, volume two.

22   Tavis (sic) Michalos, Victoria Moon.

23        Q.    Was this -- was this -- would have been

24   when you read those depositions?

25        A.    Correct.

1          Q.    And then the next thing I have here is

2     dated 11-29-12, and these are drawings of electrical

3     panels.

4               Is that what that would be?

5          A.    Yes.

6          Q.    And you've got X'd out on some of them and

7     lines drawn.

8               What is that?  What does that indicate?

9          A.    X's indicate a blank.  In other words, no

10    circuit breaker was in that slot.

11              The vertical lines indicate a double or a

12    triple-pole breaker, meaning all three or -- two or

13    three are tied together.  The letter T indicates

14    tripped.

15         Q.    Is there any significance to a circuit

16    breaker having been tripped?

17                        MS. DALY:  Objection as to form.

18                        THE WITNESS:  Not other than the

19    circuit was compromised by the fire and tripped.

20         Q.    (Mr. Wiggins)  And would that be what you

21    would expect to find in any building fire, that it

22    would trip breakers in the -- in the circuit breaker?

23         A.    Yes.

24         Q.    Let's go back to the day that you went to

25    the restaurant.

1         Again, you met Jimmy there.  He let you

2    into the restaurant -- is that correct -- Jimmy

3    Diamantopoulos?

4         A.   I believe he's the one that let us in.

5         Q.   Okay.  And you got there about nine

6    o'clock in the morning, I think you said.

7              And when you got there, just give me

8    generally what you saw or what you found when you

9    arrived at the restaurant.

10        A.   I did a -- just a quick walk-through and

11   then I proceeded to do my documentation.

12        Q.   Had you talked to anyone prior -- prior to

13   your going to the restaurant in preparation for your

14   review of the electrical systems in the restaurant?

15        A.   The discussion I would have had with Mr.

16   Lacy would have consisted of, you know, the fire by

17   the rear drive-thru window area, and there's some

18   electrical components I need -- looked at.

19        Q.   And did he give you any assessment of what

20   he had found or what he thought on his prior visits

21   to the restaurant?

22        A.   Other than what I just said, no.

23        Q.   Did you know that he had been to the

24   restaurant on January the 26th and January the 27th

25   of 2012?

1          A.    Yes.

2          Q.    And did he -- he had no discussion with

3    you about what he had found and what his thoughts

4    were about the cause of the fire?

5          A.    Until I did my work, he didn't have a

6    cause.

7          Q.    Did he have any discussion with you about

8    any thoughts that he had about the cause of the fire?

9          A.    Not that I recall.

10         Q.    And when you went there, you said Mr. --

11   in addition to Mr. Lacy being there and Jimmy being

12   there, the SBI agent was there?

13         A.    Later.

14         Q.    What time of day did he get there?

15         A.    It was towards the end of the day,

16   five-ish.

17         Q.    And did you have discussions with him?

18         A.    Right.

19         Q.    And did he give you the benefit of his

20   investigation?

21         A.    I don't recall what he may have said.  I

22   just recall giving him the result of my findings.

23         Q.    Did you ask him for what his findings

24   were?

25                    MS. DALY:  Objection.  Asked and

 1   answered.

 2                   THE WITNESS:  I don't recall.

 3        Q.    (Mr. Wiggins)  Did you ever learn from him

 4   or from Mr. Lacy that he had determined that -- he

 5   had made a determination the fire was not to be --

 6   could not be determined?

 7                   MS. DALY:  Objection to form.

 8                   THE WITNESS:  No, I don't recall.

 9        Q.    (Mr. Wiggins)  Did you have any

10   discussions with Mr. Lacy in reference to the

11   findings of anyone else other than himself?

12                   MS. DALY:  Objection to form.

13                   THE WITNESS:  I'm not sure I

14   followed that.

15        Q.    (Mr. Wiggins)  Did Mr. Lacy ever tell you

16   that he had had -- that he had found -- he had talked

17   to the SBI agent who investigated the fire, or to the

18   policemen who had investigated the fire, the police

19   department, and tell you what their findings were?

20                   MS. DALY:  Objection to form.

21              Are you talking about on that day?

22                   MR. WIGGINS:  On that day.

23                   MS. DALY:  Okay.

24                   THE WITNESS:  On that day, I don't

25   recall.  I -- I've read things since then, so I don't

1    want to confuse that.

2                    MS. DALY:  Can we take a five-minute

3    restroom break?  Is this a good time?

4                    MR. WIGGINS:  Sure.

5        (11:38-11:45 a.m. - recess)

6                    MR. WIGGINS:  Okay, back on the

7    record.

8        Q.  (Mr. Wiggins)  Mr. Martini, when you went

9    to the restaurant on the 30th of January of 2012,

10   what was the first thing that you did?

11       A.   Like I said, I did a walk-through of the

12   interior, and then I went outside and proceeded with

13   my exterior photos and diagram.

14       Q.   Are those photos that you have referenced

15   to on the -- on the documents you provided to counsel

16   today to give to us?

17       A.   Yes.

18       Q.   All of them are on that hard drive?

19       A.   Yes.

20       Q.   And after you did that did you go back

21   into the restaurant?

22       A.   Yes.

23       Q.   And when you went back into the restaurant

24   what -- what did you then do?

25       A.   My typical method is to start with where

1    the power is supplied from the exterior -- i.e.,

2    transformer to the property, any property -- what I

3    call follow the power into the -- the meter and the

4    interior circuit breaker panels, and then into the

5    area of -- of interest.

6         Q.   And when you were looking at the circuit

7    panels and the wiring, what were you looking for?

8         A.   Any signs of unusual damage.

9         Q.   And I know that in a fire wiring is

10   extensively damaged, is it not, in most cases?

11                   MS. DALY:  Objection to form.

12                   THE WITNESS:  Depending on its

13   relative location to the fire, yes.

14        Q.   (Mr. Wiggins)  And severity?

15        A.   Yes.

16        Q.   And did you find severely damaged wiring

17   in the area where this fire was identified as having

18   begun by Mr. Lacy?

19        A.   Yes.

20                   MS. DALY:  Objection.

21        Q.   (Mr. Wiggins)  And as you observed that

22   wiring, was it charred, burned wiring?

23                   MS. DALY:  Objection to form.

24                   THE WITNESS:  The -- well, the most

25   severe damage would have consisted of the insulation

1  having melted or burned off.

2       Q.  (Mr. Wiggins)  And I noticed in some of

3  the photographs there was wiring hanging down from

4  the ceiling.

5           Do you recall that?

6       A.  Yes.

7       Q.  And what kind of wiring was that?

8       A.  There was a mixture of data cables, some

9  electrical wiring.

10       Q.  Okay.

11       A.  Electrical wiring typically was -- it was

12  contained within metallic conduit, so any -- any

13  hanging wiring was not electrical service cable.

14       Q.  And the hanging wiring was not in -- was

15  not in aluminum conduit?

16       A.  Correct.

17       Q.  And did you observe any beading -- beading

18  on any of those connections of that wiring?

19       A.  No.

20       Q.  What is the significance of beading?

21       A.  Beading indicates electrical activity, and

22  -- and it also indicates that the conductor was

23  energized at the time of failure.

24       Q.  And did you -- did you look at those --

25  that wiring for identification of any such beading

1    when you made your investigation?

2         A.    Not the wiring inside the conduit at the

3    time, no.

4         Q.    But the hanging down wiring, did you

5    observe -- look at that for any beading?

6         A.    Yes.

7         Q.    What about all the circuits that you

8    previously identified that you looked at on that

9    date, did you look at those for any types of beading?

10        A.    The wiring that was inside the conduit?

11        Q.    In the conduit.

12        A.    Those would have been looked at at the lab

13   exam.  We had to pull those out, and I -- I didn't do

14   that at the scene.

15        Q.    And where was the majority of the wiring

16   located that you looked at on that date?

17        A.    In the area -- well, basically my -- my

18   sketch covered it, but in the area of the drive-thru

19   -- rear drive-thru window.

20        Q.    And was that the area where Mr. Lacy

21   identified to you to have been what he thought the

22   origin of the fire was?

23        A.    Yes.

24        Q.    And that would have been in at about the

25   wall where the drive-thru window was -- that the

1    first -- what we call the first drive-thru window at

2    the -- at the Miami Subs Restaurant?

3           A.    First as in the first window you come to

4    as you drive around?

5           Q.    Right.   When you come around, right.

6           A.    Yeah.

7           Q.    Is that -- would that be correct?

8           A.    Yes.

9           Q.    And you had mentioned in your report that

10   you saw that there was fluorescent lighting in that

11   area.   Is that correct?

12          A.    Yes.

13                     MS. DALY:   Objection.

14          Q.    (Mr. Wiggins)  And how many electrical

15   fluorescent lighting panels did you observe there?

16          A.    The suspended ceiling was gone at that

17   point in that back area.   Whatever lighting fixtures

18   had been -- originally in place were not -- no longer

19   in place.

20                There was a -- there were four or five of

21   my photographs which show a number of fluorescent

22   fixtures that were -- had been collected, and -- and

23   set up for me to look at.

24          Q.    Where were they collected and set up for

25   you to look at them?

1        A.    Before or after?

2        Q.    At the time you were there.  Where were

3   they when you were -- well, let me strike that.

4              Where were they when you first saw those

5   electrical fluorescent lighting systems?

6                   MS. DALY:  Objection to form.

7                   THE WITNESS:  Did you say

8   fluorescent fixtures or ---

9                   MR. WIGGINS:  --- Fluorescent

10  lighting fixtures.

11                  THE WITNESS:  They were lined up

12  along the front counter.  It -- it's what my -- my --

13  my photographs show.

14       Q.    (Mr Wiggins)  Did someone identify to you

15  that those fluorescent lighting fixtures had been

16  removed from the area where the drive-thru window was

17  to a different area?

18       A.    Yes.  They were identified as being

19  somewhere in that area.  No -- nobody could identify

20  which one went specifically where.  But they all had

21  heat damage, so I knew they were from -- generally

22  from that area.

23       Q.    And who told you that?  Do you recall?

24                  MS. DALY:  Objection to form.

25                  THE WITNESS:  Mr. Lacy would have

1    told me that, that the state investigator had

2    collected those, I believe.

3           Q.    (Mr. Wiggins)  And when he said state

4    investigator, would that have been ---

5           A.    --- Mr. Royal.

6           Q.    --- Mr. Royal?

7           A.    Yes.

8           Q.    And did you look at those fluorescent

9    lighting systems there where they were when you saw

10   them?

11          A.    Yes.

12          Q.    Did you look at the ballasts?

13          A.    Yes.

14          Q.    And did you examine the ballasts?

15          A.    Visually, yes.

16          Q.    And did you take them -- did you dissect

17   them. or take them apart?

18          A.    I did not.

19          Q.    A ballast is simply a system within a

20   fluorescent lighting system that regulates the heat

21   to the -- to the light, does it not?

22          A.    It regulates voltage.

23          Q.    Regulates voltage.  Sort of the

24   transformer?  Would that be a correct ---

25          A.    --- Yes.

 1        Q.    --- Description of it?

 2        A.    Yes, exactly.

 3        Q.    And did you take any of those ballasts

 4   apart to look at them to see if there were any

 5   defects in them at all?

 6                    MS. DALY:  Objection to form.

 7                    THE WITNESS:  While I was there?

 8                    MR. WIGGINS:  While you were there.

 9                    THE WITNESS:  That would -- to

10   answer your question, no, and also, that would not be

11   a task I would do on-site.

12        Q.    (Mr. Wiggins)  And was it subsequently

13   done in a laboratory at some point?

14        A.    No.

15        Q.    Was there any other items that you looked

16   at after you looked at the -- the fluorescent

17   lighting systems?

18                    MS. DALY:  Objection to form.

19                    THE WITNESS:  I looked at -- other

20   than the electrical components in that area, near the

21   origin, which we've already talked about -- we're

22   saying that's done.  Right?  Okay.

23                    Fluorescent fixtures, and then the -- Mr.

24   Royal had collected some debris that was on the

25   counter in the kitchen area that I looked at as well.

1          Q.    (Mr. Wiggins)  Now, the debris that you

2     looked at, was that identified in your report in the

3     overall view of that on my photograph 33?

4          A.    (No response)

5                         MR. WIGGINS:  I thought I brought

6     more than one, but I guess maybe I didn't.

7                    Oh, here I got it.  I'm sorry.

8                    Let me tell you what I -- -- I think we

9     previously marked this as 46, but I'm going to call

10    this 46A.  Is that okay if I do that?

11                    (* Exhibit 46A was marked *)

12         Q.    (Mr. Wiggins)  Do you recognize that

13    document, Mr. Martini?

14         A.    Yes.

15         Q.    Is that your first report that you made to

16    Nationwide Insurance Company?

17         A.    Yes.

18         Q.    And is this the photograph -- some of the

19    photographs that you took at the time you were there?

20         A.    Yes.

21         Q.    And I've asked you about some things that

22    you previously identified.

23                    Number one is on the outside of the

24    building that the -- that panel device there, you see

25    on the second page, photograph number three?

1        A.    Okay.

2        Q.    Now, that's the electrical -- outside

3    electrical panel to the restaurant?

4              Is that what that is?

5        A.    Yes.

6        Q.    And that was examined in November of 2012,

7    was it not?

8        A.    Yes.

9        Q.    And this photograph was taken by you at

10   that -- on that date?

11              MS. DALY:  Objection to form.

12       Q.    (Mr. Wiggins)  That is, in November 2012?

13       A.    These are my January 30th photos.

14       Q.    I'm sorry.  January 30 photos.

15             You went back -- I remember going back

16   there, and you were there on November -- in November

17   of 2012, and the PWC was there and they opened that

18   box.  Do you recall ---

19       A.    --- Yes.

20       Q.    Were you there on that occasion?

21       A.    I was.

22       Q.    And this is the box that they opened on

23   that date?

24       A.    It is.

25       Q.    And everybody took photographs of the open

1    box and found no issues with the electrical

2    components in that -- in that electrical box?

3                  Would that also be true?

4          A.    That is correct.

5          Q.    And the next photographs would be the main

6    service panels that you and I looked at and talked

7    about early on, and you identified as being panels A,

8    B and C.  Is that also correct?

9          A.    Yes, it is.

10         Q.    And some of these, you said, were tripped,

11    and you identified those that were tripped on your

12    drawing that you have talked to me about earlier.  Is

13    that true?

14         A.    Yes.

15         Q.    And the next photograph, number 16, is the

16    view from -- from the hallway toward the rear

17    drive-thru service area, rear drive-thru windows

18    boarded up, and that's the area that we've identified

19    as being what Mr. Lacy identified to you as being the

20    ---

21                  MS. DALY:  --- Are you referring to

22    photograph 16?

23                  MR. WIGGINS:  Sixteen.

24                  MR. DALY:  Okay.  Thank you.

25                  MR. WIGGINS:  Correct.  I'm sorry.

1              Photograph 16 as being the area of

2     original of the fire.

3                     MS. DALY:  Objection to form.

4                     THE WITNESS:  Is that a question?

5                     MR. WIGGINS:  Yeah.  The question

6     was did Mr. Lacy identify that to you as being the

7     area of origin of the fire.

8                     MS. DALY:  Objection to form.

9                     THE WITNESS:  Yes.

10        Q.  (Mr. Wiggins)  And I've asked you about

11    these receptacles one, two and three, and you also

12    identified those on your drawing that we looked at

13    earlier on.  Is that correct?

14        A.  Yes.

15        Q.  The wiring that we're looking at -- look

16    at photograph number 27, and the Bates stamp is

17    01845.

18              You see that, Mr. Martini?

19        A.  I do.

20        Q.  And was that the wiring that you

21    identified earlier that we were asking about located

22    in the ceiling area where it -- where Mr. Lacy

23    identified to you where he thought the origin of the

24    fire was?

25        A.  Yes.

1        Q.    And did you examine that wiring?

2        A.    I did.

3        Q.    I see a chain hanging down in that

4   photograph.

5              Do you see that?

6        A.    Yes.

7        Q.    And is that a chain that would have held

8   the lighting system, or do you know what that is?

9        A.    That is not holding the lighting system.

10  Probably have to look at some other -- other photos.

11  Looks more like a shelf bracket or something.

12       Q.    Okay.

13       A.    Can't quite tell completely from that

14  photo.

15       Q.    But the top of this photograph shows a

16  fluorescent light, does it not?

17       A.    Yes.

18       Q.    And again, photograph 28 and 29, Bates

19  stamp number 1848 is, again, the ceiling area in the

20  area where the origin of the fire was identified by

21  Mr. Lacy?

22       A.    Yes.

23       Q.    And then photograph number 32, Bates

24  stamped 1848, that's identifying the fluorescent

25  fixtures in the hallway near the rear drive-thru

1    service area.

2              And that's the one you were -- you and I

3    were talking about earlier.  Is that also correct?

4         A.    In photograph 27, yes.

5         Q.    Photograph number 33, Bates stamp number

6    1849, is identified as miscellaneous items recovered

7    from the rear drive-thru service area.

8              Do you see that?

9         A.    Yes.

10        Q.    And did you talk to Mr. Lacy about these

11   items?

12        A.    To the extent that I was informed that

13   they were collected from that area in back.

14        Q.    Did he tell you what it was?

15        A.    No.

16        Q.    Did you talk to Chad Royal about these

17   items?

18        A.    Only to the extent that they didn't find

19   any evidence of a failure.

20        Q.    Did you know what it was when you looked

21   at it?

22        A.    What was?

23        Q.    Did you know what this was in -- you've

24   got miscellaneous items recovered.

25              Do you know what the miscellaneous items

 1  were?

 2                    MS. DALY:  Objection to form.

 3       Q.   (Mr. Wiggins)  At the time that you first

 4  looked at it on January 30th, 2012.

 5       A.   What they all were?

 6       Q.   Yes.

 7       A.   Okay.  Various pieces of wiring, printed

 8  circuit boards, some melted mass of something.

 9       Q.   And did you know where these circuit

10  boards came from?

11       A.   Not specifically.

12       Q.   Did you talk to Mr. Lacy and ask him where

13  they came from?

14                    MS. DALY:  Objection to form.

15                    THE WITNESS:  Sure.  I was told

16  somewhere in that area.

17                    MR. WIGGINS:  Okay.

18                    THE WITNESS:  It was found -- all

19  this was found in the debris in that area.

20       Q.   (Mr. Wiggins)  And did you talk to Mr.

21  Royal about these items, these miscellaneous items?

22       A.   Other than informing him that I found no

23  evidence of a failure, I don't -- I don't think so.

24       Q.   And did Mr. Lacy tell you where the --

25  where it was found in the area where the fire, as he

1    identified it, began?

2                    MS. DALY:  Objection.  Asked and

3    answered.

4                    THE WITNESS:  Just that it was from

5    that area.

6         Q.   (Mr. Wiggins)  Did you ever ask him

7    specifically where it came from?

8                    MS. DALY:  Objection.  Asked and

9    answered.

10                    THE WITNESS:  In other words, no, he

11   didn't point to a spot on the floor and say it came

12   from there, no.  He just -- it was from that area.

13        Q.   (Mr. Wiggins)  Did you have any curiosity

14   about where it came from?

15                    MS. DALY:  Objection.

16                    THE WITNESS:  I'm always curious

17   where everything comes from on a fire scene, but

18   sometimes that's not answered.

19        Q.   (Mr. Wiggins)  Did you ask if it were --

20   if it was some kind an appliance that had been

21   located in that area?

22        A.   No.

23        Q.   Did you have any -- did any question arise

24   in your mind as to where it might have been?

25        A.   Well, I knew it was from that area based

 1    on the amount of damage.

 2         Q.    Okay, but nobody ever told you where it

 3    was situated or anything else about it.  Is that what

 4    you're saying?

 5                    MS. DALY:  Objection.

 6                    THE WITNESS:  That's my

 7    recollection, yes.

 8         Q.    (Mr. Wiggins)  Did you make any notes

 9    about this item that you had?

10         A.    No.

11         Q.    Did you read the report that I furnished

12    to counsel that was written by James Small?

13         A.    Yes.

14                    MS. DALY:  Actually, so that the

15    record is clear, are you talking about the letter

16    that you've sent us?

17                    MR. WIGGINS:  Yes.

18                    MS. DALY:  You just said a report.

19    We have a letter.

20                    MR. McLEAN:  Can we go off the

21    record for one minute.

22         (12:05-12:06 p.m. - recess)

23         Q.    (Mr. Wiggins)  Let me show you, Mr.

24    Martini, what is a report dated August 15, 2013, to

25    Trey McLean from Kodiak Fire & Safety Consulting.

1             Have you ever seen this before?

2        A.    No.

3        Q.    Do you know who James Small is?

4        A.    Yes.

5        Q.    How do you know him?

6        A.    From an article that was referenced.

7        Q.    And was that article furnished to you by

8   counsel?

9        A.    Actually, no.  I had that from before.

10        Q.    How did you obtain a copy of that article

11   written by James Small?

12        A.    I don't remember who sent that to me.  I

13   got -- I got that sometime ago, I mean, possibly a

14   year or two ago unrelated to this case.

15        Q.    And had nothing to do with this matter

16   that we're talking about here today?

17        A.    That's correct.

18        Q.    Have you ever talked to Jim Small?

19        A.    I have not.

20        Q.    And are you familiar with the article that

21   you just showed me that you have read and are

22   familiar with?

23        A.    Yes.

24        Q.    And the basis of that article had to do

25   with 24 volt or less appliances and potential for

 1    fire in those appliances ---

 2         A.    --- Yes.

 3         Q.    --- Printed circuit boards?

 4              Is that -- would that be an accurate

 5    description of it?

 6         A.    Pretty good.

 7         Q.    Have you ever done any studies on -- on

 8    printed circuit boards yourself on this -- in any

 9    respects whatsoever in relation to its potential for

10    fire?

11                        MS. DALY:  Objection to form.

12                        THE WITNESS:  Study other than

13    related to investigating fires?

14                        MR. WIGGINS:  Yes.

15                        THE WITNESS:  No.

16         Q.    (Mr. Wiggins)  And do you recall the

17    occasion of your having to become familiar with the

18    article written by James Small?

19         A.    It was not sent to me in conjunction with

20    any particular case I was working on.

21         Q.    Okay.

22         A.    It was just information that somebody

23    passed along to me.

24         Q.    Have you read that article again recently

25    in preparation for your testimony in this -- this

Page 80

1   particular case?

2           A.   I did reread it, yes.

3           Q.   And do you have any thoughts with what the

4   findings of Jim Small was in that article?

5                     MS. DALY:  Objection to form.

6                     THE WITNESS:  Well, what specific

7   finding?

8                     MR. WIGGINS:  Well ---

9                     THE WITNESS:  --- He's opening --

10  he's just raising awareness in what he's doing.  And

11  as far as findings go, he's got one -- one particular

12  case study that he's written about all the way

13  through.

14                I think it should be kept in mind that the

15  type of failure that he's discussing on a circuit

16  board level can happen.  More often than not, the

17  result is that the particular appliance stops

18  working.  There's no reason to think that anytime

19  there's a failure on a board -- at board level,

20  you're going to end up with a fire, because we'd have

21  everything blowing up around us.  Okay?

22                So first thing that would typically happen

23  is that an item would stop working.  There's no

24  indication that this wireless equipment had any kind

25  of operational problems.

1           The only one that he's -- when they show

2    something has gone to failure is in his figure six,

3    and that shows very specific damage to the board.

4    You've got a hole in the board, you've got edges of

5    the board missing.

6           Q.   (Mr. Wiggins)  Is the article that you're

7    referring to, is it entitled Class 2 Transformers and

8    Plastic Enclosed Printed Circuit Boards, a

9    Potentially Perilous Combination?

10          A.   No.

11          Q.   Is the one that you have called Low

12   Voltage, the Incomplete Ignition Source Dispelling

13   the Myth?

14          A.   Yes.

15          Q.   And you're familiar with the article?

16          A.   That one, yes.

17          Q.   Okay, and his -- I guess his conclusions

18   -- it's not really specific conclusions.

19          Well, he has a conclusion at the very last

20   page of his article, and it says conclusion, the

21   proliferation of consumer electronics in the home and

22   the ever-increasing and never-ending push to

23   miniaturize them continues to introduce new

24   challenges for the fire investigative community.

25          The utilization of manufacturing processes

1   are increasingly more difficult to control from a

2   cleanliness perspective, and the drive to reduce

3   hazardous substances such as formerly effective fire

4   retardant agents in PCB's are continuing to create

5   the, quote, perfect storm, end quote, with respect to

6   printed circuit board ignition.

7           You see that in the article?

8       A.   Yes.

9       Q.   And do you agree with that or disagree

10  with that?

11              MS. DALY:  Objection to form.

12              THE WITNESS:  I agree in general.

13      Q.   (Mr. Wiggins)  And it says, furthermore,

14  the management of these critical process parameters

15  required to ensure reliable and safe operation of

16  printed circuit boards in the hands of the consumer

17  continues to be overwhelming challenging -- challenge

18  for many companies sourcing product from contract

19  manufacturers in the Pacific Rim.

20          Do you see that?

21      A.   Yes.

22      Q.   Do you agree with that or disagree with

23  that statement?

24              MS. DALY:  Objection to form.

25              THE WITNESS:  Well, I wouldn't use

1   as many adjectives, but in general, I agree.

2          Q.    (Mr. Wiggins)   And then next paragraph he

3   says, for investigators who wish to improve their

4   accuracy in identifying the root causes of the fires

5   they investigate, virtually all electronic devices in

6   the area of origin, and in parens, and the area of

7   interest, end parens, must be considered as potential

8   ignition sources, period.

9               Do you agree or disagree with that

10  statement?

11                    MS. DALY:  Objection to form.

12                    THE WITNESS:  I agree.

13         Q.    (Mr. Wiggins)   Devises geographically

14  remote from the area of origin, comma, even those

15  located in the compartment completely unaffected by

16  fire, comma, must also be considered if connected to

17  such devices via data cable, comma, coax or like

18  wiring, period.

19              Do you agree or disagree with that

20  statement?

21                    MS. DALY:  Objection to form.

22                    THE WITNESS:  Agree.

23         Q.    (Mr. Wiggins)   And then the next point he

24  makes in the next paragraph, he says, no longer is it

25  acceptable to turn a blind eye to products that are

1    arbitrarily considered to be, quote, low voltage, end

2    quote.

3               Do you agree or disagree with that?

4                    MS. DALY:  Objection to form.

5                    THE WITNESS:  Agree.

6         Q.   (Mr. Wiggins)  And then he says, no longer

7    is it acceptable to ignore devices formerly believed

8    to be incapable of developing enough heat to initiate

9    a fire.

10              Do you agree or disagree with that

11   statement?

12                   MS. DALY:  Objection to form.

13                   THE WITNESS:  Agree.

14        Q.   (Mr. Wiggins)  And then, no longer is it

15   acceptable to apply conventional compartment fire

16   development principles to small-scale electronic

17   assemblies and devices.

18              Do you agree or disagree with that

19   statement?

20                   MS. DALY:  Object to form.

21                   THE WITNESS:  Agree.

22        Q.   (Mr. Wiggins)  When you look at this --

23   this circuit board that you've identified in

24   photograph -- photograph number 33, did you examine

25   the contents of that board for any carbonization on

1    any of the components of the board?

2         A.    Well, there were no components left on the

3    board at that time.

4         Q.    Could you see any carbonization on any of

5    the points of the board?

6         A.    That type of damage would have been masked

7    by the fire.

8         Q.    The question is you did not find any.  Is

9    that correct?

10        A.    That's correct.

11        Q.    Did you look for any?

12        A.    I looked for any specific damage, any

13   specific localized damage on the board on both sides.

14        Q.    And even in your report on May 23rd, 2012

15   -- do you have that before you there?

16              You do -- I'm sorry.  It's in the back

17   part of the photographs that you have.

18        (Witness examined documents)

19        A.    Okay.

20        Q.    This was written to Michael Jezierski on

21   May 23rd, 2012.  Is that correct?

22        A.    Is that a question?

23        Q.    It's a question.

24        A.    Yes.

25        Q.    And did you write this in conjunction with

Page 86

1    the report written by Mr. -- by Mr. Lacy?

2                    MS. DALY:  Objection to form.

3                    THE WITNESS:  I'm not sure what you

4    mean by in conjunction with.

5         Q.   (Mr. Wiggins)  Did you and he consult each

6    other when you wrote your report as opposed to when

7    he wrote his report?

8         A.   No.  I was asked to prepare a short report

9    on my findings, and I did.

10        Q.   And my question was did you consult with

11   Terry Lacy about his report that was -- that

12   pre-dated your report prior to writing your -- this

13   report?

14                   MS. DALY:  Objection to form.

15                   THE WITNESS:  I don't believe so.

16        Q.   (Mr. Wiggins)  Did you and he have any

17   discussions about your findings prior to your writing

18   this report?

19        A.   Well, he knew about my findings the day I

20   was out there.

21        Q.   Yes, yes, the day you were out there.

22        A.   I said I discussed my findings with him

23   when I was out there on the 30th.

24        Q.   Prior to writing this report, or

25   immediately prior to writing this report, did you

1    have any discussions with Terry Lacy?

2          A.    I ---

3                      MS. DALY:   --- Objection to form.

4                      THE WITNESS:   Sorry.

5                Not that I recall.

6          Q.    (Mr. Wiggins)  Did you review any report

7    that was written by Terry Lacy prior to your writing

8    this report?

9          A.    No.

10         Q.    Did you know that Terry Lacy did not

11   mention in his report this circuit board that he

12   found at or near the location of what he had found to

13   be the origin of the fire?

14                      MS. DALY:   Objection.

15   Mischaracterization.

16                You can answer.

17                      THE WITNESS:   Did I know he didn't

18   have it in his report?

19         Q.    (Mr. Wiggins)  Did you know he did not

20   contain any mention of this circuit board in his

21   report, that he found at or near the location of the

22   origin of the fire, or is that ---

23                      MS. DALY:   --- Objection.

24                      THE WITNESS:   I guess I didn't see

25   his report.

1          Q.    (Mr. Wiggins)  You didn't see his report?

2          A.    Right.

3          Q.    Have you read his report to this day?

4          A.    I've seen his most recent one.  I don't --

5     I probably read the other one at some point.

6          Q.    If I represent to you that he made no

7     mention of the circuit board in his report, would

8     that refresh your recollection?

9                     MS. DALY:  Objection.

10    Mischaracterization.

11                    THE WITNESS:  No.

12         Q.    (Mr. Wiggins)  Would not refresh your

13    recollection?

14         A.    No.

15         Q.    Did you have any discussion with Mr. Lacy

16    about whether or not he included any reference to the

17    circuit boards that you've identified in your

18    photographs in his report to Nationwide Insurance

19    Company?

20                    MS. DALY:  Objection.

21                    THE WITNESS:  I'm sorry.  Say that

22    again, please.

23         Q.    (Mr. Wiggins)  Did Mr. Lacy -- did you

24    ever have any discussion with Mr. Lacy about whether

25    or not he included any reference to the circuit

1    boards that he found in the area of the location of

2    the fire?

3          A.    No.

4          Q.    Did you ever ask him if he had mentioned

5    that in his reports?

6          A.    No.  I would have considered that an

7    electrical issue that he would have just deferred to

8    me.

9          Q.    Now, you did not make any mention of a

10   circuit board in your report, did you?

11                    MS. DALY:  Objection to form.

12                    THE WITNESS:  The last sentence in

13   the body would have covered that.

14                    MR. WIGGINS:  Wait, wait, wait.  I'm

15   sorry.

16              Which -- which page are you on?

17                    THE WITNESS:  Page three, last

18   paragraph.  Paragraph starting with four drop-in

19   fluorescent fixtures.  Last -- I'm right there.

20                    MR. WIGGINS:  I got you.  Okay.

21                    THE WITNESS:  Yeah, last sentence,

22   miscellaneous debris recovered from the floor around

23   the area of fire origin was inspected with no

24   evidence of electrical failure found.

25                    Photograph 33 is referenced, and that's

1   the one that shows the items on the counter, so that

2   sentence covered all those items.

3           Q.   (Mr. Wiggins)  Miscellaneous debris

4   recovered from the floor around the area of the fire

5   origin was inspected with no evidence of electrical

6   failure found.

7                And that was referenced, the -- to the

8   miscellaneous items identified and recovered from the

9   rear drive-thru service area, photograph 33?

10              Is that what you're saying?

11  A.    Yes.

12          Q.   But nowhere in your report to Nationwide

13  Insurance Company do you mention the printed circuit

14  board, do you, Mr. Martini?

15                      MS. DALY:  Objection to form.

16                      THE WITNESS:  It's covered in that

17  last sentence.

18          Q.   (Mr. Wiggins)  Well, my question was --

19  and you mentioned it -- did you say printed circuit

20  board was found in the area of the fire?

21                      MS. DALY:  Objection to form.

22                      THE WITNESS:  Not in detail, no.

23          Q.   (Mr. Wiggins)  Do you not think now, upon

24  reflection, that that should have been something that

25  you should have reported to Nationwide Insurance

1    Company in the first instance in this report?

2                    MS. DALY:  Objection.

3    Mischaracterization of his testimony.

4                    THE WITNESS:  I feel I did cover it

5    in my report.

6         Q.   (Mr. Wiggins)  Well, how did you cover it?

7              How did you -- how did you -- other than

8    what you just told me, is there anything else that

9    would have been -- put someone on notice that there

10   was printed circuit board in that area that was

11   electrically powered?

12                    MS. DALY:  Objection.

13                    THE WITNESS:  I don't know what your

14   question is.

15        Q.   (Mr. Wiggins)  Was this printed circuit

16   board electrically powered in some fashion?

17        A.   Well, we know that now.

18        Q.   Did you know it then?

19        A.   I assumed it was.

20        Q.   Okay, and did you go and look where the

21   power source of that circuit board was?

22                    MS. DALY:  Objection to form.

23                    THE WITNESS:  Not having known where

24   it came from specifically, no.

25        Q.   (Mr. Wiggins)  Okay, and so the answer is

1    you never looked to see if there was a source,

2    electrical source, for that printed circuit board?

3                    MS. DALY:  Objection to form.

4                    THE WITNESS:  I looked at -- let's

5    say, given where we know it is now, I looked in that

6    area and the exterior end of the office area.  I

7    looked at everything I could see.  If the power

8    supply cord was in that area, I would have seen it.

9    If it wasn't, I didn't.

10        Q.   (Mr. Wiggins)  Is it possible that you

11   missed seeing the power cord to the printed circuit

12   board?

13                   MS. DALY:  Objection to form.

14                   THE WITNESS:  Not knowing what

15   condition it was in after the fire, it's possible.

16        Q.   (Mr. Wiggins)  You knew that Nationwide

17   Insurance Company was going to rely upon your report

18   in determining whether or not to -- whether or not to

19   either approve this loss for payment or whether they

20   were going to deny the loss for payment?

21                   MS. DALY:  Objection to form.

22                   THE WITNESS:  Typically I am looking

23   at a fire scene for subrogation purposes.

24              What the case eventually turns into, I'm

25   not aware of when I'm out there, and it's -- it's

 1    really not my concern.  My goal is to do what I'm

 2    tasked to do.

 3         Q.   (Mr. Wiggins)  But you knew that

 4    Nationwide was going to rely upon your report in

 5    whatever decisions they made in relation to this,

 6    whatever it was, did you not?

 7                   MS. DALY:  Objection to form.

 8                   THE WITNESS:  Yes.

 9         Q.   (Mr. Wiggins)  And it would have been

10    important for you to identify everything in the area

11    where this fire began that might have something to do

12    -- or might be a heat source where the fire might

13    have begun.

14                   MS. DALY:  Objection to form.

15                   THE WITNESS:  Yes.  I did that.

16         Q.   (Mr. Wiggins)  Did you tag this printed

17    circuit board and identify it in any way when you

18    looked at it?

19                   MS. DALY:  Objection to form.

20                   THE WITNESS:  No.

21         Q.   (Mr. Wiggins)  Why didn't you do that?

22         A.   Why didn't I do what?

23         Q.   Why didn't you tag it and identify it in

24    some fashion?

25                   MS. DALY:  Objection.

 1                   THE WITNESS:  Everything that I

 2   examined on January 30th, including the items on the

 3   table there, the miscellaneous items we're talking

 4   about, wiring and the receptacles, etcetera,

 5   everything was examined and photographed.  Some of it

 6   was sketched.  And then I left it all in place for

 7   any possible future inspections by any other

 8   interested parties.

 9        Q.   (Mr. Wiggins)  You said that you conducted

10   this investigation in accordance with -- and I

11   believe in your report you said Section 921 of the

12   NFPA, did you not?

13        A.   Yes.

14        Q.   And do you know what -- do you know what

15   those sections contain?

16             Are you familiar with those sections?

17        A.   I'm somewhat -- I'm familiar with 921,

18   yeah.

19        Q.   And one of the things 921 requires an

20   investigator to do is to tag and to identify and

21   preserve any physical evidence that's found in the

22   scene of a fire, is it not?

23                  MS. DALY:  Objection.

24        Q.   (Mr. Wiggins)  Well, you know that, don't

25   you?

 1                    MS. DALY:  Objection.

 2    Mischaracterization.

 3                    You can go ahead and answer.

 4                    THE WITNESS:  Yes.  And I also know

 5    that preserving the scene as intact as possible for

 6    any other investigators is just as important.  But

 7    items were all left in place and the restaurant was

 8    secured when we left.

 9         Q.   (Mr. Wiggins)  And -- but nothing was

10    identified or tagged.  Is that your testimony ---

11                    MS. DALY:  --- Ob ---

12         Q.   (Mr. Wiggins)  --- To your knowledge?

13                    MS. DALY  Objection.

14                    THE WITNESS:  Correct.

15         Q.   (Mr. Wiggins)  Did Mr. Lacy ever tag or

16    identify any evidence that was identified that was

17    recovered from the scene?

18         A.   Yes.

19         Q.   What did he tag and identify?

20         A.   Anything he would have collected.

21         Q.   Pardon?

22         A.   Anything he would have collected.

23         Q.   Did you ever look at it prior to going to

24    Mr. Cavaroc's office -- lab in Raleigh?

25         A.   No.

1        Q.    921 also requires that any evidence found

2   at the scene be sent to a lab for identification or

3   examination, does it not?

4                    MS. DALY:   Objection.   It's a

5   mischaracterization.

6                    THE WITNESS:   Anything that he

7   collected was taken to a lab.

8                    MR. WIGGINS:   Pardon?

9                    THE WITNESS:   Anything that Mr. Lacy

10  collected was taken to a lab.

11       Q.    (Mr. Wiggins)  Well, this was not taken to

12  the lab, was it?  This circuit board was not taken to

13  the lab?

14       A.    It was not collected.

15       Q.    He should have collected it, shouldn't he?

16                    MS. DALY:   Objection.

17                    THE WITNESS:   Like I stated before,

18  anything I looked at I left in place for any other

19  parties to look at.

20       Q.    (Mr. Wiggins)  My question was, Mr. Lacy,

21  as the primary investigator on this fire, should have

22  tagged and collected the circuit boards for further

23  identification and evidence, should he not?

24                    MS. DALY:   Objection.

25                    THE WITNESS:   If we collected the

1    circuit boards, then I would have had to collect

2    everything else that I looked at, and that would have

3    -- we would have then later been accused of

4    expoliation of evidence or spoiling the scene, so....

5         Q.   (Mr. Wiggins)  Well, once -- this is

6    paragraph 1610 of what you just identified as what

7    you complied with 921.

8                   MS. DALY:  Do you have a copy of

9    that so he can read along with you?

10                  MR. WIGGINS:  Don't have a copy of

11   it.

12            The only thing I can do is read it to you,

13   Mr. Martini.

14        Q.   (Mr. Wiggins)  It says -- this is 1610 --

15   examination, testing of physical evidence.

16            Once collected, physical evidence is

17   usually examined and tested in a laboratory or other

18   testing facility.  Physical evidence may be examined

19   and tested to identify its chemical composition to

20   establish its physical properties to determine its

21   conformities or lack of conformity to certain legal

22   standards to establish its operation, inoperation or

23   malfunction to determine its design sufficiency or

24   deficiency or other issues that would provide the

25   fire investigator with an opportunity to understand

1      and determine the origin of the fire, a specific

2      cause of the fire, the contributing factors to a fire

3      spread or other responsibility for a fire.

4                     Are you familiar with that section of 921?

5                          MS. DALY:  Can you show it to him so

6      he can -- if you're going to ask questions about it.

7                          THE WITNESS:  1610?

8                          MR. WIGGINS:  1610.

9                          THE WITNESS:  Okay.

10            (Witness examined document)

11                         THE WITNESS:  Okay.

12         Q.   (Mr. Wiggins)  You did not send this to a

13     laboratory to be tested or mark and tag it to be sent

14     to a laboratory, did you?

15         A.   Yeah, I talked about ones collected.

16         Q.   Pardon?

17         A.   I discussed this evidence that is being

18     collected.

19         Q.   Well, didn't you collect this or didn't

20     someone from your company collect it?

21                         MS. DALY:  Objection.

22         Q.   (Mr. Wiggins)  From Donan -- didn't Mr.

23     Lacy collect it?

24                         MS. DALY:  Objection.

25     Mischaracterization.

1                    THE WITNESS:  I'm not aware of him

2    collecting it.

3         Q.   (Mr. Wiggins)  Who told you -- who told

4    you where it came from?

5         A.   Mr. Lacy did.

6         Q.   Did he say that he got it there?

7                    MS. DALY:  Objection to form.

8               Got it where?

9                    MR. WIGGINS:  From the area where he

10   determined the origin of the fire to have begun.

11                   MS. DALY:  Objection.  Asked and

12   answered.

13                   THE WITNESS:  Actually, I believe

14   Mr. Royal collected it.

15                   MR. WIGGINS:  Okay.

16                   THE WITNESS:  If I remember -- if I

17   remember the depositions correctly.

18        Q.   (Mr. Wiggins)  Do you remember him telling

19   you that, or is that just what you read from the

20   depositions?

21                   MS. DALY:  Objection to the form.

22                   THE WITNESS:  Mr. Royal was not

23   present when I looked at that earlier in the day.

24             I don't remember specifically if Mr. Lacy

25   told me he got it from there or Mr. Royal collected

1    it from there.

2         Q.   (Mr. Wiggins)  It would have been a good

3    idea, would it not, from your experience, to have had

4    this circuit board examined in a laboratory setting,

5    as the other evidence, to determine if there were any

6    defects in it, wouldn't it?

7                   MS. DALY:  Objection.

8                   THE WITNESS:  If it had been there

9    later to collect, that's what would have been the

10   process, yes.

11             Once I -- once I left the scene, the scene

12   was secured and not under my direction, so....

13        Q.   (Mr. Wiggins)  Did you develop or were you

14   asked to develop any kind of hypotheses as to how

15   this fire might have begun?

16        A.   I'm only asked to examine electrical --

17   essential electrical sources of ignition and

18   determine if any of those played a role in the cause

19   of the fire.

20        Q.   And did you develop any hypotheses based

21   upon that examination by you of electrical equipment?

22        A.   My findings are that there's no electrical

23   source of ignition for this fire.

24        Q.   When you did your investigation, were you

25   aware of the drying rack that was located adjacent to

1     the window -- the drive-in window number one at the

2     Miami Subs Restaurant?

3                     MS. DALY:  Objection to form.

4                     THE WITNESS:  Are we talking about

5     the steel rack?

6                     MR. WIGGINS:  The steel rack.

7                     THE WITNESS:  Yes.

8          Q.   (Mr. Wiggins)  And it's a drying rack, I

9     think, they were calling it.

10         A.   Oh, yeah.

11         Q.   Is that correct?

12         A.   Yes.

13         Q.   And did you inquire of anyone what was

14    stored on that rack?

15         A.   I believe I was told -- like I said, it

16    was a drying rack for cups and plates and whatever.

17         Q.   Did anyone identify to you that on that

18    rack was also these plastic cups, these styrofoam

19    cone, plates, and the wrappers, the cellophane

20    wrappers around these cups?

21                     MS. DALY:  Objection to form.

22                     THE WITNESS:  That may have been

23    mentioned.  I don't know.

24         Q.   (Mr. Wiggins)  Was that anything that you

25    would have been interested in in making your

1    investigation?

2         A.    I haven't seen sparks come from plastic

3    cups.

4         Q.    And you saw some of those plastic cups at

5    Mr. Cavaroc's lab when you went there, did you not?

6         A.    Yes.

7         Q.    And did anybody then talk about where

8    those cups or those styrofoam plates came from?

9         A.    The ones that Mr. Lacy collected?

10        Q.    Right.  Mr. Lacy brought to the....

11        A.    I don't remember specifically.  He made

12   his evidence list.  It may state where those were

13   collected from.

14        Q.    You now know from reading the depositions

15   that this HME -- this Ion IQ communicative device was

16   located about six and a half feet above the floor to

17   the right of the drive-thru window, do you not?

18                    MS. DALY:  Objection.

19                    THE WITNESS:  Yes.

20        Q.    (Mr. Wiggins)  And as a matter of fact,

21   you could see that by virtue of the fact that there

22   was a place on the wall that was not blacked out by

23   smoke or fire -- could you not -- could you not

24   identify that?

25                    MS. DALY:  Objection to form.

1                    THE WITNESS:  Yes.

2          Q.   (Mr. Wiggins)  Did you identify that

3     physically, yourself, or did you see it by photos?

4          A.   I saw it when I was there.  I didn't know

5     the significance of it till later.

6          Q.   And at the time you were there, you did

7     not know the location of the HME Ion system --

8     communication system, did you?

9          A.   That's correct.

10                    MS. DALY:  Let's go off the record

11    for a moment.

12         (12:36-1:31 p.m. - recess)

13                    MR. WIGGINS:  Everybody ready?

14                    Back on the record.

15         Q.   (Mr. Wiggins)  Mr. Martini, just going

16    back for a second on a subject we were speaking about

17    earlier, and that is the -- the preservation of

18    physical evidence.

19                    You said that you did not mark the circuit

20    boards.  Obviously you did not do that.  Do you know

21    whose responsibility that might have been?

22                    MS. DALY:  Objection to form.

23                    THE WITNESS:  Typically, evidence,

24    in my experience, is marked when it's collected.

25         Q.   (Mr. Wiggins)  And would the collector of

1    this evidence -- in your opinion, would it have been

2    -- I'm sorry -- would it have been Terry Lacy or Chad

3    -- Chad Royal?

4                        MS. DALY:  Objection.

5                        MR. WIGGINS:  If you know.

6                        MS. DALY:  Objection to the form.

7    It's a statement.

8                        THE WITNESS:  You're asking me if it

9    would have been the proper person to ---

10                       MR. WIGGINS:  --- Yes, who is the

11   proper person to -- to have collected and identified

12   and protected the physical evidence.

13                 That is, in this particular case, we're

14   talking about the circuit boards.

15                       MS. DALY:  Objection to the form of

16   the question, to the statement.

17                       THE WITNESS:  Either Mr. Lacy or I

18   could have collected them once we were sure that all

19   potential interested parties were -- were done with

20   the scene.

21       Q.   (Mr. Wiggins)  And again, I'm going to

22   show you this paragraph here, and it's -- this is in

23   chapter 16 of 921 of the NFPA rules, which you said

24   that you adhere to and -- now, let me show you what

25   is 16.1 and read that and see if you agree with that

1    statement and if this is what generally you do.

2          (Witness examined document)

3          A.    Okay, is there a question on that?

4          Q.    Yeah.  Whose responsibility is it to

5    collect and protect, preserve physical evidence?

6                     MS. DALY:  Objection to the form.

7                     THE WITNESS:  I'll say the fire

8    investigator is likely to be responsible.

9                     MR. WIGGINS:  Okay.

10                    THE WITNESS:  Doesn't say he is.

11   It's not his sole responsibility.

12         Q.    (Mr. Wiggins)  And in that case you would

13   have been one of the fire investigators?

14                    MS. DALY:  Objection to the form.

15                    THE WITNESS:  We're getting into

16   nuances of fire investigator.  I'm an electrical

17   engineer, but assisting my fire investigator.

18         Q.    (Mr. Wiggins)  So you had been insist --

19   you had been assisting Terry Lacy ---

20                    MS. DALY:  --- Objection to the

21   form.

22         Q.    (Mr. Wiggins) --- The origin and cause

23   investigator.

24                    MS. DALY:  Objection to the form.

25                    THE WITNESS:  Yes.  And typically,

1    if we were collecting evidence, he may be collecting

2    evidence pertinent to him, I may be collecting

3    evidence pertinent to me.  You know, it's not --

4    there's no hard and fast division of labor.

5              Sometimes I help their investigators

6    collect evidence and sometimes they help me.

7         Q.   (Mr. Wiggins)  What are the methods that

8    you're familiar with that can be used to identify and

9    protect evidence from destruction?

10        A.   Say it again, please.

11        Q.   What are the methods that you're familiar

12   with that are typically used by fire investigators to

13   protect it from destruction?

14        A.   In particular?

15                   MS. DALY:  Objection to the form.

16                   MR. WIGGINS:  Physical evidence ---

17                   THE WITNESS:  --- To protect it from

18   destruction?

19                   MR. WIGGINS:  Yes.

20                   MS. DALY:  Objection to form.

21                   THE WITNESS:  Well, one is to secure

22   the premises, and if -- we're talking about evidence

23   that's not yet collected or about to be collected?

24                   MR. WIGGINS:  Already is collected.

25                   THE WITNESS:  If it's about to be

1   collected -- well, if it's collected, it's stored in

2   bags, boxes, cans, whatever, and stored in a secured

3   location.

4          Q.   (Mr. Wiggins)  The circuit boards were not

5   stored in a safe location, were they?

6                    MS. DALY:  Objection to form.

7                    THE WITNESS:  The restaurant was

8   secured when I left.

9          Q.   (Mr. Wiggins)  But no other -- no other

10  means of protecting it were utilized, to your

11  knowledge?

12                    MS. DALY:  Objection to form.

13                    THE WITNESS:  They were left as I

14  found them.

15         Q.   (Mr. Wiggins)  And you found them on the

16  table?

17         A.   Yes.

18         Q.   Do you have any idea who would have had

19  any -- well, strike that.

20              Do you now know that those circuit boards

21  were no -- are no longer in existence, or they cannot

22  be found.

23              Do you know that?

24         A.   Yes.

25         Q.   Do you know who would have had any motive

1   to remove or take those circuit boards?

2        A.   I was not aware of anything like that.

3        Q.   Have you ever heard anyone, referring to

4   Mr. Lacy, speculate as to how they got missing?

5                  MS. DALY:  Objection to form.

6                  THE WITNESS:  I didn't understand.

7        Q.   (Mr. Wiggins)  Did any -- did you ever

8   have any conversation with Mr. Lacy about how he

9   thought they might have gotten missing?

10       A.   No.  We showed up in November, and it was

11  gone, along with -- along with most of the place.

12  Same time the DVR was discovered missing.

13       Q.   I'm sorry?  The DVR?

14       A.   That's the same date the DVR was

15  discovered missing, so a number of things had

16  disappeared.

17                  MR. WIGGINS:  Was that -- excuse me.

18  Let me just find -- what was that -- 46?

19                  MR. McLEAN:  46A?

20                  MR. WIGGINS:  46B.

21                  MR. McLEAN:  Go off the record a

22  second.

23       (1:39-1:41 p.m. - recess)

24                  (* Exhibit 46B was marked *)

25       Q.   (Mr. Wiggins)  Can you identify that

 1    document, Mr. Martini?

 2        A.    Yes.   It's my report.

 3        Q.    And what's the date of that report?

 4        A.    June 28, 2013.

 5        Q.    And at whose request did you prepare that

 6    report?

 7        A.    Rachel Daly.

 8        Q.    Okay, and is she counsel for Nationwide

 9    Insurance Company?

10        A.    Yes.

11        Q.    And this document was prepared as an

12    expert report to counsel.   Is that correct?

13        A.    Yes.

14        Q.    And this document says you examined the

15    fire scene at 552 North McPherson Church Road,

16    Fayetteville, North Carolina, on January 30th, 2012.

17              And that was -- that was contained in your

18    original report that had been made back in May of --

19    on May 23rd, 2012.

20              And then you added November 16th, 2012,

21    November 29th, 2012.

22              Those were the other two dates that you

23    were at the scene?   Is that correct?

24        A.    Yes.   Yes, sir.

25        Q.    What was the purpose for you being there

1    on November 16th and November 29th, 2012?

2          A.    November 16th is when PWC was put on

3    notice, I believe, and so we were -- we were notified

4    of -- John Cavaroc was representing PWC and was going

5    to the site that day.  We were notified that he would

6    be present, so we wanted to be present as well.

7          Q.    And was the fire -- was that evidence

8    examined at John Cavaroc's office on April the 17th,

9    2013?

10                      MS. DALY:  Objection to form.

11                      THE WITNESS:  Mr. Cavaroc collected

12   evidence on November 29th.

13         Q.    (Mr. Wiggins)  And when was it examined in

14   his office -- at his laboratory?

15         A.    April 17th ---

16         Q.    --- And you were present ---

17         A.    --- 2013.

18         Q.    And you were present at that meeting?

19         A.    Yes, I was.

20         Q.    And the bottom of that page says that the

21   fire -- says that the electrical supply to the

22   building did not cause or contribute to the fire.

23   The electrical supply is intact.  There was no

24   physical evidence which indicates change or failure

25   to that supply.  And there were no reported

1    electrical problems preceding the fire.

2              That was contained in your original

3    report, was it not?

4         A.   I don't have that in front of me, but --

5    well, in so many words, yes, it's covered.

6         Q.   And then, dropping down in the second page

7    of your report that was made in June 28th, 2013, on

8    number three you've got no evidence of electrical

9    failure was identified in or around the area of the

10   fire origin that could have served as ignition source

11   to the fire.  And in your original report this

12   appears in the summary of the conclusion section.

13             Why did you change that back into the

14   section as an opinion?

15                      MS. DALY:  Objection.

16                      THE WITNESS:  I don't understand

17   your question.

18        Q.   (Mr. Wiggins)  Well, in the first report

19   that you made, if you look at it -- do you have the

20   first report in front of you?

21        A.   I do.

22        Q.   It was -- on the last page you had that as

23   a -- as a summary of conclusion.

24             You see that?

25        A.   Yes.

 1          Q.   You say no evidence of electrical failure

 2    was identified in or around the area of the fire

 3    origin that could have served as ignition source for

 4    the fire, and -- but in this report you put it in a

 5    different section.  Why was that?

 6                        MS. DALY:  Objection.

 7                        MR. WIGGINS:  It's under your

 8    opinions now.

 9                        MS. DALY:  And so that it's clear

10    for the record, on the June 28th were referencing his

11    federal -- the expert report ---

12                        MR. WIGGINS:  --- Correct.

13                        MS. DALY:  --- In compliance with

14    the federal rules ---

15                        MR. WIGGINS:  --- Correct.

16                        MS. DALY:  --- Versus just the

17    letter prior to litigation.

18                        MR. WIGGINS:  Correct.

19                        MS. DALY:  You can answer if you

20    understand.

21                        THE WITNESS:  It qualifies them both

22    -- I don't....

23                        MR. WIGGINS:  I'm sorry?

24                        THE WITNESS:  I mean, there's no --

25    there's no heading for conclusions in the federal

 1   report.

 2                    MR. WIGGINS:  Okay.

 3                    THE WITNESS:  Just statement of

 4   opinions.

 5        Q.   (Mr. Wiggins)  When you wrote this report

 6   did you know where the area of the fire origin was

 7   that could have served as ignition source for the

 8   fire?

 9                    MS. DALY:  Which report?  The

10   federal expert report?

11                    MR. WIGGINS:  Yeah, the federal

12   expert report.

13                    MS. DALY:  Okay.

14                    THE WITNESS:  You're asking me, when

15   I wrote the federal expert report, did I know where

16   the origin of the fire was located?

17                    MR. WIGGINS:  Right.

18                    THE WITNESS:  Yes.

19        Q.   (Mr. Wiggins)  Okay, and did you know when

20   you wrote the federal report where the Ion IQ

21   communication device was located?

22        A.   Yes.  Based on our testimony, yes.

23        Q.   And did you write this report with the

24   knowledge of its location -- that is, the location of

25   the Ion IQ communication device -- at the time this

1    report was written?

2                    MS. DALY:  Objection.  Asked and

3    answered.

4                    THE WITNESS:  You're asking me if I

5    knew where it was installed when I wrote the report?

6                    MR. WIGGINS:  Yes.

7                    THE WITNESS:  Where it was

8    originally installed?

9                    MR. WIGGINS:  Where it was

10   originally installed.

11                    THE WITNESS:  Yes.

12        Q.   (Mr. Wiggins)  And you didn't know that

13   when you wrote the report to Nationwide Insurance

14   Company back in 2000 -- June of -- May of 2012.

15        A.   That's correct.

16        Q.   And in this report you talk about, in

17   paragraph six on the second page, a base station

18   reported to be part of the HM -- Electronics, Inc.,

19   HME, Ion IQ drive-thru audio system was reported to

20   have been installed on the wall near the top right

21   corner of the rear drive-thru window.

22             That's what you learned after you wrote

23   the initial report in May of 2012?

24        A.   That's correct.

25        Q.   And you only learned this through reading

1    the depositions of Jimmy Diamantopoulos and others

2    who have talked about the location of that system?

3         A.    Yes.

4         Q.    And you never learned about that either

5    from Terry Lacy, nor did you learn about it from Chad

6    Royal?

7                        MS. DALY:  Objection to the form.

8                        THE WITNESS:  Was that a question?

9                        MR. WIGGINS:  That's a question.

10                       THE WITNESS:  That's correct.

11        Q.    (Mr. Wiggins)  And it says, inspection --

12   then you go on down in the middle of that section,

13   you say, inspection of the recovered printed circuit

14   board revealed no evidence of electrical failure,

15   which would have been indicated by localized and

16   isolated heat damage to the printed circuit board

17   material.

18             And we talked about it earlier, and you

19   said you saw nothing to the naked eye that would

20   indicate any problem with that circuit board.

21             Is that your testimony?

22        A.    Yes.

23        Q.    The circuit board was heavily damaged, was

24   it not, Mr. Martini?

25                       MS. DALY:  Objection to the form.

1        Q.    (Mr. Wiggins)  It was heavily damaged,

2    wasn't it?

3        A.    It was heavily ---

4                  MS. DALY:  --- Objection to the

5    form.

6                  THE WITNESS:  Heavily heat damaged,

7    yes.

8        Q.    (Mr. Wiggins)  And the plastic casing on

9    that had been completely dissolved and burned away,

10   had it not?

11       A.    It was not recovered, so I'm assuming it

12   was.

13       Q.    There was no cover on the circuit boards

14   when you saw it.  No plastic covering at all.

15       A.    That's correct.

16       Q.    And you recovered one large, by

17   comparison, circuit board, and two small circuit

18   boards?

19       A.    I didn't recover anything.  I was ---

20       Q.    --- Well, I'm sorry -- that you saw on the

21   -- on the shelf that you looked at when you were

22   there?

23       A.    Yes.

24       Q.    And I think we've already established you

25   made no notes as to exactly what you saw on that day.

1    Is that correct?

2          A.    Correct.

3          Q.    But you just recalled now, having gone

4    back some time afterwards, that you saw no localized

5    isolated heat damage to that printed circuit board?

6                     MS. DALY:  Objection to the form and

7    mischaracterization of his testimony.

8          Q.    (Mr. Wiggins)  Well, you straighten me

9    out.

10         A.    Well, so in other words, if I had seen

11   something noteworthy, I would have made a note of it.

12         Q.    But I think we've already established that

13   in order to determine whether or not there is any

14   malfunction or any damage to that circuit board, it

15   should have been examined by x-ray in a laboratory

16   setting, should it not?

17         A.    No, it ---

18                     MS. DALY:  --- Objection.

19                     THE WITNESS:  We did not ---

20                     MS. DALY:  --- Mischaracterization

21   of his testimony.

22         Q.    (Mr. Wiggins)  We did not establish that?

23         A.    No.

24         Q.    What would be the correct way of

25   determining with some degree of certainty whether or

1    not there was any damage to that circuit board that

2    could have caused or generated heat have been

3    sufficient to have caused the fire?

4         A.    To have generated heat sufficient to cause

5    the fire, you would see that damage with the naked

6    eye with a thorough examination.

7         Q.    You would not have -- what do you base

8    that upon?

9         A.    Experience, and including the report that

10   you guys are referring to about the low voltage which

11   causes a fire.

12             When they show a circuit board that fails

13   to the point of causing a fire, they -- they have

14   photos of damage, you know, including holes in the

15   board, pieces of the board missing.  I would expect

16   to find the circuit traces melted apart.

17             I mean, in that report they talk about

18   electrical activity consuming copper traces.  You

19   know, I didn't see any of that.

20        Q.    Did you make any notes of that when you

21   looked at the board?

22        A.    No.

23        Q.    And did you not notice any holes in that

24   board when you looked at it?

25        A.    There were no holes ---

1        Q.    --- There were no holes?

2        A.    --- From localized heat damage, no.

3        Q.    If Mr. Small said that he saw holes in

4    that circuit board, would he be wrong about that?

5                    MS. DALY:  Objection to form.

6                    THE WITNESS:  I don't know what he's

7    seen.

8        Q.    (Mr. Wiggins)  If he said he saw holes in

9    that board, would he be -- would you disagree with

10   him?

11                   MS. DALY:  Objection to form.

12                   THE WITNESS:  Depends on what kind

13   of holes he seen.

14       Q.    (Mr. Wiggins)  If he saw -- if he -- on

15   that board he saw dark spots that would have

16   indicated that there were areas on that board that

17   could have been -- that could have been caused by --

18   let me read exactly what he said to be sure I'm not

19   mischaracterizing.

20                   MS. DALY:  And we'll make a general

21   ongoing objection to anything referencing Mr. Small.

22                   MR. WIGGINS:  Trey, do you have that

23   report?

24                   MR. McLEAN:  Small?

25                   MR. WIGGINS:  Yeah.  I know where it

1    is.  I'm sorry.  I think I know where it is.

2              Did I mark it -- did I mark that letter

3    that I got from James Small this morning?  Did we

4    have it marked?

5                    MS. DALY:  No.

6                    MR. McLEAN:  No, not to my

7    knowledge.  I don't think you did.  I don't think

8    it's been produced this morning.

9              Let's go off the record a second.

10        (1:55-1:57 p.m. - recess)

11        Q.   (Mr. Wiggins)  In the report of Mr. Small,

12   he says if any of the dark areas contained carbonized

13   material, they represent sites of possible competent

14   ignition.

15             Would you agree or disagree with that, Mr.

16   Martini?

17                    MS. DALY:  Objection.

18                    THE WITNESS:  Say that again.

19                    MR. WIGGINS:  Okay.

20        Q.   (Mr. Wiggins)  Mr. Small, when he looked

21   at the photographs, the digital photographs that were

22   taken by you of the circuit board, his comments to

23   that was as follows.

24             If any of the dark areas -- which you

25   identified was on the -- on your photograph --

1    contained carbonized material, they represent sites

2    of possible competent ignition.

3                        MS. DALY:  Objection.

4        Q.   (Mr. Wiggins)  Would you agree or disagree

5    with that?

6        A.    Neither one.

7        Q.    Okay, on photograph number two you have --

8    he says if any of the dark four circled areas -- and

9    I'll show you this in a minute -- contain carbonized

10   material, the photograph depicts points of ignition,

11   the ignition may or may not have been a competent

12   ignition source.

13                   Would you agree or disagree with that?

14       A.    Let me see that.

15   (Witness examined document)

16                        MS. DALY:  Objection to the form.

17                        THE WITNESS:  Well, what's not clear

18   to me is when he says it depicts points of ignition,

19   is that ignition from within the board or ignition

20   due to attacking fire?

21                        MR. WIGGINS:  I'm sorry?

22                        THE WITNESS:  Is it points of

23   ignition on the board due to the board failure or

24   attacking fire?  That's not clear to me.

25       Q.    (Mr. Wiggins)  In either case, what would

 1    be your answer to that?

 2                        MS. DALY:  Objection to form.

 3                        THE WITNESS:  I disagree until I

 4    have a better idea what he's trying to say.

 5         Q.   (Mr. Wiggins)  And in photo number three

 6    of his report he says, photo three -- and I'll show

 7    you this in just a moment.

 8              If any of these 14 nylon standoffs (sic)

 9    are, quote, thermally, end quote, near an ignition

10    source on the PCB, they will often allow the ignition

11    source to prove itself a competent ignition source.

12              I ask if you agree or disagree with that

13    statement?

14                        MS. DALY:  Objection.

15                        THE WITNESS:  I mean, I think

16    they're all just general statements.

17                        MR. WIGGINS:  Pardon?

18                        THE WITNESS:  These are general

19    statements -- often allow.  It depends on the flame

20    rating of the nylon.

21         Q.   (Mr. Wiggins)  Do you know what the flame

22    rating of the nylon was?

23         A.   I do not.

24         Q.   Okay.  And the last photograph he had was

25    photo ---

1       A.    --- Just for the record, I did talk to the

2   manufacturer and I asked them for flame ratings, but

3   they wouldn't give it to me.

4       Q.    Photo number four depicts an area -- he

5   says in his notes depicts an area of the printed

6   circuit board that could have contained a competent

7   ignition source.

8             And he has circled the top of that board

9   and the location where it was found, apparently by

10  either Mr. Lacy or Mr. Royal.

11                  MS. DALY:  Objection.

12                  THE WITNESS:  Again, I have to go

13  back to the big picture here.

14            The first -- first sign of a printed

15  circuit board failing in an appliance would be if the

16  appliance stops working or it malfunctions in some --

17  some manner.  There's no report of that, even up to

18  four a.m. that morning, so there's no indication of

19  any ongoing or developing electrical failure within

20  that device.

21            And to reach a point where we have enough

22  material involved to produce a fire, you're going to

23  -- you're going to end up with a hole in the board

24  just like their report shows, and we don't have that,

25  either.

1        Q.   (Mr. Wiggins)  Suppose that it had just

2   generated excessive heat and would have been near an

3   ignition source -- to wit, cellophane....

4                    MS. DALY:  Objection.

5                    MR. WIGGINS:  Or a first load.  I'm

6   sorry, a first load.

7                    MS. DALY:  Objection.

8                    THE WITNESS:  Again, there's no --

9   there's no evidence of a small scale or large scale

10   failure in that device.

11        Q.   (Mr. Wiggins)  And would not you have had

12   to examine that in an x-ray setting or in a

13   laboratory setting by x-ray to determine exactly

14   whether or not there was any damage to that circuit

15   board or not?

16                    MS. DALY:  Objection.  Asked and

17   answered.

18                    THE WITNESS:  No.

19        Q.   (Mr. Wiggins)  You do not think so?

20        A.   No.

21        Q.   And you think your casually looking at it

22   when you made the examination, not knowing where it

23   was or where it came from, was sufficient to make a

24   determination that it could not have been the source

25   of -- could not have been an ignition source in this

1    fire?

2                         MS. DALY:  Objection.

3                         THE WITNESS:  I don't treat any part

4    of my work casually.

5          Q.   (Mr. Wiggins)  Well, you didn't know where

6    it came from, did you?

7                         MS. DALY:  Objection.

8                    Mischaracterization of his testimony.

9                         THE WITNESS:  It's irrelevant.  I

10   still looked at it.

11                        MR. WIGGINS:  Pardon?

12                        THE WITNESS:  I still inspected it

13   and I still examined it, both sides.

14         Q.   (Mr. Wiggins)  Okay, when you say you

15   examined it, did you pick it up and look at it or

16   just look at it visually?

17         A.   I picked it up and looked at it.

18         Q.   Okay.

19         A.   I would have had to have looked at both

20   sides.

21         Q.   And beyond just a visual examination you

22   made no other examination of it?

23                        MS. DALY:  Objection.

24                        THE WITNESS:  That's correct.

25         Q.   (Mr Wiggins)  But in the ordinary course

1    of events, had you known at the time that this

2    circuit board came from the exact location or pretty

3    near the location where Mr. Lacy identifies being the

4    area of the source of this fire, which would you not

5    have sent it to a laboratory to have it examined?

6              A.    The process ---

7                         MS. DALY:  --- Objection.

8                         THE WITNESS:  --- Would have evolved

9    to what we did on November 29th.  It would have all

10   been collected then.

11                        MR. WIGGINS:  Okay.

12                        THE WITNESS:  That was the intent,

13   leave it there for all parties and then collect it

14   later.

15        Q.    (Mr. Wiggins)  No other person, to your

16   knowledge, ever confirmed your findings about the

17   circuit board, did they?

18                        MS. DALY:  Objection.

19                        THE WITNESS:  I'm not aware of

20   anyone.

21        Q.    (Mr. Wiggins)  Why did you feel compelled,

22   Mr. Martini, to make a detailed statement about the

23   Ion IQ device in your second report -- expert report

24   -- and did not make it in your initial report?

25                        MS. DALY:  Objection to form.

 1                    THE WITNESS:  I think we already

 2  covered that.  In my first report I wasn't aware what

 3  it was.

 4       Q.   (Mr. Wiggins)  And then you also, in the

 5  last page of your report, said the Class II supplies

 6  are energy limited and intended primarily to provide

 7  power to the low voltage electrical devices.  The

 8  energy limiting characteristic of the Class II power

 9  supply intend to minimize fire entering, initiation

10  potential or provide acceptable protection from

11  electrical shot -- shock.

12                    I notice that you did not go further and

13  say that Class II power supplies never can be the

14  source of a fire ignition, did you?

15                    MS. DALY:  Objection to form.

16                    THE WITNESS:  That's correct.

17       Q.   (Mr. Wiggins)  Okay, are you now aware

18  that sometimes that they can be a ignition source?

19                    MS. DALY:  Objection to form.

20                    THE WITNESS:  Am I now aware?

21                    MS. DALY:  Mis ---

22       Q.   (Mr. Wiggins)  --- Were you then aware

23  that -- were you then aware that it could be the

24  source of -- an ignition source?

25       A.   I've always been aware.

 1          Q.   You read last night the deposition of

 2    Steven Booth, did you not?

 3          A.   Yes.

 4          Q.   And he said that he could not rule out

 5    this Ion IQ communication device as being a source of

 6    the fire.

 7                Do you recall him saying that?

 8                     MS. DALY:  Objection to form.

 9                     THE WITNESS:  Yes.

10          Q.   (Mr. Wiggins)  And he said the reason was

11    because the only thing that he knew was that the

12    plastics had been identified as being on the shelf

13    very near the Ion IQ.

14                Was that what you recall him saying?

15                     MS. DALY:  Objection.

16                     THE WITNESS:  That's what he said,

17    and he's -- he's basing his entire theory on the

18    styrofoam being near.

19                You know, we've already had one example of

20    -- per Ms. Moon -- is that her name?

21                     MR. WIGGINS:  Mrs. Moon.

22                     THE WITNESS:  Yeah, Mrs. Moon -- she

23    had said that the -- the bread cart was -- had been

24    moved since she left at four in the morning, so

25    nothing to say that any of these other materials

1    didn't get moved as well.  So I don't think we can

2    base locations of where she last saw things as a

3    statement of fact.

4         Q.   (Mr. Wiggins)  Is there any other

5    statement that you've read from any source, from any

6    person, any deposition, that would indicate there was

7    any styrofoam products, any plastics of any sort,

8    anywhere than on the top shelf of that drying rack?

9                   MS. DALY:  Objection.

10                   THE WITNESS:  Those were the

11   statements from the last person that saw it, the last

12   employee.

13        Q.   (Mr. Wiggins)  And would not be -- would

14   not that be the best evidence, in your opinion, of

15   where the location of those items were at the time of

16   the fire?

17                   MS. DALY:  Objection.

18                   THE WITNESS:  Well, the bread cart

19   moved and nobody seems to know how it moved, so....

20        Q.   (Mr. Wiggins)  I don't understand what the

21   bread cart has to do with it.

22             What did -- how does that ---

23        A.   --- It's an example of how things changed

24   from the last time an employee left the building.

25        Q.   But there had been firemen in that

```
 1    building, had there not, prior to that time -- prior

 2    to anybody seeing the change in the bread cart?

 3                    MS. DALY:  Objection.

 4                    THE WITNESS:  Firemen had been in

 5    there, yes.

 6         Q.   (Mr. Wiggins)  Okay, and they could have

 7    moved it, couldn't they?

 8                    MS. DALY:  Objection.

 9                    THE WITNESS:  Not based on the fire

10    patterns.

11         Q.   (Mr. Wiggins)  They couldn't have moved

12    the bread cart?

13                    MS. DALY:  Objection.  Asked and

14    answered.

15                    THE WITNESS:  To the window?

16                    MR. WIGGINS:  No, no.

17         Q.   (Mr. Wiggins)  When they went in to

18    suppress the fire, couldn't they have moved the bread

19    cart?

20                    MS. DALY:  Objection.  Asked and

21    answered.

22                    THE WITNESS:  From the front window

23    to the back window?

24                    MS. DALY:  Objection to the form.

25         Q.   (Mr. Wiggins)  Who said it was moved from
```

1    the front window to the back window?  Do you recall?

2         A.    Ms. Moon.

3         Q.    And to be sure I understand what you're

4    saying, you're saying that if the bread cart were

5    moved -- were moved from the spot where Mrs. Moon

6    said it was to a different spot at or about the time

7    of the fire, then the styrofoam plates and the

8    plastic cups and the plastic knives and plastic forks

9    could have also been moved?

10              Is that what you're saying?

11                   MS. DALY:  Objection to form.

12                   THE WITNESS:  I'm saying that's

13   possible.

14        Q.    (Mr. Wiggins)  Is there any evidence that

15   that happened, that you are aware of?

16        A.    No.

17        Q.    And had you believed that those items were

18   on the shelf at the time of the fire, and had you

19   known that this Ion IQ was on the wall within six

20   inches of where those items were located, would you

21   not, then, not been able to rule out the Ion IQ as a

22   potential source of this fire?

23                   MS. DALY:  Objection to form.

24                   THE WITNESS:  My ruling out of the

25   Ion IQ wireless device was not based on proximity to

1    other materials.

2          Q.    (Mr. Wiggins)  Okay, but if it had been --

3    I'm saying if it had been -- is it possible for that

4    device to have overheated and set fire to the

5    plastics encasing those items?

6                      MS. DALY:  Objection to form.

7                      THE WITNESS:  Not without leaving

8    some evidence of having done so.

9          Q.    (Mr. Wiggins)  What evidence would you

10   have been looking at to find out that they did do so?

11         A.    Well, we've already covered that.  You

12   know, specific localized damage to the printed

13   circuit board.

14         Q.    And you would be, then, discounting the

15   findings of Mr. Small when he looked at the circuit

16   board photographs?

17                      MS. DALY:  Objection.

18                      THE WITNESS:  He spoke in general --

19   I'm sorry, what?

20                      MS. DALY:  Objection to make it

21   clear that -- one, object to Mr. Small -- anything

22   about Mr. Small, and make it clear that Mr. Martini

23   was not provided a report from Mr. Small.

24                      MR. WIGGINS:  You can go ahead and

25   answer.

1           THE WITNESS:  Well, I don't know

2   what else is in -- is in the report that you might be

3   referring to.

4       Q.   (Mr. Wiggins)  The mythology (sic) that

5   was used by Mr. Lacy was a process of elimination to

6   determine the source of this fire.  Is that correct?

7           MS. DALY:  Objection.

8           Will you repeat back that question,

9   please.

10       (Next-previous question was read back)

11           MS. DALY:  Thank you.

12           Same objection.

13           MR. WIGGINS:  You can go ahead and

14   answer.

15           THE WITNESS:  I'll let Mr. Lacy

16   address that.

17       Q.   (Mr. Wiggins)  Did he ever talk to you

18   about that, how he determined the cause of this fire?

19       A.   I'm not -- I'm aware of what he's doing,

20   but I'll let him discuss that.

21       Q.   And do you know that he classified this

22   fire as an incendiary fire?

23       A.   Yes.

24       Q.   Did he tell you that back on the 30th of

25   January, 2012, that it was his belief it was an

 1    incendiary fire?

 2          A.    January 30th?  I don't recall.

 3          Q.    Okay.

 4          A.    It was still under investigation at that

 5    point.

 6          Q.    Was it still under investigation on

 7    February 22nd, 2012?

 8          A.    I thought we were talking about January

 9    when I was there.

10          Q.    What about February the 22nd, 2012?

11          A.    I don't know what the significance of that

12    date is.

13          Q.    On January the -- February 22nd, 2012, Mr.

14    Lacy wrote a letter to Michael Jezierski in which he

15    said, per our conversation of February the 1st, 2012,

16    I have completed the fire scene examination of the

17    Miami Subs restaurant at 552 North McPherson Church

18    Road, Fayetteville, North Carolina.  Electrical

19    engineer Henry Martini, P.E. -- that's you, is it

20    not?

21          A.    Yes.

22          Q.    Examined the fire scene on January the

23    30th, 2012.

24                And that's correct, is it not?

25          A.    Yes.

1          Q.    And concluded that the -- after that

2     examination, that the fire was not a result of the

3     failure of the structural electrical components of an

4     appliance in the building.   This fire is incendiary

5     in nature.

6                    Do you recall that?  Do you remember that?

7          A.    I was not ---

8                         MS. DALY:  --- Objection.

9                         THE WITNESS:  I was not copied on

10    that.

11         Q.    (Mr. Wiggins)  Did he talk to you about

12    this?

13         A.    No.

14         Q.    Did you authorize him to say to Michael

15    Jezierski of Nationwide Insurance Company that the

16    fire was not the result of the failure of the

17    structural electrical components of an appliance in

18    the building?

19                         MS. DALY:  Objection to form.

20                         THE WITNESS:  That's what I informed

21    him on the 30th.

22         Q.    (Mr. Wiggins)  You advised him of that on

23    the 30th of January, 2012?

24         A.    When I finished my inspection, yes.

25         Q.    And was all of the investigation of the

1  fire complete at that point in time, to your

2  knowledge?

3          A.    My initial scene examination was

4  completed.

5          Q.    Did you write any letter to Mike -- to Mr.

6  Jezierski in reference to that matter?

7          A.    I did not.

8          Q.    So that I'm fairly clear about this, Mr.

9  Martini, what you would be testifying to a jury in

10 this case is that, in your opinion, the Ion IQ system

11 did not fail and could not have been the source of

12 ignition for this fire.

13              Is that your testimony?

14         A.    That's correct.

15         Q.    Is it also your testimony that the ballast

16 of the fluorescent light system could not have been

17 the source of this fire -- could not have been an

18 ignition source for this fire?

19         A.    That's correct.

20         Q.    And is it your testimony that none of the

21 wiring in the building could have been a source of

22 ignition for this fire?

23         A.    That is correct.

24         Q.    Were you involved in taking any samples

25 from the fire scene to determine if there were any

1    accelerants present?

2         A.    I was not.

3         Q.    Were you aware that it had been done by

4    someone on behalf of Donan?

5         A.    Yes.

6         Q.    And would that have been Mr. Lacy?

7         A.    Yes.

8         Q.    And do you know -- did you ever learn that

9    -- the results of that?

10        A.    At some point I did hear that the results

11   were negative.

12        Q.    Did Mr. Lacy ever discuss with you the

13   results of the information that was on the -- on the

14   hard drives that were taken from the restaurant?

15        A.    At some point I was told it was point of

16   sale information.  I don't remember who told me.

17        Q.    Did Mr. Lacy tell you that?

18                    MS. DALY:  Objection.  Asked and

19   answered.

20                    THE WITNESS:  Like I said, I don't

21   know.  I don't remember who told me.

22                    MR. WIGGINS:  Okay, I think we're

23   about through.  Let me just check this.

24              Go off the record.

25         (2:21-2:23 p.m. - recess)

1                    MR. WIGGINS:  One more thing and I'm

2    through.

3         Q.   (Mr. Wiggins)  In looking at the circuit

4    board that you included in your second report, Mr.

5    Martini, you said that the circuit board -- the color

6    on the circuit board was uniform, which would

7    indicate that the fire was uniform.  Is that correct?

8                    MS. DALY:  Objection.

9              It was included in both reports.

10                   MR. WIGGINS:  Okay, I took this from

11   the rec -- I took this from the last report.

12                   MS. DALY:  Okay.

13                   THE WITNESS:  You asked me if the --

14   if my saying that the heat damage to the printed

15   circuit board was uniform ---

16                   MR. WIGGINS:  --- Correct.

17                   THE WITNESS:  --- Does that imply

18   that the fire was uniform?

19                   MR. WIGGINS:  Yes.

20        Q.   (Mr. Wiggins)  You explained -- you were

21   saying earlier on that this fire was uniform across

22   the circuit board, did you not?

23        A.   I said the heat damage.

24                   MS. DALY:  Objection.

25                   MR. WIGGINS:  The heat damage to the

1  board was uniform.

2       Q.   (Mr. Wiggins)  I want to know what you're

3  speaking about when you say that -- from that

4  photograph.

5       A.   The board material was evenly burned off

6  and any coatings that they put on the board is

7  uniformly burned off.

8            In other words, the heat damage does not

9  extend deeper into the board at any particular place

10 -- i.e., no holes or openings.

11      Q.   Okay, what are the dark spots that are

12 identified on that board -- that I can see on the

13 board?

14                 MS. DALY:  Objection.

15                 THE WITNESS:  It's just board

16 material.

17      Q.   (Mr. Wiggins)  What kind of board

18 material?

19      A.   Printed circuit boards are a laminate

20 material of -- well, it depends on what that

21 particular manufacturer used.  Generally it's like

22 layers of glass fiber coated with various materials.

23      Q.   What is the dark spot that I'm pointing to

24 right here?

25      A.   That's a -- I believe that was a piece of

1    debris that was laying on the board.

2         Q.    Do you know that's what it was, or was it

3    something else?

4         A.    I'm pretty sure that's what it was.    I

5    would have moved it to look at -- look at it in

6    greater detail.

7         Q.    Okay.

8         A.    Just like the other smaller boards are

9    laying on it, but that's just as I found it.

10                        MR. WIGGINS:    I believe that's all I

11   have.

12                        MS. DALY:    Let's go off the record.

13        (2:27-2:30 p.m. recess)

14                        MS. DALY:    I don't have any

15   questions.

16              Thank you.

17                        MR. WIGGINS:    Thank you.

18        WHEREUPON,

19     at 2:30 o'clock p.m. the deposition was adjourned.

20

21

22

23

24

25

1              CERTIFICATE OF TRANSCRIPT

2              I, Cassandra J. Stiles, Notary Public in

3    and for the County of Forsyth, State of North

4    Carolina at Large, do hereby certify that there

5    appeared before me the foregoing witness;

6              That the testimony was duly recorded by

7    me, reduced to typewriting by me or under my

8    supervision and the foregoing consecutively numbered

9    pages are a complete and accurate record of the

10   testimony given at said time by said witness;

11             That the undersigned is not of kin nor

12   associated with any of the parties to said cause of

13   action, nor any counsel thereto, and that I am not

14   interested in the event(s) thereof.

15             IN WITNESS WHEREOF, I have hereunto set my

16   hand this the 29th day of August, 2013.

17                        Cassandra J. Stiles, CVR

18                        Certified Court Reporter

19                        Atlantic Professional Reporters

20                        Post Office Box 11672

21                        Winston-Salem, NC 27116-1672

22

23

24

25

1                     CERTIFICATE OF OATH

2                I, Cassandra J. Stiles, Notary Public in

3     and for the County of Forsyth, State of North

4     Carolina at Large, do hereby certify that there

5     appeared before me the foregoing witness;

6                That the witness personally appeared

7     before me at the date, time and location hereon

8     captioned and was personally sworn by me prior to the

9     commencement of the proceeding in the matter hereon

10    captioned.

11                IN WITNESS WHEREOF, I have hereunto set my

12    hand this the 29th day of August, 2013.

13                            Cassandra J. Stiles, CVR

14                            Certified Court Reporter

15                            Atlantic Professional Reporters

16                            Post Office Box 11672

17                            Winston-Salem, NC 27116-1672

18

19

20

21

22

23

24

25

```
 1                  WITNESS CERTIFICATION

 2           I, L. HENRY MARTINI, P.E., hereby certify:

 3           That I have read and examined the contents of

 4    the foregoing testimony as given by me at the time

 5    and place hereon indicated, and;

 6           That to the best of my knowledge and belief,

 7    the foregoing pages are a complete and accurate

 8    record of all the testimony given by me at said time,

 9    except as noted on the Attachment A hereto.

10    I have ___ have not ____

11    made changes/corrections _____

12                                   L. Henry Martini, P.E.

13           I,_____, Notary Public for the

14    County of _____, State of _____,

15    hereby certify:

16           That the herein-above named appeared before me

17    this the _____ day of _____, 19_____, and;

18           That I personally witnessed the execution of

19    this document for the intents and purposes as herein-

20    above described.

21                        _____

22                                   Notary Public

23    My Commission Expires:

24    _____          (SEAL)

25
```

1                          ADDENDUM A

2          Upon reading and examining my testimony as

3      herein transcribed, I make the following additions,

4      changes and/or corrections, with the accompanying and

5      corresponding reason(s) for the same:

6

7      Page    Line              Is Amended to Read

8      _____|_____|_____

9      _____|_____|_____

10     _____|_____|_____

11     _____|_____|_____

12     _____|_____|_____

13     _____|_____|_____

14     _____|_____|_____

15     _____|_____|_____

16     _____|_____|_____

17     _____|_____|_____

18     _____|_____|_____

19     _____|_____|_____

20     _____|_____|_____

21

22                      _____

23                            Stephen Edward Stone

24

25

1                    CERTIFICATE OF MAILING

2          I, Cassandra J. Stiles, CVR, do hereby certify

3     that a true copy of the transcription of the matter

4     hereon captioned was served on the party named below

5     by the placement of said transcript copy in the

6     United States Mail, Priority Mail delivery, with

7     proper postage affixed, addressed as follows:

8

9

10          L. Henry Martini, P.E.

11          c/o Gemma L. Saluta, Esq.

12          One West Fourth Street

13          Winston-Salem, NC  27101

14

15

16          This the 31st day of August, 2013.

17

18

19                    _____

20                         Cassandra J. Stiles, CVR

21

22

23

24

25